**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| SEAKEEPER, INCORPORATED, | |
| Plaintiff, | |
| v. | C.A. No. 1:25-cv-00484-UNA |
| DOMETIC CORPORATION, | |
| Defendant. | **JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Seakeeper Inc. ("Seakeeper"), by and through its undersigned attorneys, for its

Complaint against Defendant Corporation ("Dometic" or "Defendant") alleges as follows.

### NATURE OF THE ACTION

1.      This is an action under the patent laws of the United States, 35 U.S.C. § 100 *et*

*seq.* for patent infringement by Defendant of U.S. Patent Nos. 7,546,782 ("the '782 patent") and

8,117,930 ("the '930 patent").

2.      The acts of infringement relate to Defendant's ongoing and/or imminent

manufacture, use, sale, importation, offer to sell and/or contribution to, active inducement or

encouragement of others to do any of the foregoing, within the United States.

### THE PARTIES

3.      Seakeeper is a corporation organized and existing under the laws of the Delaware,

having its principal place of business at 5460 Pottsville Pike, Leesport, PA 19533.

4.      Seakeeper, founded in 2003, by entrepreneur Shepard McKenney and naval

architect John Adams, is the global leader in marine motion control technology. Initially inspired

by the need to minimize boat roll, Seakeeper's founders integrated advanced gyroscopes to effectively counteract the rolling motion experienced at sea, dramatically improving onboard comfort.

5.      Seakeeper's product line has revolutionized boating through gyroscopic stabilizers that eliminate up to 95% of boat roll, significantly enhancing comfort and reducing seasickness for those on board. Seakeeper's gyrostabilizing technology has been widely adopted, with tens of thousands of units installed and demand rapidly growing.

6.      On information and belief, Dometic is a corporation organized and existing under the laws of the state of Delaware with a principal place of business at 5600 N River Rd Ste 2500, Rosemont, IL, 60018.

## JURISDICTION AND VENUE

7.      Seakeeper incorporates and realleges the foregoing paragraphs.

8.      This Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. §§ 1331 and 1338(a) because this action involves substantial claims arising under the United States Patent Act (35 U.S.C. § 100 *et seq.*).

9.      This Court has personal jurisdiction over Dometic because Dometic is a corporation organized and existing under the laws of the state of Delaware.

10.     Venue is proper in this District with respect to Dometic pursuant to 28 U.S.C. §§ 1391 and 1400(b) because Dometic is a corporation organized and existing under the laws of the state of Delaware.

## BACKGROUND

### Seakeeper's Founders

11.     Seakeeper was founded in 2003 by two marine industry veterans: Shepard "Shep" McKenney and John Adams. McKenney is an entrepreneur, and Adams is a naval architect

known for his expertise in boat motion control. Together, they teamed up to create an innovative gyroscopic stabilizer that would forever change recreational boating by virtually eliminating boat roll.

12.     Seakeeper was started with a clear mission: to transform the boating experience by eliminating the debilitating roll of boats and making rides smoother and safer. The founders were driven by a desire to solve the age-old problem of seasickness and discomfort caused by a boat's rolling motion.

### Seakeeper's Initial Years of Investment

13.     Prior to the introduction of Seakeeper's innovations, other, less than satisfactory, solutions to the problem of boat roll had been attempted.  For example, stabilizers such as external hull fins had traditionally been employed.  These stabilization systems were largely limited to large yachts and commercial vessels and created added drag, were vulnerable to damage, and only worked while underway. Their effectiveness was limited, especially for smaller vessels.

14.     McKenney and Adams set out to develop a practical, modern gyro system that could stabilize recreational boats without those drawbacks. Their vision was to eliminate up to 95% of boat roll, the rocking that causes seasickness and fatigue, thereby making boating far more enjoyable for everyone.

15.     Starting essentially as a garage venture, McKenney and Adams began developing their gyro technology in a small workshop on Solomons Island, Maryland. They invested years in research and development. Seakeeper's first prototype was installed on a 43-foot Viking sportfish yacht in 2006, proving the concept.

16.     By 2008, after further years of research and development, Seakeeper officially launched its first commercial product (the Seakeeper M7000 gyro) and secured its first boatbuilder partnership.

