IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SEAKEEPER, INCORPORATED,<br><br>                           Plaintiff,<br>     v.<br><br>DOMETIC CORPORATION,<br><br>                           Defendant. | C.A. No. 25-0484-RGA<br><br>**REDACTED VERSION**<br><br>**Jury Trial Demanded** |

### DECLARATION OF WILL CIMINO

WILL CIMINO, under penalty of perjury, declares that the following is true and correct:

1. I am the Chief Commercial Officer at Seakeeper, Inc. ("Seakeeper"). I have worked at Seakeeper for approximately seven years in various capacities including Director of Global Sales, and Vice President of Growth and Strategy. My day-to-day responsibilities include overseeing commercial operations of Seakeeper, including responsibility for global sales, service, field engineering, training, and strategic planning. Out of the about 300 employees at Seakeeper, I manage about 80 Seakeeper employees. In addition, I have extensive experience monitoring the relevant marine system marketplace and have gathered information both on competitive products and customer purchasing patterns and behavior.

2. I am fully familiar with the facts and circumstances underlying this matter, and I make this declaration in support of Plaintiff Seakeeper's motion for preliminary injunction barring Defendant Dometic Corporation ("Dometic") from continuing to make or sell gyroscopic stabilizers products that infringe Seakeeper's patents.

**Seakeeper's Market and Competition**

3. Seakeeper is a worldwide designer, manufacturer, and integrator of precision gyrostabilizers used to control motion in boats. Seakeeper is based in Leesport, Pennsylvania.

4. In 2008, after years of research and development, Seakeeper officially launched its first commercial product (the Seakeeper M7000 gyro) and secured its first boatbuilder partnership to fit its gyrostabilizer into the design of the boat. Seakeeper's M7000 gyro features a flywheel spinning at high speeds within a vacuum-sealed enclosure, generating gyroscopic torque to counteract vessel movement. Before Seakeeper launched its first product in 2008, the market for boat stabilizers was relatively niche, fragmented, and largely focused on larger vessels such as commercial ships, mega-yachts, and military craft. The introduction of the Seakeeper M7000 in 2008 effectively created a new market for gyroscopic stabilizers in recreational and smaller commercial boats.

5. Seakeeper operates through two primary sales channels: OEM (Original Equipment Manufacturer) sales and aftermarket sales. Approximately ▮ of Seakeeper's business is driven by the OEM channel, in which its stabilization systems are sold directly to boat manufacturers and integrated into new boats during production. In these cases, Seakeeper products are offered either as standard equipment or as optional upgrades that customers can select when configuring a new vessel. This integration often involves close collaboration with the boat builder to ensure structural and mechanical compatibility, and permits the installation of the stabilizer on the production line before delivery to the customer. The remaining portion of Seakeeper's business is comprised of aftermarket sales, where stabilizers are installed on existing boats already in use. Aftermarket customers typically work through Seakeeper's authorized dealer network, which evaluates the vessel for retrofit feasibility and completes the installation.

6. When a boat OEM selects a gryostabilizing product for its design, the boat is designed specifically to structurally and mechanically integrate a specific gryostabilizing product. Once a stabilizer is designed into a boat model, it typically remains for the entire five- to ten-year lifecycle of that model. If Dometic is selected for integration during this critical design phase, Seakeeper is effectively locked out of those boats for years, regardless of the outcome of this litigation. At the 2025 Miami International Boat Show, Regulator Marine, Inc. ("Regulator"), a company specializing in the manufacture of sportfishing boats ranging from 23 to 41 feet in length, announced that it would incorporate Dometic's DG3 system into the design of the "Regulator 35" model. Regulator's announcement sent a signal across the industry, especially to other boat builders, some of whom were present at its launch event. It raises the risk of a cascading effect where additional manufacturers may follow suit and design their boats around Dometic's product instead of ours.

7. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ If Dometic's DG3 is selected for integration into these boat designs in the next few months, Seakeeper would likely be prevented from selling its gyroscopic product on those boats for a period of five to ten years. If Dometic is able to enter the market, and secure placement in these boat designs, Dometic's entry will drastically cut into Seakeeper market share.

8. Furthermore, when Seakeeper is displaced at the OEM level, Seakeeper loses the one-time sale, and also loses a longer period of future revenue. Seakeeper's products generate recurring income through extended warranties, spare parts, and aftermarket trade-ins, all of

which are tied to units installed at the OEM stage. If Dometic wins the initial integration, Seakeeper permanently loses the opportunity to capture these high-margin revenue streams. This is particularly damaging because the boating industry is deeply relationship-driven, and those OEM accounts often lead to multi-year or multi-model partnerships.

