# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SEAKEEPER, INCORPORATED,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>DOMETIC CORPORATION,<br><br>　　　　　Defendant. | C.A. No. 25-cv-00484-JCB |

## SUPPLEMENTAL DECLARATION OF NICK TROCHE

I, Nick Troche, declare and state as follows:

1. This declaration hereby incorporates by reference my earlier declaration, and attachments thereto, in support of Seakeeper, Incorporated's Motion for a Preliminary Injunction, including my background and credentials. *See* D.I. 10.

2. I have reviewed the written description contained in U.S. Patent No. 7,546,782 (the "'782 patent"). I note that the '782 patent emphasizes that:

> There are a great many possible implementations of the invention, too many to describe herein. Some possible implementations that are presently preferred are described below. It cannot be emphasized too strongly, however, that these are descriptions of implementations of the invention, and not descriptions of the invention, which is not limited to the detailed implementations described in this section but is described in broader terms in the claims.

D.I. 1-1 at 6:15-22.

3. Similarly, the '782 patent concludes that:

> Not all of the features described above and appearing in some of the claims below are necessary to practicing the invention. **Only the features recited in a particular claim are required for practicing the invention described in that claim. Features have been intentionally left out of claims in order to**

>   describe the invention at a breadth consistent with the inventors' contribution.

D.I. 1-1 at 10:4-10.

4. Figure 1 of the '782 patent is described as depicting "a gyroscopic roll stabilizer **10** for small boats[.]" D.I. 1-1 at 6:23-24. A "steel flywheel **12** spins within an aluminum enclosure **14**, which is evacuated to a below-ambient pressure[.]" D.I. 1-1 at 6:25-27. "An electric motor (frameless DC brushless) **16** integrated within **the interior** of the enclosure drives the flywheel, which is supported by an upper bearing assembly **18** and lower bearing assembly **20**." D.I. 1-1 at 6:29-32 (emphasis added). Figure 1 is shown below:



FIG. 1

5. The '782 patent explains that heat generated within the interior of the enclosure by the electric motor and bearings "is transferred to **the exterior** by cooling collar

2

assemblies **50**, **52** (one of many implementations of the heat transfer elements) located adjacent each bearing." D.I. 1-1 at 6:40-42 (emphasis added). The '782 patent notes that heat can more readily be transferred from the interior to the exterior of the enclosure (*i.e.* removed) from the bearing race opposite the flywheel (*i.e.* the bearing race that remains stationary). D.I. 1-1 at 2:28-31 (noting that heat can flow by conduction due to the abutting metal members). The bearing race adjacent the flywheel (*i.e.* the bearing race spinning with the flywheel and inside the partial vacuum) "tend[s] to rise in temperature" because heat cannot as easily be withdrawn from the enclosure's interior. D.I. 1-1 at 2:34-36. As the patent notes, these rising temperatures can subject the hotter bearing race to thermal expansions not seen by the cooler race, "with resulting catastrophic destruction of the bearings and apparatus." D.I. 1-1 at 2:36-40. The patent describes the use of interleaved fins to "provide a heat path to **the exterior of the device**." D.I. 1-1 at 4:15-16 (emphasis added).

6. Claims 11 and 17 of the '782 patent recite, *inter alia*, that second vanes that are "configured such that heat can be readily transferred from the second vanes to the exterior of the enclosure." Consistent with the written description, a person of skill in this art ("POSA") would understand that the purpose of the invention is to remove heat from inside the enclosure—to move heat from the enclosure's interior to its exterior.

7. The '782 patent specification explains that the second vanes are configured to "provide a heat path to the exterior of the device", including that "[h]eat may be conducted from the heat generating components to the rotating vanes by solid conduction, then across the air gap to the stationary vanes by gaseous conduction and convection and then by conduction and convection to the atmosphere or a heat sink." In other words, the vanes are configured to be part

3

of a heat path from the interior of the enclosure (including a partial vacuum) to the exterior of the enclosure (*i.e.* outside).

