IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SEAKEEPER INC. )
)
Plaintiff, )
)
v. )
) C.A. No. 25-484-JCB
DOMETIC CORPORATION, )
) **REDACTED PUBLIC VERSION**
Defendant. )

## DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION (D.I. 8)

*Of Counsel:*

Oleg Khariton
DINSMORE & SHOHL LLP
255 East Fifth Street, Suite 1900
Cincinnati, OH 45202
(513) 977-8200
oleg.khariton@dinsmore.com

Michael A. Xavier
DINSMORE & SHOHL LLP
1775 Sherman Street, Suite 2600
Denver, CO 80203
(303) 296-3996
michael.xavier@dinsmore.com

Dated: May 19, 2025

Andrew C. Mayo (#5207)
Brian A. Biggs (#5591)
ASHBY & GEDDES
500 Delaware Avenue, 8th Floor
PO Box 1150
Wilmington, DE 19899
(302) 654-1888
amayo@ashbygeddes.com
bbiggs@ashbygeddes.com

*Attorneys for Defendant*

## TABLE OF CONTENTS

I.    NATURE AND STAGE OF THE PROCEEDINGS ............................................................... 5

II.   SUMMARY OF ARGUMENT ........................................................................................ 6

III.  STATEMENT OF FACTS ............................................................................................. 7

    A.   The Seakeeper Patents ...................................................................................... 7

    B.   The Dometic DG3 Device ................................................................................. 10

IV.   ARGUMENT .............................................................................................................. 12

    A.   Seakeeper Is Not Likely to Succeed on the Merits. ........................................... 12

        1.   Dometic Corporation Has No Involvement With the Accused Product. ..................... 12

        2.   The DG3 Does Not Infringe the Asserted Claims of the '930 and '782 Patents. ......... 14

    B.   Seakeeper Has Not Shown Irreparable Harm. .................................................... 18

    C.   The Balance of the Equities Does Not Favor an Injunction. ............................... 24

    D.   The Public Interest Does Not Favor an Injunction. ............................................ 24

V.   CONCLUSION .............................................................................................................. 24

# TABLE OF AUTHORITIES

## Cases

*A. Stucki Co. v. Worthington Indus.*,
849 F.2d 593 (Fed. Cir. 1988) ..................................................................................... 13

*Abbott Labs. v. Andrx Pharms., Inc.*,
452 F.3d 1331 (Fed. Cir. 2006) ................................................................................... 24

*ActiveVideo Networks, Inc. v. Verizon Communs., Inc.*,
694 F.3d 1312 (Fed. Cir. 2012) ................................................................................... 22

*Altana Pharma AG v. Teva Pharms. USA, Inc.*,
532 F. Supp. 2d 666 (D.N.J. 2007) .............................................................................. 19

*Apple v. Samsung*,
695 F.3d 1370 (Fed. Cir. 2012) ................................................................................... 23

*Automated Merch. Sys. v. Crane Co.*,
357 F. App'x 297 (Fed. Cir. 2009) .............................................................................. 20

*Daimler AG v. Bauman*,
571 U.S. 117 (2014) .................................................................................................... 14

*eBay Inc. v. MercExchange, L.L.C.*,
547 U.S. 388 (2006) .................................................................................................... 19

*Freres v. SPI Pharma, Inc.*,
629 F. Supp. 2d 374 (D. Del. 2009) ............................................................................ 14

*Graceway Pharm., LLC v. Perrigo Co.*,
697 F. Supp. 2d 600 (D.N.J. 2010) ............................................................................. 24

*Gryphon Oilfield Sols., LLC v. Stage Completions (USA) Corp.*,
No. H-17-3220, 2018 U.S. Dist. LEXIS 7007 (S.D. Tex. Jan. 17, 2018) ...................... 24

*Intel Corp. v. ULSI Sys. Tech., Inc.*,
995 F.2d 1566 (Fed. Cir. 1993) ................................................................................... 12

*Jack Guttman, Inc. v. Kopykake Enters., Inc.*,
302 F.3d 1352 (Fed. Cir. 2002) ................................................................................... 12

# TABLE OF AUTHORITIES (CONT.)

*M2M Sols., LLC v. Telit Communs. PLC*,
   No. 14-1103-RGA, 2015 U.S. Dist. LEXIS 102349 (D. Del. Aug. 5, 2015) ................. 13

*Nutrition 21 v. United States*,
   930 F.2d 867 (Fed. Cir. 1991) ......................................................................................... 21

*Robert Bosch LLC v. Pylon Mfg. Corp.*,
   659 F.3d 1142 (Fed. Cir. 2011) ....................................................................................... 19

*Sebela Int'l Ltd. v. Actavis Labs. FL, Inc.*,
   No. 17-4789-CCC-MF, 2017 U.S. Dist. LEXIS 175318 (D.N.J. Sep. 14, 2017) ........... 23

*SmartSky Networks, LLC v. Gogo Bus. Aviation, LLC*,
   No. 2023-1058, 2024 U.S. App. LEXIS 2100 (Fed. Cir. Jan. 31, 2024) ........................ 22

*Sunoco Partners Mktg. & Terminals L.P. v. Powder Springs Logistics, LLC*,
   No. 17-1390-LPS-CJB, 2018 U.S. Dist. LEXIS 7479 (D. Del. Jan. 8, 2018) ................ 22

*Symbol Techs., Inc. v. Janam Techs. LLC*,
   729 F. Supp. 2d 646 (D. Del. 2010) ................................................................................ 21

