IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SEAKEEPER INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | C.A. No. 25-484-JCB |
| DOMETIC CORPORATION, | ) | |
| | ) | **REDACTED PUBLIC VERSION** |
| Defendant. | ) | |

## DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER (D.I. 29)

ASHBY & GEDDES

Andrew C. Mayo (#5207)
Brian A. Biggs (#5591)
500 Delaware Avenue, 8th Floor
PO Box 1150
Wilmington, DE 19899
(302) 654-1888
amayo@ashbygeddes.com
bbiggs@ashbygeddes.com

*Attorneys for Defendant*

*Of Counsel:*

Oleg Khariton
DINSMORE & SHOHL LLP
255 East Fifth Street, Suite 1900
Cincinnati, OH 45202
(513) 977-8200
oleg.khariton@dinsmore.com

Michael A. Xavier
DINSMORE & SHOHL LLP
1775 Sherman Street, Suite 2600
Denver, CO 80203
(303) 296-3996
michael.xavier@dinsmore.com

Dated: May 22, 2025

## TABLE OF CONTENTS

I.    NATURE AND STAGE OF THE PROCEEDINGS ............................................................. 5

II.   SUMMARY OF ARGUMENT ...................................................................................... 6

III.  STATEMENT OF FACTS ........................................................................................... 7

   A.   The Seakeeper Patents ........................................................................................ 7

   B.   The Dometic DG3 Device .................................................................................... 9

IV.   ARGUMENT ........................................................................................................... 11

   A.   Seakeeper Is Not Likely to Succeed on the Merits. ............................................ 11

      1.   Dometic Corporation Has No Involvement With the Accused Product. ...................... 11

      2.   The DG3 Does Not Infringe the Asserted Patent Claims. ............................................ 13

      3.   There Is a Substantial Question as to the Validity of the '930 and '782 Patents.......... 17

   B.   Seakeeper Has Not Shown Irreparable Harm. .................................................... 19

   C.   Neither the Equities nor the Public Interest Favor an Injunction....................................... 24

V.    CONCLUSION ........................................................................................................ 24

## TABLE OF AUTHORITIES

<u>**Cases**</u>

*A. Stucki Co. v. Worthington Indus.*,
    849 F.2d 593 (Fed. Cir. 1988) ........................................................................................ 12

*ActiveVideo Networks, Inc. v. Verizon Communs., Inc.*,
    694 F.3d 1312 (Fed. Cir. 2012) ..................................................................................... 23

*Apple, Inc. v. Samsung Elecs. Co.*,
    678 F.3d 1314 (Fed. Cir. 2012) ............................................................................... 19, 24

*Apple v. Samsung*,
    695 F.3d 1370 (Fed. Cir. 2012) ..................................................................................... 23

*Daimler AG v. Bauman*,
    571 U.S. 117 (2014) ....................................................................................................... 13

*eBay Inc. v. MercExchange, L.L.C.*,
    547 U.S. 388 (2006) ....................................................................................................... 20

*Freres v. SPI Pharma, Inc.*,
    629 F. Supp. 2d 374 (D. Del. 2009) .............................................................................. 13

*Genentech, Inc. v. Immunex R.I. Corp.*,
    395 F. Supp. 3d 357, 366 (D. Del. 2019) ...................................................................... 11

*Graceway Pharm., LLC v. Perrigo Co.*,
    697 F. Supp. 2d 600 (D.N.J. 2010) ............................................................................... 24

*High Tech Med. Instrumentation, Inc. v. New Image Indus.*,
    49 F.3d 1551 (Fed. Cir. 1995) ....................................................................................... 20

*Intel Corp. v. ULSI Sys. Tech., Inc.*,
    995 F.2d 1566 (Fed. Cir. 1993) ..................................................................................... 11

*Jack Guttman, Inc. v. Kopykake Enters., Inc.*,
    302 F.3d 1352 (Fed. Cir. 2002) ..................................................................................... 11

*M2M Sols., LLC v. Telit Communs. PLC*,
    No. 14-1103-RGA, 2015 U.S. Dist. LEXIS 102349 (D. Del. Aug. 5, 2015) ................ 12

## TABLE OF AUTHORITIES (CONT.)

*Robert Bosch LLC v. Pylon Mfg. Corp.*,
    659 F.3d 1142 (Fed. Cir. 2011)........................................................................20

*Sebela Int'l Ltd. v. Actavis Labs. FL, Inc.*,
    No. 17-4789-CCC-MF, 2017 U.S. Dist. LEXIS 175318 (D.N.J. Sep. 14, 2017)............23

*SmartSky Networks, LLC v. Gogo Bus. Aviation, LLC*,
    No. 2023-1058, 2024 U.S. App. LEXIS 2100 (Fed. Cir. Jan. 31, 2024)........................22

*United Therapeutics Corp. v. Liquidia Techs., Inc.*,
    No. 23-975-RGA, 2024 U.S. Dist. LEXIS 97445 (D. Del. May 31, 2024)....................22

## **Rules**

Federal Rule of Civil Procedure 65(d)(2) .....................................................................13

## I.    NATURE AND STAGE OF THE PROCEEDINGS

Plaintiff Seakeeper, Inc. ("Seakeeper") has not shown that it is entitled to the extraordinary remedy of a temporary restraining order ("TRO").  For one, it is unlikely to—indeed, it appears it cannot—succeed on the merits.  Its assertion that the accused Dometic DG3 gyroscopic stabilizer (the "DG3") infringes its U.S. Patents No. 7,546,782 (the "'782 Patent") and 8,117,930 (the "'930 Patent") is based on speculative, and completely unfounded, assumptions about the DG3's construction, design, and operation.  Worse still, Seakeeper did not sue the right party (or even file suit in the right court).   Dometic Corporation, the entity that Seakeeper has sued, is not even the entity that is responsible for the design, manufacture, and distribution of the DG3.  That entity is Dometic Marine Canada, Inc. ("DMC"), a Canadian corporation which has no pertinent ties to Delaware, and which therefore lies outside of this Court's jurisdiction.

