UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

————

No. 1:25-cv-00484

————

**Seakeeper Inc.,**
*Plaintiff,*

v.

**Dometic Corporation,**
*Defendant.*

————

## OPINION AND ORDER

This case involves patents for gyroscopic boat stabilizers. Plaintiff Seakeeper Inc. filed a motion for a preliminary injunction and a motion for a temporary restraining order. In its motion for a preliminary injunction, plaintiff asks the court to enjoin defendant Dometic Corporation "from launching and shipping its infringing DG3 gyrostabilizer product" during the pendency of the litigation. Doc. 9 at 6. The court held a hearing on plaintiff's motion for a TRO on May 28, 2025, and now addresses the nearly identical TRO and PI motions in one order.

As explained below, the court finds that the motions (Docs. 8, 29) should be denied because there is a substantial question of validity as to plaintiff's '782 patent and plaintiff fails to convince this court that its alleged harms will be irreparable.

### I.  Background

#### A.  The disputed patents and devices

Seakeeper Inc. is the owner of two U.S. patents—U.S. Patent Nos. 7,546,782 and 8,117,930—that cover marine gyrostabilizers for use on smaller boats. Doc. 30 at 6. To adapt larger marine gyrostabilizers to small boats, the gyroscopes must use smaller flywheels spinning at higher speeds. Doc. 9 at 8. To achieve these higher speeds, the flywheels spin in a partial-vacuum enclosure. *Id.* at 8–9. That design, while power-efficient, generates significant heat in the bearings that hold the flywheel. *Id.* The Seakeeper

patents claim an invention to dissipate that heat through inter-leaved, cylindrical vanes that are "in close proximity to one another so that substantial heat is transferred" from the interior rotating vanes to fixed vanes attached to the enclosure. *Id.* at 9.

For purposes of Seakeeper's motions, dependent claim 17 of the '782 patent is representative. Doc. 9 at 12; Doc. 75 at 14. That claim and independent claim 11 state the following:

**Claim 11.** Cooling apparatus for transferring heat from and cooling one or more heat generating components that support or drive a flywheel or other spinning member, the apparatus comprising:

an enclosure enclosing the spinning member, the enclosure containing a gas at below-ambient pressure or below-ambient density, wherein an axis of rotation about which the spinning member spins defines an axial direction;

a first plurality of vanes attached to the spinning member such that the first plurality of vanes spin with the spinning member relative to the enclosure, wherein the first vanes are cylindrical elements extending in a first direction substantially parallel to the axial direction;

a second plurality of vanes fixed relative to the enclosure and the spinning member such that the first vanes move with respect to the second vanes, wherein the second vanes are cylindrical elements extending in a second direction substantially parallel to the axial direction and opposite the first direction, the second vanes defining cylindrical shaped channels into which the first vanes extend so that the first and second vanes are interleaved; and

wherein the first and second vanes are positioned in close proximity to one another so that substantial heat is transferred from the first vanes to the

second vanes and the second vanes are configured such that that heat can be readily transferred from the second vanes to the exterior of the enclosure.

. . .

**Claim 17.** The apparatus of claim 11 wherein the spinning member is a flywheel and the flywheel and enclosure are part of gyroscopic roll stabilizer for a boat.

'782 patent at 11:6–33, 12:15–17. The following figures help illustrate the invention:



**'782 patent, fig. 1**



**'782 patent, fig. 2**

Seakeeper accuses the DG3 device of infringing claim 17 of the '782 patent. Doc. 9 at 12–15. As with the patented technology, the DG3 device is also designed for use in boat stabilization. The DG3

utilizes a bearing assembly that rotates a flywheel in an enclosure with below-ambient pressure. Doc. 41 at 11. It contains cooling fins that are coupled to the flywheel that rotate in close proximity to adjacent fins fixed to the enclosure. *Id.* Dometic argues, however, that the DG3 differs from the Seakeeper patent because the DG3 uses "an active cooling system, which . . . circulates [a] cooling liquid through a coolant 'loop,' formed by a plurality of coolant channels, inside the device's enclosure." *Id.*

### B. Procedural history

The DG3 debuted on February 11, 2025, at the 2025 Miami International Boat Show. Doc. 9 at 11. Seakeeper filed suit against Dometic Corporation on April 21, 2025. Doc. 1. On May 5, 2025, Seakeeper moved for a preliminary injunction, seeking to enjoin Dometic from "launching and shipping" the DG3 stabilizer. Doc. 9 at 6. Seakeeper then moved for a TRO on May 15, 2025, reporting that Dometic would begin shipments of the DG3 device in June 2025. Doc. 30 at 18. The court held a hearing on the TRO motion on May 28, 2025.

## II. Analysis

The court first addresses two procedural issues in this case. The court then analyzes Seakeeper's requests for a preliminary injunction and TRO.

### A. Procedural arguments

First, the court considers whether Seakeeper's motions are moot in light of letters filed after the TRO hearing. *See* Docs. 65, 67, 68. Second, the court addresses its power to enjoin defendant Dometic Corporation and its indirect subsidiary Dometic Marine Canada.

#### 1. Mootness

After the TRO hearing, defendant filed a letter with the court stating that it was willing to change the DG3 device to avoid infringement. Specifically, defendant claims that the alternative design will avoid the '782 patent's requirement of having a "first plurality of vanes" that are "cylindrical" and "interleaved" with

a "second plurality of vanes." Doc. 65 at 2. Defendant filed a sealed product diagram represented as showing that its new design avoids cylindrical, interleaved vanes. Doc. 65-1 at 2. It claims that these product modifications render plaintiff's motions for injunctive relief moot. Doc. 65 at 3. Plaintiff claims that this new design is nothing more than a "last-minute attempt to stave off a preliminary injunction." Doc. 67 at 2.

"A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (cleaned up). Mere voluntary cessation of the challenged conduct "does not deprive a federal court of its power to determine the legality of the practice." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000). Instead, to establish mootness from voluntary cessation, defendant must meet a "stringent" standard: that "subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* (emphasis added); *see also Already*, 568 U.S. at 91.

Defendant fails to meet that formidable standard. First, its letters do little to convince the court that the allegedly infringing conduct could not reasonably be expected to recur. The letters effectively serve as a promise to the court to cease the allegedly infringing conduct. *See* Doc. 65 at 2 ("Dometic will not make, sell, or ship the version of the accused DG3 design that is depicted in . . . Seakeeper's TRO and PI Motions."); Doc. 68 at 2 (noting it "will put into production" the newer design). They only include a design diagram of a possible redesigned machine showing new vane architecture. Doc. 65-1 at 2. This is not enough to convince the court that defendant's conduct cannot reasonably be expected to recur. On top of this, defendant previously expressed its unwillingness to self-enjoin allegedly infringing gyroscope activities, including shipments. Doc. 32-4 at 2, 4 ("Dometic is not willing to

self-enjoin . . . for the duration of the preliminary injunction pro-
ceedings.").

Defendant offers no supplemental information to instill confi-
dence that the redesigned DG3 will completely replace the exist-
ing DG3 design. The court needs more than design diagrams and
affirmative statements by counsel. *Cf. Already*, 568 U.S. at 93–95
(holding that an "unconditional and irrevocable" covenant that
prohibited the challenged conduct made it "absolutely clear" the
allegedly unlawful activity could not reasonably be expected to re-
cur). This is especially true when, like the gyroscopes here, a ma-
chine is precision-manufactured to withstand extremely fast
speeds (thousands of revolutions per minute, as plaintiff's coun-
sel noted at oral argument) with tight spatial tolerances (as little
as 0.025 mm of separation between the vanes, in the '782 patent).
These design changes represent a significant undertaking that will
take time to implement.