**Seakeeper's Original Innovation**

17.     A control moment gyro is a torque amplification device.  It uses controlled precession of stored angular momentum to produce large control torques, commonly referred to as gyro dynamics. The torque generated by a control moment gyro helps keep boats steady by reducing side-to-side rolling. A control moment gyro works by using a flywheel, held in place by bearings, that spins and creates strong forces used to balance the movement of the boat.

18.     Before Seakeeper's innovations, marine gyros were big, heavy and limited to large vessels.  Because their flywheels spun in air, they were subject to air resistance, constraining their speeds. Air friction is a major factor contributing to the power required for spinning the gyro up, and the dominant factor in maintaining flywheel speed because air friction goes up with the cube of rpm.

19.     In order to provide sufficient angular momentum at these slower speeds, their flywheels were large and heavy.  For a given weight of the flywheel, increasing the diameter of the flywheel is the most energy efficient way to increase its angular momentum, and thus its effectiveness. The reason is that (all other things being equal) the angular momentum goes up with the square of the radius of gyration of the flywheel. Such flywheels were only practical on larger ships that could more easily accommodate large flywheels.

20.     The resulting power required to operate these gyros was also beyond the capacity of most boats.  Ships, with their extensive power plants, had large generators available to power such gyro stabilizers, whereas many small boats have minimum electrical resources.

21.     While it is possible to reduce both the weight and size of a flywheel, to achieve sufficient force for stabilization it becomes necessary to increase the speed at which the flywheel spins.  However, while angular momentum goes up arithmetically with rpm, the power required to overcome air friction rises exponentially, requiring even more power.

22.     Thus, small boats were caught in a bind. If the weight of the flywheel was increased, the device would be too heavy. If the diameter of the flywheel was increased, it would be too large.  If the flywheel was spun faster, it would require too much power. Collectively, prior to the innovations of McKenney and Adams, these problems appeared insurmountable for small boats.

23.     McKenney and Adams conceived of employing a vacuum enclosure to achieve high flywheel speeds with reduced size and power requirements.  Seakeeper's M7000 gyro features a flywheel spinning at high speeds within a vacuum-sealed enclosure, generating gyroscopic torque to counteract vessel movement. The introduction of the Seakeeper M7000 in 2008 effectively created a new market for gyroscopic stabilizers in recreational and smaller commercial boats.

24.     McKenney and Adams patented their concept. For example, on June 4, 2003, they filed U.S. Patent Application No. 10/454,905 which was duly issued on December 13, 2005 by the United States Patent Office as U.S. Patent No. 6,973,847, entitled "Gyroscopic Roll Stabilizer for Boats."

**Seakeeper's Further Essential Innovations in Cooling**

25.     Having conquered problems relating to a high-torque stabilization system through use of a vacuum enclosure, among other advances, McKenney and Adams observed that the high heat produced by the moving parts within the system presented a unique problem with such

vacuum-sealed environments.  Flywheels racing at thousands of RPM generate not only stabilizing torque but also intense thermal energy.

26.     Flywheels supported in an ambient environment can dissipate heat by air convection. If the flywheel is enclosed in a partial vacuum, such as described in U.S. Pat. No. 6,973,847, there is not enough air to permit adequate convection. Seakeeper's design, with its nearly airless vacuum chamber, could not vent or dissipate this heat through air.

27.     Heat differentials were possible at bearing locations.  Bearings were positioned between the rotating flywheel and stationary support.  This stationary support is conductively connected to the device's outer enclosure.  Because the stationary support is thermally connected to the outer enclosure, heat located at its interface with the bearings can be more effectively drawn off, than can the heat building up where the rotating flywheel and bearing meet.  These rising temperature differences can threaten the gyro's precise tolerances. In a marine environment, failure of an overheated gyro might occur precisely when it was needed most.

28.     McKenney and Adams' use of a vacuum allowed smaller, lighter gyros to generate massive stabilizing force, but only if they could conquer the thermal challenge.

29.     McKenney and Adams overcame this additional challenge through further extensive research. McKenney and Adams determined traditional cooling methods were unsuitable for a vacuum environment. Bearings supporting the heavy flywheel must survive high rates of speed.  Conventional cooling lubricants, such as oil, would vaporize in the vacuum. While a special grease ultimately solved the need for lubrication, the problem of carrying away the excessive heat remained.

30.     After years of work, McKenney and Adams achieved what many thought impossible. McKenney and Adams conceived of an apparatus having a first heat transfer element

attached to and spinning with the spinning member. This first heat transfer element moves relative to a second heat transfer element that is stationary and thermally connected to the enclosure.  The first and second heat transfer elements are shaped and positioned in close proximity to one another so that substantial heat is transferred from the first heat transfer element to the second heat transfer element.