9.  Regulator's decision and highly publicized announcement to incorporate the DG3 poses a direct and immediate threat to Seakeeper's customer base and market position. Regulator has historically been a key Seakeeper partner, and its shift to Dometic's DG3 signals a potential loss of a valued OEM relationship but also sets a precedent that other boat manufacturers may follow. In the marine industry, manufacturers often look to competitors and market leaders when selecting equipment for new models. Therefore, Regulator's public endorsement of the DG3 risks triggering a broader move away from Seakeeper's gyroscopic products, which could erode Seakeeper's existing OEM partnerships and brand loyalty, causing long-term harm to Seakeeper's competitive standing.

### Seakeeper Market Share

10. The marine industry's reception to Seakeeper's patented vacuum encapsulated, water cooled system evolved from skepticism to fervent adoption as the benefits were demonstrated. Sportfishermen and yacht owners who long previously accepted nauseating roll as just part of boating, had a product that could provide rock-solid decks and steady stomachs. ██ ███████████████████████████████ and the pace of adoption has accelerated since. In the following years, the company expanded its product line from one flagship model to a whole family of gyros, scaling the technology to both larger and smaller boats. Today, Seakeeper® gyros can be found on vessels from 23-foot center-console fishing boats to 200-foot mega-yachts.

11. In the gyrostabilizer market for recreational and small commercial boats, Seakeeper has about a 95% market share. Our most significant competitor, Quick Spa ("Quick"), reported in 2022 to have sold 11 million in gyrostabilizers, which corresponds to sales covering about 5% of the market for recreational and small commercial boats built in 2022 with a gyroscopic stabilizer. Quick's products lack Seakeeper's proprietary vacuum and cooling technology, so unlike Dometic's DG3, Quick's products are unable to compete effectively with Seakeeper's gyroscopic products.

12. Dometic's entry in the gyrostabilizer market for recreational and small commercial boats, a market in which Seakeeper has ■■■■■■ market share will take away market share that Seakeeper will be unable to get back. Seakeeper will suffer harm from the continued infringement due to the loss of market share in the recreational and small commercial boat gyrostabilizer market. As a leader in marine stabilization technology, Seakeeper's market position and customer relationships are critical assets that cannot be restored through monetary damages alone. Continued infringement threatens to erode Seakeeper's competitive edge, diminish its brand loyalty, and cause long-term harm.

## Seakeeper's Intrinsic Value

13. The entry of Dometic into the gyroscopic stabilization market has also significantly impacted Seakeeper's perceived value to potential acquirers. ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■



14.

### Erosion of Seakeeper's Pricing Power

15.　　Dometic's entry into the market has also caused irreparable harm by affecting Seakeeper's relationship with boat builders. Independent Boat Builders, Inc. ("IBBI") is a purchasing cooperative composed of independently owned boat manufacturing companies. IBBI allows its members to pool their purchasing power to negotiate more favorable pricing and terms with suppliers of marine components and materials. The organization represents a significant share of the North American recreational boat market, giving it substantial leverage in supplier negotiations. Regulator, among other Seakeeper OEM customers, is one of IBBI's core members and has significant influence on its supplier relationships.

16.　　Seakeeper has avoided participating in marine industry buying groups like the IBBI in order to preserve its pricing flexibility and maintain healthier margins through direct OEM relationships. However, Dometic's entry into the gyroscopic stabilizer market threatens to force Seakeeper into cooperating with these groups, which aggregate the purchasing power of

multiple boat builders and demand, higher discounts, credit concessions, and rigid commercial terms.

17. Dometic already has an established presence within these groups through its other product lines, making it easy for them to add the DG3 to the approved supplier list. If that happens, boat builders, who are also the owners of these groups, will be incentivized to choose the DG3 in order to meet their collective purchasing quotas, thereby penalizing any purchase of Seakeeper products. As a result, Seakeeper risks being entirely excluded from consideration by OEMs who are members of these groups or, alternatively, being forced to join on unfavorable terms that would irreparably compress its margins and undermine long-standing commercial relationships.