8. I understand that Dometic contends that Claims 11 and 17 require an "air-cooled" device that employs heat dissipating vanes affixed to the exterior surface of the enclosure. I understand that Dometic relies upon certain embodiments described in the patent's specification in support of these arguments.

9. Neither Claim 11 nor Claim 17 requires that the device be air-cooled using additional vanes affixed to the exterior surface of the enclosure. Consistent with the directions provided in the patent's written description (discussed above), a POSA would not understand that either Claim 11 or Claim 17 required an air-cooled device, or one which employed vanes affixed to the outer surface of the enclosure, where such limitations were not recited in those claims.

10. In fact, the '782 patent includes dependent Claim 19. Claim 19 depends from Claim 11 and recites use of "air-cooled fins" on the exterior of the enclosure. I understand that there is a doctrine in patent law known as claim differentiation. I understand that with few exceptions this doctrine provides that different claims are presumed to have different scope and that under this doctrine it is improper to read limitations from a dependent claim into the independent claim from which it depends. Dometic thus improperly reads limitations found in Claim 19 into Claim 11, in which they are not recited.

11. I also understand that Dometic has further argued that Claim 11 and 17 cannot encompass the use of fluid to remove heat from the stationary vanes once that heat has been transferred to those vanes from the vanes that spin with the flywheel. I understand that Dometic's only support for this argument is the following statement in the '782 patent's specification: "heat

[may] be removed passively without circulating any fluids inside the enclosure … [which] considerably simplifies the device … as a coolant pump … and heat exchanger are not required." D.I. 1-1 at 4:45-48.

12. Dometic has misconstrued this statement. A POSA would not understand this statement to preclude the use of fluid to dissipate heat. This statement of one possible embodiment of the invention is contrasted in the very next paragraph with another device that employs a liquid to cool the interleaved vanes, described as follows:

> In a second aspect, the invention features cooling apparatus for transferring heat from and cooling one or more heat generating components that support or drive a flywheel or other spinning member. The apparatus comprises a set of rotating vanes mounted to rotate with the spinning member, an orifice **configured to direct a spray of cooling liquid onto the rotating vanes,** wherein the cooling liquid is sprayed onto the rotating vanes at a radially inward location, so that the liquid flows radially outward over the surface of the vanes as a thin film of liquid, **and is thrown off the vanes by centrifugal action**; and collecting apparatus configured to collect the liquid thrown off of the vanes.

D.I. 1-1 at 4:51-62 (emphasis added).

13. A POSA would understand that the statement emphasized by Dometic offers merely one embodiment that avoids the added complications in a design that sprays liquid onto the rotating vanes to help cool them. First, my understanding is that Dometic's device does not spray liquid on its vanes in this manner. Second, it bears repeating that the '782 patent emphasizes that the claims are the measure of the invention, not various different embodiments described in the patent's specification.

14. Neither the claims nor the portion of the specification cited by Dometic preclude the use of circulating fluid to assist in the removal of heat that has been transferred from the spinning vanes to the stationary vanes, so as to achieve the purpose of the invention which is to transfer heat from the interior of the enclosure to its exterior.

5

15. Dometic's DG3 device removes heat from the interior of the enclosure and transfers it to the exterior of the enclosure.

16. Specifically, Dometic's DG3 device removes heat from the interior of the enclosure by transferring heat from the stationary fins (second vanes) to a coolant loop and then to the surrounding body of water. *See* D.I. 41 at 17 ("DG3 removes heat from the interior of its enclosure by … an internal coolant 'loop' … adjacent to the stationary fins. … Heat is then removed from the internal coolant loop by placing it into contact with pipes that circulate water from the surrounding body of water.").

17. The *surrounding* body of water is not on the "interior" of the enclosure—thus it must be on the "exterior" of the enclosure.

18. That Dometic's DG3 device uses a "coolant loop" as part of the heat path to transfer heat from the interior of the enclosure to the exterior does not change this fact—Dometic's DG3 device includes second vanes that are configured such that heat can be readily transferred to the exterior of the enclosure since the vanes are part of the heat path transferring heat from the interior of the enclosure to the exterior.