*Woodard v. Sage Prods.*,
   818 F.2d 841 (Fed. Cir. 1987) ......................................................................................... 20

## <u>Rules</u>

Federal Rule of Civil Procedure 65(d)(2) ................................................................................... 13

## I.      NATURE AND STAGE OF THE PROCEEDINGS

Plaintiff Seakeeper, Inc. ("Seakeeper") alleges that the accused Dometic DG3 gyroscopic stabilizer (the "DG3") infringes its U.S. Patents No. 7,546,782 (the "'782 Patent") and 8,117,930 (the "'930 Patent") based on mere speculative assumptions about the DG3's construction, design, and operation—assumptions that have no basis in reality.  Moreover, Seakeeper failed to conduct enough due diligence to even name the right party as the defendant.  Contrary to Seakeeper's bare assertions, Dometic Corporation (the named defendant) does not manufacture, sell, or offer for sale the accused device.  Rather, the entity responsible for the design, manufacture, and distribution of the DG3 is Dometic Marine Canada, Inc. ("DMC").  Worse yet, Seakeeper did not even file suit in the right court, as DMC—a Canadian corporation with headquarters in Vancouver and no pertinent ties to Delaware—would not be subject to personal jurisdiction in this Court.

Having filed a substantively and procedurally defective complaint, Seakeeper proceeded to make matters even worse by filing a motion for a preliminary injunction (the "PI Motion"), three months after the DG3 was revealed in February 2025 and without the necessary discovery to demonstrate any right to its extraordinary request for injunctive relief.  (D.I. 8.)  Indeed, in its PI Motion, Seakeeper told the Court that its record was insufficient and that it "intend[ed] to seek entry of a schedule governing the preliminary injunction [that] would include discovery."  (D.I. 9 at 1 fn. 1.)  Seakeeper then did the opposite, refused to negotiate a schedule that would have allowed the parties the opportunity to conduct discovery, and instead demanded that Dometic Corporation enjoin itself and DMC pending a decision on the PI Motion.  (D.I. 32-2 at 5-9.)  Since then, perhaps forced into this path by its own delay in filing the PI Motion, Seakeeper has continued to move in reckless fashion and, late on Thursday of last week, filed an emergency motion for a temporary restraining order.  (D.I. 29.)

The PI Motion is procedurally flawed and lacks substance.  It should be denied.

## II.    SUMMARY OF ARGUMENT

A.    Seakeeper has not shown a likelihood of success on the merits.  For one, it cannot establish liability for infringement for the simple reason that Dometic Corporation, the named defendant, has no involvement in the manufacture or distribution of the accused device.  But even setting that aside, Seakeeper's assertion that the DG3 practices its patented technology is completely baseless.  Starting with the '930 Patent, its asserted claims require the enclosure of the gyroscopic stabilizer to contain "a below-ambient density gas . . . ha[ving] a thermal conductivity at least 5 times greater than air."  Seakeeper speculates that the DG3 meets this limitation because its enclosure includes helium.  But that speculative assumption has no basis in fact—in reality, the DG3's enclosure **contains not helium but air**, and so by definition does not include a "below-ambient density gas" with a "thermal conductivity at least 5 times greater than air."  Seakeeper's infringement contentions with respect to the '782 Patent are similarly meritless.  The patent's asserted claims describe a system for cooling the internal components of the gyrostabilizer, in which heat is forced to move from the heat-generating components inside the device's enclosure "to the exterior of the enclosure," where the heat can be dissipated into the surrounding atmosphere.  By contrast, the DG3 is **designed specifically to prevent heat from flowing to the exterior of the enclosure** to keep components mounted on the enclosure from overheating.

B.    Seakeeper has not shown that the entry of the DG3 onto the market will cause it irreparable harm.  Its allegations that it will suffer loss of substantial market share, price erosion, and lost R&D opportunities are exaggerated, speculative, and unsupported by competent evidence.  Moreover, even if Seakeeper had established that these harms were imminent, none would qualify as irreparable, because all would be readily calculable and thus compensable by money damages

(as Seakeeper's own declarations confirm). Finally, even if Seakeeper had established that it would suffer irreparable competitive injury due to the DG3's entrance onto the market, the PI motion adduces no evidence tying this injury to the DG3's alleged incorporation of Seakeeper's patented technology, which is a pre-requisite for obtaining preliminary injunctive relief.

C.    Seakeeper has not shown that the balance of the equities or the public interest favors entering a preliminary injunction. It would be neither equitable nor in the interests of the public to shield Seakeeper from legitimate competition in the marketplace.

## III.    STATEMENT OF FACTS

### A.    The Seakeeper Patents

The '782 and '930 Patents, both entitled "Cooling bearings, motors and other rotating heat generating components" and sharing an identical specification, purport to disclose a cooling system for use in gyroscopic stabilizers. (D.I. 1-1 at 11[1] (1:14-2:40).) A gyroscopic stabilizer is a device that reduces the side-to-side rolling of a marine vessel, especially in rough water. (D.I. 1 at ¶ 17.) The device contains a large, heavy disc (called a flywheel) turning at very high rotational speeds. (*Id.*; D.I. 1-1 at 11 (1:14-16).) The rotation of the flywheel generates torque to counteract the rolling motion experienced at sea, which balances the vessel's movement. (D.I. 1 at ¶¶ 4, 17.) The specific problem the patents purport to address is the build-up of heat inside the gyrostabilizer. (D.I. 1-1 at 11 (1:14-20).) The flywheel is held in place by bearings, which generate a lot of frictional heat due to the high rotational speed of the flywheel, and this heat must be dissipated in order to keep the device from overheating. (*Id.*)