Further, Seakeeper has not shown that it will suffer irreparable harm due to the presence of the DG3 on the market, ***let alone*** that it will suffer such harm in the time that it takes the Court to decide its pending motion for a preliminary injunction (the "PI Motion").   Seakeeper's allegations of immediate, irreversible harm are unsupported.  Its own delay in requesting a TRO belies its assertion that its market position is irreparably threatened.  After the DG3 was announced, Seakeeper waited over two months to file suit.  It did not seek a TRO at that time.  Seakeeper then waited another two weeks to file the PI Motion.  Again, it did not include a TRO request in that motion, or otherwise indicate any desire to seek an emergency ruling from the Court.  It was not until May 15—over three months after it first learned of the DG3—that Seakeeper finally bootstrapped its flawed PI Motion with a motion for a TRO (the "TRO Motion").  Indeed, though Seakeeper has now filed this "emergency" motion—largely a carbon copy of its PI Motion restyled as a motion for a TRO—in an apparent attempt to obtain an expedited ruling on the PI Motion,

Seakeeper had conceded in the PI Motion that it required additional discovery in order to present its claims. In light of these substantive and procedural flaws, the TRO Motion should be denied.

## II.     SUMMARY OF ARGUMENT

A.     Seakeeper has not shown a likelihood of success on the merits. It cannot establish liability for infringement at least because Dometic Corporation has no involvement in the manufacture or distribution of the accused device. Even setting that aside, Seakeeper's assertion that the DG3 infringes its patents is baseless. The asserted claims of the '930 Patent require the enclosure of the gyrostabilizer to contain "a below-ambient density gas . . . ha[ving] a thermal conductivity at least 5 times greater than air." Seakeeper speculates that the DG3 meets this element because its enclosure includes helium. In reality, the DG3's enclosure ***contains not helium but air***, and so by definition does not include a "below-ambient density gas" with a "thermal conductivity at least 5 times greater than air." As to the asserted claims of the '782 Patent, they describe a cooling assembly in which heat is forced to move from the heat-generating components inside the gyrostabilizer's enclosure "to the exterior of the enclosure," where the heat is dissipated into surrounding air. By contrast, the DG3 is ***designed to prevent heat from flowing to the enclosure's exterior*** to keep components mounted on the enclosure from overheating.

B.     Seakeeper has not shown that the entry of the DG3 onto the market will cause it imminent, irreparable harm absent a TRO. Its delay of over three months in requesting a TRO alone justifies denying the request. Regardless, Seakeeper has failed to show that it will suffer any substantial competitive harm just in the time that it will take the Court to rule on the pending PI Motion. Seakeeper's allegations of imminent loss of substantial market share, price erosion, and lost R&D opportunities are speculative and unsupported. Moreover, even if Seakeeper had shown that these harms were imminent, none would qualify as irreparable, because all would be compensable by money damages. Finally, even if Seakeeper had shown that it would suffer

immediate competitive harm, it has offered no evidence tying this harm to the DG3's alleged incorporation of its patented technology, which is a pre-requisite for obtaining injunctive relief.

C.      Neither the balance of the equities nor the public interest favors shielding Seakeeper from legitimate competition in the marketplace.

## III.    STATEMENT OF FACTS

### A.    The Seakeeper Patents

A gyroscopic stabilizer is a device that reduces the side-to-side rolling of a marine vessel, especially in rough water.  (D.I. 1 at ¶ 17.)  It contains a large disc, called a flywheel, turning at very high rotational speeds.  (*Id.*; D.I. 1-1 at 11 (1:14-16).)  The flywheel's rotation generates torque to counteract the rolling motion experienced at sea, balancing the vessel's movement.  (D.I. 1 at ¶¶ 4, 17.)  However, the bearings that hold the flywheel in place generate a lot of frictional heat due to the high rotational speed of the flywheel, and this heat must be dissipated to keep the device from overheating.  (D.I. 1-1 at 11 (1:14-20).)  The '782 and '930 Patents, which share a common specification, describe an assembly for cooling the internal heat-generating components of a gyrostabilizer.  (D.I. 1-1 at 11 (1:14-2:40).)  Figure 1, reproduced below with highlighting, illustrates a cross-sectional view of a gyrostabilizer comprising the inventors' cooling assembly:



The gyrostabilizer has a flywheel **12** (yellow) spinning in an enclosure **14** (green).  (D.I. 1-1 at 13 (6:25-29).)  The enclosure may contain a "below-ambient density gas (e.g., helium or hydrogen) to reduce friction on the spinning flywheel."  (*Id.*)  The flywheel is spun by an electric motor **16** (light blue).  (*Id.* at 13 (6:29-32).)  Two sets of bearing assemblies—one upper, one lower—hold the flywheel in place.  (*Id.*)  Figure 2 provides an enlarged view of the upper bearing assembly:



The bearing assembly includes an outer housing **22** (orange), an outer race **26** (blue), an inner race **30** (red), and balls **34** (brown).  (D.I. 1-1 at 13 (6:33-38).)  Upper and lower retainers **40**, **42** (purple) hold the bearing assembly in place.  (*Id.*)  Each race of the bearing is a ring-shaped track around the circumference of the flywheel that provides a smooth surface for the rolling elements (balls) to move upon in order to reduce rotational friction.  (D.I. 10 at ¶ 22.)  The outer race is stationary; the inner race is affixed to the flywheel and rotates with it.  (D.I. 1-1 at 11 (2:23-24, 2:34-35).)