Second, at oral argument, defendant clarified that approxi-
mately 12 units of the DG3 device are slated to be shipped in June.
Defendant did not contest at the hearing that these units meet the
plurality-of-cylindrical-interleaved-vanes limitation in dispute in
plaintiff's motions. Defendant also did not clarify in its letter
whether these shipments will be canceled or whether the DG3
units in these shipments will be retrofitted to the new design.
Based on the information available to the court, these shipments
of the existing allegedly infringing devices might reasonably occur
in the future, with new devices manufactured after existing inven-
tory is exhausted. *See Lane Shark USA, LLC v. Titan Implement,
LLC*, No. 1:19-cv-00326, 2020 WL 13888633, at *4 (E.D. Tenn.
Nov. 30, 2020) (holding similarly when there was "nothing pre-
venting" the defendant from again manufacturing an infringing
design and when "models remain[ed] in the market" from various
dealers nationwide).

Defendant has failed to meet its burden to make it absolutely
clear that the allegedly infringing DG3 is not reasonably expected
to be made, used, offered for sale, or sold in the United States. *Cf.*

*Infiltrator Sys., Inc. v. Cultec, Inc.*, 171 F. App'x 847, 848 (Fed. Cir. 2006) (unpublished) (holding infringing sales not reasonably expected to recur where an allegedly infringing product design was not manufactured for at least three years and all old inventory had been scrapped). Therefore, plaintiff's motions for injunctive relief are not moot. The court will assess plaintiff's arguments as to the design of the DG3 that was presented in its motions and at oral argument.

### 2. Enjoining Dometic Corporation

Next, defendant Dometic Corporation argues that plaintiff sued the wrong entity. It claims that defendant has "no involvement with the DG3." Doc. 41 at 12. Instead, Dometic Marine Canada, Inc. (DMC)—a Canadian indirect subsidiary of the American Dometic Corporation—is the entity that is "responsible for [the DG3's] design, manufacture, and distribution." *Id.* The ultimate parent company of both Dometic Corporation and DMC is a Swedish company, Dometic Group AB. Doc. 46 at 12 n.3. So the court analyzes whether it can enjoin defendant Dometic Corporation.

Federal Rule of Civil Procedure 65(d)(2) states that an order granting an injunction "binds only the following who receive actual notice of it by personal service or otherwise: (A) the parties; (B) the parties' officers, agents, servants, employees, and attorneys; and (C) other persons who are in active concert or participation" with the entities described in (A) and (B).

"A district court must have personal jurisdiction over a party before it can enjoin its actions." *Ins. Corp. of Ir. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 711 n.1 (1982) (Powell, J., concurring) (citing *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 111–12 (1969)). The Supreme Court recognizes two classifications of personal jurisdiction: general jurisdiction and specific jurisdiction. Specific jurisdiction encompasses actions that "aris[e] out of or relate[] to the defendant's contacts with the forum." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 923–24 (2011). General jurisdiction is distinct from the

defendant's contacts with a State—general jurisdiction may be exercised only when the corporation's "affiliations with the State [in which suit is brought] are so 'continuous and systematic' as to render [it] essentially at home in the forum State." *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014). In assessing a personal-jurisdiction question in a patent case, the court looks to Federal Circuit precedent. *Tigo Energy Inc. v. SMA Solar Tech. Am. LLS*, No. 1:22-cv-00915, 2023 WL 6990896, at *3 (D. Del. Oct. 23, 2023) (citing *Avocent Huntsville Corp. v. Aten Int'l Co.*, 552 F.3d 1324, 1328 (Fed. Cir. 2008)).

The parties do not contest that this court has personal jurisdiction, by means of general jurisdiction, over defendant Dometic Corporation, Doc. 75 at 64, since it is incorporated in Delaware. *Daimler*, 571 U.S. at 137 (reiterating that "the place of incorporation and principle place of business are paradigm bases for general jurisdiction" (cleaned up)). Because the court has general jurisdiction over defendant, it need not engage in a specific-jurisdiction analysis as to it.

### a. Direct liability

Having assessed that the court has jurisdiction over Dometic Corporation, the court next determines what involvement, if any, Dometic Corporation demonstrates regarding the DG3 device. This is a consideration of causation and redressability. Plaintiff must show that that the injury is "likely caused by the defendant." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). It then must show that its alleged harms "would likely be redressed by judicial relief"—that is, a potential injunction governing the actions of Dometic Corporation. *Id.*

Plaintiff points to three direct actions that defendant takes with regard to the DG3 that may suffice to subject it to an injunction: offering the DG3 for sale on its website, importing the device into the United States, and using the DG3 at public boat show in Miami earlier in the year. Doc. 62 at 5–6; *see also* 35 U.S.C. § 271(a).

First, plaintiff argues that defendant offers the DG3 device for sale on its website, which induces boat manufacturers to do the same. Doc. 62 at 5. The facts support the conclusion that the DG3 is offered for sale on Dometic Corporation's website. *See generally* Doc. 54. That website states that it is run by "Dometic Corporation (U.S.)." *Id.* at 6. The website's terms and conditions of sale state that the terms apply to Dometic Corporation and "any Dometic Corporation subsidiary," indicating defendant sets some of the terms of its subsidiary's sales and warranties. *Id.* at 8. Most importantly, the website invites customers to submit contact information so that a specialist may "reach out with more information." *Id.* at 9. The U.S. company also announced the release of the DG3 from Illinois. Doc. 54-1 at 2.

These types of activities constitute potentially infringing activities. This court has held that offers for sale, which are acts of infringement under § 271(a), encompass website advertisements that provide "pricing and/or other ordering information." *ISCO Int'l, Inc. v. Conductus, Inc.*, No. 1:01-cv-00487, 2003 WL 280276, at *2 (D. Del. Feb. 10, 2003) (declining to enter summary judgment when a "question of material fact" existed regarding whether pricing details or ordering information was present on a website); *see also 3D Sys., Inc. v. Aarotech Labs., Inc.*, 160 F.3d 1373, 1379 (Fed. Cir. 1998) (holding that price-quotation letters were offers for sale under § 271 where they contained "a description of the allegedly infringing merchandise and the price at which it can be purchased"). In sum, this collection of information "generat[es] interest in a potential infringing product to the commercial detriment of" plaintiff, which is "exactly the type of activity" that § 271(a)'s prohibition on offers for sale was designed to prevent. *3D Sys.*, 160 F.3d at 1379.

Second, plaintiff argues that defendant imported and used the DG3 device at a trade show in Miami. Doc. 62 at 6. The parties agree that the DG3 is manufactured outside of the United States. Plaintiff argues that "Dometic operated a booth at which imported units of the DG3 product were showcased." *Id.* This

included hourly demonstrations. Doc. 54 at 1. Defendant notes that it was "possible" that a Dometic Corporation employee was in the booth. Doc. 75 at 61. Plaintiff further submits evidence of the booth and its employees' uniforms, which bear the Dometic trademark. Doc. 54 at 2.[1]

As discussed at oral argument, neither party has provided any indication that the DG3 will continue to be displayed by defendant at future boat shows—and this information alone would not be sufficient to subject defendant to plaintiff's request for *prospective* relief. But this use, combined with its offering for sale, builds on a series of actions by defendant that demonstrate ongoing involvement sufficient to hold Dometic Corporation to an injunction if this court finds that plaintiff meets the injunctive-relief test below. *See Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 484 (1964) ("[I]t has often and clearly been held that unauthorized use, without more, constitutes infringement.").