31.     The close proximity of the two promotes heat transfer by conduction. Gaseous conduction benefits from the fact that the thermal conductivity of a gas increases with temperature so that as the gas warms up it will conduct more heat across the gap (for a fixed temperature differential) between the rotating and stationary vanes.

32.     The relative rotational movement, combined with this proximity, creates rotating cavity flows that also promote heat transfer by gaseous convection.  Rotating cavity flows will exist in the small gaps between the fixed and rotating vanes even in a partial vacuum. In some applications, the gas density and/or rotational speed will be high enough that gaseous convection will augment the gaseous conduction cooling. The rotating flow circulates the gas molecules so they are continuously transported from the hot rotating vanes to the cooler stationary vanes.

33.     Heat may be conducted from the heat generating components to the rotating vanes by solid conduction, then across the air gap to the stationary vanes by gaseous conduction and convection and then by conduction and convection to the atmosphere or a heat sink.

34.     The design permits heat to be removed passively without circulating any fluids inside the enclosure. This considerably simplifies the device or machine, as a coolant pump, motor, filter and heat exchanger are not required. Grease can replace oil as a lubricant, reducing frictional torque.

35.    Seakeeper's breakthrough—compact, fully internal gyros with efficient vacuum-enclosed flywheels and a proprietary cooling system—made stabilization viable for vessels of all sizes at rest or low speed. By solving the long-standing issue of boat roll in a compact, self-contained package, Seakeeper introduced an entirely new category of marine technology, transforming expectations for comfort and usability across the boating world.

36.    With friction no longer causing overheating from within, the founders' vision to bring gyroscopic stabilizers to recreational and smaller commercial boats could be realized. The gyroscopic stabilizers could now run without overheating, even in the hottest engine rooms or tropical climates, freeing it from the last major constraint.

37.    The improved Seakeeper gyro could spin roughly three times faster than an equivalent non-vacuum gyro without extra power. It could deliver the same stabilizing ability with a flywheel weighing only one-third of what earlier designs required, and it needed only about half the electrical power to operate, making it feasible on much smaller boats.

38.    These advances turned the Seakeeper® into a must-have technology. What had begun as an idea in a Maryland garage in 2002 was, by the late 2000s, a practical reality.

39.    The marine industry's reception evolved from skepticism to fervent adoption as the benefits were demonstrated. Fishermen and yacht owners who long previously accepted nauseating roll as just part of boating, had a product that could provide rock-solid decks and steady stomachs. This was all enabled by the innovations developed by McKenney and Adams to remove heat from within the vacuum enclosure.

40.    By 2013, Seakeeper had shipped its 1,000th Seakeeper® unit, and the pace of adoption has accelerated since. In the following years, the company expanded its product line from one flagship model to a whole family of gyros, scaling the technology to both larger and

8

smaller boats. Today, Seakeeper® gyros can be found on vessels from 23-foot center-console fishing boats to 200-foot mega-yachts.

41.     From a business standpoint, solving the overheating problem was the key to Seakeeper's success. It gave the young company a proprietary, patented solution no competitor had, and justified the years of investment when sales finally took off.

## SEAKEEPER'S PATENTED TECHNOLOGIES

42.     On January 12, 2006, Seakeeper filed a patent application directed to this advance in control moment gyro technology. On June 16, 2009, the U.S. Patent & Trademark Office issued U.S. Patent No. 7,546,782 ("the '782 patent") titled "Cooling bearings, motors and other rotating heat generating components." The '782 patent lists Shepard McKenney and John Adams as inventors. A true and correct copy of the '782 patent is attached as Exhibit A.

43.     The '782 patent claims are directed to a cooling apparatus for transferring heat from and cooling one or more heat generating components that support or drive a flywheel or other spinning member. The '782 patent is valid and duly issued, and will not expire until at least February 11, 2027.

44.     On June 15, 2009, Seakeeper filed a further patent application directed to this advance in control moment gyro technology. On February 21, 2012, the U.S. Patent & Trademark Office issued U.S. Patent No. 8,117,930 ("the '930 patent") titled "Cooling bearings, motors and other rotating heat generating components." The '930 patent lists Shepard McKenney and John Adams as inventors. A true and correct copy of the '930 patent is attached as Exhibit B.