18. If Dometic is accepted as an approved vendor by the IBBI, Seakeeper will suffer irreparable harm due to the structural and long-term nature of boat design decisions made by IBBI member manufacturers. Because IBBI members commit to incorporating components primarily from approved vendors, acceptance of Dometic would result in widespread adoption of Dometic's infringing product across multiple boat lines. Boat manufacturers would design their hulls and internal layouts around Dometic's system specifications, effectively locking Seakeeper out of future sales opportunities. This design-based exclusion would not only cause Seakeeper immediate market share loss, but also result in lasting damage to its customer relationships, competitive position, and ability to re-enter key OEM channels.

19. Seakeeper has invested significant resources into the research and development of its proprietary marine stabilization technology, which represents years of innovation, engineering expertise, and market cultivation. If Dometic is allowed to continue its infringement, it will undermine Seakeeper's ability to maintain its competitive position as the industry leader in this

specialized field. This erosion of competitive differentiation and the ability to continue R&D efforts constitute irreparable harm, as they affect Seakeeper's long-term ability to lead, grow, and compete in a high-tech, evolving marketplace.

20. Seakeeper is already experiencing price erosion by Dometic's entry. ███



21. ███

### Immediate Financial and Market Harm

22.     Dometic's entry into the gyroscopic stabilization market has already begun causing substantial financial and market harm. Marine OEMs operate on long product cycles, typically around five to ten years, and prioritize stable, integrated platforms when selecting core technologies like gyrostabilizers. ███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████ Regulator is also a member of the IBBI buying group. ████████████████████

███████████████████████████████████████

██████████████████████████████████

███████████████████████████████████████

Dometic's inclusion as an IBBI vendor therefore places the entirety of that business at risk, due to IBBI's preference for standardizing purchases through approved suppliers. ████████

███████████████████████████████████████

███████████████████████████████████████

████████████

23.     In addition to these long-term financial threats, the disruption has caused significant immediate operational harm. ████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

9

███████████████ These disruptions, individually and collectively, pose a material threat to Seakeeper's financial health and long-term market position.

**R&D Costs and Product Transition Planning**

24. Seakeeper has spent significant time and money in the development, extension, and advancement of the Seakeeper® gyrostabilizer products. ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

25. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ However, Dometic's entry, which was made possible by the use of our patented technology, forced Seakeeper to reprioritize its product development efforts in order to defend its competitive position. This shift diverted resources away from strategic launches, ████████████████████████████████████████████████████████████████████████████████████████████████████████████ The urgency of this pivot was amplified when Dometic's DG3 was publicly promoted and ultimately awarded an Innovation Award at the 2025 Miami International Boat Show, with judges citing its 48-volt advancement and faster spool-up

10

times as a key differentiator. ███████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████ The resulting disruption to Seakeeper's launch timeline, resource allocation, and perceived innovation leadership constitutes strategic harm that cannot be undone or remedied by monetary damages alone.

### Seakeeper's Marketing

26.     Seakeeper has always been able to market its products as being technologically differentiated from the competition because of its vacuum encapsulation and patented water colling system. Exhibit WC-2 (Seakeeper's Promotional Materials) at 4-12. Seakeeper's market dominance in the gyroscopic stabilization market is based on its use of its patented vacuum-enclosed cooling system, which enables the flywheel to spin at extremely high speeds while minimizing heat buildup and energy loss. This innovative technology allows Seakeeper units to deliver powerful stabilization performance in a compact, self-contained design, making them uniquely suitable for smaller recreational boats where space and power are limited. Unlike traditional systems, which rely on complex external cooling or are constrained by size and weight, Seakeeper's approach allows for quieter, more efficient operation with superior performance. This patented cooling architecture is not only central to Seakeeper's product design, but is also a cornerstone of its marketing strategy. *See id.* Seakeeper consistently promotes this engineering breakthrough as the key factor that differentiates its products from any potential competitor. *See id.* Without this technological edge, which Dometic has copied and incorporated into its DG3 product, Seakeeper would not hold the commanding market position it occupies today.

27.     Indeed, the cooling system was touted by Dometic in speeches at the launch of DG3 at the 2025 Miami International Boat Show. Dometic acknowledges that its use of Seakeeper's patent cooling technology makes its device possible. In February 2025, Dometic's Eric Fetchko, explained:

> With heat gradients in the bearings between the inner and outer race, if they sped up how fast the current ones on the market ramped up or slowed it down, it could explode their bearings because the differential can only be a few degrees between the inner race and the outer race. As the tolerances are so tight, you'd explode the ceramic balls. **We got around that with our cooling methods.**

Eric Fetchko Q&A - Trade Only Today at https://tradeonlytoday.com/post-type-feature/eric-fetchko-q-a/ (emphasis added).