19. A POSA would understand that Dometic's DG3 device meets all the limitations of claims 11 and 17 of the '782 patent, as discussed above.

20. I understand that Dometic contends that "although the patents describe a vacuum-sealed enclosure, it is not the claimed advance over the prior art; rather, the patents' specification admits that enclosing the flywheel of a gyrostabilizer in a partial vacuum was well-known." D.I. 41 at 23. The patented invention, however, is not agnostic to or unrelated to using a partial vacuum. Enclosing a flywheel in a partial vacuum presents a problem for removing heat from components within the vacuum. Seakeeper's patented cooling system solves this problem,

thereby allowing operation of a flywheel within a partial vacuum where significant heat is generated at components within the vacuum and needs to be transferred out of the device.

21. In 2017, petitions for *inter partes* review ("IPR") were filed challenging both the '782 patent and the '930 patent.

22. I understand that Dometic relies on two purported combinations of prior art references identified in the IPR Petition to allege that claims 11 and 17 of the '782 patent are obvious: (1) U.S. Patent No. 6,973,847 ("Adams") in view of U.S. Patent Publication No. 2005/0040776 ("Sibley") and in further view of U.S. Patent No. 3,844,341 ("Bimshas"); and (2) Adams in view of DEl9909491 ("Jäger") and in further view of Bimshas. *See* D.I. 46 at 17.

23. Adams is an expired patent owned by Seakeeper that has the same inventors as the '782 and '930 patents. I understand that Adams is not prior art to the '782 and '930 patents.

24. Sibley, as previously noted, discloses the use of interleaved fins to transfer heat using a fluid-filled heat pipe and *radiant* heat transfer in a high vacuum using air. *See* Att. NT-5 at [0033], [0140]. Sibley does not disclose using gaseous *conduction* for heat transfer.

25. Sibley relies also on fluid to draw heat off the bearings and teaches away from locating the interleaved fins adjacent the bearings. *See* Att. NT-5 at [0139], [0140], Fig. 4; D.I. 10 at ¶¶92-95.

26. A POSA would not be motivated to incorporate Sibley into Adams at least because incorporating Sibley's fluid-filled heat pipe with radially extending fins that are not located adjacent the bearings would render Adams inoperable for its intended purpose. A POSA would similarly not have a reasonable expectation of success of incorporating Sibley's teachings into Adams.

27. Jäger teaches using interleaved fins to cool a shaft using *gas convection* at *atmospheric pressure*. **Attachment NT-6** at 1:36-47 ("The heat transfer is in this case aided by the rotation of the first heat sink on the side of the shaft and by the strong *turbulence* created in this manner of the gas located between the cooling bodies.") (emphasis added).

28. Jäger is not directed to a gyrostabilizer nor does it involve a flywheel. A POSA would not look to Jäger when confronting the cooling problems unique to the claimed gyrostabilizer.



29.     Jäger teaches a method of cooling a shaft rotating in close tolerances within a sleeve. Att. NT-6 at 3:1-30. The proximity of the shaft to the sleeve within which it rotates demands interleaved fins along the length of that shaft be necessarily oriented perpendicular (NOT parallel) to the axis of rotation. *Id.* The effectiveness of this arrangement is dependent upon the close tolerances between the shaft and its sleeve. *Id.* Jäger notes that this allows the amount of heat dissipation to be adjusted, merely by adding fins along the length of the shaft. *Id.* at 4:16-20.

30.     Jager depicts locating these fins at the mid-point of this shaft, equidistant from bearings located along the shaft's length. *See id.* at Fig. 1 (reproduced above). In contrast, the variable profile of the flywheel of the claimed gyrostabilizer does not rotate within a closely adjacent sleeve from which stationary fins could project. Placing the interleaved fins at the midpoint between the supporting bearings would locate them on the outmost circumference of the flywheel's bulge, far from the bearings they are intended to cool, and potentially interfering with the flywheel's operation. *See* D.I. 1-1 at Figure 1 (reproduced and annotated below):



31.     A POSA would also not have a reasonable expectation of success in combining Jäger with Adams at least because Jäger contemplates ambient or higher pressure between the fins and does not address the differing concerns related to below-ambient pressure implementations.