Figure 1 of the '782 and '930 Patents, reproduced below with highlighting, illustrates a

---

[1] Throughout this brief, pincite references to attachments to the Complaint, PI Motion, or this brief include the cover page of the PDF attachment. For example, "D.I. 1-1 at 11" is citing to page 11 of the PDF document (not page 11 of the '782 Patent, which would be page 12 of the PDF document).

cross-sectional view of a gyrostabilizer comprising the inventors' patented cooling system:



The gyrostabilizer includes a flywheel **12** (yellow) spinning in an enclosure **14** (green).  (D.I. 1-1 at 13 (6:25-29).)  The enclosure may contain a "below-ambient density gas (e.g., helium or hydrogen) to reduce friction on the spinning flywheel."  (*Id.*)  The flywheel is spun by an electric motor **16** (light blue).  (*Id.* at 13 (6:29-32).)  Two sets of bearing assemblies—one upper, one lower—hold the flywheel in place.  (*Id.*)  Figure 2 provides an enlarged view of the upper bearing assembly:



The bearing assembly includes an outer housing **22** (orange), an outer race **26** (blue), an inner race

**30** (red), and balls **34** (brown).  (D.I. 1-1 at 13 (6:33-38).)  Upper and lower retainers **40**, **42** (purple) hold the bearing assembly in place.  (*Id.*)  Each race of the bearing is a ring-shaped track around the circumference of the flywheel that provides a smooth surface for the rolling elements (balls) to move upon in order to reduce rotational friction.  (D.I. 10 at ¶ 22.)  The outer race is stationary; the inner race is affixed to the flywheel and rotates with it.  (D.I. 1-1 at 11 (2:23-24, 2:34-35).)

The patents' specification states that, "[t]ypically, heat will build up on the inner races of the bearings that support the flywheel" due to the high rotational speeds of the flywheel, and that "[s]uch a build up of heat on the inner races can lead to failure of the apparatus, as a large temperature differential can result between the inner and outer bearing races."  (D.I. 1-1 at 11 (2:23-28).)  The patent purports to solve this problem by providing the inner races of the bearing assemblies with a ready cooling path to the exterior of the device.  Specifically, the inventors' cooling system comprises cooling collar assemblies located adjacent to each bearing assembly.  (*Id.* at 13 (6:39-42).)  Each cooling collar assembly consists of an inner collar **54** (pink), which is attached to the flywheel and rotates with it, and an outer collar **58** (green), which forms part of the enclosure and is therefore stationary.  (*Id.* at 13 (6:43-45).)  Each collar includes a set of cylindrical, tooth-like elements called "vanes" **62**, **66**.  (*Id.* at 13 (6:48-67).)  The vanes of the rotating inner collar are configured to mate with the vanes of the stationary outer collar, leaving only small gaps between them to allow the rotating vanes to move freely with respect to the stationary vanes.  (*Id.*)

According to the specification, this configuration provides the inner races of the bearing assemblies with a cooling path because heat that builds up at an inner race (red) can flow from the inner race to the vanes of the adjacent rotating inner collar (pink).  (D.I. 1-1 at 12 (4:17-22).)  From there, the heat can travel to the vanes of the stationary outer collar (green), as the movement of the rotating vanes relative to the stationary vanes promotes heat transfer from one to the other by

convection or gaseous conduction.  (*Id.*)  Finally, once the heat reaches the outer collar, it can travel to the exterior surface of the enclosure, where it is dissipated through atmospheric cooling. (*Id.*)  The exterior of the enclosure may optionally include a "heat sink," which comprises yet another, outward-facing set of vanes that assist in transferring heat from the exterior of the enclosure to the surrounding atmosphere.  (*Id.* at 12 (4:3-5).)  The specification asserts that this cooling method is beneficial because heat can be "removed passively [*i.e.*, by atmospheric cooling only] without circulating any [cooling] fluids inside the enclosure," which "considerably simplifies the device" by eliminating the need for additional components, such as a "coolant pump" and/or a "heat exchanger."  (*Id.* at 12 (4:45-50).)

### B.    The Dometic DG3 Device

The accused DG3 gyrostabilizer, designed and marketed by DMC (Ex. A, Hall Decl., at ¶ 8), is shown below in partial cross-section:



(Ex. B, Dyck Decl., ¶ 8.)  The DG3 includes a flywheel (blue), which rotates about a stationary support (white).  (*Id.*)  A bearing assembly supports rotation between the stationary support and the flywheel.  (*Id.*)  The bearing assembly includes an inner race and an outer race (both dark grey). (*Id.*)  The inner race of the bearing assembly is ███████████████████████████

█████ the outer race is coupled to the flywheel and rotates with the flywheel.[2] (*Id.*) Rotating cooling fins (purple) are coupled to the flywheel; stationary cooling fins (light grey) are coupled to the enclosure (green). (*Id.*) The enclosure contains air under below-ambient pressure. (*Id.*)

The DG3 employs a cooling system fundamentally different from Seakeeper's. The DG3 is not designed to direct the flow of heat from the bearing assemblies to the exterior of the device, so that it can be dissipated by atmospheric cooling. (Ex. B, Dyck Decl., ¶¶ 9-12.) The DG3 is specifically designed to ***avoid the transfer of heat to the exterior of the enclosure***. (*Id.*) ████