The patents' specification states that, "[t]ypically, heat will build up on the inner races of the bearings that support the flywheel" due to the high rotational speeds of the flywheel, and that "[s]uch a build up of heat on the inner races can lead to failure of the apparatus."  (D.I. 1-1 at 11 (2:23-28).)  The patent purports to solve this problem by providing the inner races of the bearing assemblies with a ready cooling path to the exterior of the device.  Specifically, the inventors' cooling system comprises cooling collar assemblies located adjacent to each bearing assembly.  (*Id.* at 13 (6:39-42).)  Each cooling collar assembly consists of an inner collar **54** (pink), which is attached to the flywheel and rotates with it, and an outer collar **58** (green), which forms part of the

enclosure and is therefore stationary. (*Id.* at 13 (6:43-45).) Each collar includes a set of cylindrical, tooth-like elements called "vanes" **62**, **66**. (*Id.* at 13 (6:48-67).) The vanes of the rotating inner collar are configured to mate with the vanes of the stationary outer collar, leaving only small gaps between them to allow the rotating vanes to move freely with respect to the stationary vanes. (*Id.*)

Heat that builds up at an inner race (red) of the bearing assembly flows from the inner race to the vanes of the adjacent rotating inner collar (pink). (D.I. 1-1 at 12 (4:17-22).) From there, the heat flows to the vanes of the stationary outer collar (green), as the movement of the rotating vanes relative to the stationary vanes promotes heat transfer from one to the other by convection or gaseous conduction. (*Id.*) Finally, once the heat reaches the outer collar, it flows to the exterior surface of the enclosure, where it is dissipated through atmospheric cooling. (*Id.*) The specification asserts that this cooling method is beneficial because heat can be "removed passively [*i.e.*, by atmospheric cooling only] without circulating any [cooling] fluids inside the enclosure," which "considerably simplifies the device" by eliminating the need for additional components, such as a "coolant pump" and/or a "heat exchanger." (*Id.* at 12 (4:45-50).)

### B.    The Dometic DG3 Device

The accused DG3 gyrostabilizer, designed and marketed by DMC (D.I. 41-1 at ¶ 8), is shown below in partial cross-section. It includes a flywheel (blue), which rotates about a stationary support (white). (D.I. 41-2 at ¶ 8.) A bearing assembly supports rotation between the stationary support and flywheel. (*Id.*) The bearing assembly includes an inner race and outer race (both dark grey). (*Id.*) The inner race of the bearing assembly is ███████████████████ ███████ the outer race is coupled to the flywheel and rotates with the flywheel. (*Id.*) Rotating cooling fins (purple) are coupled to the flywheel; stationary cooling fins (light grey) are coupled to the enclosure (green). (*Id.*) The enclosure contains air under below-ambient pressure. (*Id.*)



The DG3 employs a cooling system fundamentally different from Seakeeper's. The DG3 is not designed to direct the flow of heat from the bearing assemblies to the exterior of the device, so that it can be dissipated by atmospheric cooling. (D.I. 41-2 at ¶¶ 9-12.) The DG3 is specifically designed to ***avoid the transfer of heat to the exterior of the enclosure***. (*Id.*) ▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ (*Id.*) In lieu of relying on passive, atmospheric cooling, the DG3 employs an active cooling system, which pumps a cooling liquid, specifically a glycol mixture, from a reservoir and circulates this cooling liquid through a coolant "loop," formed by a plurality of coolant channels, inside the device's enclosure. (*Id.*) The coolant loop includes, *inter alia*, coolant channels adjacent to the stationary fins (light grey).[1] (*Id.*) The following drawing provides an alternative sectional perspective of the coolant loop system:



----

[1] ▉▉▉▉▉▉▉▉▉▉▉ (D.I. 41-2 at ¶ 11).) ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
▉▉▉▉▉▉▉ (*Id.*)

(*Id.* at ¶ 9.)  Thus, heat generated at the outer race (dark grey) is directed to flow from the outer race to the rotating fins (purple); then from the rotating fins to the stationary fins (light grey); and then from the stationary fins into the coolant channels, and ***not*** to the exterior of the enclosure. (*Id.* at ¶ 12.)  Finally, heat is removed from the internal coolant loop by placing the loop in contact with piping that circulates raw water ingested from the surrounding body of water.  (*Id.* at ¶ 9.)

## IV.    ARGUMENT

A motion for a TRO is evaluated under the same standards as a motion for a preliminary injunction.  *Genentech, Inc. v. Immunex R.I. Corp.*, 395 F. Supp. 3d 357, 366 (D. Del. 2019).[2] Seakeeper has the burden to show that it is entitled to the "drastic and extraordinary remedy" of preliminary injunctive relief.  *Intel Corp. v. ULSI Sys. Tech., Inc.*, 995 F.2d 1566, 1568 (Fed. Cir. 1993).  A district court must consider (1) whether the movant is likely to succeed on the merits, (2) whether it would suffer irreparable harm absent an injunction, (3) whether the balance of the equities tips in its favor, and (4) whether an injunction is in the public interest.  *Id.*  A TRO request may be denied based on the movant's "failure to show any one of the four factors—especially either of the first two—without analyzing the others."  *Jack Guttman, Inc. v. Kopykake Enters., Inc.*, 302 F.3d 1352, 1356 (Fed. Cir. 2002).  Seakeeper has not met its burden on ***any*** of the factors.