Plaintiff has successfully alleged activities by Dometic Corporation under § 271(a) that convince this court Dometic Corporation is the alleged cause to some of plaintiff's injury and that prospective relief, by its enjoining ongoing uses and offers for sale within the United States, would at least partially redress that harm. This is enough for the analysis to move forward to the substantive portion of plaintiff's request for injunctive relief.

### b. Subsidiary liability

If defendant had not performed the activities above, plaintiff would still seek to impute the actions of defendant's Canadian subsidiary, DMC, to defendant itself. "As a general matter, a parent company may be held liable for the patent infringement of its subsidiaries." *Tarkus Imaging, Inc. v. Adobe Sys., Inc.*, No. 1:10-cv-00063, 2011 WL 1557930, at *2 n.1 (D. Del. Apr. 21, 2011) (citing *A. Stucki Co. v. Worthington Indus., Inc.*, 849 F.2d 593, 596 (Fed. Cir. 1988)). This requires a veil-piercing analysis. *A. Stucki*, 89

---

[1] The court considers below whether DMC's actions can be imputed to defendant. However, here, the question is whether this demonstration involved the direct contributions of defendant's U.S. employees.

- 10 -

F.2d at 596. Two tests—the alter ego test and the agency test—
are considered to determine whether piercing the corporate veil is
appropriate. *SRI Int'l, Inc. v. Internet Sec. Sys., Inc.*, No. 1:04-cv-
01199, 2005 WL 851126, at *3 (D. Del. Apr. 13, 2005).[2]

The court begins with alter ego. "[P]laintiffs must essentially
demonstrate that in all aspects of the business, the two corpora-
tions actually functioned as a single entity and should be treated
as such." *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 485 (3d
Cir. 2001). This can include a showing that the parent exercised
"complete domination and control" over the subsidiary. *Mobil Oil
Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 266 (D. Del. 1989).
Plaintiff must demonstrate "some fraud, injustice, or inequity in
the use of the corporate form." *C.R. Bard, Inc. v. Guidant Corp.*,
997 F. Supp. 556, 559 (D. Del. 1998).

Plaintiff does not attempt to argue that DMC is Dometic Cor-
poration's alter ego. Instead, in describing the relationship be-
tween DMC and Dometic Corporation, plaintiff argues it is "not
necessary" to establish an alter-ego relationship. Doc. 62 at 7. De-
fendant then asserts that "DMC is an independent corporation,
separate from Dometic Corporation, and is responsible for its own
management, operations, and governance." Doc. 41 at 13. Based
on the facts as they are currently developed, the court cannot con-
clude that defendant is the alter ego of DMC.

The court next considers the agency theory. The focus of this
theory is on "the arrangement between the parent and the subsid-
iary, the authority given in that arrangement, and the relevance of
that arrangement to the plaintiff's claim." *C.R. Bard*, 997 F. Supp.
at 560. For liability to extend to the parent, there must be a "close
connection between the relationship of the corporations and the
cause of action." *Id.* The agency theory differs from the alter ego

---

[2] In the event that DMC is joined as a defendant, this court has before
described these tests as "two theories under which a defendant company may
be subject to personal jurisdiction in Delaware by virtue of the court's personal
jurisdiction over the defendant company's affiliate." *Cephalon, Inc. v. Watson
Pharms., Inc.*, 629 F. Supp. 2d 338, 347 (D. Del. 2009).

theory in that it "attributes specific acts to the parent" but does not treat them "as one entity." *Id.*

Plaintiff, for the first time in its reply, attempts to show a possible agency relationship. Defendant and DMC are both indirect subsidiaries of Dometic Group AB, Doc. 46 at 12 n.3, and DMC is an indirect subsidiary of defendant Dometic Corporation, Doc. 62 at 6. Defendant argues that DMC is independent, separate, and responsible for its own operations. Doc. 46 at 12. But plaintiff alleges that Dometic Corporation sets pricing, warranty, and payment terms for DMC and its sales of the DG3. Doc. 62 at 5. The court agrees that there is some level of control that exists in the relationship between the two and in the context of the cause of action before the court.

On the current record, the court finds a substantial likelihood that the two businesses held themselves out as one "Dometic" company when displaying the DG3 at the Miami boat show. Doc. 54 at 2. Defendant conceded that Dometic Corporation employees were possibly present at the "Dometic" booth. Doc. 75 at 61. These employees displayed similar "Dometic" trademarks on their promotional materials and uniforms. Doc. 54 at 2. Dometic Corporation has before claimed, in a complaint in the Southern District of Florida,[3] that the same "Dometic" trademark is one that it "has expended significant time and effort in advertising, promoting, and developing." Doc. 54-3 at 5–6. This trademark has "become associated *exclusively* with Dometic by . . . the general public at large." *Id.* at 6 (emphasis added). Though it claims it does so "for the sake of brevity and simplicity," defendant also refers to the companies collectively. Doc. 65 at 2 n.1.

The court has little information on the level of control defendant has over DMC, especially concerning defendant's role, if any, in importing the DG3. But the facts above demonstrate a substantial likelihood that an agency relationship exists between the two

---

[3] In that case, the plaintiff was "Dometic Corporation d/b/a Dometic Marine," and that party, the same Delaware company that is the defendant here, referred to itself as "Dometic" throughout the complaint. Doc. 54-3 at 2, 4.

corporations. Because of the early stage of the case, plaintiff has had little to no opportunity for discovery covering the corporate structure and division of responsibilities between the two companies. But, at this juncture, the court makes a preliminary finding of an agency relationship for the purposes of resolving plaintiff's injunctive-relief motions.

### 3. Enjoining Dometic Marine Corporation

Plaintiff did not formally move for an injunction against DMC and clarified that it sought an injunction against Dometic Corporation to prevent it from "acting in concert, aiding, abetting, or otherwise doing anything . . . with others to infringe this patent." Doc. 75 at 55:3–6. But plaintiff might seek to enforce any injunction against DMC, should it work with defendant to import the DG3, in another motion. *Id.* at 55:12–14 (noting that said motion might be brought before this court or "perhaps . . . where [DMC] admits to being subject to that personal jurisdiction"). For purposes of completeness, the court considers whether it could include DMC in injunctive relief.