45.     The '930 patent claims are directed to a cooling apparatus for transferring heat from and cooling one or more heat generating components that support or drive a flywheel or other spinning member. The '930 patent is valid and duly issued, and will not expire until at least April 5, 2026.

**DEFENDANT'S PRODUCT AND INFRINGING CONDUCT**

46.     On February 12, 2025, Dometic issued a press release announcing the DG3

product, which "marks Dometic's entry into the rapidly growing vessel stabilizer market." *See*

Exhibit B. Eric Fetchko, the President of Dometic's Marine Division, emphasized that Dometic

is "not just launching a new product, we're taking Dometic into an important new category for

the global boating business." *Id.*  On February 11, 2025, Dometic, for the first time, revealed its

DG3 to the public at the 2025 Miami International Boat Show, which represented Dometic's

entry into the vessel stabilization market. *See*

https://www.youtube.com/watch?v=mcfgMCTFv0M (Fetchko Speech at 2025 Miami Boat

Show).

47.     The Dometic DG3 is a marine gyrostabilizer designed to enhance boat stability by

minimizing roll motion at sea. Dometic's DG3 was presented in various videos as having the

following internal structure:



*See* Dometic YouTube Video, https://www.youtube.com/watch?v=6c1JaSP0cOo, at 1:08.

Dometic also described its use of an internal glycol cooling loop, which is circulated and cooled

in the same manner as the method developed by McKenney and Adams for their Seakeeper®

product. *See* https://www.youtube.com/watch?v=NM33FWzQc5c&t=92s (Dometic Sales Rep.

Video) at 7:31.

48.     The Dometic DG3 employs a first and second plurality of vanes to dissipate heat.

The first plurality is attached to the spinning flywheel (green).  The second set is stationary and

attached to the enclosure:



**DEFENDANT'S ACCESS TO CONFIDENTIAL SEAKEEPER INFORMATION**

49.     More than a year ago, in January 2024, Dometic's parent approached Seakeeper expressing an interest in acquiring Seakeeper.  Dometic represented that it wished to discuss incorporating Seakeeper's gyrostabilizing products into its Marine division product line. Dometic was apparently seeking to develop its own gyrostabilizing product at that time. Nevertheless, Dometic executives explained to Seakeeper representatives that they viewed Seakeeper and its products as essentially the "Kleenex" of marine stabilization products—in other words that Seakeeper's products served to define this product segment.  Dometic executives represented that they sought to acquire Seakeeper in lieu of developing their own gyrostabilizing product.

50.     On February 4, 2024, as part of Dometic's potential acquisition of Seakeeper, Dometic and Seakeeper entered into a confidentiality agreement under which Seakeeper shared its confidential and proprietary business and technical information with Dometic.  Dometic

agreed to only use Seakeeper's confidential information for the purpose of "evaluating, negotiating and consummating a Potential Transaction between the parties." *Id*. at 2.

51.     In reliance upon the terms of the Non-Disclosure Agreement and the representations of Dometic's executives, Seakeeper shared confidential financial and technical information with Dometic.  This information encompassed information concerning the sales of Seakeeper® products, its profit margins, its assessment of the market for gyrostabilizers, its plans for future developments and new products, its marketing plans and intended target segments, its market assessments and competitive intelligence, as well as details concerning Seakeeper's technical advances essential to Seakeeper's market dominance.

52.     Following these discussions and its receipt of confidential Seakeeper information and plans, Dometic discontinued discussions. A little over one year later, Dometic announced its DG3 gyrostabilizer product. As noted above, Dometic's DG3 product incorporated Seakeeper's patented cooling technology.

53.     Prior to its discussions with Seakeeper at which Dometic was apprised of Seakeeper's technology, Dometic had disclosed its design for a marine gyrostabilization product to the United States Patent Office.  In a 2021 patent application, Dometic depicted a design for a product that lacked the multiple cooling vanes employed in Seakeeper's patent products.  As shown below in Figure 66 of Dometic's patent application publication, the Dometic design did not employ interleaved vanes as a means of cooling the heat generating components:



**FIG. 66**

U.S. Patent Appl. No. 2024/0400167 (the "Dometic Patent App.") at Figure 66.

54.    In filings with the United States Patent Office as late as May 2024, Dometic depicted a design which did not employ Seakeeper's patented cooling vanes.  *See* Dometic Patent App.