28.     ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ This change in focus to address the competition from Dometic will adversely affect Seakeeper's marketing of its other products. In addition, I have had to spend a lot of my time and the time of my team members to create a marketing response to Dometic's entry into the market, time I was not able to spend on growing Seakeeper's business.

### Damage to Reputation and Good Will

29.     Seakeeper will also suffer irreparable harm to its reputation and brand if Dometic, through its infringing product, gains acceptance in the marketplace. Seakeeper has built its brand on innovation, performance, and reliability in marine stabilization technology, and any confusion between its patented systems and Dometic's infringing product threatens to dilute that reputation. If boat builders and consumers associate the Dometic product with similar functionality or

12

performance, especially if it underperforms or lacks Seakeeper's engineering quality, Seakeeper's brand image as the industry leader may be irreversibly damaged. This erosion of trust and differentiation in a competitive, reputation-driven industry cannot be completely undone through monetary compensation and constitutes irreparable harm.

30. At the 2025 Miami International Boat Show, Dometic's DG3 product was awarded an Innovation Award, an honor for which a Seakeeper product was also a nominee. This public recognition of Dometic's product not only lends legitimacy to the infringing product, but also directly undermines Seakeeper's position as the recognized innovator in the marine stabilization space. Such an award significantly influences market perception, dealer confidence, and OEM purchasing decisions, all of which are deeply tied to brand prestige and technological leadership. The reputational damage resulting from the loss of this high-profile accolade to an infringing competitor cannot be undone, nor can it be fully compensated by monetary damages, as the long-term impact on Seakeeper's brand credibility, perceived innovation, and market influence constitutes clear irreparable harm.

31. Sea trials are a critical component of Seakeeper's marketing and sales strategy, as they provide real-world performance data that validates the effectiveness of Seakeeper's gyroscopic stabilizers on specific boat models. When a Seakeeper unit is integrated into a new boat, Seakeeper typically conducts sea trials in collaboration with the manufacturer, capturing detailed measurements on roll reduction performance. This data is then published in Seakeeper's online sea trial database, which prospective customers use to evaluate how Seakeeper performs on the exact model they are considering. If a competing product like Dometic's DG3 is selected instead, Seakeeper loses not only the OEM sale, but also the opportunity to conduct and publish a sea trial for that model, which can significantly reduce customer confidence and visibility.

Without that data, Seakeeper is excluded from the research and decision-making process of some future buyers, resulting in a long-term marketing and sales disadvantage.

### Loss of Cross-Selling Opportunities

32. Seakeeper's product ecosystem is designed to offer comprehensive stabilization solutions, and a key part of its future strategy is the joint promotion and sale of both its gyroscopic stabilizers and its newer Seakeeper Ride system. Seakeeper Ride, which attaches directly to the flat vertical section at the rear of the vessel (the "transom"), uses real-time motion data and adjusts the blades to create lift at the stern, counteracting unwanted boat movements like pitch, roll, and yaw. While the gyroscopic products eliminate roll both at rest and underway by stabilizing the boat's center of mass, Seakeeper Ride enhances underway comfort by actively controlling pitch, roll, and yaw through rapid adjustments at the boat's transom. These two technologies are highly complementary: many OEM boat builders and customers choose to install both systems together to provide maximum stabilization performance across all operating conditions. [REDACTED]

33. If Seakeeper's gyro business is displaced by a competitor like Dometic, Seakeeper will also lose sales of Seakeeper Ride. [REDACTED]

14

34.     In summary, if Dometic is permitted to proceed with its plans to launch, any such launch including price erosion and lost market share will have further wide-ranging, multi-faceted, long-term effects on the company as a whole. The launch will impact Seakeeper's investments in R&D and planned sales and marketing efforts. A negative impact in any one of these areas will necessarily have compounding ripple effects that negatively affect the others. As noted above, the full extent of these ripple effects would be both incalculable and irreversible.

35.     For all of these reasons, the harm that Seakeeper will suffer due to a launch of Dometric's DG3 has the potential to be considerable and, in any case, irreparable.

Date: 5/2/2025

By: *[signature]*
Will Cimino