32.     Bimshas discloses using interleaved cooling fins to transfer heat from a heat source to a heat sink using a gas or liquid *at ambient or higher pressure*. **Attachment NT-7** at 3:17-24 (A "gas such as helium or a liquid could be provided *under pressure* within the gaps" of the interleaved fins) (emphasis added).

33.     Bimshas explains that its invention relates to applications such as the "*intergimbal* assembly of inertial guidance structures," and provides "a heat transfer path between relatively rotating *gimbals* without the undesirable effects of blower devices." Att. NT-7 at 1:22-26 (emphasis added). Bimshas is not directed to cooling high heat generating bearings supporting gyrostabilizer flywheels spinning at very high speeds. *Id*.

34.     Unlike a flywheel, which is designed to spin as fast as possible about its axis within practical constraints, gimbals are designed to merely react about their axis. In a control moment gyro ("CMG") gimbals support either side of a gyrostabilizer's enclosure, allowing it to rock forward and back as the boat pitches up and down. For example, in a Seakeeper CMG, the flywheel precesses about the gimbal axis at up to around 25 RPM. A Seakeeper flywheel, however, rotates about its spin axis at more than 8000 RPM.

35.     This intermittent, slow movement, and the heat it imparts to bearings, is fundamentally unlike the extremely high heat produced by bearing supporting a gyrostabilizer flywheel. *See* Att. NT-7 at 1:22-26.

36. Bimshas's relatively slow rotating, gimbal application would not generate significant heat or frictional losses from viscous drag on the rotating components. *See* Att. NT-7 at 1:5-26.

37. A POSA would not have considered cooling vanes adapted for such low, fluctuating heat to be suitable for gyrostabilizer flywheels spinning at very high speeds.

38. Moreover, Bimshas teaches using helium or a liquid provided "under pressure" within the gaps between the fins in order to enhance thermal conductivity. Att. NT-7 at 4:23-24.

39. As the pressure of a gas or liquid decreases, so does the thermal conductivity.

40. Thus, Bimshas teaches away from using below-ambient pressure gas/liquid, as it would decrease the thermal conductivity necessary for the heat-transfer device of Bimshas to function. Similarly, a POSA would not look to Bimshas when confronting a problem relating to flywheels enclosed in a partial vacuum.

41. A POSA would not have been motivated to incorporate Bimshas' vanes, dependent on pressurized environments, into the cooling assembly of Sibley which operated in a vacuum. Similarly, a POSA would not have a reasonable expectation of success in combining Adams, Sibley and Bimshas.

42. A POSA also would not be motivated to combine Adams with Jäger and further with Bimshas at least because Adams teaches using a partial vacuum enclosure to allow higher flywheel speeds, thereby minimizing power, size and weight requirements. Thus, a POSA would not look to Jäger and Bimshas' ambient or above pressure systems, as it would render Adams inoperable for its intended purpose and a POSA would not have a reasonable expectation of success.

43.     A POSA also would not be motivated to alter the perpendicular orientation of Jager's fins in favor of the parallel orientation shown in Bimshas, nor would a POSA have expected success. For example, the clearance between the rotating shaft and the sleeve would not permit use of Bimshas' parallel oriented fins. *See* Att. NT-6 at 3:1-30. Nor would it be possible to realize the advantages of Jager's perpendicular design which allows for increasing heat dissipation simply by adding additional perpendicular fins along a greater length of the rotating shaft. *See* Att. NT-6 at 4:16-20. A POSA would not have been motivated to use Jager's design or to modify it in view of Bimshas, nor would they have reasonably expected success.

**[SIGNATURE APPEARS ON FOLLOWING PAGE.]**

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 5/25/25

_____
Nick Troche