████████████████████████████████████████████████████

████████████████████████████ (*Id.*) In lieu of relying on passive, atmospheric cooling, the DG3 employs an active cooling system, which pumps a cooling liquid, specifically a glycol mixture, from a reservoir and circulates this cooling liquid through a coolant "loop," formed by a plurality of coolant channels, inside the device's enclosure. (*Id.*) The coolant loop includes, *inter alia*, coolant channels adjacent to the stationary fins (light grey).[3] (*Id.*) The following drawing provides an alternative sectional perspective of the coolant loop system:



_____

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

(Ex. B, Dyck Decl., ¶ 11).) ███████████████████████████████ (*Id.*)

(*Id.* at ¶ 9.)  Thus, heat generated at the outer race (dark grey) is directed to flow from the outer race to the rotating fins (purple); then from the rotating fins to the stationary fins (light grey); and then from the stationary fins into these coolant channels, and ***not*** to the exterior of the enclosure. (*Id.* at ¶ 12.)  Finally, heat is removed from the internal coolant loop by placing the loop into contact with piping that circulates raw water ingested from the surrounding body of water.  (*Id.* at ¶ 9.)

## IV.    ARGUMENT

Seakeeper bears the burden to show that it is entitled to the "drastic and extraordinary remedy" of a preliminary injunction.  *Intel Corp. v. ULSI Sys. Tech., Inc.*, 995 F.2d 1566, 1568 (Fed. Cir. 1993).  In determining whether Seakeeper has met that burden, the Court must consider (1) whether it is likely to succeed on the merits, (2) whether it would suffer irreparable harm if the injunction were not granted, (3) whether the balance of the equities tips in its favor, and (4) whether an injunction is in the public interest.  *Id.*  The Court may deny Seakeeper's motion based on its "failure to show any one of the four factors—especially either of the first two—without analyzing the others." *Jack Guttman, Inc. v. Kopykake Enters., Inc.*, 302 F.3d 1352, 1356 (Fed. Cir. 2002). Here, Seakeeper has not met its burden on ***any*** of the preliminary injunction factors.

### A.    Seakeeper Is Not Likely to Succeed on the Merits.

#### 1.    Dometic Corporation Has No Involvement With the Accused Product.

The Complaint and PI Motion allege that Dometic Corporation makes, uses, sells, offers for sale, and/or imports the accused DG3 device.  (D.I. 1 at ¶¶ 68, 88; D.I. 9 at 1.)  This is not true. Dometic Corporation has no involvement with the DG3; rather, the company responsible for its design, manufacture, and distribution is DMC, a legally distinct entity in the global Dometic

corporate family.[4]  (Ex. A, Hall Decl., ¶¶ 5-8.)

Neither the Complaint nor PI Motion presents any facts linking Dometic Corporation, the named defendant, to the DG3.  Dometic Corporation is not mentioned in connection with the accused product in any of the materials attached to the Complaint or PI Motion.  On the contrary, these materials specifically reference DMC.  In particular, the Dometic patent application alleged by Seakeeper to cover the allegedly infringing device lists DMC, not Dometic Corporation, as the applicant.  (D.I. 10-1 at 6.)

Further, Seakeeper has not alleged (let alone proven) any facts that would justify holding Dometic Corporation liable for the acts of its corporate affiliate.  That Dometic Corporation happens to be situated as DMC's indirect parent in the Dometic corporate structure (Ex. A, Hall Decl., ¶ 8) is immaterial.  A parent corporation may be liable for infringement by a subsidiary "***only if*** the evidence reveals circumstances justifying disregard of the status of [the subsidiaries and the parent] as distinct, separate corporations."  *A. Stucki Co. v. Worthington Indus.*, 849 F.2d 593, 596 (Fed. Cir. 1988) (emphasis added).  DMC is an independent corporation, separate from Dometic Corporation, and is responsible for its own management, operations, and governance. (Ex. A, Hall Decl., ¶ 10.)  Because this is not a case where "the parent effectively controls the conduct of the subsidiary," no basis exists for piercing the corporate veil and holding Dometic Corporation liable for the allegedly infringing conduct of DMC.  *M2M Sols., LLC v. Telit Communs. PLC*, No. 14-1103-RGA, 2015 U.S. Dist. LEXIS 102349, at *8 (D. Del. Aug. 5, 2015).

Nor is Seakeeper's failure to sue the proper party something it could fix by simply seeking a broad injunction order.  Federal Rule of Civil Procedure 65(d)(2) only permits binding the party, its agents, and "other persons who are in active concert or participation" with the enjoined party,

---

[4] Dometic Corporation and DMC are indirect subsidiaries of Dometic Group AB, a Swedish corporation. (Ex. A, Hall Decl., ¶ 4.)

and there is no evidence that DMC is acting as an agent of, or in active concert or participation

with, Dometic Corporation.  Moreover, DMC could not be joined as a defendant in this action.  As

a British Columbia corporation headquartered in Vancouver (Ex. A, Hall Decl., ¶ 9), DMC is not

"at home" in Delaware, and so is not subject to general jurisdiction in the state.  *Daimler AG v.*

*Bauman*, 571 U.S. 117, 139 (2014).  Further, neither the Complaint nor PI Motion contains any

allegations tying the accused DG3 device to Delaware, such as an allegation that the DG3 has been

shipped to or sold in Delaware.  Thus, there exists no basis for exercising specific jurisdiction over

DMC, either.  *See Freres v. SPI Pharma, Inc.*, 629 F. Supp. 2d 374, 389 (D. Del. 2009) ("specific

jurisdiction requires that some act on the part of [a defendant] must have occurred in Delaware

and that [the plaintiff's] claims arise out of that act").[5]

   In short, Seakeeper sued the wrong party, and this Court lacks jurisdiction over the party

Seakeeper should have named.  The PI Motion should be denied on this basis alone.