### A.  Seakeeper Is Not Likely to Succeed on the Merits.

Seakeeper is unlikely to succeed on the merits for at least three independent reasons: (1) it has sued the wrong party; (2) it has no credible case that the DG3 infringes the '930 and '782 Patents; and (3) there is at least a substantial question as to the validity of the asserted patents.

### 1.    Dometic Corporation Has No Involvement With the Accused Product.

The Complaint and TRO Motion allege that Dometic Corporation makes, uses, sells, offers

---

[2] Internal quotation marks and citations are omitted throughout this brief, unless otherwise noted.

for sale, and/or imports the accused DG3 device.  (D.I. 1 at ¶¶ 68, 88; D.I. 30 at 6.)  This is not true.  Dometic Corporation has no involvement with the DG3; rather, the company responsible for its design, manufacture, and distribution is DMC, a legally distinct entity in the global Dometic corporate family.[3]  (D.I. 41-1 at ¶¶ 5-8.)  And, indeed, neither the Complaint nor PI Motion presents any facts linking Dometic Corporation, the named defendant, to the DG3.  Dometic Corporation is not mentioned in connection with the accused product in any of the materials attached to the Complaint or PI Motion.  On the contrary, these materials specifically reference DMC.  In particular, the Dometic patent application alleged by Seakeeper to cover the allegedly infringing device lists DMC, not Dometic Corporation, as the applicant.  (D.I. 10-1 at 6.)

Further, Seakeeper has not alleged (let alone proven) any facts that would justify holding Dometic Corporation liable for the acts of its corporate affiliate.  That Dometic Corporation happens to be situated as DMC's indirect parent in the Dometic corporate structure (D.I. 41-1 at ¶ 8) is immaterial.  A parent corporation may be liable for infringement by a subsidiary "***only if*** the evidence reveals circumstances justifying disregard of the status of [the subsidiaries and the parent] as distinct, separate corporations."  *A. Stucki Co. v. Worthington Indus.*, 849 F.2d 593, 596 (Fed. Cir. 1988) (emphasis added).  DMC is an independent corporation, separate from Dometic Corporation, and is responsible for its own management, operations, and governance.  (D.I. 41-1 at ¶ 10.)  Because this is not a case where "the parent effectively controls the conduct of the subsidiary," no basis exists for piercing the corporate veil and holding Dometic Corporation liable for the allegedly infringing conduct of DMC.  *M2M Sols., LLC v. Telit Communs. PLC*, No. 14-1103-RGA, 2015 U.S. Dist. LEXIS 102349, at *8 (D. Del. Aug. 5, 2015).

Nor is Seakeeper's failure to sue the proper party something it could fix by simply seeking

---

[3] Dometic Corporation and DMC are indirect subsidiaries of Dometic Group AB, a Swedish corporation. (D.I. 41-1 at ¶ 4.)

a broad injunction order. Federal Rule of Civil Procedure 65(d)(2) only permits binding the party, its agents, and "other persons who are in active concert or participation" with the enjoined party, and there is no evidence that DMC is acting as an agent of, or in active concert or participation with, Dometic Corporation. Moreover, DMC could not be joined as a defendant in this action. As a British Columbia corporation headquartered in Vancouver (D.I. 41-1 at ¶ 9), DMC is not "at home" in Delaware, and so is not subject to general jurisdiction in the state. *Daimler AG v. Bauman*, 571 U.S. 117, 139 (2014). Further, neither the Complaint nor TRO Motion contains any allegations tying the accused DG3 device to Delaware, such as an allegation that the DG3 has been shipped to or sold in Delaware. Thus, there exists no basis for exercising specific jurisdiction over DMC, either. *Freres v. SPI Pharma, Inc.*, 629 F. Supp. 2d 374, 389 (D. Del. 2009).[4]

In short, Seakeeper sued the wrong party, and this Court lacks jurisdiction over the party Seakeeper should have named. The TRO Motion should be denied on this basis alone.

### 2.    The DG3 Does Not Infringe the Asserted Patent Claims.

Seakeeper asserts claims 1 and 14 of the '930 Patent[5] and claims 11 and 17 of the '782 Patent. (D.I. 30 at 12.) Seakeeper has not come close to showing that it is likely to succeed in proving infringement. Indeed, the record establishes that the DG3 ***could not possibly*** infringe.

### a.    The DG3 Does Not Infringe Claims 1 and 14 of the '930 Patent.

Independent claims 1 of the '930 Patent describes a "gyroscopic roll stabilizer for a boat" comprising, *inter alia*, a "flywheel"; a "first plurality of vanes coupled to the flywheel"; a "second plurality of vanes fixed relative to the enclosure . . . such that the first plurality of vanes spin with

---

[4] While this brief cites to a declaration from an employee of DMC discussing the technical aspects of the accused DG3 device (which is necessary to rebut Seakeeper's allegation that the device infringes the '782 and '930 Patents) (D.I. 41-2), the submission of this declaration for that limited purpose in no way constitutes waiver of any jurisdictional objection, or any other substantive or procedural objection, that DMC might interpose in the event Seakeeper sought to add it as a party to this case.