Relevant guidance from the Federal Circuit encourages a reading of Rule 65(d) that prevents naming DMC in the injunction. *See Additive Controls & Measurement Sys., Inc. v. Flowdata, Inc.* (*Additive Controls I*), 96 F.3d 1390, 1395–96 (Fed. Cir. 1996). In *Additive Controls I*, the court held that, even in light of the language in Rule 65(d), a nonparty having a relationship of the sort specified in subsections (B) and (C) "does not justify granting injunctive relief against the non-party in its separate capacity." *Id.* The Federal Circuit distinguished between "entering an injunction against a non-party, which is forbidden, and holding a non-party in contempt for aiding and abetting in the violation of an injunction that has been entered against a party, which is permitted." *Id.* at 1395. An entity "never made [a party] to the underlying action . . . [that] never had an opportunity to contest the findings of liability" cannot be enjoined or held in contempt with respect to their conduct. *Id.*

Relying on *Additive Controls I*, the District of Delaware recently held that Rule 65(d)'s "active concert or participation" subsection was intended to provide an avenue for *holding in contempt* parties that have assisted an enjoined party in violating an injunction. *Goddard Sys., Inc. v. Gondal*, No. 1:17-cv-01003, 2018 WL 1566570, at *30 (D. Del. Mar. 29, 2018) (citing *Additive Controls I*, 96 F.3d at 1395). Rule 65(d)(2)(C) was meant to allow a nonparty to be "subject to a contempt proceeding and, ultimately, a contempt finding" if the nonparty were "to have engaged in *future* 'active concert and participation' with Defendants that violated any of the terms of any issued injunction." *Id.* at *32 (emphasis added). For these reasons, the court declined to grant a motion for injunctive relief that included non-parties that were alleged successors in interest or in active concert or participation with the defendant, even when they had participated in the injunction hearing. *Id.* at *29, 32.

Even though a potential injunction would not be formally entered against DMC, an injunction could still bind DMC in future contempt proceedings. *Goddard*, 2018 WL 1566570, at *31–32. "Non-parties may be held in contempt . . . if they either abet the defendant, or are legally identified with him." *Id.* at *31 (citing *Additive Controls & Measurement Sys., Inc. v. Flowdata, Inc.* (*Additive Controls II*), 154 F.3d 1345, 1351 (Fed. Cir. 1998)).

Though the parties have not fully briefed whether DMC is "legally identified" with Dometic Corporation, at least some facts have been presented to lead this court to that possible conclusion. As mentioned above, plaintiff argues DMC and Dometic Corporation "identify their employees as a unified entity," "employ common trademarks designed to identify them as a single source," and report financial performance "as a single unit." Doc. 53 at 7. Based on the analysis above, if the court were to enter an injunction against Dometic Corporation, there is a substantial possibility that DMC could be subject to future contempt proceedings if it continued activities within the United States as to which the court found a substantial likelihood of infringement.

- 14 -

### B. Preliminary injunction and TRO

Now, the court moves to the merits of Seakeeper's requests for injunctive relief. "[T]he decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts . . . ." *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 394 (2006). A plaintiff seeking a preliminary injunction must establish (1) that it is likely to succeed on the merits, (2) that it is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in its favor, and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "[A] trial court may . . . deny a motion based on a patentee's failure to show any one of the four factors — especially either of the first two — without analyzing the others." *Jack Guttman, Inc. v. Kopykake Enters., Inc.*, 302 F.3d 1352, 1356 (Fed. Cir. 2002) (citation omitted).

The Federal Circuit reviews the grant or denial of a preliminary injunction under the law of the regional circuit — here, the Third Circuit. *Natera, Inc. v. NeoGenomics Labs., Inc.*, 106 F.4th 1369, 1374 (Fed. Cir. 2024). "However, the Federal Circuit has itself built a body of precedent" applying preliminary-injunction considerations to patent cases, and it "gives dominant effect to Federal Circuit precedent" for patent-specific issues. *Id.* at 1375.

In certain situations where a party faces the possibility of irreparable harm before the court can hold a hearing on the motion for a preliminary injunction, a temporary restraining order may be appropriate to preserve the status quo and prevent such irreparable harm. *See Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers*, 415 U.S. 423, 439 (1974). For plaintiff's TRO motion, the court assesses the four preliminary-injunction factors. *See Nutrasweet Co. v. Vit–Mar Enters., Inc.*, 112 F.3d 689, 693 (3d Cir. 1997); *e.g. CrowdStrike, Inc. v. NSS Labs. Inc.*, No. 1:17-cv-00146, 2017 WL 588713, at *2 (D. Del. Feb. 13, 2017). For judicial efficiency, the court evaluates both motions together.

### 1. Likelihood of success on the merits

To show a likelihood of success on the merits in patent cases, a patentee must show that "(1) it will likely prove infringement and (2) its infringement claim will likely withstand challenges to the validity and enforceability of the patents." *Natera*, 106 F.4th at 1375. Before delving into the merits of the '782 patent, it is appropriate to briefly address the second patent in this case, the '930 patent.

### a. The '930 patent

Initially, plaintiff's infringement arguments and defendant's noninfringement defenses relied on both the '930 patent and the '782 patent. At oral argument, plaintiff clarified that, for purposes of the TRO hearing, it was not relying on arguments that defendant infringed the '930 patent. Doc. 75 at 80. Therefore, only arguments as to the '782 patent will be addressed for the purposes of resolving plaintiff's request for injunctive relief, in line with the parties' representations.

Even if plaintiff did not forgo these arguments, the independent claims of '930 patent describe an enclosure that "contain[s] a below-ambient density gas . . . [that] has a thermal conductivity at least 5 times greater than air." '930 patent at 12:18–21. Defendant argued that the DG3 did not meet this limitation. Doc. 41 at 15. The declaration from defendant's chief engineer clarifies that the DG3's enclosure "contains atmospheric air under below-ambient pressure." Doc. 41-2 at 3. It thus would not meet the below-ambient-density-gas limitation. So the court finds that, on the record as it exists for injunctive relief, plaintiff has not shown a likelihood of success in proving that defendant infringes the '930 patent.

### b. Infringement of the '782 patent

The court now turns to whether plaintiff has shown a likelihood of success on its claim that Dometic's DG3 infringes claim 17 of the '782 patent. The parties dispute only one limitation of the '782 patent:

wherein . . . the second vanes are configured such that that heat *can be readily transferred* from the second vanes *to the exterior of the enclosure.*

'782 patent at 11:28–33 (emphases added). Defendant argues that the DG3 does not meet this limitation because it is "designed to avoid the transfer of heat from the stationary fins to the exterior of the enclosure." Doc. 46 at 15. It claims that the distinction between the patent's passive cooling method of transferring heat across vanes and to the atmosphere, as opposed to DG3's active coolant loop, means that the DG3 does not practice the '782 patent's disputed limitation.

The court begins with the meaning of "exterior of the enclosure." Defendant asks the court to define the term "exterior" to mean the gyroscope enclosure's outside *surface*. That view comports with patent claim language describing the exterior as something that air-cooled fins can be mounted upon, to promote faster heat transfer to the atmosphere. *See* Doc. 41 at 16 (discussing the DG3's "components mounted on the exterior"). Plaintiff defines the term "exterior of the enclosure" more broadly as any area not inside the enclosure, such that the term encompasses all situations where heat is "removed from the interior of the device." Doc. 62 at 8.

Resolving that dispute requires a preliminary claim construction. "In deciding a motion for preliminary injunction in a patent infringement case, a court may issue tentative claim constructions and may base its resolution of the preliminary injunction upon those tentative constructions." *Symbol Techs., Inc. v. Janam Techs. LLC*, 729 F. Supp. 2d 646, 651 n.1 (D. Del. 2010) (citing *Jack Guttman*, 302 F.3d at 1361). These tentative constructions need not be definitive at the preliminary-injunction stage and may be subject to change. *Sofamor Danek Grp., Inc. v. DePuy-Motech, Inc.*, 74 F.3d 1216, 1221 (Fed. Cir. 1996); *Jack Guttman*, 302 F.3d at 1361.