55.    Within a year of its confidential discussions with Seakeeper, however, Dometic had radically overhauled its design to now copy the patented cooling technologies embodied in the Seakeeper products.

56.    Additionally, Dometic specifically chose to target the 35-foot boat segment in view of information that Seakeeper shared with it during their confidential discussions.

57.    Dometic's actions further targeted a specific customer of Seakeeper's.  Dometic persuaded that customer to discontinue purchases from Seakeeper in favor of Dometic's infringing product.

58.    Dometic has further indicated that the next iteration of its infringing product will target another market segment that Dometic has chosen based upon confidential information

14

Seakeeper shared with Dometic concerning Seakeeper's plans and product development and marketing strategies.

## IRREPARABLE HARM TO SEAKEEPER

59.     Dometic's entry in the gyrostabilizer market for recreational and small commercial boats, a market in which Seakeeper has about a 95% market share, will irreparably harm Seakeeper. Seakeeper will suffer irreparable harm from the continued infringement due to the loss of market share in the recreational and small commercial boat gyrostabilizer market. As a leader in marine stabilization technology, Seakeeper's market position and customer relationships are critical assets that cannot be restored through monetary damages alone. Continued infringement threatens to erode Seakeeper's competitive edge, diminish its brand loyalty, and cause long-term harm that injunctive relief is necessary to prevent.

60.     Dometic's entry into the market has also caused irreparable harm by affecting Seakeeper's relationship with boat builders.  Independent Boat Builders, Inc. ("IBBI") is a purchasing cooperative composed of independently owned boat manufacturing companies. IBBI allows its members to pool their purchasing power to negotiate more favorable pricing and terms with suppliers of marine components and materials. The organization represents a significant share of the North American recreational boat market, giving it substantial leverage in supplier negotiations.

61.     If Dometic is accepted as an approved vendor by the IBBI, Seakeeper will suffer irreparable harm due to the structural and long-term nature of boat design decisions made by IBBI member manufacturers. Because IBBI members commit to incorporating only components from approved vendors, acceptance of Dometic would result in widespread adoption of Dometic's infringing product across multiple boat lines. Boat manufacturers would design their hulls and internal layouts around Dometic's system specifications, effectively locking Seakeeper

15

out of future sales opportunities even if infringement is later proven. This design-based exclusion would not only cause Seakeeper immediate market share loss, but also result in lasting damage to its customer relationships, competitive position, and ability to re-enter key OEM channels—harms that cannot be adequately remedied by monetary damages alone.

62.     Seakeeper has invested significant resources into the research and development of its proprietary marine stabilization technology, which represents years of innovation, engineering expertise, and market cultivation. If Dometic is allowed to continue its infringement, it will undermine Seakeeper's ability to maintain its competitive position as the industry leader in this specialized field. The presence of an infringing product in the market—particularly one offered through influential purchasing groups like IBBI—dilutes the value of Seakeeper's technological advancements and discourages further investment in innovation. This erosion of competitive differentiation and the disincentive to continue R&D efforts constitute irreparable harm, as they affect Seakeeper's long-term ability to lead, grow, and compete in a high-tech, evolving marketplace.

63.     Seakeeper will also suffer irreparable harm to its reputation and brand if Dometic, through its infringing product, gains acceptance in the marketplace. Seakeeper has built its brand on innovation, performance, and reliability in marine stabilization technology, and any confusion between its patented systems and Dometic's infringing product threatens to dilute that reputation. If boat builders and consumers associate the Dometic product with similar functionality or performance, especially if it underperforms or lacks Seakeeper's engineering quality, Seakeeper's brand image as the industry leader may be irreversibly damaged. This erosion of trust and differentiation in a competitive, reputation-driven industry cannot be completely undone through monetary compensation and constitutes irreparable harm.

16

64.    At the 2025 Miami International Boat Show, Dometic's DG3 product was awarded an Innovation Award, an honor for which Seakeeper was also a nominee. This public recognition of Dometic's product not only lends legitimacy to the infringing product, but also directly undermines Seakeeper's position as the recognized innovator in the marine stabilization space. Such an award significantly influences market perception, dealer confidence, and OEM purchasing decisions, all of which are deeply tied to brand prestige and technological leadership. The reputational damage resulting from the loss of this high-profile accolade to an infringing competitor cannot be undone, nor can it be fully compensated by monetary damages, as the long-term impact on Seakeeper's brand credibility, perceived innovation, and market influence constitutes clear irreparable harm.