### 2.     The DG3 Does Not Infringe the Asserted Claims of the '930 and '782 Patents.[6]

Seakeeper asserts claims 1, 6, and 14 of the '930 Patent and claims 11 and 17 of the '782

---

[5] While this brief includes a declaration from an employee of DMC discussing the technical aspects of the accused DG3 device (which is necessary to rebut Seakeeper's allegation that the device infringes the '782 and '930 Patents) (Ex. B, Dyck Decl.), the submission of this declaration for that limited purpose in no way constitutes waiver of any jurisdictional objection, or any other substantive or procedural objection, that DMC might interpose in the event Seakeeper sought to add it as a party to this case.

[6] Given the time and space constraints, Defendant has not had the opportunity to fully develop and brief potential invalidity arguments relating to the '782 and '930 Patents.  Of course, this in no way means that Defendant concedes that the patents are valid.  In fact, though Seakeeper does not acknowledge this, both patents have been subject to petitions for *inter partes* review ("IPR") before the U.S. Patent Trial and Appeal Board (the "PTAB").  (*See* Ex. C; Ex. D.)  The PTAB never ruled on the merits of the petitions, because the third-party petitioner voluntarily withdrew them due to a technicality.  Specifically, the petitioner had inadvertently cited the wrong version of a key prior art reference—instead of citing the prior art published patent application, it cited the patent that subsequently issued from that prior art application, even though the issued patent did not qualify as prior art on its own.  (*See* Ex. E.)  Tellingly, though Seakeeper purports to pre-emptively address invalidity in its PI Motion, it limits its discussion to the prior art it was able to overcome during prosecution of the patents and entirely omits any discussion of the additional prior art cited in the IPR petitions.  (D.I. 9 at 10-11.)  The art cited in the IPR Petition is thus likely to raise at least a substantial question as to the patents' validity.

Patent. (D.I. 9 at 7.) Seakeeper has not come close to showing that it is likely to succeed in proving infringement; on the contrary, the record establishes that the DG3 *could not possibly* infringe.

    **a.**    **The DG3 Does Not Infringe Claims 1, 6, and 14 of the '930 Patent.**

Claims 1 and 14 of the '930 Patent are independent claims; claim 6 ultimately depends from claim 1. Claim 1 describes a "gyroscopic roll stabilizer for a boat" comprising, *inter alia*, a "flywheel"; a "first plurality of vanes coupled to the flywheel"; a "second plurality of vanes fixed relative to the enclosure . . . such that the first plurality of vanes spin with respect to the second plurality of vanes"; "at least one rotating heat generating component coupled to the flywheel and positioned such that heat is transferred from the heat generating component to the first plurality of vanes"; and a ***"below-ambient density gas"*** in the enclosure, "wherein the below ambient density gas ***has a thermal conductivity at least 5 times greater than air***." (Emphasis added.) Claim 14 describes a "method of stabilizing a boat" that references many of the same components as claim 1, including the requirement that the enclosure contain a "below-ambient density gas" having a "thermal conductivity at least 5 times greater than air."

The DG3 cannot infringe these claims because ***its enclosure contains air***. (Ex. B, Dyck Decl., ¶¶ 8, 26).) Air is not a "below-ambient density gas." A person of ordinary skill in the art would understand the term "a below-ambient density gas" to mean that, under standard atmospheric conditions, the gas has a lower density than air. (*Id.* at ¶ 27.) The specification of the '930 Patent mentions helium and hydrogen as examples of such gases. (D.I. 1-2 at 13 (6:40-41).) By definition, however, the term "a below-ambient density gas" excludes air because air cannot have a lower density than itself. (Ex. B, Dyck Decl., ¶ 27.) Similarly, the gas in the enclosure of the DG3 cannot have a "thermal conductivity at least 5 times greater than air," because the gas in the enclosure ***is air***, and, to state the obvious again, air cannot have "thermal conductivity at least

5 times greater than air." (*Id.* at ¶¶ 28-29.)

Indeed, Seekeper's entire infringement theory rests on its speculative assumption that the DG3 enclosure contains helium. (D.I. 10 at ¶ 65.) The sole basis for that assumption is that a patent application filed by DMC describes a gyrostabilizer in which the housing optionally "may include . . . helium." (*Id.*) But, as Seakeeper well knows (or at least should know), the fact that a patent application describes the optional use of a particular material or component does not mean that the applicant's real-world commercial product in fact includes that material or component.

In sum, Seakeeper's assertion that the DG3 infringes the '930 Patent is plain wrong and fails to demonstrate a substantial likelihood of success.

### b.    The DG3 Does Not Infringe Claims 11 and 17 of the '782 Patent.

Claim 11 of the '782 Patent is an independent claim; claim 17 depends from claim 11. Claim 11 describes a "[c]ooling apparatus" comprising, *inter alia*, a "flywheel or other spinning member"; an "enclosure enclosing the spinning member"; a "first plurality of vanes attached to the spinning member"; "a second plurality of vanes fixed relative to the enclosure and the spinning member such that the first vanes move with respect to the second vanes," "wherein the first and second vanes are positioned in close proximity to one another so that substantial heat is transferred from the first vanes to the second vanes and ***the second vanes are configured such that heat can be readily transferred from the second vanes to the exterior of the enclosure***." (Emphasis added.)