[5] The PI Motion also asserted claim 6 of the '930 Patent. (D.I. 9 at 7.) The TRO Motion omits claim 6.

respect to the second plurality of vanes"; "at least one rotating heat generating component coupled to the flywheel and positioned such that heat is transferred from the heat generating component to the first plurality of vanes"; and a ***"below-ambient density gas"*** in the enclosure, "wherein the below ambient density gas ***has a thermal conductivity at least 5 times greater than air***." (Emphasis added.)  Independent claim 14 describes a "method of stabilizing a boat" that recites many of the same elements as claim 1, including an enclosure containing a "below-ambient density gas" having a "thermal conductivity at least 5 times greater than air."

The DG3 cannot infringe these claims because ***its enclosure contains air***.  (D.I. 41-2 at ¶¶ 8, 26).)  Air is not a "below-ambient density gas."  A person of ordinary skill in the art would understand the term "a below-ambient density gas" to mean that, under standard atmospheric conditions, the gas has a lower density than air.  (*Id.* at ¶ 27.)  The specification of the '930 Patent mentions helium and hydrogen as examples of such gases.  (D.I. 1-2 at 13 (6:40-41).)  By definition, the term "a below-ambient density gas" excludes air because air cannot have a lower density than itself.  (D.I. 41-2 at ¶ 27.)  Similarly, the gas in the enclosure of the DG3 cannot have a "thermal conductivity at least 5 times greater than air," because the gas in the enclosure ***is air***, and air cannot have "thermal conductivity at least 5 times greater than air."  (*Id.* at ¶¶ 28-29.)

Seekeper's entire infringement theory rests on its speculative assumption that the DG3 enclosure contains not air but helium.  (D.I. 10 at ¶ 65.)  The sole basis for that assumption is that a patent application filed by DMC describes a gyrostabilizer in which the housing optionally "may include . . . helium."  (*Id.*)  But, as Seakeeper well knows (or at least should know), the fact that a patent application describes the optional use of a particular material or component does not mean that the applicant's real-world commercial product in fact includes that material or component.

In sum, Seakeeper's assertion that the DG3 infringes the '930 Patent is plain wrong.

**b.      The DG3 Does Not Infringe Claims 11 and 17 of the '782 Patent.**

Claim 11 of the '782 Patent is an independent claim; claim 17 depends from claim 11.
Claim 11 describes a "[c]ooling apparatus" comprising, *inter alia*, a "flywheel or other spinning
member"; an "enclosure enclosing the spinning member"; a "first plurality of vanes attached to
the spinning member"; "a second plurality of vanes fixed relative to the enclosure and the spinning
member such that the first vanes move with respect to the second vanes," "wherein the first and
second vanes are positioned in close proximity to one another so that substantial heat is transferred
from the first vanes to the second vanes and ***the second vanes are configured such that heat can
be readily transferred from the second vanes to the exterior of the enclosure***." (Emphasis added.)

The DG3 cannot infringe claims 11 and 17 at least because it lacks second (stationary)
vanes configured to "readily transfer[]" heat to the "exterior of the enclosure." In fact, as discussed
*supra* at 10-11, the DG3 is specifically designed to avoid the transfer of heat from the stationary
fins to the exterior of the enclosure ███████████████████████████████████████████

███████████      Thus, instead of employing the "passive," atmospheric-cooling method of the '782
Patent—which directs the flow of heat from the heat-generating components inside the enclosure
to its exterior, from where it is dissipated into the atmosphere—the DG3 removes heat from the
interior of its enclosure by circulating a cooling liquid through an internal coolant "loop." (*See
supra* at 10-11.) This coolant loop system includes cooling channels adjacent to the stationary
fins, which are positioned there specifically to ***keep heat from moving from the stationary fins to
the exterior of the enclosure***; instead, the heat is redirected into the adjacent cooling channels.
(*See supra* at 10-11.) Heat is then removed from the internal coolant loop by placing it in contact
with pipes that circulate water from the surrounding body of water. (*See supra* at 11.)

In effect, the DG3 employs a fluid-to-fluid heat exchanger to dissipate heat, the two fluids
being the cooling glycol mixture (which is pumped into the internal coolant loop, and which

removes heat from the heat-generating components inside the enclosure) and the raw sea water (which is ingested into the piping adjacent to the coolant loop, and which in turn removes heat from the coolant loop). (*See supra* at 10-11; *see also* D.I. 41-2 at ¶ 9.) This is exactly the type of cooling system that the inventors of the '782 Patent ***expressly criticized and distinguished from their patented system***. (D.I. 1-1 at 12 (4:45-50); *see supra* at 9.)[6]

The TRO Motion reveals no reasonable basis for the assertion that the DG3 infringes the '782 Patent. Seakeeper's declarant assumes that, in the DG3, the "only" thermal path is from the inner race to the first (rotating) vanes to the second (stationary) vanes and "then to the enclosure." (D.I. 10 at ¶ 51.) However, he provides no support for this assumption. Similarly, the TRO Motion includes a statement by DMC's President referencing a "cooling method" employed in the DG3, and, based on this generic statement, it leaps to the conclusion that the DG3 ***must*** be using Seakeeper's technology. (D.I. 30 at 15.) But, as discussed *supra*, this speculation has no basis in fact, and even a cursory review of publicly available information should have put Seakeeper on notice that the DG3 removes heat from the enclosure not by Seakeeper's "passive" atmospheric-cooling method but instead by employing an active cooling method (*i.e.*, a heat exchanger) of the type the inventors criticized in the '782 Patent. For example, a promotional DG3 video cited in the Complaint (D.I. 1 at ¶ 47) specifically references the use of an "advanced cooling system" comprising, *inter alia*, a "titanium heat exchanger." *How the New Dometic DG3 Gyro Works*, https://www.youtube.com/watch?v=6c1JaSP0cOo, at 3:30 (last accessed on May 21, 2025).