The court finds more support for defendant's limited reading of "exterior of the enclosure"—such that the claim requires a

transfer of heat to the enclosure's outside surface. Claim 19, for example, claims a heat sink with "air-cooled fins on the exterior of the enclosure." '782 patent at 12:20–21. For this to be possible, the fins must be affixed to a physical structure. The air-cooled fins cannot be "on" the atmosphere outside of the enclosure generally—they must be affixed to the enclosure's outside surface. Similarly, language elsewhere within the '782 patent describes air "passing across the warm exterior *surface*." *Id.* at 2:32–33. This evinces the patent drafter's intent that "exterior" involves the tangible outer surface of the flywheel's enclosure.

Plaintiff is broadly correct that the presence of a dependent claim is evidence of an independent claim's broader scope, *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005), and that it is impermissible to read limitations in the specification into the patent claims, *Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1342 (Fed. Cir. 2013). But intrinsic evidence shines light on the drafter's meaning of claim terms. *Phillips*, 415 F.3d at 1315 ("[T]he specification . . . is the single best guide to the meaning of a disputed term."). Here, it is reasonably likely that the "exterior of the enclosure" refers to its outer surface. The court adopts this meaning as its preliminary construction of the term.

At the same time, this claim limitation does not mandate that *all* heat be transferred from the second vanes to the exterior of the enclosure—rather, the limitation discusses heat transfer in a permissive sense. By requiring that "heat *can* be readily transferred," plaintiff's patent covers all embodiments except those where the vanes are structured such that heat *cannot* be readily transferred to the exterior of the enclosure. As discussed below, the DG3 is not a device that makes heat transfer to the device's exterior impossible.

Crediting plaintiff's characterization of how the DG3 works, the second vanes in some locations are in physical contact with thermally conductive material that comprises the enclosure, including its outer surface. *See* Doc. 41-2 at 4 (showing a gray second vane maintaining some contact with a teal outer enclosure). The

court also credits plaintiff's preliminary statement that the DG3 enclosure is thermally conductive, likely as a metal to withstand the intense revolutions per minute of the flywheel. Doc. 75 at 106 ("[The DG3's enclosure] is made of metal . . . ."). Although a significant amount of heat is removed through the DG3's coolant loops, defendant's diagram of the DG3 device makes it reasonably likely that at least some heat is transferred through metal-on-metal contact with the exterior surface of the enclosure. *See* Doc. 41-2 at 8 (explaining that the DG3 "us[es] this type of active cooling system to minimize"—not eliminate—"heat transfer to the enclosure").

Therefore, even if the court defines the exterior to mean the enclosure's outer surface, the second vanes are still configured so that at least some heat can be transferred from the vanes through the metal enclosure to its outside surface. The DG3's coolant loop may prevent some—or even most—of the heat from reaching the device's exterior surface itself, as opposed to passing through that surface in the heated coolant. But the DG3 does not appear designed to ensure that *no* heat can readily reach the exterior surface of the flywheel's enclosure. Plaintiff has thus demonstrated a substantial likelihood that the DG3 infringes the disputed limitation.

Having reviewed the remainder of plaintiff's arguments toward the non-disputed limitations of the '782 patent, Doc. 9 at 12–14, the court concludes that plaintiff has shown that it is more likely than not, and thus substantially likely, that the DG3 device infringes the '782 patent. *See Trebro Mfg., Inc. v. Firefly Equip., LLC*, 748 F.3d 1159, 1166 (Fed. Cir. 2014).

### c.  Validity of the '782 patent

The court thus moves to the second question: whether plaintiff has demonstrated that the patent will likely withstand challenges to its validity. *Natera*, 106 F.4th at 1375. "[I]f the accused infringer presents a substantial question of validity, i.e., asserts an invalidity defense that the patentee cannot prove lacks substantial merit, the preliminary injunction should not issue." *BlephEx, LLC v. Myco Indus., Inc.*, 24 F.4th 1391, 1399 (Fed. Cir. 2022)

(quotation marks omitted) (citing *Genentech, Inc. v. Novo Nordisk*, 108 F.3d 1361, 1364 (Fed. Cir. 1997)). At this preliminary-injunction stage, defendant need not show by "clear and convincing evidence" that plaintiff's patents are invalid. *Id.* It need only show that "there is a substantial question of validity despite the presumption of patent validity . . . such that [plaintiff's] likelihood of success is in question." *Id.*

Defendant argues that the '782 patent is invalid as obvious. "An analysis of obviousness must be based on several factual inquiries: (1) the scope and content of the prior art; (2) the differences between the prior art and the claims at issue; (3) the level of ordinary skill in the art at the time the invention was made; and (4) objective evidence of nonobviousness, if any." *In re Kubin*, 561 F.3d 1351, 1355 (Fed. Cir. 2009) (citing *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966)). Objective evidence of nonobviousness includes "commercial success enjoyed by devices practicing the patented invention, industry praise for the patented invention, copying by others, and the existence of a long-felt but unsatisfied need for the invention." *Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1052 (Fed. Cir. 2016).

### i. Prima facie case of obviousness

Defendant argues that four pieces of prior art, when combined, raise a substantial question of obviousness. As its base reference, defendant cites the Adams publication: a published patent application by the co-inventors of the '782 patent. Doc. 46 at 17. The Adams publication describes a "gyroscopic roll stabilizer for a boat." Doc. 46-7 at 2. It discloses a flywheel (16) that is supported by bearings (20) and contained within a below-ambient pressure enclosure (30). *Id.* at 13, 15. It also recognizes a need for a cooling device, but it does not disclose that device. *Id.* at 13 ¶ 47.



**Adams publication, fig. 5**

Missing from the Adams publication is a mention of the vane structure of the '782 patent that could assist with cooling. For this solution, defendant cites the Sibley publication. Doc. 46-8. Sibley discloses a flywheel contained within a vacuum enclosure. *Id.* at 32–33. This vacuum enclosure contains, in one embodiment, first cooling fins (438) and second cooling fins (440) shown to be interleaved. *Id.* ¶ 142. These cooling fins work with cooling fins on the exterior of the embodiment (452) to "dump the heat generated within [the] vacuum enclosure" through the structure of the vacuum enclosure. *Id.* ¶ 144.



**Sibley publication, fig. 4**

A similar invention is taught in the Jäger publication, but Jäger employs cooling fins (12, 13) around a rotating shaft. Doc. 46-9 at 2. These fins enable "the friction heat generated on the inner rings of the ball bearings [to] be dissipated." *Id.* at 4:5–7. This shaft is also designed for "high rotational speeds." *Id.* at 2:5.



**Jäger publication, fig. 1**

These fins are missing some of the characteristics of the vanes in the '782 patent. That patent requires that the first and second vanes take cylindrical forms and extend in opposite directions that are parallel to the "axial direction," or the "axis of rotation about which the spinning member spins." '782 patent at 11:12–27.

This is where a fourth piece of prior art, the Bimshas patent, fills in the gaps. Bimshas describes a "rotatable finned heat transfer device" that comprises a "plurality of equally spaced concentric cylinders." Doc. 46-10 at 2:5–6, 2:38–39. These cylinders have first fins (12) and second fins (16) that are interleaved and rotate in relative directions. *Id.* at 2:13–37. These cylinders serve "to transfer heat from a heat source to a relatively rotating heat sink." *Id.* at 1:9–10.