### COUNT I – INFRINGEMENT OF THE '782 PATENT

65.    Seakeeper incorporates and realleges the foregoing paragraphs.

66.    The '782 patent is cooling apparatuses with improved cooling efficiency, capable of cooling a flywheel or other spinning member. The '782 patent inventors discovered building vanes into the enclosure containing a flywheel or other spinning member at below-ambient pressure or below-ambient density results in a more efficient cooling of the parts that are subjected to heat-generating friction.

67.    The '782 patent issued with 23 claims. Independent claim 11 recites:

11. Cooling apparatus for transferring heat from and cooling one or more heat generating components that support or drive a flywheel or other spinning member; the apparatus comprising:

an enclosure enclosing the spinning member, the enclosure containing a gas at below-ambient pressure or below-ambient density, wherein an axis of rotation about which the spinning member spins defines an axial direction;

a first plurality of vanes attached to the spinning member such that the first plurality of vanes spin with the spinning member relative to the enclosure,

wherein the first vanes are cylindrical elements extending in a first direction substantially parallel to the axial direction;

a second plurality of vanes fixed relative to the enclosure and the spinning member such that the first vanes move with respect to the second vanes, wherein the second vanes are cylindrical elements extending in a second direction substantially parallel to the axial direction and opposite the first direction, the second vanes defining cylindrical shaped channels into which the first vanes extend so that the first and second vanes are interleaved; and

wherein the first and second vanes are positioned in close proximity to one another so that substantial heat is transferred from the first vanes to the second vanes and the second vanes are configured such that that heat can be readily transferred from the second vanes to the exterior of the enclosure.

68. Dometic manufactures, uses, sells, offers for sale and/or imports Defendant's Product constituting infringement of at least claim 11 of the '782 patent under 35 U.S.C. § 271(a), (b), and (c).

69. As illustrated below, Dometic's DG3 product includes an enclosure that encloses a spinning member at below-ambient pressure or below-ambient density, whereby the spinning member defines an axial direction.

70. As illustrated below, Dometic's DG3 product includes a first plurality of vanes attached to the spinning member such that the first plurality of vanes spin with the spinning member relative to the enclosure, where the first vanes are cylindrical elements extending in a first direction substantially parallel to the axial direction.

71. As illustrated below, Dometic's DG3 product includes a second plurality of vanes fixed relative to the enclosure and the spinning member such that the first vanes move with respect to the second vanes, where the second vanes are cylindrical elements extending in a second direction substantially parallel to the axial direction and opposite the first direction, the second vanes defining cylindrical shaped channels into which the first vanes extend so that the first and second vanes are interleaved.

18

72.    As illustrated below, the first and second vanes are positioned in close proximity to one another so that substantial heat is transferred from the first vanes to the second vanes and the second vanes are configured such that that heat can be readily transferred from the second vanes to the exterior of the enclosure.

73.    The following diagram illustrates that Dometic's DG3 product embodies the elements of at least claim 11 of the '782 patent:



74.    The manufacture, use, sale, offer for sale and/or importation of Dometic's DG3 product infringes the claims of the '782 patent, and one or more of Dometic's actions constitutes direct infringement of the claims of the '782 patent.

75.    The manufacture, sale, offer for sale and/or importation of Dometic's DG3 product infringes the claims of the '782 patent, and one or more of Dometic's actions are

inducing third parties, including contract manufacturers to commit acts that constitute

infringement of the '782 patent in violation of 35 U.S.C. § 271(b). For example, Dometic's sale

of its DG3 product induces infringement by actively, knowingly and intentionally aiding,

abetting, directing, encouraging, or otherwise instructing its customers to use the DG3 product in

a manner that constitutes infringement of the '782 patent.

76.    The manufacture, sale, offer for sale and/or importation of Dometic's DG3

product infringes the claims of the '782 patent, and one or more of Dometic's actions contribute

to the infringement of the '782 patent by third parties, including contract manufacturers in

violation of 35 U.S.C. § 271(c). Dometic has done so knowing that its DG3 product constitutes a

material part of Seakeeper's patent invention, and knowing the same to be especially made or

especially adapted for use in an infringement of such patent, and not a staple article or

commodity of commerce suitable for substantial noninfringing use.