The DG3 cannot infringe claim 11 at least because it lacks second (stationary) vanes configured to "readily transfer[]" heat to the "exterior of the enclosure." In fact, as discussed *supra* at 11-12, the DG3 is specifically designed to avoid the transfer of heat from the stationary fins to the exterior of the enclosure ███████████████████████████████████████ ███████████ Thus, instead of employing the "passive," atmospheric-cooling method of the '782 Patent—which directs the flow of heat from the heat-generating components inside the enclosure

of the gyrostabilizer to the exterior of the enclosure, from where it is dissipated into the atmosphere—the DG3 removes heat from the interior of its enclosure by circulating a cooling liquid through an internal coolant "loop." (*See supra* at 11-12.) This coolant loop system includes cooling channels adjacent to the stationary fins. These cooling channels are positioned there specifically to **keep heat from moving from the stationary fins to the exterior of the enclosure**; instead, the heat is redirected into the adjacent cooling channels. (*See supra* at 11-12.) Heat is then removed from the internal coolant loop by placing it in contact with pipes that circulate water from the surrounding body of water. (*See supra* at 11-12.)

In effect, the DG3 employs a fluid-to-fluid heat exchanger to dissipate heat, the two fluids being the cooling glycol mixture (which is pumped into the internal coolant loop, and which removes heat from the heat-generating components inside the enclosure) and the raw sea water (which is ingested into the piping adjacent to the coolant loop, and which in turn removes heat from the coolant loop). (*See supra* at 11-12; *see also* Ex. B, Dyck Decl., ¶ 9.) This is exactly the type of cooling system that the inventors of the '782 Patent **expressly criticized and distinguished from their patented system**. (D.I. 1-1 at 12 (4:45-50) (stating that the inventors' cooling system is superior because heat is "removed passively without circulating any fluids inside the enclosure," thereby eliminating the need for components like a "coolant pump" and/or a "heat exchanger").)[7]

Seakeeper's filings reveal no reasonable basis for its assertion that the DG3 infringes the '782 Patent. Seakeeper's declarant states in reference to the DG3 that "the only conductive path

---

[7] Although the specification of the '732 Patent purports to disclose an alternative embodiment, shown in Figures 10-14, in which a cooling liquid is sprayed onto the rotating vanes to cool them down (D.I. 1-1 at 12 (4:51-62); *id.* at 13 (6:1-11)), this embodiment is not claimed in the patent. In fact, during prosecution of the patent, the Examiner issued a restriction requirement advising the applicants that this alternative embodiment in Figures 10-14 was "distinct" from, and "mutually exclusive" with, the embodiment described in the rest of the application, in which no cooling spray is used to remove heat. (Ex. F at 4.) The applicants elected to proceed with the latter (Group I) embodiment and cancelled all pending claims directed to the former (Group II) embodiment. (Ex. G at 8.)

for heat to be drawn off the bearing race adjacent the flywheel is from the race to the first plurality of vanes to the second plurality of vanes and then to the enclosure." (D.I. 10 at ¶ 51.) However, he provides zero support for his assumption that the DG3 is designed to force heat to travel from the second (stationary) vanes "to the enclosure." Similarly, the PI Motion includes a statement by the President of DMC referencing the "cooling method" employed in the DG3, and, based on this generic statement, leaps to the conclusion that the DG3 **must** be using Seakeeper's patented method. (D.I. 9 at 10.) However, as discussed *supra*, Seakeeper's bare assumption has no basis in fact. Indeed, even a cursory review of publicly available information would have put Seakeeper on notice that its infringement theory had no merit. For example, a promotional DG3 video cited by Seakeeper in the Complaint (D.I. 1 at ¶ 47) specifically references the use of an "advanced cooling system" comprising, *inter alia*, a "titanium heat exchanger":



*How the New Dometic DG3 Gyro Works*, https://www.youtube.com/watch?v=6c1JaSP0cOo, at 3:30 (last accessed on May 18, 2025). This alone should have put Seakeeper on notice that, by contrast to its patented system, the DG3 removes heat from the enclosure not by "passive" atmospheric cooling but instead by employing an active cooling method (*i.e.*, a heat exchanger) of the type the inventors specifically criticized in the '782 Patent.

Put simply, Seakeeper cannot show that it is likely to prove infringement of the '782 Patent.

**B.    Seakeeper Has Not Shown Irreparable Harm.**

Not only has Seakeeper failed to present a viable infringement case, but its proof of

irreparable harm is also completely lacking. Seakeeper asserts that it is entitled to a "presumption" of irreparable harm because it has shown a "strong" likelihood of success on the merits. (D.I. 9 at 12.) Not so. Setting aside that Seakeeper has not, in fact, shown that it is likely to prove infringement, its suggestion that a district court may "presume" irreparable harm in deciding whether to issue injunctive relief is wrong. The Federal Circuit made it clear long ago that "*eBay* [*Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006)] jettisoned the presumption of irreparable harm as it applies to determining the appropriateness of injunctive relief." *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1149 (Fed. Cir. 2011).[8] Rather, Seakeeper must **prove** that it will suffer irreparable harm absent a preliminary injunction. It has failed to meet that burden.