---

[6] Although the specification of the '782 Patent purports to disclose an alternative embodiment, shown in Figures 10-14, in which a cooling liquid is sprayed onto the rotating vanes to cool them down (D.I. 1-1 at 12 (4:51-62); *id.* at 13 (6:1-11)), this embodiment is not claimed in the patent. In fact, during prosecution of the patent, the Examiner issued a restriction requirement advising the applicants that this alternative embodiment in Figures 10-14 was "distinct" from, and "mutually exclusive" with, the embodiment described in the rest of the application, in which no cooling spray is used to remove heat. (D.I. 41-6 at 4.) The applicants elected to proceed with the latter (Group I) embodiment and cancelled all pending claims directed to the former (Group II) embodiment. (D.I. 41-7 at 8.)

### 3. There Is a Substantial Question as to the Validity of the '930 and '782 Patents.

Seakeeper suggests that no substantial question of invalidity exists simply because the PTO allowed the '930 and '782 Patents. (D.I. 30 at 15-16.) In particular, it focuses its invalidity discussion on the Sibley reference, which it was able to overcome during prosecution of the patents. (*Id.*) However, Seakeeper fails to disclose that both patents have been subject to petitions for *inter partes* review ("IPR") before the U.S. Patent Trial and Appeal Board (the "PTAB"), which raised numerous additional prior art references besides Sibley. (*See* Ex. A; Ex. D.) The PTAB never ruled on the merits of the petitions, because the third-party petitioner voluntarily withdrew them due to a technicality.[7] At least the following obviousness grounds asserted in the IPR petitions raise a substantial question as to the validity of the asserted claims:

| Patent | Asserted Claim | Obviousness Combination |
|--------|----------------|-------------------------|
| '930 | 1, 14 | Adams in view of Sibley |
| | | Adams in view of Jäger |
| | | Adams in view of Bimshas |
| '782 | 11, 17 | Adams in view of Sibley and Bimshas |
| | | Adams in view of Jäger and Bimshas |

The Adams publication (an earlier and unrelated application filed by the co-inventors of the '930 and '782 Patents) discloses a gyroscopic stabilizer, in which a flywheel, supported by bearings, is positioned within an enclosure containing a below-ambient density gas (*e.g.*, helium) and maintaining a below-ambient pressure. (Ex. A at 27, 29.) Sibley, Jäger, and Bimshas disclose cooling assemblies comprising interleaving fins for cooling the bearings of a flywheel (Sibley) or a rotating shaft (Jäger) or for transferring heat between other rotating components (Bimshas). (*Id.*

---

[7] Specifically, the petitioner had inadvertently cited the wrong version of the Adams reference, a key prior art reference. Instead of citing the published Adams patent application, which indisputably qualified as prior art to the '930 and '782 Patents, the petitioner cited the patent that subsequently issued from that published application, even though the issued patent did not qualify as prior art in its own right. (*See* Ex. F.) Although this error could have been fixed in subsequent petitions, the petitioner, for unknown reasons, chose not to refile the petitions.

at 27-28, 41, 53.)  As explained by Dr. Gregory Buckner, a professor of mechanical and aerospace engineering at North Carolina State University, it would have been obvious to a person skilled in the art to employ Sibley's, Jäger's, or Bimshas's interleaving cooling fins in Adams's gyrostabilizer, at least because Adams itself recognizes the need to cool the bearings of its flywheel.  (*Id.* at 28, 41-42, 53; Ex. B at ¶ 26.)  The combination of Adams with Sibley, Jäger, or Bimshas thus teaches all elements of claims 1 and 14 of the '930 Patent.  (Ex. A at 65-69, 75-79.)

Claims 11 and 17 of the '782 Patent additionally require the first and second vanes to be cylindrical elements extending in a direction substantially parallel to the axis of rotation of the spinning member (flywheel).  To the extent Sibley or Jäger do not disclose cooling fins that extend in a direction parallel to the spinning member, Bimshas does.  (Ex. D at 57.)  Therefore, claims 11 and 17 would have been obvious over the Adams publication in combination with either Sibley and Jäger, and in further view of Bimshas.  (*Id.* at 56-58.)

Of note, in its preliminary response to the IPR petition challenging the '930 Patent, Seakeeper did not purport to identify any substantive gaps in the petitioner's *prima facie* case of obviousness.[8]  (*See* Ex. C.)  Instead, Seakeeper limited its substantive arguments to secondary considerations of non-obviousness.  (Ex. C at 21-33.)  Similarly, in its TRO Motion, Seakeeper suggests that evidence of secondary considerations supports non-obviousness.  (D.I. 30 at 16-17.)  However, such evidence is only significant if it "ha[s] a 'nexus' to the claims."  *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373 (Fed. Cir. 2019).  This means that the patentee has to show that its commercial success and/or other secondary considerations are the "direct result of the unique characteristics of the claimed invention."  *Id.* at 1374.  Seakeeper has made no such showing here (or even tried to).  If anything, the record confirms that it owes the alleged success

---

[8] Seakeeper did not file a preliminary response to the petition challenging the '782 Patent because the petitioner withdrew the petition prior to Seakeeper's preliminary response deadline.

of its gyrostabilizers to the presence of other, "unclaimed" product features. *Id.* at 1376.