**Bimshas patent, fig. 1**

In short, all of the limitations of the '782 patent are present in the prior art. That moves the obviousness analysis on to analyzing the motive to combine these elements in the manner claimed.

"[A]ny need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 420 (2007). "One skilled in the art would naturally look to prior art addressing the same problem as the invention at hand . . . ." *In re ICON Health & Fitness, Inc.*, 496 F.3d 1374, 1380 (Fed. Cir. 2007). In *In re ICON*, for example, the Federal Circuit held that a patent for a "dual-action spring" that "partially supports the weight of the bed in both the closed and open positions" was analogous art for a patent application that sought to claim "a gas spring to assist in stably retaining [a treadmill] base in the upright position." *Id.* at 1377–78. The court held that "analogous art" could come from "any area describing hinges, springs, latches, . . . or other similar mechanisms." *Id.* at 1380. Further, because the folding-bed patent addressed a similar problem of counterbalancing a folding weight as it opens and closes, the prior art "[went] a long way towards demonstrating a reason to combine the two references." *Id.*

The same is true here. The Adams publication explicitly identified a problem and a need for a "[p]rovision for cooling the flywheel bearings" that "may be necessary at very high tip speeds."

Doc. 46-7 at 13. Sibley, Bimshas, and Jäger are designed to solve the same Adams-publication problem that the Seakeeper patent aims to address: "transferring heat away from heat generating components . . . that support and drive rotating machinery *such as* flywheels." '782 patent at 2:20–23 (emphasis added); *see* Doc. 46-8 at 33 ¶ 144 (Sibley describing the "required convection cooling to ambient air needed to dump the heat generated within [a] vacuum enclosure" surrounding a flywheel); Doc. 46-9 at 3–4 (Jäger describing the problem of "friction heat generated on the inner rings of ball bearings" for a shaft that is "rotatably mounted in a housing"); Doc. 46-10 at 5:1 (the Bimshas patent being designed "to transfer heat from a heat source to a relatively rotating heat sink . . . without the disadvantages of [a] fan and blower").

Regardless of whether these pieces of prior art supported flywheels designed for boat stabilization as opposed to energy storage, the heat-dissipation problem is the same. A person of ordinary skill in the art would have looked to solutions for heat buildup in relatively rotating systems and would have a reason to combine Adams with Sibley, Jäger, and Bimshas to produce the solution that the Seakeeper patent claims. This provides a very strong showing that there is a substantial question of whether plaintiff's patent is prima facie obvious.

To rebut defendant's obviousness arguments, plaintiff points out small differences between the patents. First, plaintiff argues that the Sibley publication described a heat sink for use in dissipating heat within an energy-storage flywheel, as opposed to a flywheel for boat stabilization. This, plaintiff argues, would prevent a person of ordinary skill in the art from being "motivated to incorporate Sibley's cooling design" or from having a reasonable expectation of success. Doc. 53 at 10. Because Sibley is directed to solve the problem that Adams specifically identified, as explained above, this argument is not persuasive.

Plaintiff next argues that a person of ordinary skill in the art would not have combined Jäger because it depicts fins at the midpoint of the shaft and along the length of the shaft. Doc. 57 ¶ 30.

- 24 -

Plaintiff argues that the tight tolerances of the Jäger device would not permit any modification of the fins. Doc. 62 at 11.

There is at least a substantial possibility a person of ordinary skill in the art would look to modify Jäger by placing the fins closer to the heat-generating elements, i.e., the bearings, in flywheels. Given the substantial weight required in the middle of the flywheel to achieve its stabilization purpose, there is more space at the ends supporting the flywheel to include cooling improvements. Including fins at only the heat-generating ends is not the type of arrangement that would have unexpected performance benefits. *See KSR*, 550 U.S. at 416 (stating that nonobviousness is supported when "the elements worked together in an unexpected and fruitful manner"). Instead, it is a common-sense modification to solve the problems of the Seakeeper patent's particular application. *See id.* at 421 ("If [a choice among finite and predictable solutions] leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense.").

Next, plaintiff argues that the Bimshas and Jäger references use a pressurized environment instead of a vacuum. Doc. 62 at 10–11. Bimshas identifies a need to reduce thermal impedance by introducing a thermally efficient gas such as helium that "could be provided" under pressure. *Id.* at 10. Jäger also claims that the space between the two vanes could be filled with "air or another gas." Doc. 46-9 at 4:47. The possibility that helium, or another below-ambient density gas, could be introduced under pressure in the prior art is not enough to show that a person of ordinary skill in the art would not have had a reason to combine Jäger and Bimshas with the existing prior art.

The same is true with the fact that Bimshas identified rotating gimbals as a possible application for the invention. Doc. 46-10 at 1:22. The Bimshas patent is broader than that—it simply seeks to transfer heat from a heat-generating source to a relatively rotating heat sink. *Id.* at 1:9–10. Further, the reason to combine Bimshas comes from its cylindrical fin geometry, not its rotating gimbals or its pressurized environment. Doc. 46 at 17–18. There is at least

a substantial likelihood that a person of ordinary skill in the art would isolate the improvement of cylindrical vanes and recognize that these vanes could be combined with a high-speed rotating flywheel within a low-pressure environment. Doc. 46-4 at 57. For the same reasons, the court also finds unpersuasive plaintiff's argument that the speeds of the Bimshas device would render it inoperable for use in flywheels due to the pressurized environment. Doc. 57 ¶ 34.

With the above considerations in mind, defendant has put forth enough evidence to show, prima facie, a substantial question of patent validity. This is especially true when considering that the parties have not had the assistance of expert testimony.

### ii. Secondary considerations

The court now considers plaintiff's discussion of secondary considerations in an attempt to rebut defendant's prima facie showing of obviousness. Evidence of secondary considerations can include commercial success, long-felt but unsolved need, failure of others, and unexpected results. *See Graham*, 383 U.S. at 17–18. "Although secondary considerations must be taken into account, they do not necessarily control the obviousness conclusion." *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1372 (Fed. Cir. 2007). "In order to accord substantial weight to secondary considerations in an obviousness analysis, the evidence of secondary considerations must have a 'nexus' to the claims, i.e., there must be a legally and factually sufficient connection between the evidence and the patented invention." *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373 (Fed. Cir. 2019) (cleaned up).

Plaintiff argues that the Seakeeper gyroscope "solved a long-felt need, overcame industry skepticism, produced unexpected results, enjoyed substantial commercial success and was copied by Dometic." Doc. 30 at 16–17. Defendant challenges that plaintiff has demonstrated the required nexus. Doc. 46 at 18–19.

The court thus turns to plaintiff's cited evidence for secondary considerations. Plaintiff's declarant explains that control moment gyroscopes before the introduction of Seakeeper's devices

- 26 -

were unusually large and heavy and were limited to large vessels. Doc. 11 at 5. They were also exposed in the open and subject to air resistance, leading to larger power consumptions. *Id.* Solving these problems required innovative cooling methods. *Id.* at 7. Seakeeper's devices seem to have been the first commercially viable devices to fill that need. Doc. 30 at 9 ("Seakeeper's invention made stabilization viable for vessels of all sizes at rest or low speed, solving a long-standing need.").