77.    As a consequence of Dometic's actions alleged above, customers and contract

builders, among others, have committed acts that would constitute direct infringement of the

'782 patent.

78.    Dometic knew about the '782 patent by at least as early as February 2024 during

its due diligence as part of Dometic's potential acquisition of Seakeeper.

79.    Dometic has no reasonable basis for believing that Dometic's DG3 product will

not infringe one or more valid claims of the '782 patent and no reasonable basis for believing

that the infringed claims are invalid.

80.    Dometic's manufacture, use, importation, sale, and/or offer for sale of Dometic's

DG3 product constitutes willful infringement.

81.    This case is "exceptional," and Seakeeper is entitled to an award of reasonable attorneys' fees under 35 U.S.C. § 285.

82.    Seakeeper has suffered damages as a result of Dometic's infringement of the '782 patent. Seakeeper is entitled to an award of compensatory damages, including at least reasonable royalties for Dometic's infringement of the '782 patent.

83.    The acts of infringement by Dometic set forth above will cause Seakeeper irreparable harm for which it has no adequate remedy at law, and those acts will continue unless enjoined by this Court.

84.    Seakeeper is entitled to a preliminary injunction prohibiting Dometic from manufacturing, using, offering for sale, or selling Dometic's DG3 and related products in the United States before expiration of the '782 patent.

## COUNT II – INFRINGEMENT OF THE '930 PATENT

85.    Seakeeper incorporates and realleges the foregoing paragraphs.

86.    The '930 patent is cooling apparatuses with improved cooling efficiency, capable of cooling a flywheel or other spinning member. The '930 patent inventors discovered building vanes into the enclosure containing a flywheel or other spinning member at below-ambient pressure or below-ambient density results in a more efficient cooling of the parts that are subjected to heat-generating friction.

87.    The '930 patent issued with 17 claims. Independent claim 1 recites:

1. A **gyroscopic** roll stabilizer for a boat, the stabilizer comprising:

a flywheel, the flywheel being configured to be spun about a spin axis;

a first plurality of vanes coupled to the flywheel such that the first plurality of vanes spin with the flywheel relative to an enclosure;

a second plurality of vanes fixed relative to the enclosure and the flywheel such that the first plurality of vanes spin with respect to the second

plurality of vanes, the second plurality of vanes defining gaps into which the first plurality of vanes extend so that the first and second plurality of vanes are interleaved;

at least one rotating heat generating component coupled to the flywheel and positioned such that heat is transferred from the heat generating component to the first plurality of vanes;

the enclosure surrounding the first plurality of vanes, the second plurality of vanes, the heat generating component, and a portion or all of the flywheel, the enclosure containing a below-ambient density gas and maintaining a below-ambient pressure, wherein the below ambient density gas has a thermal conductivity at least 5 times greater than air; and

wherein the flywheel, the first plurality of vanes, the second plurality of vanes, the heat generating component, the enclosure, and the gimbal structure are configured so that, when installed in the boat, the stabilizer damps roll motion of the boat.

88.      Dometic manufactures, uses, sells, offers for sale and/or imports Defendant's Product constituting infringement of at least claim 1 of the '930 patent under 35 U.S.C. § 271(a), (b), and (c).

89.      As illustrated below, Dometic's DG3 product includes an enclosure that encloses a flywheel at below-ambient pressure and below-ambient density, whereby the flywheel is configured to be spun about a spin axis.

90.      As illustrated below, Dometic's DG3 product includes a first plurality of vanes coupled to the flywheel such that the first plurality of vanes spin with the flywheel relative to an enclosure.

91.      As illustrated below, Dometic's DG3 product includes a second plurality of vanes defining gaps into which the first plurality of vanes extend so that the first and second plurality of vanes are interleaved.

92.    As illustrated below, Dometic's DG3 product includes at least one rotating heat generating component that is coupled to the flywheel and positioned such that heat is transferred from the heat generating component to the first plurality of vanes.

93.    As illustrated below, Dometic's DG3 product includes an enclosure containing a below-ambient density gas and maintaining a below-ambient pressure. On information and belief, the enclosure in Dometic's DG3 contains helium, which has a thermal conductivity at least 5 times greater than air.

94.    As illustrated below, in Dometic's DG3 product, the flywheel, the first plurality of vanes, the second plurality of vanes, the heat generating component, the enclosure, and the gimbal structure are configured so that, when installed in the boat, the stabilizer damps roll motion of the boat.