*First,* Seakeeper's suggestion that it will be permanently harmed by the launch of an allegedly infringing competing product rings hollow because the '930 and '782 Patents will soon be expiring anyway. The '930 Patent will expire roughly 10 months from now, in April 2026; the '782 Patent will expire in roughly 20 months, in February 2027. (D.I. 1 at ¶¶ 43, 45.) And yet, if one accepts Seakeeper's assertions of irreparable harm, one might conclude that "the company will essentially cease to exist upon expiration of [its patents]." *Altana Pharma AG v. Teva Pharms. USA, Inc.*, 532 F. Supp. 2d 666, 682 (D.N.J. 2007), *aff'd* 566 F.3d 999 (Fed. Cir. 2009). Of course, "[t]his cannot be the case." *Id.* Surely, Seakeeper "ha[s] a business plan in place" to deal with the nearing expiration of the '930 and '782 Patents. *Id.* ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████         Therefore, Seakeeper's

---

[8] Although Seakeeper claims that "[p]ost-*eBay* decisions in this Circuit have recognized likelihood of success gives rise to a presumption of irreparable harm" (D.I. 9 at 12), all of the district court cases it cites **pre-date** the Federal Circuit's holding in *Robert Bosch*.

claim that its "very existence" depends on maintaining its patent exclusivity for the next 10 to 20 months (D.I. 9 at 19) is simply not credible.[9]

**Second,** Seakeeper exaggerates the extent to which the allegedly infringing DG3 poses a competitive threat to its products. Seakeeper's gyrostabilizers are offered in no less than "twelve (12) sizes that can be found on vessels from 23-foot center-console fishing boats to 200-foot mega-yachts." (D.I. 13 at ¶ 8; *see also* D.I. 13-1 at 24-25 (Att. RS-2 at 11-12).) By contrast, the DG3 is "specifically designed for the 35- to 41-foot boat market." (D.I. 11-1 at 185 (Att. AS-7 at 3).) Thus, out of Seakeeper's 12 gyrostabilizer product offerings, the DG3 might compete with at most only two: Seakeeper 3 and Seakeeper 4, designed for 35-41 foot and 38-44 foot boats, respectively. (D.I. 13-1 at 24 (Att. RS-2 at 11).) Seakeeper's assertion that its entire business will be irreparably damaged by a competitor's entry into this narrow segment of the market is wholly implausible.

**Third**, none of the specific types of harm alleged in Seakeeper's motion—loss of substantial market share, price erosion, and lost opportunity to conduct R&D—are adequately supported by credible evidence. Beginning with Seakeeper's assertion that the launch of the DG3 will "inevitably cause [it] to lose substantial market share" (D.I. 9 at 14), that assertion is based on pure conjecture. Seakeeper speculates that, because one boat builder (Regulator Marine, Inc.) has announced its intention to install the DG3 in its 35-foot boat, other boat builders will follow suit and choose the DG3 over Seakeeper 3 and Seakeeper 4. (*Id.* at 14.) However, "lost market share must be proven (or at least substantiated with some evidence) in order for it to support entry of a preliminary injunction, because granting preliminary injunctions on the basis of speculative loss of market share would result in granting preliminary injunctions 'in every patent case where the

---

[9] Seakeeper suggests that the short remaining life of its patents somehow has the opposite effect and actually bolsters its assertion of irreparable harm. (D.I. 9 at 16.) In fact, however, the Federal Circuit has squarely rejected the notion that the "need for injunctive relief necessarily is more imperative as the end of the patent term approaches." *Woodard v. Sage Prods.*, 818 F.2d 841, 854 (Fed. Cir. 1987).

patentee practices the invention.'" *Automated Merch. Sys. v. Crane Co.*, 357 F. App'x 297, 301 (Fed. Cir. 2009) (quoting *Nutrition 21 v. United States*, 930 F.2d 867, 871 (Fed. Cir. 1991)). "[A]n injunction will not issue merely to assuage the fears of the movant." *Symbol Techs., Inc. v. Janam Techs. LLC*, 729 F. Supp. 2d 646, 663 (D. Del. 2010) (internal quotation marks and citation omitted). Seakeeper claims to be the "global leader in marine motion control technology." (D.I. 11 at ¶ 7.) The boating industry, it says, is a "deeply relationship-driven industry." (D.I. 12 at ¶ 8.) Given its pole position as a global technology leader in a deeply relationship-driven industry, its suggestion that it will "inevitably" lose a "substantial" portion of its customer base to a complete upstart in this technology space (D.I. 9 at 14) is speculative at best.

██████████████████████████████████████████████████████████

████████████████████████████████ However, none of these events has yet come to pass. Therefore, Seakeeper's price-erosion argument is entirely speculative. *See SmartSky Networks, LLC v. Gogo Bus. Aviation, LLC*, No. 2023-1058, 2024 U.S. App. LEXIS 2100, at *14 (Fed. Cir. Jan. 31, 2024) ("requir[ing] concrete evidence of reduced price to find price erosion").

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████ However, Seakeeper again fails to substantiate this assertion of harm. ███████

██████████████████████████████████████████████████

████████████████████████████████████ *See Sunoco Partners Mktg. & Terminals L.P. v. Powder Springs Logistics, LLC*, No. 17-1390-LPS-CJB, 2018 U.S. Dist. LEXIS 7479, at *38 (D. Del. Jan. 8, 2018) (holding that "conclusory and speculative allegations with respect to [the patentee's] lost business opportunities fail to demonstrate irreparable harm").