Thus, Seakeeper's marketing materials tout the following features of its gyrostabilizers: "active control," a "vacuum sealed" enclosure, and an "innovative cooling system." (D.I. 13-1 at 5 (Att. RS-1 at 5).) However, the "active control" feature, which supposedly automatically adjusts gyro force depending on sea conditions (*id.*), is not even hinted at in the '782 and '930 Patents. Further, although the patents describe a vacuum-sealed enclosure, it is not the claimed advance over the prior art; rather, the patents' specification admits that enclosing the flywheel of a gyrostabilizer in a partial vacuum was well-known. (D.I. 1-1 at 11 (1:24-26).) Lastly, even the cooling system touted in Seakeeper's marketing materials *is not the patented system*. Instead of the "passive" atmospheric-cooling system disclosed and claimed in the '782 and '930 Patents (*see supra* at 9), Seakeeper's commercial gyrostabilizers appear to employ an active cooling system that removes heat from the enclosure using a "glycol/seawater" combination. (D.I. 13-1 at 11-13 (Att. RS-1 at 11-13).) In other words, they use a cooling system more akin to that found in the DG3, and expressly criticized as inferior in the patents' specification. (*See supra* at 9-11.)

In light of the foregoing, there exists at least a substantial question as to the validity of the '930 and '782 Patents. Accordingly, the TRO Motion should be denied for that reason alone.

### B.    Seakeeper Has Not Shown Irreparable Harm.

Seakeeper has not made a "clear showing" that it will suffer "substantial and immediate irreparable injury" absent emergency injunctive relief. *Apple, Inc. v. Samsung Elecs. Co.*, 678 F.3d 1314, 1324-25 (Fed. Cir. 2012). It says it is entitled to a "presumption" of irreparable harm because it has shown a "strong" likelihood of success on the merits. (D.I. 30 at 17.) Not so. Setting aside that Seakeeper is not, in fact, likely to succeed on the merits, the Supreme Court has in any event "jettisoned the presumption of irreparable harm as it applies to determining the

appropriateness of injunctive relief." *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1149 (Fed. Cir. 2011) (citing *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006)).[9]  Seakeeper must ***prove*** that it will suffer irreparable harm without a TRO.  It has failed to meet that burden.

    ***First,*** Seakeeper's delay in moving for a TRO alone requires denying its motion.  "[D]elay in seeking a remedy is an important factor bearing on the need for a preliminary injunction."  *High Tech Med. Instrumentation, Inc. v. New Image Indus.*, 49 F.3d 1551, 1557 (Fed. Cir. 1995).  Here, the launch of the DG3 was announced on February 11, 2025 at the 2025 Miami International Boat Show.  (D.I. 1 at ¶ 46.)  Seakeeper was present at that trade event.  (D.I. 12 at ¶ 23.)  However, it did not file this suit until April 21.  (D.I. 1.)  It did not move for a preliminary injunction until May 5.  (D.I. 8.)  And, even in that motion, it made no mention of any desire to seek an emergency ruling from the Court; on the contrary, the PI Motion stated that Seakeeper expected to be able to conduct discovery and "supplement" its brief prior to any hearing.  (D.I. 9 at 1 fn. 1.)  It was not until May 15—over three months after it first learned of the product that it now claims represents an imminent, existential threat to its business—that Seakeeper suddenly moved for an "emergency" TRO.  (D.I. 30.)  There was nothing stopping Seakeeper from filing the TRO Motion earlier (for example, together with the Complaint, or even sooner).  Its lack of urgency in bringing this motion refutes its assertion of imminent, irreparable harm.

    ***Second,*** even putting aside its unexplained delay in requesting a TRO, Seakeeper has not shown that it is likely to suffer any irreparable harm in the relatively short time between now and when the Court issues its ruling on the PI Motion.  For context, Seakeeper's gyrostabilizers are offered in no less than "twelve (12) sizes that can be found on vessels from 23-foot center-console

---

[9] Although Seakeeper claims that "[p]ost-*eBay* decisions in this Circuit have recognized likelihood of success gives rise to a presumption of irreparable harm" (D.I. 30 at 17), all of the district court cases it cites ***pre-date*** the Federal Circuit's holding in *Robert Bosch*.

fishing boats to 200-foot mega-yachts." (D.I. 13 at ¶ 8; *see also* D.I. 13-1 at 24-25 (Att. RS-2 at 11-12).) By contrast, the DG3 is "specifically designed for the 35- to 41-foot boat market." (D.I. 11-1 at 185 (Att. AS-7 at 3).) Thus, out of Seakeeper's 12 gyrostabilizers, the DG3 might compete with at most only two: Seakeeper 3 and Seakeeper 4, designed for 35-41 foot and 38-44 foot boats, respectively. (D.I. 13-1 at 24 (Att. RS-2 at 11).) It is wholly implausible for Seakeeper to suggest that competition in this narrow segment of the market will irreparably injure its business— including through "substantial" loss of market share, irreversible price erosion, and lost R&D opportunities (D.I. 30 at 18-24)—just in the time that it takes the Court to rule on the PI motion. Indeed, Seakeeper's assertions of harm are not backed up by any credible, competent evidence.