There also was an initial skepticism in the marine industry toward these gyroscopes. Plaintiff notes that it spent a substantial amount on marketing efforts to educate potential purchasers of its new gyrostabilizer product. *Id.* at 10. These efforts, plaintiff claims, led to widespread adoption of its devices. *Id.* at 9.

Seakeeper also claims that it has had a significant amount of commercial success. For example, it states that the company's revenue has grown significantly, in both revenue and unit sales, over the lifetime of its patents. *Id.* at 10. It connects this performance to the "patented innovative cooling system," which "has been recognized through various awards." *Id.*; *see also* Doc. 13 at 8–9 (describing that the "Seakeeper 1" and "Seakeeper 2" devices have both received industry awards). Plaintiff also claims that the "Seakeeper" is "recognized as the 'Kleenex' or 'Xerox' of boat stabilization." Doc. 9 at 10.

With these considerations in mind, plaintiff argues that, because the device as it was commercialized (involving high speeds for smaller marine vessels) would have been impossible without the patented invention, that provides all the nexus needed. Doc. 53 at 14. In the court's view, however, because claim 11 only requires that heat *can* be transferred, tying market success to this claim becomes more difficult.

After all, some of the Seakeeper devices actually dissipate heat with the assistance of an active cooling system. Doc. 13-1 at 41; *cf.* Doc. 53 at 14 (noting that Seakeeper "expressly features cooling in its promotional materials," some of which include features outside the scope the patented invention). Although the breadth of

claim 11 assists plaintiff in showing a likelihood of success in proving infringement, that same breadth makes it more difficult to determine whether the broad *patented* features, as opposed to the Seakeeper device's improved technical implementations, led to the commercial success of the device.

It is also plausible that this commercial success may have resulted from timing and the state of the economy, or business acumen and marketing efforts. *See* Doc. 9 at 9–10 (describing marketing efforts). While the court does not formally conclude that this was the case, the court believes that there is insufficient proof that Seakeeper's sales "'were a direct result of the unique characteristics of the *claimed invention.*'" *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1246 (Fed. Cir. 2010) (quoting *In re Huang*, 100 F.3d 135, 140 (Fed. Cir. 1996)). This is especially true when the prima facie case of obviousness is strong, as it is here. *Id.*

The court is left with at least a substantial question, if not more, whether plaintiff's patent is no more than "the predictable use of prior art elements according to their established functions." *KSR*, 550 U.S. at 417. So the court concludes that defendant has demonstrated a substantial question of patent validity—a strong possibility that plaintiff's patent is obvious in light of the prior art. Plaintiff's arguments about secondary considerations, while not insignificant, are not strong enough to rebut defendant's strong prima facie showing of obviousness. Accordingly, the court cannot conclude that plaintiff has shown a likelihood of success on the merits. *See BlephEx*, 24 F.4th at 1399.

### 2. Irreparable harm

The court next considers whether plaintiff would be likely to suffer irreparable harm in the absence of injunctive relief. Seakeeper needs to make a "clear showing . . . [of] a likelihood of substantial and immediate irreparable injury." *Apple, Inc. v. Samsung Elecs. Co.*, 678 F.3d 1314, 1325 (Fed. Cir. 2012). Injunctions, a form of equitable relief, are available only when there is no adequate remedy at law. *See N. Cal. Power Agency v. Grace Geothermal Corp.*, 469 U.S. 1306, 1306 (1984) (Rehnquist, J., in chambers)

("A party seeking an injunction from a federal court must invariably show that it does not have an adequate remedy at law."). Plaintiff thus must "clearly establish[] that monetary damages could not suffice." *Abbott Labs. v. Andrx Pharms., Inc.*, 452 F.3d 1331, 1348 (Fed. Cir. 2006).

Because the allegedly infringing DG3 will begin shipping soon if it has not already, plaintiff argues that it will suffer irreparable harm from a loss of market share, price erosion, and peril to future research and development. Doc. 30 at 18–24; *see also Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012) (noting "[p]rice erosion, loss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm"). Plaintiff certainly establishes that it will encounter some harm without injunctive relief. But the court is not convinced that this harm is irreparable in the eyes of the law.

It is important to begin the irreparability discussion by noting that plaintiff's patents will expire in less than two years. The court acknowledges plaintiff's arguments that a short remaining patent term might tip the equities toward the plaintiff. Doc. 30 at 21 (citing *H.H. Robertson, Co. v. United Steel Deck, Inc.*, 820 F.2d 384, 391 (Fed. Cir. 1987), *overruled on other grounds*, *Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995)). *H.H. Robertson* says that "the *equities* weigh heavily against the wrongdoer" when the "patent does not have many more years to run." 820 F.2d at 391 (emphasis added). Excluding a defendant's potentially infringing conduct for one year is not as burdensome as doing so for years and years of litigation.

But this court doubts the assertion that a shortened remaining patent term supports a finding of *irreparability*. The hypothetical monetary value of plaintiff's patent (i.e., market value resulting from plaintiff's ability to exclude) is approaching its end. This shorter remaining period of exclusivity means that the unrealized revenue resulting from the patent is quickly diminishing. The remaining benefits of the patent monopoly, from entrenched customer bases to complementary product lines, are nearing their

natural end and reaching the balance set by Congress in defining the patent term. That these benefits are nearing their end also puts them within the realm of quantifiability. *See ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1339 (Fed. Cir. 2012) (holding that a district court erred when it found "clearly quantifiable" losses to support a finding of irreparable harm).

As to the alleged harms, plaintiff notes that it will lose its current hold of a substantial portion of the gyroscopic-stabilizer market share. Doc. 30 at 20. "[A] district court's reliance on possible market share loss would apply in every patent case where the patentee practices the invention." *Nutrition 21 v. United States*, 930 F.2d 867, 871 (Fed. Cir. 1991). But when the defendant is a "large and financially responsible company" that "would be answerable in damages," it is less necessary for this court to utilize the "extraordinary relief of an injunction prior to trial." *Id.*

Here, Dometic Corporation is exactly the type of company that would be financially responsible and answerable in damages. *Cf. Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1152 (Fed. Cir. 2011) (determining that harm was irreparable when the plaintiff submitted evidence that the defendant posed a "[m]oderate risk of severe financial stress, such a bankruptcy, over the next 12 months"). Defendant has relatively high revenue. Doc. 30 at 25. And defendant agrees that the Dometic companies would be fit to pay a monetary judgment if plaintiff ultimately succeeds on the merits after a trial. Doc. 75 at 68–69.

Further, any loss of market share seems to be readily quantifiable. Plaintiff attempts to quantify the portions of its business that are threatened by the DG3's entry into the marketplace. *See* Doc. 53 at 13 (noting that the DG3 only competes with a quarter of plaintiff's overall sales); Doc. 12 at 3 (quantifying the number of boat designs that would fit the DG3 and the amount of time the DG3 would affect plaintiff's sales). This is true even in light of the multi-year lock-in effect that boat manufacturers might have with gyrostabilizer producers. Doc. 9 at 19. Such lock-in will also begin occurring in two years, regardless.

The court is of the opinion that, with the assistance of damages experts, monetary damages can be assessed to make plaintiff whole if liability is ultimately found. Therefore, plaintiff's harm is the type of harm that "can be rectified." *Robert Bosch*, 659 F.3d at 1152.