95.    The following diagram illustrates that Dometic's DG3 product embodies the elements of at least claim 1 of the '930 Patent:



96.    The manufacture, use, sale, offer for sale and/or importation of Dometic's DG3 product infringes the claims of the '930 patent, and one or more of Dometic's actions constitutes direct infringement of the claims of the '930 patent.

97.    The manufacture, sale, offer for sale and/or importation of Dometic's DG3 product infringes the claims of the '930 patent, and one or more of Dometic's actions are inducing third parties, including contract manufacturers to commit acts that constitute infringement of the '930 patent in violation of 35 U.S.C. § 271(b). For example, Dometic's sale of its DG3 product induces infringement by actively, knowingly and intentionally aiding, abetting, directing, encouraging, or otherwise instructing its customers to use the DG3 product in a manner that constitutes infringement of the '930 patent.

98.    The manufacture, sale, offer for sale and/or importation of Dometic's DG3 product infringes the claims of the '930 patent, and one or more of Dometic's actions contribute to the infringement of the '930 patent by third parties, including contract manufacturers in violation of 35 U.S.C. § 271(c). Dometic has done so knowing that its DG3 product constitutes a material part of Seakeeper's patented invention, and knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use.

99.    As a consequence of Dometic's actions alleged above, customers and contract builders, among others, have committed acts that would constitute direct infringement of the '930 patent.

100.    Dometic knew about the '930 patent by at least as early as February 2024 during its due diligence as part of Dometic's potential acquisition of Seakeeper.

101.    Dometic has no reasonable basis for believing that Dometic's DG3 product will not infringe one or more valid claims of the '930 patent and no reasonable basis for believing that the infringed claims are invalid.

102.    Dometic's manufacture, use, importation, sale, and/or offer for sale of Dometic's DG3 product constitutes willful infringement.

103.    This case is "exceptional," and Seakeeper is entitled to an award of reasonable attorneys' fees under 35 U.S.C. § 285.

104.    Seakeeper has suffered damages as a result of Dometic's infringement of the '930 patent. Seakeeper is entitled to an award of compensatory damages, including reasonable royalties for Dometic's infringement of the '930 patent.

105.    The acts of infringement by Dometic set forth above will cause Seakeeper irreparable harm for which it has no adequate remedy at law, and those acts will continue unless enjoined by this Court.

106.    Seakeeper is entitled to a preliminary injunction prohibiting Dometic from manufacturing, using, offering for sale, or selling Dometic's DG3 and related products in the United States before expiration of the '930 patent.

## PRAYER FOR RELIEF

**WHEREFORE**, Seakeeper respectfully requests the following relief:

A.    A judgment, pursuant to 35 U.S.C. § 271(a), (b), and/or (c), that the commercial manufacture, use, offering to sell, or sale within the United States, and/or importation into the United States of Defendant's Product has infringed the '782 and '930 patents;

B.    A preliminary injunction that Dometic is prevented from manufacturing, using, importing, selling, or offering to sell Dometic's DG3 product and related products until a date not earlier than the date of expiration of both the '782 and '930 patents;

C.    An award, pursuant to 35 U.S.C. § 284, of damages or other monetary relief to compensate Seakeeper for Dometic's engagement in the manufacture, use, offer for sale, sale, marketing, distribution, and/or importation of Dometic's DG3 product, or any product the making, using, offering for sale, sale, marketing, distribution, and/or importation of which infringes the '782 and '930 patents;

D.    A judgment pursuant to 35 U.S.C. § 285 that this case against Dometic is an exceptional case and an award of enhanced damages, attorneys' fees and costs; and

E.    Such other and further relief to Seakeeper as this Court may deem just and

proper.

## DEMAND FOR A JURY TRIAL

Seakeeper hereby demands a jury trial on all issues so triable.

OF COUNSEL:

MARSHALL, GERSTEIN & BORUN LLP
6300 Willis Tower
233 S. Wacker Drive
Chicago, IL 60606
(312) 474-6300


Dated:  April 21, 2025

*/s/ Kelly E. Farnan*
Kelly E. Farnan (#4395)
Christine D. Haynes (#4697)
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
302-651-7700
farnan@rlf.com
haynes@rlf.com

*Attorneys for Plaintiff*
*Seakeeper, Inc.*