**Fourth,** even if Seakeeper had presented any non-speculative evidence of imminent loss of substantial market share, price erosion, or lost R&D opportunities due to the DG3's launch, these harms would not be irreparable. If harm is "quantifiable," then it is not irreparable, because it may be compensable by money damages. *ActiveVideo Networks, Inc. v. Verizon Communs., Inc.*, 694 F.3d 1312, 1339 (Fed. Cir. 2012). And here, Seakeeper has little trouble reducing its fanciful allegations of harm to specific dollar amounts. (*See, e.g.*, D.I. 12 at ¶¶ 22, 25, 33.) By admitting that its alleged losses are calculable, Seakeeper has effectively argued itself out of

injunctive relief. *See Sebela Int'l Ltd. v. Actavis Labs. FL, Inc.*, No. 17-4789-CCC-MF, 2017 U.S. Dist. LEXIS 175318, at *21 (D.N.J. Sep. 14, 2017) (finding no irreparable harm where "[the plaintiff] itself appears to support Defendants' assertion that [its] damages are calculable").

**Finally,** even if Seakeeper had shown some irreparable harm, it has not shown a "causal nexus" between such harm and the alleged infringement. *Apple v. Samsung*, 695 F.3d 1370, 1374 (Fed. Cir. 2012). The causal nexus requirement keeps the plaintiff from "leverag[ing] its patent for competitive gain beyond that which the inventive contribution and value of the patent warrant." *Id.* at 1375. Thus, a plaintiff seeking a preliminary injunction must provide "evidence that directly ties consumer demand for the [allegedly infringing product] to its allegedly infringing feature." *Id.* Yet Seakeeper's PI Motion does not address the causal nexus requirement at all, much less adduce concrete evidence tying the anticipated consumer demand for the DG3 to the product's alleged incorporation of Seakeeper's patented technology.

In fact, Seakeeper does not even establish that the demand for ***its own*** gyrostabilizers is driven by any patented feature. The record actually shows otherwise. For example, Seakeeper's marketing materials tout the following features of its gyrostabilizers: "active control," a "vacuum sealed" enclosure, and an "innovative cooling system." (D.I. 13-1 at 5 (Att. RS-1 at 5).) However, the "active control" feature, which supposedly automatically adjusts gyro force depending on sea conditions (*id.*), is not even hinted at in the '782 and '930 Patents. Further, although the patents describe a vacuum-sealed enclosure, it is not the claimed advance over the prior art; rather, the patents' specification admits that enclosing the flywheel of a gyrostabilizer in a partial vacuum was well-known. (D.I. 1-1 at 11 (1:24-26).) Lastly, even the cooling system touted in Seakeeper's marketing materials ***is not the patented system***. Instead of the "passive" atmospheric-cooling system disclosed and claimed in the '782 and '930 Patents (*see supra* at 9-10), Seakeeper's

commercial gyrostabilizers appear to employ an active cooling system that removes heat from the enclosure using a "glycol/seawater" combination.  (D.I. 13-1 at 11-13 (Att. RS-1 at 11-13).)  In other words, they use a cooling system more akin to that found in the DG3, and expressly criticized as inferior in the patents' specification.  (*See supra* at 10-11.)

Seakeeper has not shown that it will suffer any irreparable competitive injury absent an injunction, much less that such injury could be ascribed directly to the alleged patent infringement.

### C.    The Balance of the Equities Does Not Favor an Injunction.

Seakeeper argues that the balance of the equities tips in its favor because "[its] very existence depends upon its patented gyrostabilizer products."  (D.I. 9 at 19.)  As discussed *supra* at 19-22, Seakeeper's claim that the launch of the DG3 poses an existential threat to its business is unsupported.  Thus, the balance of the equities does not favor shielding Seakeeper from competition, "particularly since [it] has failed to show a likelihood of success on the merits of its infringement claim." *Gryphon Oilfield Sols., LLC v. Stage Completions (USA) Corp.*, No. H-17-3220, 2018 U.S. Dist. LEXIS 7007, at *13 (S.D. Tex. Jan. 17, 2018).  On the contrary, it would be inequitable to let Seakeeper misuse its patents to keep a non-infringing product off the market.

### D.    The Public Interest Does Not Favor an Injunction.

The public interest is best served by denying a preliminary injunction where, as here, the patentee fails to show a likelihood of success on the merits.  *Abbott Labs. v. Andrx Pharms., Inc.*, 452 F.3d 1331, 1348 (Fed. Cir. 2006).  The public interest is "enhanced by competition," *Graceway Pharm., LLC v. Perrigo Co.*, 697 F. Supp. 2d 600, 609 (D.N.J. 2010); an injunction here would only stifle it.

## V.    CONCLUSION

No injunctive relief should issue.  Seakeeper's PI Motion should be denied.

ASHBY & GEDDES

*/s/ Andrew C. Mayo*

_____

Andrew C. Mayo (#5207)
Brian A. Biggs (#5591)
500 Delaware Avenue, 8th Floor
PO Box 1150
Wilmington, DE 19899
(302) 654-1888
amayo@ashbygeddes.com
bbiggs@ashbygeddes.com

*Attorneys for Defendant*

*Of Counsel:*

Oleg Khariton
DINSMORE & SHOHL LLP
255 East Fifth Street, Suite 1900
Cincinnati, OH 45202
(513) 977-8200
oleg.khariton@dinsmore.com

Michael A. Xavier
DINSMORE & SHOHL LLP
1775 Sherman Street, Suite 2600
Denver, CO 80203
(303) 296-3996
michael.xavier@dinsmore.com

Dated: May 19, 2025