Beginning with loss of market share, Seakeeper speculates that, because one boat builder (Regulator Marine, Inc.) has announced its intention to install the DG3 in its 35-foot boat, other boat builders are about to follow suit and commit to the DG3 over Seakeeper 3/4. (D.I. 30 at 18-19.) Seakeeper claims to be aware of "45 new boat designs now in the planning stages that could employ Dometic's DG3." (*Id.*) But Seakeeper provides no support for its implicit assumption that, but for the availability of the DG3, these boat builders would necessarily choose to install Seakeeper's products. ██████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████ And,

regardless, Seakeeper claims to be the "global leader in marine motion control technology." (D.I. 11 at ¶ 7.) The boating industry, it says, is a "deeply relationship-driven industry." (D.I. 12 at ¶ 8.) Given its pole position as a global technology leader in a deeply relationship-driven industry,

it undoubtedly possesses "substantial experience and resources and is prepared to compete" with a brand new entrant in the market. *United Therapeutics Corp. v. Liquidia Techs., Inc.*, No. 23-975-RGA, 2024 U.S. Dist. LEXIS 97445, at *38 (D. Del. May 31, 2024). Thus, its suggestion that it is about to lose a "substantial" portion of its market share (D.I. 30 at 19) is speculative at best.



In fact, Seakeeper's website continues to list the price of Seakeeper 4 at $46,200. *Seakeeper 4*, https://www.seakeeper.com/seakeeper-products/seakeeper-4/ (last accessed on May 21, 2025).

None of these events has yet come to pass. And, even more to the point, Seakeeper offers no evidence that this entire chain of events is likely to unfold *in the time that it takes the Court to resolve the PI Motion*. Seakeeper's price-erosion argument is thus unsupported and speculative. *See SmartSky Networks, LLC v. Gogo Bus. Aviation, LLC*, No. 2023-1058, 2024 U.S. App. LEXIS 2100, at *14



(Fed. Cir. Jan. 31, 2024) ("requir[ing] concrete evidence of reduced price to find price erosion").



But Seakeeper again fails to substantiate this assertion of harm. Seakeeper does not explain what purpose a TRO would even serve in these circumstances.

**Fourth,** even if Seakeeper had presented any non-speculative evidence of imminent loss of substantial market share, price erosion, or lost R&D opportunities due to the DG3's launch, these harms would not be irreparable. If harm is "quantifiable," then it is not irreparable, because it may be compensable by money damages. *ActiveVideo Networks, Inc. v. Verizon Communs., Inc.*, 694 F.3d 1312, 1339 (Fed. Cir. 2012). And here, Seakeeper has little trouble reducing its fanciful allegations of harm to specific dollar amounts. (*See, e.g.*, D.I. 12 at ¶¶ 22, 25, 33.) By admitting that its alleged losses are calculable, Seakeeper has effectively argued itself out of injunctive relief. *See Sebela Int'l Ltd. v. Actavis Labs. FL, Inc.*, No. 17-4789-CCC-MF, 2017 U.S. Dist. LEXIS 175318, at *21 (D.N.J. Sep. 14, 2017) (finding no irreparable harm where "[the plaintiff] itself appears to support Defendants' assertion that [its] damages are calculable").

**Finally,** even if Seakeeper had shown any irreparable harm imminent enough to justify issuing a TRO, it has not shown a "causal nexus" between such harm and the alleged infringement. *Apple v. Samsung*, 695 F.3d 1370, 1374 (Fed. Cir. 2012). "To show irreparable harm, it is

necessary to show that ***the infringement*** caused harm in the first place. Sales lost to an infringing product cannot irreparably harm a patentee if consumers buy that product for reasons other than the patented feature." *Apple*, 678 F.3d at 1324 (emphasis added). Thus, to obtain an injunction, the patentee is required to provide "evidence that directly ties consumer demand for the [accused product] to its allegedly infringing feature." *Id.* at 1375. Yet Seakeeper's TRO Motion does not address the causal nexus at all, much less adduce evidence "directly t[ying]" the anticipated consumer demand for the DG3 to the product's alleged incorporation of Seakeeper's patented technology. In fact, the record does not even establish that the demand for ***Seakeeper's own gyrostabilizers*** is driven by any feature(s) unique to the '782 or '930 Patents. As discussed *supra* at 18-19, the record actually shows otherwise.

Seakeeper has not shown that it will suffer any irreparable harm absent an emergency TRO, much less that such harm could be ascribed directly to the alleged patent infringement.

### C.    Neither the Equities nor the Public Interest Favor an Injunction.

Seakeeper argues that the balance of the equities tips in its favor because "[its] very existence depends upon its patented gyrostabilizer products," and that an emergency injunction would serve the public interest in protecting patents. (D.I. 30 at 24-25.) However, as discussed *supra*, Seakeeper's claim that the launch of the DG3 poses an imminent, existential threat to its business is unsupported. Further, given that Seakeeper has made an exceedingly weak showing of a likelihood of success on the merits, any public interest in protecting its patents is far outweighed by the public interest in promoting legitimate competition in the marketplace. *Graceway Pharm., LLC v. Perrigo Co.*, 697 F. Supp. 2d 600, 609 (D.N.J. 2010). Therefore, it would be neither equitable nor in the public's interest to shield Seakeeper from such legitimate competition.

## V.    CONCLUSION

Seakeeper's TRO Motion should be denied.

ASHBY & GEDDES

/s/ Andrew C. Mayo

OF COUNSEL:

DINSMORE & SHOHL LLP

Oleg Khariton
255 East Fifth Street, Suite 1900,
Cincinnati, OH 45202
(513) 977-8200
oleg.khariton@dinsmore.com

Michael A. Xavier
1775 Sherman Street, Suite 2600
Denver, CO 80203
(303) 831-6980
michael.xavier@dinsmore.com

Dated: May 22, 2025

Andrew C. Mayo (#5207)
Brian A. Biggs (#5591)
500 Delaware Avenue, 8th Floor
PO Box 1150
Wilmington, DE 19899
(302) 654-1888
amayo@ashbygeddes.com
bbiggs@ashbygeddes.com

*Attorneys for Defendant*