Plaintiff also alleges that it will suffer "ecosystem effects" by losing downstream revenues from trade-ins, replacement parts, and extended warranties. Doc. 9 at 20. The court is not persuaded that these harms are of the type that would be difficult to quantify, especially given plaintiff's existing attempt to quantify the damages. Doc. 12 at 9–10, 14 (attempting to quantify threatened revenue from lost original equipment manufacturer model sales and lost sales of future and complementary[4] products). Pairing this consideration with the short remaining life span of the Seakeeper patents, these potential damages are not the type that "may have a far-reaching impact on [plaintiff's] future revenues." *Apple Inc. v. Samsung Elecs. Co.*, 809 F.3d 633, 645 (Fed. Cir. 2015). Potential losses to plaintiff's customer network in the near future can similarly be quantified.

Next, the court addresses harms to plaintiff's research and development opportunities. Plaintiff attempted to estimate the damages caused by having to reposition its products and prioritize different products in response to the announcement of the DG3. Doc. 12 at 10. Thus, it seems that these harms are also quantifiable. But plaintiff also speaks of product design changes in the *past tense. See id.* at 11 (describing the "resulting disruption to Seakeeper's launch timeline" that the DG3's debut caused). The court is not aware of any factual showing that, should injunctive relief be awarded, plaintiff would restart its former plans that were disrupted. Plaintiff thus has not convinced the court that injunctive relief would provide any redressability for these alleged

---

[4] Though plaintiff maintains that it has other products that are intended to be complementary, Doc. 30 at 21, its evidence also seems to contradict that point. *See* Doc. 13-1 at 145.

research and development harms, irreparable or not. Doc. 11 at 20 (noting harms "may well never be recovered").

Plaintiff's arguments regarding price erosion encounter similar problems. A significant portion of plaintiff's supposed price-erosion harms have already occurred. Doc. 9 at 21–22; *see also Apple*, 809 F.3d at 652 (Reyna, J., concurring) (citing *United States v. Or. State Med. Soc.*, 343 U.S. 326, 333 (1952)) ("injunctive relief addresses future harms and the past is only relevant as an indicator of the future"). And, to the extent future price might still be affected by collective bargaining or purchasing cooperatives, the court agrees with defendant that such evidence is too speculative. Doc. 41 at 22; *see also SmartSky Networks, LLC v. Gogo Bus. Aviation, LLC*, No. 2023-1058, 2024 WL 358136, at *5 (Fed. Cir. Jan. 31, 2024) ("In previous cases, we have required concrete evidence of reduced price to find price erosion.").

Even if there was a threat of irreparable harm, plaintiff fails to demonstrate that a substantial part of the harm is due to practicing the patented features of the Seakeeper products. As defendant argues, Seakeeper's products employ other commercially desirable features such as active gyroscope monitoring and tilt control. Doc. 41 at 23; Doc. 13-1 at 42. Plaintiff's materials show that at least some models also use an active glycol and seawater combination to dissipate the heat, which, though used in conjunction with the patented features, may provide the primary commercial desirability. Doc. 13-1 at 41. Put differently, it is more than possible that harm incurred by plaintiff arising from DG3's entry into the marketplace may arise from the device's non-patented features.

Although plaintiff makes some showing of the difficulties of quantifying its damages, the court must balance and weigh those difficulties against the likelihood of success. On balance, this is a case where a damages award is available, and defendant would be able to fulfill a damages award. These damages, especially given the limited time remaining on the patents, are calculable with the aid of expert discovery. Other harms are either too speculative to form the basis of an injunction or past harms for which injunctive

relief is inappropriate. Thus, the court concludes plaintiff has not shown that the absence of a preliminary injunction or TRO would cause plaintiff to incur irreparable harm.

### 3. Balance of the equities

Plaintiff offers a few points to convince the court that the balance of the equities tips toward granting the injunction. First, it claims that Dometic has a broad product line aside from the DG3. Doc. 9 at 24. But the parties represented at oral argument that Dometic's DG3 largely competes with the SK3 and SK4 products, meaning Seakeeper has other models designed for differently sized boats that are not affected by DG3's entry into the marketplace. *See* Doc. 75 at 109; Doc. 46 at 21. Second, plaintiff claims in its injunction motion that defendant has not yet shipped its product, which would favor plaintiff's equities. Doc. 9 at 24 (citing *Impax Labs., Inc. v. Aventis Pharms., Inc.*, 235 F. Supp. 2d 390, 396 (D. Del. 2002)). However, at oral argument, the parties represented that a few units had been shipped before the lawsuit began. Doc. 75 at 67. More have likely been shipped since. *Id.*

Plaintiff argues that flexibility remains for Dometic to eliminate the infringing cooling technology from the design. Doc. 30 at 25. Even in light of defendant's proposed redesigns (which plaintiff has not yet agreed are noninfringing), Doc. 67 at 1, the court is not convinced that a redesign would constitute "a non-infringing alternative which [defendant] could easily deliver to the market" that would sway the equities in plaintiff's favor. *Douglas Dynamics*, 717 F.3d at 1345; *see also supra* subsection II.A.1 (discussing the suspected difficulties of a redesign at this stage).

In balancing the equities, the court must still consider the harm of a possible injunction to defendant. Dometic would encounter the same loss of economic opportunity that plaintiff alleges if this court enjoined it from launching its DG3 product. Should plaintiff ultimately not prevail on the merits of its suit, defendant would have incurred similar irreparable harm if enjoined.

The court must weigh these equities against the likelihood of success. A damages award is available, and defendant appears to

be solvent. As mentioned above, there are no financial impediments to a potential damages award being paid, and defendant's strong sales figures bolster the conclusion that, if infringement is ultimately found, plaintiff will be able to be made whole by monetary damages. Therefore, the court does not find that the equities tip in favor of granting injunctive relief here.

### 4. Public interest

The court addresses the public interest only briefly, as the discussion largely tracks the merits of the dispute. "[T]here are competing—and substantial—public interests at stake on both sides of this litigation." *The Rsch. Found. of State Univ. of N.Y. v. Mylan Pharms. Inc.*, 723 F. Supp. 2d 638, 663 (D. Del. 2010) (quoting *Sanofi-Synthelabo v. Apotex Inc.*, 488 F. Supp. 2d 317, 321 (S.D.N.Y. 2006)). Plaintiff is correct that there is a strong public interest in protecting valid patents. *See id.* But there is little public interest in enforcing, at the preliminary-injunction stage, rights to a patent to which a substantial question of validity has been raised. *See United States v. Glaxo Grp. Ltd.*, 410 U.S. 52, 69 (1973) (Rehnquist, J., dissenting) ("For when a patent is invalid, the public parts with the monopoly grant for no return, the public has been imposed upon and the patent clause subverted." (cleaned up)). Therefore, the court is not convinced that an injunction would be in the public interest.

## III. Conclusion

Dometic Corporation is a proper party, and the parties' dispute is not moot. But plaintiff has not shown a sufficient likelihood of ultimate success on the merits in light of defendant's demonstration of a substantial question as to the '782 patent's obviousness. Further, although some cognizable harm might result from the absence of an injunction, that harm is not irreparable in money damages at the end of the case. Finally, neither the balance of the equities nor the public interest tips the result in favor of an injunction. For those reasons, plaintiff's TRO and PI motions (Docs. 8, 29) are denied.

*So ordered by the court on July 7, 2025.*

J. CAMPBELL BARKER
United States District Judge