1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF DELAWARE
2

3

4    SEAKEEPER, INCORPORATED,        )
                                     )
5              Plaintiff,            )    C.A. No. 25-0484-JCB
                                     )
6         -vs-                       )
                                     )
7    DOMETIC CORPORATION,            )    Tyler, Texas
                                     )    2:02 p.m.
8              Defendant.            )    May 28, 2025

9

10

11

12

13

14                 TRANSCRIPT OF MOTION HEARING
            BEFORE THE HONORABLE JOHN CAMPBELL BARKER
15                 UNITED STATES DISTRICT JUDGE

16

17

18

19

20

21

22

23

24

25

1                          A P P E A R A N C E S

2

3    FOR THE PLAINTIFF:

4    MR. ERIC H. FINDLAY
     FINDLAY CRAFT, PC
5    7270 Crosswater Avenue, Suite B
     Tyler, TX 75703
6
     MR. THOMAS L. DUSTON
7    MR. RAYMOND R. RICORDATI, III
     MR. MARK H. IZRAELEWICZ
8    MARSHALL, GERSTEIN & BORUN LLP
     600 Willis Tower
9    233 South Wacker Drive
     Chicago, IL 60606
10
     MR. STEVEN J. FINEMAN
11   RICHARDS, LAYTON & FINGER, PA
     One Rodney Square
12   Suite 600
     920 North King Street
13   Wilmington, DE 19801

14
     FOR THE DEFENDANT:
15
     MR. BRIAN A. BIGGS
16   ASHBY & GEDDES
     500 Delaware Avenue
17   8th Floor
     Wilmington, DE 19801
18
     MR. OLEG KHARITON
19   DINSMORE & SHOHL LLP
     255 East Fifth Street
20   Suite 1900
     Cincinnati, OH 45202
21

22   COURT REPORTER:          MS. SHEA SLOAN, CSR, RPR
                              FEDERAL OFFICIAL COURT REPORTER
23                            211 W. Ferguson
                              Tyler, TX 75702
24
     Proceedings taken by Machine Stenotype; transcript was
25   produced by computer-aided transcription.

<pre>
 1                    P R O C E E D I N G S

 2            (CALL TO ORDER OF THE COURT.)

 3            THE COURT:  Please be seated.

 4            Good afternoon.  Could I have counsel please make

 5   their appearances?

 6            MR. FINDLAY:  Good afternoon, Your Honor.  Here on

 7   behalf of the Plaintiff, Seakeeper, Eric Findlay.

 8            Also with me at counsel table from the Marshall

 9   Gerstein firm, Mr. Thomas Duston, Raymond Ricordati, and Mark

10   Izraelewicz.  And also, on my side, Mr. Steven Fineman from

11   the Richards Layton firm in Delaware.

12            And, Your Honor, we are pleased to have three

13   representatives from Seakeeper here with us today, Mr. Andrew

14   Semprevivo, the CEO of Seakeeper; Mr. Will Cimino, our chief

15   commercial officer; and Mr. Nick Troche, our chief technology

16   officer.

17            And on behalf of all of us, Your Honor, we would

18   like to thank the Court for its welcoming today and

19   appreciate the opportunity to be here.  Thank you.

20            THE COURT:  All right.  Thank you, Mr. Findlay.

21            And for the Defendant?

22            MR. BIGGS:  Good afternoon, Your Honor.  Brian

23   Biggs from Ashby & Geddes in Delaware.  With me at counsel's

24   table is Oleg Khariton from Dinsmore & Shohl on behalf of

25   Defendant, Dometic Corporation.
</pre>

 1          And with Your Honor's indulgence, Mr. Khariton will

 2   be providing argument today.

 3          THE COURT:  All right.  Very well.  Well, thank you

 4   to you as well.

 5          I think we will proceed in something like the

 6   standard oral argument format where we let the movant go

 7   first, and you can just walk me through your arguments, and I

 8   will jump in as I have questions.  I do have a couple, but I

 9   will let you get to those points in your argument before I

10   jump in.

11          So who will be arguing?  Is that you, Mr. Findlay,

12   or --

13          MR. DUSTON:  Mr. Duston, Your Honor.

14          THE COURT:  Mr. Duston.

15          All right.  You may proceed.

16          MR. FINDLAY:  May we hand up some slides,

17   Your Honor?

18          THE COURT:  Yes.

19          MR. FINDLAY:  How many copies would the Court like?

20          THE COURT:  Two copies for the Court, please.  And

21   you are also free if you want to hook up your laptop, if you

22   have an HDMI, I think you can display them.

23          MR. FINDLAY:  I think we are set up.  Thank you,

24   Your Honor.

25          May we approach?

```
 1              THE COURT:  Yes.

 2              (Binders distributed.)

 3              THE COURT:  Can I ask one question off the bat,

 4   Mr. Duston?

 5              MR. DUSTON:  Yes, Your Honor.

 6              THE COURT:  As I was reviewing the technology,

 7   essentially it is using the high-speed gyroscope to control

 8   the roll of a ship.  The patents refer to controlling the

 9   roll, but as I was just thinking through how this all works

10   physically, doesn't a gyro -- wouldn't a gyroscope that is

11   mounted vertically also control the pitch of the ship and not

12   just the roll?  And is there a reason why it controls only

13   the roll?

14              MR. DUSTON:  It is possible to control the pitch as

15   well, Your Honor, but the -- my understanding of the

16   technology is that the gyroscope is -- has a flywheel that is

17   spinning in this direction (indicating), and it is in an

18   enclosure that is mounted on the sides on gimbals that allow

19   the enclosure to move forward and back.

20              So it allows --

21              THE COURT:  Okay.

22              MR. DUSTON:  -- for the pitch front and back --

23              THE COURT:  Okay.

24              MR. DUSTON:  -- but resists the side-to-side

25   motion.
```

1          THE COURT:  It is only mounted rigidly to the ship

2     in a lateral orientation.

3          MR. DUSTON:  That's correct, Your Honor.

4          THE COURT:  Okay.  Okay.  I will let you proceed.

5          And if you have any demonstratives to hand up, like

6     a gyroscope --

7          MR. DUSTON:  They are a bit heavy, Your Honor.

8          THE COURT:  I imagine.

9          MR. DUSTON:  I'm not sure I could have gotten one

10    in the courtroom.

11         All right.  I see that the slides are up.

12         All right.  May it please the Court, Your Honor.

13    Thomas Duston on behalf of the Plaintiff, Seakeeper.

14         Let me just give the Court a bit of background

15    about Seakeeper.

16         Seakeeper was founded in 2003 by "Shep" McKenney

17    and Naval architect, John Adams, who each had an idea for the

18    solution to the rolling motion that, particularly, small

19    craft endured as a result of wave action.

20         THE COURT:  And they have these on big cruise

21    ships, right?

22         MR. DUSTON:  They do have them on big cruise ships.

23         THE COURT:  Yeah.

24         MR. DUSTON:  But the key to this particular

25    invention, Your Honor, is really its ability to scale down

1    for the smaller craft.

2         THE COURT:  Yeah.

3         MR. DUSTON:  Which didn't have this ability to

4    resist the pitch and roll.  And, you know, obviously, it is

5    an uncomfortable situation for people who are boating, and

6    this really revolutionized, particularly, the smaller craft.

7         These two gentlemen developed this gyrostabilizer.

8    Essentially, this is, you know, the quintessential garage

9    invention by two individuals operating in the Solomons

10   Islands, Maryland, to come up with this idea, and ultimately

11   filed for a patent on this particular cooling technology in

12   2006 which ultimately resulted in what we call the '782

13   patent.

14        They launched their first commercial gyroscope --

15   gyrostabilizer, rather, in 2008 called the M7000.  And since

16   2008, Your Honor -- and I should probably pause here.  I

17   don't know whether this is a public hearing, if it going out

18   over the airwaves or not, but we do have some confidential

19   information that may be coming up.

20        THE COURT:  Let's see, it is not being broadcast.

21   If -- there is a transcript being taken, so if you would like

22   to move to seal anything, then we can provisionally seal the

23   transcript to allow your side time to submit any redactions.

24        MR. DUSTON:  I would be -- that would be very

25   welcome, Your Honor, and I'm sure that the Defendant would

1    probably concur in that request as well.

2            THE COURT:  Yeah, this is an open hearing.  So if

3    there is anyone that walks in or that you see, of course.

4            MR. DUSTON:  I believe everyone here, although I

5    don't know the folks in the back of the room there, but --

6            THE COURT:  Okay.  Well, I don't think I can seal

7    the whole hearing, so --

8            MR. DUSTON:  Understood, Your Honor.

9            THE COURT:  -- if you want to just refer to

10   anything in your filings which are sealed.  I have read all

11   of your filings.

12           MR. DUSTON:  All right.

13           THE COURT:  But it will recall it to mind.

14           MR. DUSTON:  I don't think I'm going into anything

15   here that necessarily requires sealing the courtroom,

16   Your Honor.

17           THE COURT:  Okay.

18           MR. DUSTON:  But getting back to the story of

19   Seakeeper, Your Honor.  ████████████████████████████

20   ███████████████████████████████████████

21   ███████████████████████████████████████

22   ███████████████████████████████████████

23   ██████████

24        ████████████████████████████████████

25   ██████████████████████████████  And their product

1    has become -- what was once a luxury, has now become a

2    must-have for these -- for these particular boats,

3    Your Honor.

4           Now, the invention has to do with the unique

5    problems that arise with regard to vacuum-enclosed flywheel

6    geo stabilizers (sic).  That was the idea that Mr. Adams and

7    Mr. McKenney came up with before 2006, and the reason for the

8    movement to vacuum enclosure was that prior to their

9    invention, while there were marine flywheel stabilizers, as

10   Your Honor has commented, they tended to be for very large

11   ships.  And that was because they required tremendous space,

12   they weighed a ton, and they drew a tremendous amount of

13   power.

14          And that is because they spun in air.  And air

15   causes friction, particularly for the outer surfaces of the

16   flywheel.  That resists its ability to turn quickly.  And so

17   you had to have a bigger flywheel, bigger space, more power,

18   more weight in order to impart the necessary, what's called

19   "N-m-s," which is the forces that are measured to prevent the

20   roll of the ship.

21          Their solution was to put the flywheel into a

22   vacuum enclosure.

23          Now, that was a fantastic solution, but it

24   introduced new problems that had not yet been apparent in

25   these devices until they were put into vacuum enclosures, and

1    that was the thermal challenge that was created by these

2    spinning bearings that were now in a vacuum environment where

3    they could not dissipate their heat through air convection.

4    All right?

5         And more to the point, because these bearings sat

6    between a spinning object and a stationary object, it was

7    relatively straightforward to remove heat from the stationary

8    side because the stationary side had a thermal connection or

9    pathway directly to the outside of the device.

10         But the spinning part was free and was not able to

11    communicate the heat that was generated on its side of the

12    bearings to the outside of the device.

13         Now, various attempts have been made to use

14    liquids, lubricants, oils to coat bearings, to remove heat.

15         The problem, again, is that in a vacuum, these

16    oils, once they reach the temperatures that they would

17    achieve given the speed with which this flywheel was

18    spinning, the oil would vaporize.  And so oil was not a

19    solution.

20         So the solution that the inventors came up with was

21    to mount a set of fins or vanes adjacent to each side of the

22    bearings.  And the vanes could spin with the flywheel because

23    they were cylindrical, and they were oriented in a parallel

24    direction.  They were in a -- parallel to the axis of

25    rotation of the flywheel.

1    And they interleaved with fins that were stationary

2    that could then receive heat from the flywheel bearing side

3    of the equation, and then transmit that heat out of the

4    device to the exterior of the device.

5    And this -- what I just went through is sort of

6    illustrated by these two diagrams.  You can see on the left,

7    Your Honor, is you have what is called a "race," which is

8    sort of a track in which the bearing sits and rotates.

9    THE COURT:  Uh-huh.

10    MR. DUSTON:  And you have a race on either side of

11    the bearing.  And when you have a race on the flywheel side,

12    it is free; it is not connected to anything.  The heat that

13    is generated there is hard to draw off unless you draw that

14    heat off through the bearing and out the other side.

15    But the problem there is that you end up heating

16    the far side of the bearing because you are drawing heat, not

17    only from its heat generating surfaces, but the generating

18    surfaces on the far side.

19    And you have to have a heat differential in order

20    for this to work, which is anathema to these devices because

21    you cannot have heat that is different on one side of the

22    bearing to the other side of the bearing without risking

23    catastrophic failure.

24    THE COURT:  Do the --

25    MR. DUSTON:  So how do you -- I'm sorry,

1  Your Honor.

2         THE COURT:  Just a table-setting question, does the

3  flywheel itself have to be a thermal conductor for this to

4  work, so the heat can travel from the bearings through the

5  flywheel into the rotating fins, or does the heat from the

6  bearings get transported into the rotating fins in another

7  way?

8         MR. DUSTON:  The claim is not specific to that in

9  terms of whether or not -- whether or not the path could be,

10  in part, through portions of the flywheel to the fins or

11  whether -- whether the fins are in direct contact with the

12  bearings race.

13         But the idea here is we have to draw heat off of

14  this moving part, and there is no way to necessarily connect

15  that moving part to anything the way the opposite side of the

16  bearing is connected to the exterior.

17         So we create this interleaved fins, which you see

18  on the right-hand side of the diagram here, in which heat

19  that is generated by the yellow fins that is in contact with

20  this heat generating bearing on the flywheel, can be

21  communicated to stationary fins which then can carry that

22  heat out of the device.

23         THE COURT:  Right.

24         Right.  Well, let me move you a little bit ahead to

25  the claim terms.  I am looking at the '782 patent.

1        And Claim 1's first element requires that the gas

2   in the enclosure be at -- below-ambient pressure or

3   below-ambient density.

4        And I take it your client is relying on the

5   pressure part of that regarding the DG3?

6        MR. DUSTON:  That is correct, Your Honor.  They

7   have a vacuum enclosure similar to ours.

8        THE COURT:  Okay.  So it's a, at least on your

9   view, the facts support a finding that it is a below-ambient

10  pressure gas of air.

11       MR. DUSTON:  That is correct, Your Honor.

12       THE COURT:  I know you thought it was helium at

13  first, and then now there is some evidence that it is air,

14  but either way it is a gas.

15       MR. DUSTON:  We have chosen to focus on Claim 17 of

16  the '782 patent just for simplicity, Your Honor.

17       THE COURT:  Okay.

18       MR. DUSTON:  Because we can do away with all of the

19  arguments of whether helium is present and the like.  This

20  claim is clearly infringed.

21       And, in fact, to Your Honor's point, those

22  limitations are not disputed by Dometic.  The only dispute

23  that they have raised in their papers is with respect to this

24  final element, this final limitation.

25       THE COURT:  Right.

1          MR. DUSTON:  Which has to do with transferring heat

2    from the second vanes to the exterior of the enclosure,

3    Your Honor.

4          THE COURT:  Right.  Now, this is Claim 17 of the

5    '782.  Okay.  Right.  Where the heat is transferred from the

6    second vanes to the exterior of the enclosure.

7          And that seems to be the big claim construction

8    dispute.  We are obviously pretty early in the case, and I

9    haven't had a full Markman hearing or anything like that, so

10   any claim construction I would give would just be a tentative

11   claim construction.

12         But what do you say to their argument that

13   the -- you know, it seems like the defense case is something

14   along the lines of some of the beauty of the invention was

15   how simple it was in a lot of ways.  It didn't have a lot of

16   moving parts, and it relied on, you know, the motion of the

17   flywheel itself to do some of the air circulation that would

18   help promote the heat transfer.

19         And sort of in keeping with that theme of the

20   invention, I think the Defendants say -- the inventors

21   envisioned and claimed that the heat would go to sort of the

22   literal exterior of the enclosure, you know, not just the

23   atmosphere, but it wouldn't have any other moving parts to

24   dissipate the heat away from the entire enclosure.

25         What can you point me to that suggests that that

1    should be given the broader reading of, you know, that --

2    anything not inside the enclosure is the exterior of the

3    enclosure?

4        MR. DUSTON:  Certainly, Your Honor.

5        So, as a first matter, the law is that it is

6    improper to import limitations from the specification, from

7    examples provided in the specification, to import those

8    limitations into the claim and to treat them as limitations

9    of the claim.

10       And that is exactly what the Plaintiff has done

11   here, Your Honor.  That is a principle that is set forth in

12   Douglas Dynamics vs. Buyers Products, 717 F.3d 1336, which is

13   cited on page 8 of our reply brief in connection with the

14   TRO.

15       I would also point out, Your Honor, that that

16   reading, that effort to move limitations that are only

17   mentioned in the specification and move them into the claim,

18   to insert language such as, the second vanes transfer heat to

19   the exterior surface of the enclosure, which is not found in

20   the claim, that effort to import those limitations from the

21   specification is specifically rebutted by the specification's

22   language itself in at least two places.

23       THE COURT:  Okay.  What are your best two places?

24       MR. DUSTON:  So in the -- in the -- in the '782

25   patent at Column 6, Lines 15 through 22, the patent makes

1    clear that it -- I am quoting here, and there are some

2    ellipses in here, but I will quote from page 8 of our brief,

3    reply:  It cannot be emphasized too strongly, cannot be

4    emphasized too strongly that the invention is not limited to

5    the detailed implementations described.

6         Now, the patent goes on at Column 10, Lines 4

7    through 10, to again say:  The features -- discussing the

8    features that have been described in the specification, it

9    notes that features have been intentionally left out of the

10   claims in order to describe the invention at a breadth

11   consistent with the inventors' contribution.

12        The inventors' contribution, Your Honor, which

13   is -- which is, again, it is also described in Column 4 at

14   Lines 15 through 16, the inventors' contribution was simply

15   to develop a mechanism for removing heat from the flywheel

16   side of the bearings, removing it to the exterior of the

17   device.

18        And at 4 -- Column 4, Lines 15 through 16, it is

19   emphasized that the fins serve as a part of a heat path to

20   the exterior of the device.  Not to the exterior surface of

21   the enclosure, but basically a path to rid the inside of the

22   device of heat, to get that heat out of the device.  Not just

23   to the surface of the exterior but ultimately out of the

24   device entirely.

25        And whether it is to the surface of the exterior

1    and then from there it is dissipated in some fashion, the

2    Plaintiff -- I'm sorry, the Defendant would have you believe

3    that the claims recite an air-coolant device, that the heat

4    is transferred to the exterior of the enclosure, and from

5    that point, it dissipates into the atmosphere.  It radiates

6    from the surface of the enclosure, the outer surface of the

7    enclosure.

8          Well, this air-cooled notion, Your Honor, is

9    specifically claimed in a dependent claim.

10         THE COURT:  Uh-huh.

11         MR. DUSTON:  Claim 19 of the patent speaks

12   specifically to an air-coolant device.

13         And it is fundamental patent law, Your Honor, under

14   Phillips vs. AWH, 415 F.3d 1303, that:  The presence of a

15   dependent claim that adds a particular limitation gives rise

16   to a presumption that the limitation in question is not in

17   the independent claim.

18         THE COURT:  Do you think -- do you think that the

19   air cooled could have been a refinement, a subset of just the

20   broader category of any means of cooling the exterior?  So

21   you could cool the exterior without fins.  You could just

22   have the heat dissipate out without fins on the exterior.

23         Do you think that that could explain why 19 adds

24   the limit of air-cooled fins on the exterior?

25         MR. DUSTON:  I don't believe that is the case,

1    Your Honor.  I think -- I think it is a clear indication that

2    cooling the exterior in some fashion was not necessarily the

3    be-all and end-all of the independent claims.

4            THE COURT:  Right.  Yeah, I think that is where I

5    have a little confusion still, and maybe a full Markman

6    hearing would be more helpful.

7            But let me give you -- you have given me two, let

8    me give you two parts of the specification that create a

9    little confusion in my mind, and see if you can provide me

10   your client's position on that.

11           The first is in Column 4 -- really, you can find

12   the same language in Claim 19, which you just quoted, but it

13   also appears in Column 4 at Line 5 where it says:  The heat

14   sink may comprise air-cooled fins on the exterior of the

15   enclosure.

16           That is the same language that is in Claim 19 --

17           MR. DUSTON:  If you give me just a moment,

18   Your Honor, I am without a copy of the --

19           THE COURT:  Yeah.  Sure.  That language is the --

20   is what makes Claim 19 a dependent claim.  It is the same

21   language:  The heat sink comprises air-cooled fins on the

22   exterior of the enclosure.

23           That is the language you just read.

24           So what caught my eye about that language was that

25   it is using the same term that is a requirement to infringe

Claim 1 and Claim 11, which are your independent claims. And that term is "exterior of the enclosure." But it is using the preposition "on" to modify it. And it is saying the air-cooled fins can be on the exterior of the enclosure.

That suggests to me that the exterior of the enclosure is a tangible thing. It is literally the outer surface of the casing of the enclosure because it is something that you can mount fins onto.

In other words, if the exterior of the enclosure was just all of the air, you know, over the ocean where the boat is, you can't mount air -- you can't mount fins to the atmosphere, but you can mount fins to a surface.

So do you think the use of the preposition "on" in Claim 19, which is the same language on Column 4, undercuts a little bit your position about that? Or do you have a response on that?

MR. DUSTON: I don't think it does, Your Honor. If you could possibly direct me again to the specific lines of Column 4 that you are looking at.

THE COURT: Well, we can just look at Claim 19, which is on the final page: The apparatus of Claim 18 wherein the heat sink comprises air-cooled fins on the exterior of the enclosure.

It is the same grammatical and physics-based point about what does the preposition "on" mean if exterior just

1    means anything that is not inside?  Doesn't the preposition

2    "on" imply that exterior means an exterior surface?

3                MR. DUSTON:  Well, I think, Your Honor, that the

4    drawings would have you believe that the fins that are

5    depicted in the figures are an integral part of that

6    enclosure rather than something that is bolted on or is

7    somehow placed onto the surface of the exterior.

8                For example, if we go back to -- if we go back to

9    our slide presentation.

10                For example, on the right-hand side, you see the --

11    you see these fins are formed in the enclosure itself, as

12    opposed to -- the possibility exists that you could then --

13    you could then attach something to the enclosure; you can

14    form something in the enclosure.

15                THE COURT:  Right.

16                MR. DUSTON:  Or you could draw heat in other ways.

17                I think Your Honor's point is that, once you get

18    the heat to an area exterior to the device, you can then

19    dissipate it in a number of ways.

20                The patent is not limited to any particular way of

21    disposing of the heat once the two fins are configured to

22    create a path for that heat to exit the device.  The claim is

23    framed in terms of a comprising transition.

24                THE COURT:  Right.  Well, I mean, I guess that the

25    question is, is that what was claimed or not?  I mean, I

think I do actually tend to, just on my very first-cut review

of this -- this not a full Markman -- I tend to agree with

you that the main focus of the claimed invention is using the

interleaved vanes in the vacuum-type enclosure to draw heat

away from the flywheel and the bearings of the flywheel into

something that is stationary so that it can be dissipated

from there.  There is a lot of talk about why that is better

than the prior art.

There is some talk about why prior arts --

instances that involve pumping things were difficult.  This

is in the summary.  It says:  Some methods that involved

pumping water were difficult to apply.

It also criticizes some prior art as -- that

involved jetting oils as complicated.

So I sort of -- I see enough here to think it is

plausible that the inventors would have also claimed that

there needs to be -- the heat pathway needs to involve the

exterior surface of the enclosure and not just the stationary

fins inside the enclosure, but that there needs to -- the

heat needs to flow from the spinning vanes to the stationary

vanes through the exterior and then be dissipated somehow.

And Claim 11 might not say how.  Claim 19 adds it

has to be air-cooled fins.  I think that is plausible.  I

wouldn't say it is crystal clear, but a lot depends on what

the interpretation is of -- that the heat has to be

1    transferred from the second vanes to the exterior of the

2    enclosure, and whether that means to the exterior surface of

3    the enclosure or just to the atmosphere around the enclosure.

4        MR. DUSTON:  I think if the inventors had intended

5    there to be -- and there is expert -- not expert -- but there

6    is testimony submitted through declaration of what a person

7    of skill in the art reading this claim would understand.

8    There is nothing similar I think that is submitted by

9    Dometic.

10       But the argument is that a person reading this

11   patent would not understand that the inventor was making a

12   critical point about this surface of the exterior.

13       There is really no emphasis within the

14   specification of the importance of heating the surface of the

15   exterior, of transferring that heat to the surface of that

16   exterior.

17       In fact, the only talk of a surface of an

18   exterior -- the only talk of transferring heat to something

19   that is associated with the exterior is Claim 19, which again

20   is a dependent claim that is suggesting that getting the heat

21   to the exterior of the device can involve air-cooled fins but

22   need not involve air-cooled fins.

23       In other words, it is not -- it is not essential

24   that you transfer that heat into the enclosure and then have

25   some further mechanism to dissipate that heat from the

1    surface of the enclosure.

2          THE COURT:  Right.

3          MR. DUSTON:  If that were the case, then you would

4    probably see that reference in all of the claims.  You would

5    probably see discussion of surface of the exterior being

6    mentioned in all of the claims, and that is just not the

7    case, Your Honor.

8          THE COURT:  Well, I guess my final phrasing

9    question about this is, at least in one point of the patent

10   the drafter uses the term "the surrounding atmosphere."  This

11   is in Column 7 at Line 14.

12          Now, admittedly, this is, you know, description of

13   embodiments, so I am not claiming this is some sort of

14   disclaimer, but this is just to show what terminology is on

15   the table for people to describe what they mean, and this is

16   talking about Figures 6 through 7.

17          And, there, the patent says that in these

18   particular figures, which I know is not the full scope of the

19   patent, but in these particular figures, the exterior

20   surfaces of outer collars have additional heat transfer vanes

21   which transfer heat from the collar to the surrounding

22   atmosphere.

23          And then it explains how the transfer happens by

24   conduction and convection.

25          So at least once the drafter used the word "the

1    surrounding atmosphere" when they meant to just say heat is

2    being dissipated from the enclosure out to the air either

3    through fins on the outside or some other method.

4         But in the claims, there is a claim that -- in

5    Claim 1 that there be solid conduction from the secondary

6    vanes to the exterior.  And then Claim 11 drops the solid

7    conduction but still requires that there be some

8    transfer -- well, that the vanes be configured such that the

9    heat can be readily transferred from the secondary vanes to

10    the exterior.

11         So just to put a point on this, if the exterior of

12    the enclosure, the exterior surface was not important, why

13    wouldn't the drafters have just said to the atmosphere around

14    the enclosure?

15         MR. DUSTON:  Well, I think they thought they were

16    saying that when they said to the exterior of the device,

17    Your Honor, as they talk about a path, a heat path to the

18    exterior of the device.  Not to the exterior -- you know, not

19    simply to the exterior surface of the device.

20         I would point out, Your Honor, also on Column 7 I

21    read that slightly differently.  I note that they emphasize

22    that, as shown in Figure 6 and 7, the exterior surfaces of

23    outer collars 58, 60 have additional heat transfer vanes 70,

24    which transfer heat from the collar to the surrounding

25    atmosphere.

1          In other words, the inventors knew if they wanted

2    to claim transfer heat to exterior surfaces of the enclosure,

3    they could have said that.  They said it here, but they

4    didn't say it in the claims.

5          And it is improper to import this particular

6    limitation of transferring heat to an exterior surface of the

7    enclosure into a claim that says transferring heat to the

8    exterior of the enclosure, Your Honor.

9          THE COURT:  Right.  What exactly is the outer

10   collar, by the way?  Again, I know this isn't a full Markman

11   where you have some sort of model or a detailed slideshow, so

12   you might not have this answer, but do you happen to know

13   just off the cuff what is the outer collar?  That is part of

14   the disclosure of the flywheel, right?

15         MR. DUSTON:  My understanding, Your Honor, and I

16   think it is also -- it is shown -- if you look at Figure 1,

17   which relates to Figure 6, and shows this collar that is

18   present in both Figure 6 and Figure 1, it is a --

19         THE COURT:  It is the top.

20         MR. DUSTON:  -- like a cap --

21         THE COURT:  It is the top.

22         MR. DUSTON:  -- right, that fits over the top.

23         THE COURT:  Okay.  I thought so.  And there is a

24   bottom collar and a top collar.

25         MR. DUSTON:  Correct.

1          THE COURT:  Yeah, okay.

2          MR. DUSTON:  Again, elements that are not requested

3    or required by the claims, embodiments that the patent makes

4    clear are illustrative only and are in no way a limitation on

5    the scope of the claims.

6          The fundamental idea here, Your Honor, is to move

7    heat from the inside of the device to the outside where you

8    do not have a direct metallic conductive path like you have

9    when you are dealing with a flywheel that is not attached

10   other than at the bearings.

11         To move that heat, you have to create these

12   interleaved vanes that allow for that transfer.  And that is

13   how the heat is designed to exit the device.

14         THE COURT:  Okay.  So I think those are all my

15   questions on the '782.  Did you have anything more you wanted

16   to cover technically or infringement-wise on the '782 before

17   I move on to the '930?

18         MR. DUSTON:  Well, I think we can save ourselves

19   some time, Your Honor, because we are not going to address

20   the '930 because we think it is unnecessary.  As long as one

21   claim of the --

22         THE COURT:  Right.

23         MR. DUSTON:  -- two patents is infringed --

24         THE COURT:  Okay.

25         MR. DUSTON:  -- which we think Claim 17 is, we

1    believe we are entitled to the restraining order that we have

2    sought.

3         THE COURT:  Okay.  So you are resting the TRO and

4    the preliminary injunction on the '782 patent at this

5    juncture?

6         MR. DUSTON:  The TRO certainly, Your Honor.

7         THE COURT:  TRO.

8         MR. DUSTON:  If discovery that may be taken before

9    a PI hearing is held reveals additional information about the

10   gases that are used in the interior of the DG3 --

11        THE COURT:  Right.

12        MR. DUSTON:  -- it may be that we will also be

13   pressing those claims.

14        But at the moment, since we have a clear indication

15   that the '782 patent is infringed, we think it is simpler to

16   just -- to move forward on that --

17        THE COURT:  Right, okay.

18        MR. DUSTON:  -- without introducing these other --

19        THE COURT:  The helium issue.

20        MR. DUSTON:  -- complexities.

21        THE COURT:  Right.  The helium issue is avoided --

22        MR. DUSTON:  Correct, Your Honor.

23        THE COURT:  -- for now.

24        Okay.  So then that brings us to the Defendant's

25   argument about obviousness or invalidity.  I don't think they

1    raised anticipation but at least obviousness was raised.

2           Do you want to give me an overview of your position

3    on that?

4           MR. DUSTON:  Sure.  And if, Your Honor, if I could

5    just step back for one second and say one more thing on claim

6    construction.

7           THE COURT:  Uh-huh.

8           MR. DUSTON:  There is also a separate argument that

9    has been made by the Defendant that beyond what the exterior

10   of the enclosure requires, they have also suggested that

11   there has been a disclaimer within the specification that the

12   Plaintiff, that Seakeeper, disclaimed any use of fluid as

13   part of the heat dissipation process.  And they point to

14   language in the claim that involves spraying these vanes with

15   a liquid and having it thrown off and then recollected and

16   recirculated.

17          Again, that is not what the DG3 does.  So even if

18   it constituted a disclaimer, it is not a disclaimer of the

19   DG3 design because that is not the use that the DG3 design

20   makes of fluid.

21          But, secondly, that is nowhere near a disclaimer

22   under Federal Circuit law in terms of a clear and unequivocal

23   disavowal of a particular embodiment, Your Honor.

24          THE COURT:  Okay.

25          MR. DUSTON:  Now to the obviousness argument.

1          Now, as I understand it, and again it is a little

2     unclear from the Defendant's papers, and of course, they bear

3     the burden of proof here and will ultimately bear a clear and

4     convincing evidence burden to establish these facts, but they

5     have recycled some IPR, inter partes review papers, and a

6     eight year old declaration they have dusted off that was

7     submitted by another party to argue that the -- that the

8     claims of the '782 patent are obvious.

9          I would first point out that those IPRs were

10    unsuccessful; they were dismissed and never instituted.

11         They relate or discuss a reference, a primary

12    reference which even Dometic admits is not prior art.  But,

13    instead, they move forward and ask Your Honor to rewrite

14    these papers and to substitute in for the reference which is

15    not prior art, this Adams reference, another reference that

16    they argue is prior art, and then they ask you to then apply

17    those same secondary references to that new -- newly

18    identified prior art reference and to -- and to hold that

19    there is a sufficient, substantial question, substantial

20    question of invalidity of obviousness.

21         Now, they don't present any of the particularized

22    testimony from an expert as to the understandings of persons

23    of skill of the art as to the motivations of those persons as

24    to whether or not they reasonably expected success in these

25    combinations.  None of that is in their paper because they

1    didn't put these papers together.  They resurrected them from

2    an eight year old unsuccessful IPR.

3            THE COURT:  Right.  And I know this is just a TRO

4    that, you know, I scheduled on your requested emergency

5    timeline, so I expect we would be getting more from both

6    sides on this should the case develop, but do you have any

7    initial reactions to -- I think it is labeled Exhibit 1011,

8    the Jäger or Jäger (different pronunciation), however you

9    pronounce that reference, the device for cooling a shaft that

10   seems to disclose cooling fans arranged coaxially with a

11   rotating mounted shaft in thermally conductive contact with

12   cooling fins arranged coaxially to the shaft axis with some

13   sort of cooling medium arranged at a small distance on the

14   opposite side.

15           Again, I am still coming to the case, and you all

16   know this much better than I do, but it seems at least

17   relevant.  But what is your main reaction to that?

18           MR. DUSTON:  So there are several reactions,

19   Your Honor.  First of all, they have now -- they presented

20   two grounds for obviousness, one is a combination of the

21   primary reference they call Adams with Sibley --

22           THE COURT:  Uh-huh.

23           MR. DUSTON:  -- and Bimshas.  So they have got a

24   string of references that they have to string together kind

25   of in hindsight to assemble the elements of the claim and to

1  now declare without sufficient supporting expert testimony as

2  to motivation and reasonable expectation of success that this

3  would have been obvious to a person of skill in the art at

4  the time that the patent was filed in 2006.

5          THE COURT:  That is the same Adams that is a named

6  inventor on this patent, correct?

7          MR. DUSTON:  Correct, but a different reference

8  than the one that was cited in the declaration of the

9  expert.

10         THE COURT:  Okay.

11         MR. DUSTON:  Now, we have gone through in our

12  opening papers on the TRO why Sibley is not combinable with

13  Adams, why this Sibley reference, which has to do with -- not

14  with gyrostabilizers, which are a different animal, but with

15  energy storage devices, which Sibley indicates spin at a

16  relatively slow rate as compared to gyrostabilizers.

17         And Sibley relies upon what is called a "heat

18  pipe."  It creates a liquid-filled tube with the liquid

19  adjacent to the heat generating bearings.

20         The heat from those bearings is absorbed by the

21  liquid, and the liquid vaporizes.

22         The vapor then transits to the other end of this

23  tube where these fins are located.  And the fins are not

24  there to cool the bearings.  The fins are there to cool the

25  liquid, to recondense the liquid from some temperature above

1    212 degrees to a temperature below 212 degrees so it would

2    become liquid again and move back to the opposite end of the

3    heat tube.  Okay?

4         These are temperatures that are very different than

5    the ones experienced in the gyrostabilizer, and these fins,

6    by definition, they cannot be located adjacent to the heat

7    generating bearings.  They must be located a distance from

8    those bearings because they are intended to condense the

9    liquid which has to be cooled.

10        That liquid can't be cooled adjacent to bearings.

11   The bearings are hot enough to vaporize that liquid.  So

12   these fins are displaced from the bearings, unlike what is

13   claimed in the invention, Your Honor.

14        Now, additionally, and this was also a problem for

15   Jäger, these fins are not radial.  They are not oriented in

16   parallel to the axis of rotation.  They are not cylindrical

17   interleaved fins as the patent claims call for.  They are

18   perpendicular to the direction of rotation, not parallel to

19   the direction of rotation.

20        THE COURT:  As to the first point that you made

21   going back to Adams combining with Sibley and that concerning

22   the flywheels for storing energy, which I think everyone

23   agrees tend to spin at a lower speed and are larger, what do

24   you say about there being motivation to consider flywheel

25   heat dissipation nonetheless as disclosed in the '782 patent

1    itself in the background section, which cites that same

2    cooling problem may exist in other devices in which flywheels

3    spin in partially evacuated enclosures, e.g., mechanical

4    energy storage devices?  Does that give some motivation for

5    the hypothetical person having average skill in the art to

6    look to flywheel energy storage device heat dissipation?

7         MR. DUSTON:  I don't think so, Your Honor, and for

8    this reason:  Claim 11 is not specific to a gyrostabilizer.

9    So some claims are broad enough to cover a variety of

10   devices, both energy storage devices as well as

11   gyrostabilizers.

12        But Claim 17, the one upon which we rely here

13   today, is specific to a gyrostabilizer.  And the question

14   becomes whether that claim, which is specific to a

15   gyrostabilizer, would be a claim that one would use or look

16   to energy storage devices spinning relatively slowly and is

17   for -- and additionally is using this complicated heat pipe

18   to dissipate that heat.

19        Whether somebody would look to that as a solution

20   for a gyrostabilizer whose heat demands, heat generating

21   properties are far in excess of those energy storage devices.

22        So I think perhaps, depending on what claim we are

23   looking at, Your Honor's point might be well-taken, but when

24   we are looking at Claim 17, we are talking about whether or

25   not this energy storage device is deemed to be sufficiently

1    analogous to a high-speed, high heat generating

2    gyrostabilizer, Your Honor.

3              THE COURT:  Okay.

4              MR. DUSTON:  Let me also say something about -- I

5    wanted to emphasize again this radial versus perpendicular

6    aspect.

7              They need to get these fins -- let's assume that

8    Sibley could be imported into -- into Adams.  We have cited

9    also to reasons why it wouldn't be.  And if they can't do

10   that, then that ground is done.

11             But for the sake of argument, let's assume that

12   they can get that far.  Now they have a problem because the

13   orientation of the fins is wrong.  They have to move those

14   fins 90 degrees.  They rely on Bimshas to do that.

15             Okay.  They say someone would take Bimshas and

16   Sibley, and they would modify Sibley's fins because Bimshas

17   suggests a parallel orientation rather than a perpendicular

18   orientation.

19             The problem there is that Bimshas is a completely

20   different animal from Sibley.  Okay?  Sibley is a

21   vacuum-enclosed system.

22             Bimshas, in contrast, relies upon atmosphere, in

23   fact, more than atmosphere.  It cites the preference for a

24   pressurized environment in order to dissipate heat using its

25   particular configuration.

1          This is not a configuration that anyone would see

2     as suitable for a vacuum enclosure.  Okay?

3          Secondly, we talked about the -- we talked about

4     the energy storage device moving more slowly than a

5     gyrostabilizer.  Bimshas moves even more slowly than that

6     because Bimshas is talking about this heat transfer mechanism

7     that is related to what is called a gimbal axis.

8          You remember, Your Honor, we talked a little about

9     pitch versus roll and these gimbals that hold the enclosure

10    and allow it to move forward and back.  Those are not

11    spinning at 8,000 RPM.  They are moving back and forth at a

12    very gradual rate.

13         Our declarant has indicated that we are talking

14    about 25 RPM versus 8,000 RPM.  And we are talking about

15    intermittent movement.  Not movement in one direction

16    generating heat, but movement that moves back and forth at 25

17    RPM.

18         THE COURT:  And are those movements -- this really

19    goes to more the secondary indicia, but are those movements

20    into pitch, are those purely passive on the gimbal, or are

21    those actively controlled by some sort of sensor within the

22    broader Seakeeper system that uses pistons to -- I got the

23    sense that, at least from some of the literature, that there

24    was an active control of the gyroscope on the gimbaled axis

25    to control pitch.

1    MR. DUSTON:  So there is -- there is -- there is

2  a -- these gimbals allow the enclosure to rock back and

3  forth.

4    Now, you can resist that rocking and then that, in

5  turn, transfers force to the boat to stabilize it, and then

6  you can release that and let the boat pitch and roll as you

7  would, but you can -- you can sort of lock that down and

8  resist it to transfer that energy into a method to -- to --

9  to eradicate the roll or to limit the roll.

10    So I believe the term that -- is "procession,"

11  allowing the procession of the -- of the device on these

12  gimbals.

13    THE COURT:  I was reading this in the discussion of

14  secondary indicia of obviousness where your friends on the

15  other side are arguing that some of the commercial success

16  came from aspects of the product that are not claimed in this

17  patent, including the active ocean monitoring and control.

18    So I took it that the way it worked was there was

19  some sort of computer board or logic being done that was --

20  you know, a gyroscope only has so much energy, and you have

21  to decide how much to be directed into roll control versus

22  pitch control, and that the pistons, in combination with some

23  logic and computer board, were doing that calculation.

24    Is that present in at least some of the Seakeeper

25  products?

1          MR. DUSTON:  There is a -- there are mechanisms by

2     which this rocking that is allowed at the gimbals can be

3     limited.

4          THE COURT:  Uh-huh.

5          MR. DUSTON:  For various reasons, Your Honor.

6          THE COURT:  That is not claimed in these patents,

7     though?

8          MR. DUSTON:  That is not specifically claimed in

9     these claims, no, Your Honor, that is correct.

10          If I could digress a minute to your secondary

11     considerations argument as long as we are on that topic.

12          THE COURT:  It is not a digression.  Why don't we

13     move there.

14          MR. DUSTON:  The Defendants argue that our

15     commercial success, the accolades that we have received, the

16     skepticism that we overcame were due to what you have said,

17     Your Honor, which is the movement of the enclosure within its

18     gimbals.  And that is -- that is what has prompted the

19     success of this product.

20          That is not what prompts the success of this

21     product, Your Honor.  That movement doesn't do anything

22     unless the flywheel has sufficient speed and power to

23     stabilize the boat.  And that flywheel does not have

24     sufficient speed and power to stabilize the boat unless you

25     can cool it.

1          It doesn't have the small size that we were able to

2     achieve with a cooled flywheel just because it can move

3     forward and back within its gimbals.  It doesn't have the

4     weight advantages that this product has over other vacuum --

5     non-vacuum devices unless you can cool it.  Right?  It

6     doesn't have the energy savings over these other devices

7     unless you can cool it.  It is inoperable unless you can cool

8     it.

9          All of the performance advantages that this device

10    realizes, all of the things that people buy this device for

11    and that they laud in their awards to us for the performance

12    of this device all come back to your ability to cool it.

13    Because if you cannot keep those bearings cool, if you cannot

14    prevent a heat differential from rising in those bearings,

15    your device is going to fail.

16          THE COURT:  Do you think that DG3 has the

17    same -- the same small size and the same degree of low

18    complexity that allows for the low weight, given that they do

19    seem to add a pumping of coolant through some part of the

20    enclosure and maybe even down into the middle of the

21    flywheel?  Does that increase their weight somewhat and

22    increase the complexity which, you know, might differentiate

23    it from an infringement standpoint?

24          MR. DUSTON:  Not from an infringement standpoint,

25    Your Honor.  The addition of added features does not avoid

1    the claim.  If the claimed elements are present in the

2    device, adding additional features does not avoid -- avoid

3    infringement, Your Honor.

4              THE COURT:  That is a fair response.  How about

5    from an equities standpoint?  So if -- you know, if what

6    makes your product commercially successful is the combination

7    of all of the things in the patent, plus the gimbals, plus

8    the control boards, and assuming, just for sake of argument,

9    that there is infringement but their system also has other

10   things that don't achieve the same advantages that yours

11   does, does that undercut the argument that you need emergency

12   relief because their system, you know, on that view just

13   wouldn't be as commercially successful since it is not as

14   robust?

15             MR. DUSTON:  No, Your Honor, I don't believe it

16   does.  I think the proof is in the pudding here, in fact,

17   Your Honor.  Because a year before they announced their

18   launch of their product, they met with us under confidential

19   circumstances, and they filed a patent application at or

20   about the time of that meeting.

21             And in that application, which was directed to the

22   cooling of a gyrostabilizer, that application made no

23   reference to the use of this interleaved fin feature.

24             In fact, all of the cooling in that particular

25   patent was directed to removing heat off of the stationary

1    side of the bearings, running heat -- running fluid through

2    that central post that is fixed and is on the fixed side of

3    the bearings.

4            There was no solution mentioned in that patent

5    application for how to get the heat off of the opposite side

6    of the bearings, the patented solution that Seakeeper came up

7    with.

8            But a year after those conversations, lo and behold

9    suddenly those fins, those interleaved fins, appear in the

10   DG3 device.

11           And we have made that point in our papers,

12   Your Honor, that among the secondary factors of

13   non-obviousness is the Defendant's own copying of our

14   patented design.

15           And there has been no refutation by Defendants of

16   those charges that the design that they incorporated into

17   their device originated with us, came -- that the idea for

18   that came from us.  They have said nothing on that subject,

19   Your Honor.

20           If these fins were not essential to their -- the

21   performance of their product, those fins would not be there.

22           Their own -- their own -- their own executive,

23   Your Honor, pointed out in comments in an interview that he

24   gave that the cooling is the key to their invention, that

25   avoiding this differential across the bearings -- now, that

1    is important.  The differential is what he called out.  It

2    wasn't just cooling.  It was keeping the bearings on each

3    side from overheating and different --

4            THE COURT:  Right.

5            MR. DUSTON:  -- heats occurring.

6            THE COURT:  So help me understand the timing here a

7    little bit.  This patent, the '782, the application was filed

8    in 2006, and it issued in 2009.  And it has had the fins

9    since then.  And the patent has been available to anyone in

10   the public to view as part of the patent bargain.

11           So Dometic, if it was interested in learning about

12   how to cool smaller, high-velocity flywheels in a vacuum-type

13   environment, could have just read the patent to learn that,

14   right?

15           MR. DUSTON:  True.  No question.

16           THE COURT:  So the timing of this confidential

17   acquisition meeting was in -- earlier this year, 2025, right?

18           MR. DUSTON:  2024.

19           THE COURT:  2024.

20           MR. DUSTON:  A year ago.

21           THE COURT:  But the product demo in Florida

22   somewhere was earlier this year.

23           MR. DUSTON:  That is correct.

24           THE COURT:  So -- you know, I have heard of cases,

25   I have even worked on a case in private practice where there

1   is a confidential business meeting while the patent

2   application is private.  But, here, the patent application

3   was, you know, at least -- almost two decades, maybe a decade

4   before.

5           So what was the -- what is the claim of something

6   happening in a meeting that shows a strong likelihood of

7   either infringement or non-obviousness?

8           MR. DUSTON:  So the meeting has to do -- I use the

9   meeting as a -- as a -- as a stake in the ground, Your Honor,

10  to show that a year before they introduced a product with the

11  patented interleaved fins, a year before that, the

12  interleaved fins were not on their agenda.  They were not --

13  they were not envisioning a product that had interleaved

14  fins.

15          And they spoke with us.  We obviously emphasized

16  the keys to our technology in those confidential discussions,

17  as well as shared with them where we were going to be placing

18  our efforts, Your Honor, which models and which boat sizes

19  and things of that kind we were going to be targeting, which

20  they took to heart in that year after we revealed that and

21  slipped in and targeted areas that we said we were going

22  to -- ████████████████████████████████████████████████

23  ████████████████████████████████████

24          That is exactly where they targeted us,

25  Your Honor --

1           THE COURT:  Right.

2           MR. DUSTON:  -- on that particular product.

3           THE COURT:  Okay.

4           MR. DUSTON:  But my point was, that if this was a

5    feature that was so insignificant, okay, why is it -- why was

6    this mad scramble over the year since they spoke with us to

7    incorporate it into their product?  Why is their executive

8    emphasizing cooling as the key to the longevity and

9    robustness and performance of their device?

10           And not just any cooling, but the need to make sure

11   that there isn't a differential that arises across these

12   bearings, which is -- which is basically, you know, reading

13   between the lines, or said another way, getting heat off of

14   the flywheel side.

15           We have to find a solution for that.  And the

16   solutions they were pitching back in 2024 were all directed

17   to getting heat off of the stationary side.  They did not

18   have a solution for getting heat off of the -- off of the

19   flywheel side.

20           And as they developed this product, they obviously

21   realized they needed that solution, that the device that they

22   had initially contemplated would not work unless you added a

23   feature to pull heat from the flywheel side, and that is when

24   they adopted our patented solution for that.  Because,

25   frankly, that is about the only way you can get heat off of

1    that side of the equation, Your Honor.

2            THE COURT:  Okay.  Let me -- let me give you a

3    chance to finish up with any final points.  We may have

4    covered the big ones, but any final points you want to

5    emphasize today orally on non-obviousness, and then I want to

6    briefly touch on the equities, on jurisdiction, and on an

7    appeal bond before we wrap up.  So do you have anything --

8    I'm sorry, not an appeal bond, an injunction bond.

9            Do you have anything finally you want to emphasize

10    on obviousness or non-obviousness?

11            MR. DUSTON:  So we haven't really talked about

12    Jäger specifically.  I have been talking about Sibley and

13    Bimshas.  Let's talk about Jäger, for example.

14            Once again, Jäger -- Jäger is not a gyrostabilizer.

15    It is simply a rotating shaft in a sleeve or in a bore.

16    Okay?

17            And it has fins, but those fins are

18    perpendicular.

19            THE COURT:  Yeah, they go out like that

20    (indicating).

21            MR. DUSTON:  And they suggest that you would have

22    bent these fins over 90 degrees.  But Jäger is completely

23    anathema to that idea.  Okay?  Because Jäger depends on this

24    shaft sitting within a sleeve that has a close tolerance.

25            In other words, there is very little space between

1   the shaft and the walls of the sleeve.  Okay?

2        And that is because you can now put fins out,

3   jutting out perpendicular to the shaft, into similar openings

4   that are formed in the wall of the sleeve.  Okay?

5        And what Jäger talks about is that this is -- this

6   is -- this is an advantage to doing it this way.  Because if

7   you want to increase the amount of heat that you

8   dissipate -- let's assume that the shaft is generating --

9   these bearings on the shaft are generating more heat than,

10  say, three or four fins would accommodate.  All right?

11       It is a simple matter of adding more fins along the

12  length of the shaft.  Okay?  But to do that, you have to have

13  them in a perpendicular orientation.  In order to spread fins

14  out across the length of the shaft, they have to be jutting

15  out at 90 degrees from that shaft.

16       You can't -- there is no effective way to turn

17  those fins around 90 degrees and then to expand those fins

18  out as if there is some kind of disc -- it wouldn't fit in

19  the shaft.

20       The problem is you have to go through so many

21  design changes to incorporate the design that they say is

22  obvious, that the fact that you have to go through that

23  exercise indicates just the opposite.  It is not obvious to

24  make that kind of modification to Jäger.

25       THE COURT:  Do you think -- do you think there is

1    any motivation to combine that with, you know, Adams, for

2    instance, by the fact that Jäger is talking about a shaft

3    that is spinning but has some work to do either above or

4    below the shaft, like it is attached to something?

5        And so the fins can -- really there is only room

6    for the fins is -- out perpendicular to the axis of the

7    shaft, whereas with the flywheel the things that are

8    perpendicular to the axis are the motors spinning it up, and

9    so there is the room for the -- you can't have fins and

10   motors there, so the room for the fins is on top?  Do you

11   think the basic physics of the problem would create

12   motivation to combine them?

13       MR. DUSTON:  I don't believe so, Your Honor.

14   Because -- because there is such a relationship between

15   Jäger's design and the fact that the bore is in a closely

16   tolerant sleeve, that to now extend that to a gyrostabilizer

17   enclosure with a spinning element that is not a shaft, is not

18   symmetrically and elongated like that but is instead an

19   irregular shape with a bulge at the center where these fins

20   would be positioned if you were adopting Jäger's design,

21   it's -- they are so different.

22       The apples and oranges is so stark that it just --

23   you would need a very strong showing, expert testimony

24   explaining exactly how somebody would have thought to do that

25   and how that would have been obvious to them.  And that just

 1    is not in this record, Your Honor.

 2          THE COURT:  Okay.  Well, let's move to the

 3    equities.  And in some ways that is the bulk of what a TRO is

 4    about, although you have also filed a fully-briefed motion

 5    for a preliminary injunction.

 6          But what exactly is going to happen in the next 28

 7    days that could not be repaired by damages if you

 8    ultimately -- if your client ultimately prevails on the

 9    merits?

10          MR. DUSTON:  Well, we have already lost sales,

11    Your Honor.  It is not just hypothetical.  We have lost sales

12    to Regulator, who has been a client of ours for a

13    considerable period of time.  We have Seakeepers on many of

14    their other boats, but suddenly our opportunities to provide

15    that Seakeeper model to their new 35-foot boat has been

16    stolen from us by Dometic.

17    ███████████████████████████

18    █████████████████████████████████████████████

19    ████████████   The new boat model year is essentially July.

20    And so decisions are made before then about how these boats

21    are to be configured.

22          And you have to configure these boats in order to

23    accept or receive these gyrostabilizers.  It is not -- it is

24    not a simple matter of taking a boat and then slapping it in,

25    although we do have retrofits.  But the ideal situation is

1    for the boat manufacturer to actually design the boat around

2    the gyrostabilizer.

3         And if they design boats around gyrostabilizers

4    that are supplied by Dometic, those -- those installations

5    are not going to be as available to us because there are

6    particular wiring considerations and coolant considerations

7    and the hoses and movement of fluid that are unique to DG3

8    that are going to be difficult if DG3 is designed into those

9    boats.  They won't be necessarily as suitable for our

10   products.

11        And these boat designs, Your Honor, once these

12   designs are made, as our declarants have indicated, and there

13   has been no disagreement from Dometic, Your Honor, on this

14   point, these boats are five to 10-year cycles, once you get

15   into a boat, you are their supplier for gyrostabilizers for

16   five, or as many as 10 years.

17        And those decisions are being made now.  They will

18   have critical effects on our ability to realize the plans

19   that we have put in place that have been dependent upon the

20   remaining life of our patent protecting us over the next two

21   years as we position ourselves in these various boat models.

22   They have jumped the line, Your Honor, and they are taking

23   that away from us.

24        THE COURT:  Well, let's see -- let's say I leave

25   today thinking something along the lines of, you know, there

1    is a reasonable argument of infringement, but I would need to

2    hear more before gaining some confidence, and there is a

3    possible argument of obviousness, but I would need to hear

4    more, so it is fuzzy, the likelihood of your client winning

5    is fuzzy.  And let's say I focus more on the equities.

6          Your client is obviously a decently-sized business,

7    attracts its sales.  A TRO is an extraordinary remedy that

8    requires a showing of not just harm, which I think, you know,

9    you make out some facts for why there would be financial harm

10   to your client, but irreparable harm.

11         What about the harms that you are discussing makes

12   them such that if you ultimately prevail with a final

13   judgment, that the harm cannot be compensated with a damages

14   award that Dometic would be able to pay, given that they seem

15   to be a pretty big company that I think would be able to pay

16   a judgment if you win?

17         MR. DUSTON:  The issue is not their ability to pay,

18   Your Honor.  The issue is whether or not that we would suffer

19   harms that you cannot measure in damages or that would be

20   difficult to measure in damages.

21         I mean, obviously, Your Honor, if you deny our

22   injunction, we will be left with a damages case, and we will

23   do our utmost to prove up damages.  But it becomes very

24   difficult when we are talking about things like market share

25   and price erosion.  Right?

1    When we lose an installation, as I pointed out, we

2    lose it for five to 10 years.  And when we lose an

3    installation, we lose the data that is driven back to us from

4    those installations.  We lose the word of mouth and the

5    network effects that have been recognized as irreparable

6    harm, from those installations.

7    We lose the reputational -- the reputation we have

8    gained as the market leader ██████████████████████ of

9    gyrostabilizers all because we are competing against our own

10   technology, Your Honor, that Dometic has no right to use.

11   And they are securing awards, they are securing

12   installations, they are securing things that will block us

13   for a considerable period of time.  And those are -- those

14   are hard to value, Your Honor.  They are hard to value.

15   And we also have other products.  We are in the

16   process of launching other stabilization products like our

17   Ride product.  And that product is -- we are able to use our

18   position and the fact that we have a reputation in the

19   industry driven by our gyrostabilizers to pair the Ride

20   product with those gyrostabilizers.

21   So it is more than just the gyrostabilizer sales

22   that we would lose, Your Honor, and the market share that we

23   would lose.

24   And, in addition, once a competitor enters the

25   market and pushes our price down, that price never goes back

1 up unless we are willing to suffer incredible reputational

2 harm by telling our customers that what was a 20 percent

3 lower price last week is now going to be a 50 percent higher

4 price, which doesn't happen.  You have to eat that price

5 erosion.  And that will be across all of our products.

6    And price erosion is a quintessential irreparable

7 harm as recognized by the Federal Circuit and the Third

8 Circuit.

9    THE COURT:  Right.  Right.  I mean, I know you can

10 hire experts to try to -- damage experts to try to quantify

11 that, and sometimes they will.  But, I mean, I take your

12 point that the more -- the more abstract the injury that is

13 getting quantified the easier it is to call the likelihood of

14 a damages award not sufficient.

15    On that last point, there are potential harms on

16 both sides.  As I said, if I leave today thinking it is fuzzy

17 who is going to ultimately prevail on the merits, it could be

18 either side.

19    On your side of the equitable ledger is the fact

20 that even if you were to win on the merits after a full

21 proceeding, you might not be able to quantify all of your

22 client's harms to recover that with a damages award.

23    On the other side of the ledger for the current

24 posture is, there is a possibility that one of these defenses

25 might also prove meritorious, in which case I have enjoined

1    the Defendant from things that it was entitled to do, the

2    purpose -- which is the purpose for the injunction bond under

3    Rule 65(d).

4          Do your clients have any position on the correct

5    amount of an injunction bond if I were to issue a preliminary

6    injunction?

7          MR. DUSTON:  Your Honor, we have heard no

8    articulation from Dometic that they would be harmed by an

9    injunction of any length.  There has been nothing presented

10   by them in the record as to what the effects of a 28-day stay

11   of their efforts to introduce these products.

12         We are talking here about trying to preserve the

13   status quo.  We are not -- we are not trying to undo

14   something that has been done.

15         The indications from Dometic are that they haven't

16   yet shipped these products, that they are not intending to

17   ship these products until June, which, you know, admittedly

18   is somewhat days away.

19         But would a 28-day postponement of those shipments

20   do any particular harm to them?  There has been no suggestion

21   that that would happen, Your Honor.

22         And we have put forward considerable harms that

23   have not only -- not only will occur but have occurred, and

24   are likely to continue to occur if this injunction is not

25   entered, Your Honor.

1          THE COURT:  Okay.  And then the last item I had

2    questions on was jurisdiction.  Tell me your view on how

3    jurisdiction works regarding the different entities here.

4          There is the -- obviously the Delaware corporation,

5    and I think you have made out a case that they have a website

6    where, at the least, they are offering for sale the accused

7    products.

8          However, if I -- you know, is the scope of my

9    remedy limited to the scope of the acts creating jurisdiction

10   such that if I were to enter a TRO or a preliminary

11   injunction against the Defendant in the Delaware corporation

12   from offering for sale, would that really solve the problems

13   that your client cares about?  Because it would seemingly

14   leave the foreign corporations free to actually sell the

15   product.  It would just be the Delaware corporation would be

16   enjoined from offering it on its website.

17         Do you think that would be a meaningful remedy, or

18   do you have a broader view of the Court's jurisdiction?

19         MR. DUSTON:  So as the first matter, you have

20   absolute jurisdiction over the Defendant in this case.  They

21   are a Delaware corporation.  You can issue an injunction

22   against them, not just for Delaware actions, but for actions

23   throughout the United States.  So that is not an issue.

24         And while they suggest that they don't control the

25   Canadians, the evidence is far to the contrary on that,

1    Your Honor.  There are -- as we pointed out, there are terms

2    and conditions on Dometic's website with respect to the DG3

3    that is offered for sale by Dometic Corporation on its

4    website.  And there is no doubt that that is Dometic

5    Corporation's website.

6        They told Your Honor that they had -- this was a

7    stark and relatively bold statement:  "We have no involvement

8    in the DG3."  That is a quote:  "We have no involvement in

9    the DG3."

10        And yet the DG3 is all over their website.  That

11   website is stated to be Dometic Corporation's website.  The

12   DG3 was offered and presented in Miami on boats installed by

13   Dometic Corporation.  Demonstrated to potential purchasers.

14   Dometic Corporation branding throughout, which Dometic

15   Corporation in a filing in 2020 in Florida indicated was

16   their branding, and that that branding identified them as a

17   source of the products that were presented in association

18   with that branding.

19        They argued that that branding was protected by

20   them, and that they exercised control over any products that

21   were shown or displayed or offered for sale using that

22   branding.  And for them to come in now and say, we don't have

23   any involvement with the DG3, just -- it is -- unbelievable,

24   Your Honor.

25        THE COURT:  Well --

1    MR. DUSTON:  In terms of the Canadian entity --

2    THE COURT:  Yeah, let's talk about --

3    MR. DUSTON:  -- if Your Honor enters an injunction

4 against Dometic Corporation which prevents it from acting in

5 concert, aiding, abetting, or otherwise doing anything alone

6 or together with others to infringe this patent, I -- I --

7 I -- I suggest to Your Honor that that order will have the

8 desired effect.  All right?

9    THE COURT:  All right.

10    MR. DUSTON:  And if it doesn't, if we see that

11 Canada in violation of that order is continuing to move

12 product into the United States, perhaps we could come back

13 before Your Honor or perhaps we find another venue where

14 Canada admits to being subject to that personal jurisdiction.

15    I think they are subject to Your Honor's personal

16 jurisdiction.  Under Judge Williams' case, 2023, the Tigo

17 case, which we cited in our reply, Your Honor, that case is

18 on almost all fours with this situation.

19    We have got a situation where two companies are

20 essentially operating as one, as a single entity, presenting

21 themselves to the market as a single entity.

22    Dometic Corporation is effectively serving as a

23 U.S. sales and promotional arm of this Canadian company if

24 they are to be believed they are separate from this company.

25    They have financial statements that make no

1    distinction, draw no distinction between these two companies

2    but treat them essentially as the marine division of Dometic

3    company -- Dometic Corporation.

4              That case clearly says under stream of commerce

5    theory, under the agency theory that Delaware recognizes,

6    that this Canadian company is as subject to Your Honor's

7    jurisdiction as Dometic Corporation is.

8              THE COURT:  All right.  Well, I think that is all I

9    have for you, Mr. Duston.  Thank you for your presentation.

10             The Court will now hear from Dometic.  And, again,

11   I will give you the same courtesy of some time to give me an

12   orientation, and then I will jump into some questions.

13             MR. KHARITON:  May it please the Court.  Oleg

14   Khariton from Dinsmore & Shohl for Defendant, Dometic

15   Corporation.

16             Your Honor, I don't have PowerPoint slides, but I

17   do have some very simple demonstratives that I may put up on

18   the docu --

19             THE COURT:  Yes.

20             MR. KHARITON:  -- cam from time to time.

21             This motion for a temporary restraining order

22   should be denied for a whole number of reasons.  And I am

23   happy to and I intend to cover non-infringement, 103, lack of

24   irreparable harm, the equities.

25             But I do want to at least briefly cover the

1    threshold issue, which is that -- I mean, there is a

2    fundamental flaw with this suit, with this motion in

3    particular, and that is that -- the fact that Seakeeper is

4    simply going after the wrong party.  The Dometic Corporation,

5    the named Defendant, does not make, use, sale, offer for

6    sale, or import the DG3, the accused device.

7         There is a lot of discussion in the reply brief

8    that Seakeeper filed about the U.S. Dometic website, and

9    there is a suggestion that the Dometic Corporation, through

10   their website, is offering the accused product for sale.  The

11   fact is that product is not being offered for sale through

12   that website.

13        The Federal Circuit has interpreted the term "offer

14   for sale" as it's used -- as it's used in Section 271 in a

15   way that essentially makes it -- it is defined according to

16   the general commercial contract principles.

17        So an offer for sale must be such that -- it has to

18   be capable of being made into a binding contract by simple

19   acceptance.

20        So, for example, it has to include things like

21   pricing terms.  And that is the MEMC Electric (sic) Materials

22   vs. Mitsubishi case from the Federal Circuit, 2005.

23        There are no -- the content on the U.S. Dometic

24   website is purely informational.  It does not constitute an

25   offer for sale.  There are no pricing terms that are offered.

1    There is a reference to the MSRP price, which is the

2    suggested price that the dealers might sell this product at.

3            And it is literally impossible to get this product

4    through the Dometic website.  It is not like you can just add

5    it to your shopping cart, check out, and then it is getting

6    shipped to your house.  It doesn't work like that.  I mean,

7    the website specifically instructs parties interested in this

8    product to go and find a dealer.  And there are no dealers

9    that are carrying this product at this time.

10           THE COURT:  Do you think that the case law requires

11   that a customer be able to check out and pay for a product on

12   a defendant's website, or merely that the defendant's website

13   includes information on pricing and how to order even if the

14   actual order is submitted to an out-of-country or at least

15   out-of-state entity?

16           MR. KHARITON:  So the law from the Federal Circuit

17   on this is that the offer for sale must be of such character

18   that it has to be capable of being made into a binding

19   contract by simple acceptance.  So there is no --

20           THE COURT:  Is Mitsubishi your best case for that?

21           MR. KHARITON:  Yes, it is one of the cases.  I

22   think there are others, but that is the one that I can cite

23   right now.

24           THE COURT:  Okay.  And do you have any response

25   to -- this is not a Federal Circuit case so it is not

1    binding, but the Delaware -- this court's, the District of

2    Delaware's decision in 2003, ISCO International vs.

3    Conductus, Inc., which states that website pages are

4    considered offers for sale if they include pricing or other

5    ordering information?

6            MR. KHARITON:  I think there was a lot more going

7    on in the case that just that quotation might suggest.

8    Effectively, in that court -- in that case, the court I

9    believe found there was an agency relationship between the

10   parent and the sub.

11           Again, there is no here -- there is no evidence

12   here that Dometic Corporation, which is actually an indirect

13   parent of the Canadian entity, that somehow that parent

14   corporation is an agent of its subsidiary.

15           And, by the way, just so we are clear, the ultimate

16   parent here is not Dometic Corporation.  The ultimate parent

17   here is Dometic Group AB, which is a Swedish company.

18           THE COURT:  Dometic Group AB has some form of

19   parent relationship to the Defendant in this case, Dometic

20   Corporation, correct?

21           MR. KHARITON:  Yes, everything flows from -- the

22   corporate food chain flows from Dometic Group AB, down to,

23   you know, Dometic Corporation, then to Dometic Marine

24   Canada.

25           THE COURT:  And then Dometic Corporation, the

1    Defendant in this case, is either a direct or indirect parent

2    of the Canadian entity that, your client's position, is the

3    only entity that does one of the prohibited actions for at

4    least infringing devices?

5            MR. KHARITON:  Yes.  So Dometic Marine Canada is an

6    indirect subsidiary of Dometic Corporation.  There is at

7    least one other entity that is sort of positioned between

8    those two.  I think there might be more than one, maybe two.

9    But there is at least one.

10           THE COURT:  And at this TRO stage, are you

11   disputing any of the Plaintiff's facts?  I mean, I think you

12   have your legal points about it's not an agent relationship,

13   and you can't check out through the website that your client

14   maintains.

15           Are you disputing any of their facts regarding

16   jurisdiction about what facts are, in fact, on your client's

17   website or the boat show in Florida and different trademarks

18   that your client owns being displayed there?

19           MR. KHARITON:  So I will start with the trademarks.

20   The trademarks are not owned by Dometic Corporation.  The

21   trademarks are owned by Dometic Sweden AB, which is an IP

22   holding company in Sweden.  And that company licenses the

23   Dometic trademark.  It is an intracompany license.  And it is

24   for the benefit of essentially any affiliate, a subsidiary

25   that is using the Dometic trademark.

1              And as far as the boat show in Miami earlier this

2    year, you know, there were a lot of different Dometic

3    products that were being showcased at that -- at that trade

4    show.  DG3 was just one of them.

5              There were -- the promotional activity related to

6    the DG3 was really driven by the folks from Canada.  Now, is

7    it possible that there was an employee of Dometic Corporation

8    in the booth somewhere?  It is possible.  I don't know the

9    answer to that question.

10             But I don't think the mere presence of a Dometic

11   Corporation employee in that booth would somehow establish

12   that Dometic Corporation is, quote, unquote, using the

13   accused product, which is what -- I take it that is the

14   Plaintiff's theory as it relates to that particular trade

15   show, that it constitutes use by the Dometic Corporation of

16   the accused product.

17             THE COURT:  Well, this -- I mean, this is

18   for -- the motion before the Court today -- well,

19   technically, there is two fully-briefed motions, the motion

20   for a TRO and a PI are for prospective relief only, so unless

21   there is another boat show planned, I don't really think the

22   use theory matters for the purposes of today.  It might

23   matter for damages.

24             MR. KHARITON:  I agree.

25             THE COURT:  But I think what would matter is if it

1    shows some sort of alter ego or agency or veil piercing-type

2    relationship.  So I am not really intending to focus on

3    whether there is another boat show coming up in the next 28

4    days.  No one has told me about that.

5        I think there are indications there will be an

6    offer for sale by some Dometic entity, whether or not it is,

7    you know, something that this Court has corporate -- personal

8    jurisdiction over.

9        But you are not disputing that fact, are you, that

10    some Dometic entity plans to offer the DG3 for -- either you

11    are currently offering it for sale but plans to begin the

12    delivery on those sales within the next 28 days?

13        MR. KHARITON:  That would be Dometic Marine

14    Canada.

15        THE COURT:  Okay.

16        MR. KHARITON:  Yes, the Canadian entity.

17        THE COURT:  Okay.

18        MR. KHARITON:  And I should say that, I mean, as

19    far as jurisdiction over the Canadian entity is concerned, I

20    mean, there is no general jurisdiction obviously because it

21    is a Canadian entity with a, you know, principal place of

22    business in Vancouver.

23        And as far as specific jurisdiction is concerned,

24    these products, the DG3, have not been shipped into the state

25    of Delaware as of today.

1          So there is no -- there is no act of

2   infringement -- alleged infringement that would give rise to

3   Seakeeper's claims here so as to create specific

4   jurisdiction.

5          THE COURT:  Okay.

6          Okay.  So I think I have your position on that.

7   And on, again, just on the facts before the Court for the

8   purposes of these motions, are you -- were you disputing what

9   was on the Dometic Corporation's website regarding

10  information about the DG3?  I know you are not calling it an

11  offer for sale, but just factually have the Plaintiffs

12  accurately represented what was on the website?

13         MR. KHARITON:  I believe the screenshots that they

14  have introduced into the record are an accurate

15  representation of the website.

16         THE COURT:  And so if the Court were to conclude

17  there was enough of a risk of that being a prohibited offer

18  for sale, which is not going to be settled after today, that

19  is a final judgment, but if there was enough of a risk and

20  the equities all balanced out the right way and the appeal

21  bond issue was satisfactory, the Court would have personal

22  jurisdiction -- that is a lot of ifs, but the Court would

23  have personal jurisdiction to enjoin the Defendant in this

24  case to at least that much action regarding its own website

25  and any of its other actions that the Court determined

1    present the sufficient risks to justify a TRO?

2           MR. KHARITON:  So, in theory, yes, if all of those

3    hurdles are overcome --

4           THE COURT:  Right.

5           MR. KHARITON:  -- you know, the Court does have --

6    we are not disputing that the Court has jurisdiction over

7    Dometic Corporation.  They are a Delaware company.

8           THE COURT:  It is a Delaware corporation.  Okay.

9           Okay.  Well, I think I have your position on

10   jurisdiction, but is there anything else you wanted to make

11   sure you emphasized before we moved on?

12          MR. KHARITON:  No, I think I've covered everything

13   I wanted to cover as far as the wrong-entity issue is

14   concerned.

15          THE COURT:  Okay.  Before we get into some of the

16   others, let me circle back to something I mentioned with your

17   friend on the other side, which was an appeal bond.

18          MR. KHARITON:  Yeah.

19          THE COURT:  I'm sorry, an injunction bond.  I keep

20   using the wrong language, a Rule 65(d) injunction bond.

21   Sorry, a Rule 65(c) injunction bond.

22          Is your client asking that if an injunction is

23   entered, preliminary injunction, that the Court impose an

24   injunction bond to make your client whole should it

25   ultimately be decided that your client is successful on the

1    merits, and the junction was, therefore, improper?

2         MR. KHARITON:  Yes, and -- I was going to say an

3    appeal bond.  No, but a bond would be necessary and

4    appropriate because Dometic does have plans to launch this

5    product.

6         And an injunction, even though a temporary

7    injunction, would obviously impair its ability to do that and

8    to build those relationships and generate business, and that

9    is a -- that is a financial harm.

10        THE COURT:  What evidence is before the Court, at

11   least at the TRO stage where we are today -- maybe you will

12   introduce more if there is more preliminary injunction

13   briefing -- but what evidence is before the Court from which

14   I could calculate or at least set the amount of any

15   injunction bond?

16        MR. KHARITON:  You know, we have not put any

17   specific dollar amounts or, you know, shipping or delivery

18   schedules, information of that into the record.  But I think

19   the fact that, you know, Plaintiff is coming to the court and

20   suggesting that just by launching this product in the next 28

21   days and, you know, maybe the next four to six months beyond

22   that, that it is going to severely impair their market

23   position.

24        So, obviously, you know, I think there is a

25   recognition on their part that, you know, by enjoining

1    Dometic Corporation -- I guess it depends on the scope of the

2    injunction whether it includes the Canadian entity -- that

3    that is going to, you know, create a significant problem for

4    the Defendant here by just being unable to proceed with its

5    plans.

6          THE COURT:  All right.  And I know this TRO motion

7    was heard on an expedited schedule, but are you anticipating

8    asking the Court for leave to put in any more information on

9    the amount of an injunction bond, any sort of further

10   affidavits that could be forthcoming that might relate to a

11   preliminary injunction even if they are not available in time

12   for the TRO ruling?

13         MR. KHARITON:  Yes, I think we would like the

14   opportunity to submit that information so that we can

15   establish the amount of the bond, if necessary.

16         THE COURT:  Okay.  So I think we will just work

17   backwards to the order that we -- that your friend went

18   through.  So we have addressed the bond and jurisdiction.

19         Let's turn to the equities and -- before we finish

20   perhaps on the actual Title 35 issues.  That is the patent

21   title.

22         So on the equities of either a TRO or PI, I just

23   want to nail down what facts are disputed and what facts are

24   not disputed at this stage.

25         Is it disputed that Dometic Marine Canada, at

1    least, intends to begin fulfilling sales and installing --

2    either installing or at least reaching binding contracts for

3    sales of the DG3 in June, or can you clarify what is disputed

4    and undisputed there?

5         MR. KHARITON:  The company -- the Dometic Marine

6    Canada does intend to start shipments.  And I should declare,

7    three of these units have already been shipped.  They were

8    shipped before even this lawsuit, and they were shipped to

9    Regulator.

10         I think at this point Dometic has about 12 units

11    that it has committed to shipping.  So that's, you know -- I

12    believe that Seakeeper is selling I think -- I mean, their

13    annual sales are in the thousands of units.  So that is a

14    very small -- a relatively small amount.

15         Now, beyond that, of course, Dometic would like to

16    build on those relationships and generate more business.  But

17    in terms of its specific plans at this point, things that are

18    set in stone that's, you know, that is pretty much it.  So

19    the suggestion that --

20         THE COURT:  And that's in -- the 12 units was for

21    June or just total?

22         MR. KHARITON:  I think some of them will be going

23    out in June, but I don't think all of them will be going out

24    in June.  That is my understanding.

25         THE COURT:  But some would be going out in June.

```
 1    And then, as any company does, you would hope to grow sales

 2    after that.

 3              MR. KHARITON:  Yes.

 4              THE COURT:  And your position, of course, is that

 5    none of this is infringing.

 6              MR. KHARITON:  Yes.

 7              THE COURT:  And I'm just trying to get a handle on

 8    the equities here.

 9              Is Dometic Corporation -- does it have the same

10    assets or at least access to the same assets that its

11    ultimate parent group has access to when it comes to the

12    potential to pay any sort of money judgment that may be

13    entered in this case if, let's say, a jury hypothetically

14    does find liability and the Court finds jurisdiction

15    hypothetically?

16              MR. KHARITON:  I don't know if it has access to

17    exactly the same assets, but it is a very large company.

18    And, you know, I wouldn't anticipate any issues with its

19    ability to satisfy any kind of judgment that might issue.

20              THE COURT:  Okay.  So if it is found ultimately

21    that there is an infringement -- obviously, the other side is

22    going to have a stronger incentive to investigate this as the

23    case goes on -- but you're not here telling me there is some

24    sort of bankruptcy pending --

25              MR. KHARITON:  No.
```

1          THE COURT:  -- or something like that with regard

2  to either your client or a subsidiary or parent?

3          MR. KHARITON:  Correct, Your Honor.

4          THE COURT:  Okay.  So those are the equities there.

5          Regarding -- regarding some of the claims that the

6  harms that have brought Seakeeper to court are not just harms

7  but are irreparable harms, are you prepared to offer any

8  limitations on your clients' or its parents' or subsidiaries'

9  activities in the next 28 days that could allow your client

10  to move forward with its business while still addressing some

11  of the features that may make any of the harms irreparable?

12          You know, for example, limitations on its marketing

13  of certain features or interactions regarding ship designs

14  versus retrofits, that sort of thing.

15          MR. KHARITON:  That's a good question, Your Honor.

16  I don't have any specific things that I can propose at the

17  moment that Dometic or Dometic Marine Canada would be willing

18  and able to do.

19          THE COURT:  Okay.  And you are -- are you just --

20  are you aware of or are you disputing the concept that some

21  of these sales might require ships to be designed in a

22  certain way that makes them incompatible with a Seakeeper

23  product such that once the sale is made, Seakeeper would not

24  have an opportunity to go back during the remaining two to

25  three years of its patent?

1    MR. KHARITON:  Seakeeper, as I said, a large

2    portion of its business is retrofitting existing boats and

3    just installing its gyrostabilizer onto existing designs.

4    THE COURT:  And does your company at any chain of

5    the level of the Dometic chain of companies, do they sell

6    only new installs or only retrofits, or do they sell both?

7    MR. KHARITON:  At this point I believe -- I'm not

8    completely sure about this, but I believe the only sales that

9    have been made would be for new boats.  I'm not sure that

10   any -- other than for, you know, demonstrative purposes

11   perhaps at the trade show, I'm not sure that any boats have

12   been retrofitted.

13   THE COURT:  Okay.  Okay.  All right.

14   Then in terms of the harms to your company if the

15   Court were to enter a TRO, I think I understand the main

16   thrust of how these cases go, lost -- you know, lost

17   opportunity for your own corporate growth and so forth, but

18   it seems like maybe some of your customer relationships are a

19   little bit less longstanding than are Seakeeper's.

20   Do you have anything else you want to point out,

21   though, about the harms to your company if an injunction was

22   entered and the Court needs to balance those in balancing all

23   of the equities?

24   MR. KHARITON:  Yeah, so in this particular space,

25   Dometic Marine Canada is essentially a complete upstart.  It

1   doesn't have, you know, the market position that Seakeeper

2   has as -- you know, Seakeeper claims to be the global leader

3   in this technology space.  It claims -- I mean, this is

4   coming from its declarations, that this is a deeply

5   relationship-driven industry.

6        So I think Seakeeper being in that position, I

7   think the level of harm that it might suffer from a few lost

8   business opportunities I think is far outweighed by the harm

9   that could be caused to Dometic by an early injunction that

10  essentially prohibits Dometic from -- I'm sorry, from

11  launching this part of its business.

12       You know, again, in terms of the irreparable harm

13  that Seakeeper is alleging, you know, there is some

14  allegation of substantial market share loss.

15       I don't know what that is based on other than this,

16  you know, ███████████████████████████████████████

17  ███████████████████████████████████████████████████████

18  ███████████████████████   And the implication is that but for

19  Dometic's presence in the market or but for competition from

20  Dometic, that all of those -- all of that business would go

21  to Seakeeper.  And I don't think there is any -- there is any

22  basis for that assumption.

23       You know, I think Seakeeper admits that not all

24  boats even have a gyrostabilizer.  And even according to

25  their own internal analysis that Seakeeper prepared and put

1   in the record, I think its sort of ████████████████

2   ████████████████████████████████████████████████

3   ████████████████████████

4           So it cannot be assumed that that business would be

5   going to Seakeeper even if, you know, Dometic wasn't

6   competing.

7           And I think there is also evidence in the record,

8   again this is coming from Seakeeper's own documents, ████████

9   ████████████████████████████████████████████

10  ████████████████████████

11          So a lost sale to -- my point is this is not a

12  finite pie.  A lost sale to Seakeeper is not necessarily

13  something that they have lost forever.  I mean, they can go

14  in and make another sale to a different customer.

15          THE COURT:  And do your products, at least the DG3

16  that we are focusing on, are you in a position to say

17  publicly or maybe this needs to be sealed, but does the DG3

18  sell at a similar price point to at least -- I think it was

19  Seakeeper's 3 product, and there may have been two other ones

20  in there, the 4 and the 5, are they at a similar price point,

21  or are we in a situation where you are, you know, in a

22  different market niche?

23          MR. KHARITON:  ████████████████████████████████

24  ████████████████████████████████████████████

25  ████████████████████████████████████████████████



8   THE COURT:  All right.  And what is your client's

9   position on the measurability of any lost sales or loss of

10  relationships or data?  Do you have any case you want to

11  point me towards on whether those -- you know, how strongly

12  those are weighed as irreparable versus reparable harm

13  through damages?

14  MR. KHARITON:  Yes, I think we did cite a case in

15  our -- this is Docket 46, which is our opposition to the TRO.

16  But the point we made is that the suggestion made by the

17  Plaintiff that a lot of these harms are incapable to be

18  quantified is sort of refuted by its own declarations that it

19  put in the record where its declarants are able to put very

20  exact numbers on the loss that allegedly Seakeeper is about

21  to suffer imminently if DG3 is competing with its products in

22  the market.

23  So I think -- there is nothing -- you know, there

24  is a lot of talk about reputational harm, word of mouth, that

25  kind of stuff.  I mean, this is not a trademark case.  This

1    is a patent infringement case.

2          And when you talk about things like lost market

3    share, price erosion, there is no reason, especially in view

4    of the -- again, the evidence they put in the record, there

5    is no reason to think that those kinds of harms are not

6    capable of being quantified.

7          THE COURT:  Okay.

8          Well, before we move to the patent law issues, let

9    me give you a chance to emphasize any final points on the

10   remedial issue, as well as -- I don't know if I gave you a

11   chance to address Seakeeper's citation of the Tigo case on

12   jurisdiction if you want to circle back to jurisdiction.

13   There was some mention of Judge Williams' decision on the

14   Tigo case.

15         MR. KHARITON:  So I think there, if I remember

16   correctly, the court found there was jurisdiction over a

17   foreign entity because -- I think the court found it under

18   two different theories, stream of commerce and an agency

19   theory.

20         So if we are talking about jurisdiction over the

21   Canadian entity, the reality is that the Canadian entity has

22   not -- you know, its products, accused products have not

23   reached Delaware.

24         So if we are using the stream of commerce theory, I

25   don't think that is really applicable.

1        And as far as the agency theory, again, there is no

2   indication, there is no evidence that the parent here,

3   Dometic Corporation, is somehow an agent of its subsidiary.

4   I mean, that doesn't even make sense.

5        In fact, the only declaration that we put in the

6   record indicates that, yes, I mean, these companies are part

7   of the same corporate family, but Dometic Marine Canada is

8   responsible for its own management, operations, it has its

9   own board, employees, so on and so forth.

10       So there is no evidentiary basis in which it should

11  be concluded that the Dometic Corporation is somehow an agent

12  of its subsidiary Dometic Marine Canada.

13       THE COURT:  Now, you are able to answer questions

14  about Dometic Marine Canada, though, as their attorney?  I

15  mean, you have given me some pricing information, that sort

16  of stuff.  Are you able to at least get information from

17  them, if needed, for the purposes of crafting an injunction

18  bond if the Court does go that way?

19       You know, I have told you I would be interested in

20  hearing more about that.

21       MR. KHARITON:  Yeah.

22       THE COURT:  Rule 65(c) is an important part of

23  preliminary relief.  It is one that Congress has directed

24  courts to pay more attention to recently, albeit not in the

25  patent context but in issues on the national stage.  So are

1    you able to provide that information, if needed?

2        MR. KHARITON:  Dometic Marine Canada is a friendly

3    corporation.  It is part of the same family.  So we are able

4    to provide that information.

5        Obviously, they are not a party to this case.  And,

6    you know, if they were -- if the Plaintiff did try to add

7    them as a party to this case, and I know at this point they

8    would need the Court's leave, I think, you know, there would

9    be an objection as to the futility of the amendment because

10   there is no personal jurisdiction.

11       THE COURT:  Right.  Okay.

12       Well, I am prepared to move to the patent issues.

13   Do you have anything else on the rest?

14       MR. KHARITON:  Just one last point on the

15   irreparable harm issue.  The nexus.  I mean, there is really

16   no discussion of the nexus, no meaningful discussion of the

17   nexus requirement in the briefing that Seakeeper has

18   submitted.

19       I mean, there is a very short paragraph, I think it

20   is the very last paragraph in their reply brief, that

21   briefly, you know, pays lip service to the nexus requirement.

22   But it doesn't even really address the right issue.

23       I mean, the claim made in that one paragraph is

24   that there is a nexus between the sales of the commercial

25   embodiment -- well, actually, I don't think it is necessarily

the commercial embodiment.  But there is a nexus between the
sales of Seakeeper's own products and the features that are
unique to these patents.

But for purposes of an injunction, really the
question is, is there a nexus between the features of the
infringing product and the features of the patent?

So, right, so is the alleged infringement, the
accused infringer's incorporation of the patented features,
is that driving its sales?

And there is really nothing in the record to
indicate that that is what is going on.  You know, I think
the argument has been made that, well, because the DG3
includes some cooling mechanism, that that means that the
patented features are driving the demand for it.

But, in reality, you know, yes, the DG3 has a
cooling system.  It has to have a cooling system.  But is
that cooling system the same system that is being claimed in
the patent?

But for purposes of this question, let's just
assume for argument sake there is infringement.  But the
reality is that the DG3 is, in fact, practicing Claim 11 of
the '782 patent.

But the reality is that, and this is undisputed,
that there are additional features, including features that
are related to the cooling system, that are included in the

1    Dometic product.

2          You know, there is like the heat exchanger, for

3    example.  That is really, you know, a key component of the

4    overall cooling method.

5          That feature of the cooling -- the heat exchange

6    system is not claimed in Claim 11.  It is not -- well, it is

7    discussed in the patent but only in a disparaging way.

8    Because the suggestion in the patent is that while our way of

9    doing it, the passive method of removing heat is better than,

10   you know, using additional components, that you have to have

11   for a heat exchanger.

12         So there is nothing -- and, you know, as far as

13   Dometic's own marketing of the DG3, you know, certainly, the

14   cooling method is not the only feature that is called out in

15   those materials.

16         You know, there is a discussion about faster spin

17   up and down times.  There is a multifunction display that is

18   connected to the device.  Again, there is heat exchangers.

19   There is all of those additional components that are driving

20   the demand for the product.

21         THE COURT:  I think your opposing party's answer to

22   that is something along the lines of, all of the extra

23   features of the DG3, even if they are driving sales, are only

24   driving sales because they are extra, on top of a core

25   functionality which they claim is patented.

1           And I want to hear your position on that.  But

2    since we are assuming that the core functionality is covered

3    by the patent, what do you have to say to that nexus argument

4    about irreparable harm?  Do you think it is not, in fact,

5    core to the improvements that your product is offering over

6    what is allegedly covered by the claims?

7           MR. KHARITON:  Yeah, because ultimately it is -- I

8    mean, these features -- there are features in the product

9    that are unclaimed, and that are clearly integral to the

10   cooling method.

11          If we are going to just focus on the cooling method

12   for now, there are clearly features in the product that are

13   not claimed and that are integral to the cooling method.  I

14   mean, this is the heat exchanger, this is the, you know, the

15   internal coolant system.  There is a reservoir and pump and

16   all of that.  I mean, this --

17          THE COURT:  Okay.  So you are essentially saying --

18   okay.  You are essentially saying if hypothetically the DG3

19   does practice all of the elements of Claim 11 because it has

20   vanes that are configured such that heat can be readily

21   transferred to the exterior and if that just means to the

22   atmosphere, you are saying, well, if that is how broad the

23   claim is, it is any heat transfer to the exterior through the

24   vanes, that your product, if it steal sales or takes sales,

25   would only take them because of an additional technological

1    improvement that is not claimed here, so that makes it --

2    that makes the equitable case for an injunction lesser?

3              MR. KHARITON:  Yes.  And I would say --

4              THE COURT:  Okay.

5              MR. KHARITON:  -- even before we get to the

6    balancing of the equities, you know, Seakeeper has to

7    establish that they are irreparably harmed.  And to establish

8    irreparable harm, they have to show this nexus.

9              So without the nexus, there is no irreparable harm,

10   and we don't even really get to the balancing of the equities

11   because, you know, the irreparable harm is sort of a

12   prerequisite to an injunction.

13             THE COURT:  Okay.  Well, then let's move to the

14   first issue in the briefing, the last one for your

15   presentation, which is the patent law issues of infringement

16   and obviousness.

17             Again, we are just looking at what is substantially

18   likely.  Is there substantial likelihood of success?  It

19   doesn't have to be overwhelming or definitive but a

20   substantial likelihood.

21             So I think we have established today that for

22   purposes of the TRO, not the PI but the TRO at least, the

23   '930 patent is off the table.  So we are focusing on the '782

24   patent.

25             I think your client's declaration about the fact

1    there was not helium in the DG3 established at the same time

2    that there was air that was below-ambient pressure.  I think

3    it literally uses that phrase.

4         So that meets the -- well, that is Claim 1 and 11's

5    first element, right --

6         MR. KHARITON:  Right.

7         THE COURT:  -- is that there is a gas below-ambient

8    pressure?  So but just to confirm that, your client is not

9    disputing that the DG3 does have an enclosure containing a

10   gas at below-ambient pressure?

11        MR. KHARITON:  For purposes of this motion, we are

12   not disputing that.

13        THE COURT:  Right.  I mean, that's what the only

14   declaration I saw addressing this says, and maybe you will

15   have some other evidence that comes out later.

16        So if I am right about that, that means the focus

17   now -- there are some other requirements that I think are

18   also not disputed.  But the focus for this motion and the PI

19   motion is on the final limitation of Claim 11 --

20        MR. KHARITON:  Yes.

21        THE COURT:  -- of the '782?

22        Did I accurately summarize your client's position

23   on what "the exterior of the enclosure" means?

24        MR. KHARITON:  Yes, Your Honor.  And to that I

25   would just add that the claim specifically talks about the

second vanes being adapted or configured such that heat can be readily transferred from the second vanes to the exterior of the enclosure.

So this phrase, additional phrase "readily transferred," you know, very strongly indicates that there is a direct thermal path from the second vanes to the enclosure -- or the exterior surface of the enclosure.

In fact, there is no other thermal path that is really described in the specification. You know, there is some discussion about this alternative embodiment which was restricted out and never claimed, that it employs cooling spray and that --

THE COURT: Right. Yeah, I'm not focused on that because -- so your position then is that the DG3 doesn't involve the readily transfer because the heat is collected by the cooling channels --

MR. KHARITON: Right.

THE COURT: -- that are inside the closure? There is one that goes around in a circular, and then --

MR. KHARITON: Yes.

THE COURT: -- there is another channel that dips into the flywheel --

MR. KHARITON: Yes. Yes, there's --

THE COURT: -- and out of it? But that takes the heat directly --

1          MR. KHARITON:  Yes.

2          THE COURT:  -- through the enclosure, not to its

3    surface but out to the seawater, right?

4          MR. KHARITON:  Yeah, there is a piping that ingests

5    seawater, and that -- you know, that is what is cooling down

6    the liquid inside the cooling channel.  That is the heat

7    exchanger.

8          THE COURT:  That is the liquid that -- so -- so a

9    lot turns on the construction of what it means for heat to be

10   readily transferred from the second vanes to the exterior of

11   the enclosure.  Whether that means to some area that is not

12   inside the enclosure is whether that means to the surface

13   that is, quote, the exterior of the enclosure, and that that

14   is a shorthand for -- or it is a longhand way of describing a

15   surface and not just a volume in space.

16         MR. KHARITON:  Yes.

17         THE COURT:  Okay.

18         MR. KHARITON:  And it clearly describes the surface

19   and not just the surrounding atmosphere, at least for the

20   reason that Your Honor mentioned, which is that -- I mean, it

21   talks -- the specification talks about, in Dependent Claim 19

22   talks about certain components of heat sink being positioned

23   on the exterior of the surface.

24         So, again, we are not talking -- the exterior of

25   the surface in the context of this patent is not referring to

1    just the ambient air outside of the device.  It is talking

2    about just the exterior surface, the outside of the device.

3            THE COURT:  Well, I played devil's advocate for the

4    other side, so let me do that with you as well.

5            If I could direct your attention to Column 6, if

6    you have the patent in front of you.

7            MR. KHARITON:  Let me just flip to that.

8            THE COURT:  And then I am looking at Line 40, plus

9    or minus one line.

10           MR. KHARITON:  Okay.  I'm there.

11           THE COURT:  And so it is, the paragraph there

12   begins:  Heat generated by the bearing inner races and

13   electric motor rotor, is transferred to the exterior by

14   cooling collar assemblies 50 and 52 located adjacent to each

15   bearing.

16           I ellipsized out the parentheses.

17           And then you look at the diagram to see where 50

18   and 52 are.  We talked about this earlier.  Figure 1 shows

19   it.

20           These are the -- essentially the top and bottom of

21   the enclosure.  And in Figure 1, this embodiment, these

22   collars themselves have air fins that are exposed to the air.

23           And so putting that together with the Column 6,

24   Line 40 text, the drafter here is using the phrase

25   transferred -- heat...is transferred to the exterior to

1    describe heat flowing to the atmosphere, essentially.

2            Now, here, admittedly he is talking about the

3    transfer happening by the cooling collar and not by the

4    vanes.  So I think that is one possible distinction.

5            But this is at least one potential argument that

6    exterior could mean the atmosphere.  What do you have to say

7    to that?

8            MR. KHARITON:  Well, Your Honor, I am not sure -- I

9    am not sure that Column 6 actually, when it is referring to

10   the exterior, I am not sure that it is referring to the

11   atmosphere.

12           I think the fact is that the exterior of the

13   enclosure includes -- I mean, the enclosure itself includes

14   the collar assemblies.  I mean, there is a -- well, at least

15   an outer collar assembly.  So this is the stationary -- the

16   assembly that includes the stationary fence.

17           So that is -- that is what forms part of the

18   enclosure.  So when the claims and the specification, when

19   they talk about heat going through the exterior of the

20   enclosure, it essentially means that the heat -- okay.  So it

21   is going from the rotating vanes, and it is flowing to the --

22   into the cooling collar, and then it is flowing from the

23   interior of the cooling collar to the exterior of the cooling

24   collar, i.e., the enclosure.

25           And from there it is dissipated either just through

1    atmospheric cooling or, you know, you also have the option of

2    including this heat sink, which is essentially another set of

3    fins that is optional but is sort of facilitating that -- the

4    dissipation of heat through the atmosphere.

5           THE COURT:  Right.  And that is what is shown on 50

6    and 52 --

7           MR. KHARITON:  Right.

8           THE COURT:  -- and Figure 1 is the option heat

9    sinks on the exterior of the collars.

10          MR. KHARITON:  Yes.

11          THE COURT:  And I am just getting to the phrasing

12   point of -- maybe you can tell me if you think I am reading

13   this wrong, but is Column 6, Line 40, using the phrase

14   "transfer to the exterior" to refer to the heat having

15   already been transferred from the flywheel, to the moving

16   vanes, to the stationary vanes, and up to the collars now

17   being dissipated from the optional heat sinks on the collars

18   into the air?  That's how I read it.  But maybe you read it

19   differently.

20          MR. KHARITON:  I think -- and I think we are on the

21   same page, but the way I read it is it is simply saying that

22   the heat goes from the -- you know, the heat generating

23   component, the bearing, then it goes to the inner collar

24   which has the rotating vanes, then the outer collar, and then

25   from there it goes through the exterior of the enclosure.

1        When it says the exterior, I think it is talking

2   the exterior of the enclosure as, in the outside surface of

3   the enclosure, the surface of the enclosure that is facing

4   outward.

5        THE COURT:  Oh, okay.  So you are saying the heat

6   generated by these inner parts is transferred to the

7   exterior, referring to the surface, by the cooling collar

8   assemblies.

9        So you are saying that the cooling collar

10  assemblies do both things, they transfer the inner heat to

11  the surface, and then as part of the surface themselves, they

12  also take that surface heat and dissipate it to the air?

13       MR. KHARITON:  Yes.

14       THE COURT:  Is the surface itself thermally

15  conductive?  Is that required?  It is metal, essentially?

16       MR. KHARITON:  I don't think that is

17  specifically --

18       THE COURT:  Okay.

19       MR. KHARITON:  I am not totally sure, Your Honor.

20       THE COURT:  Okay.  Well, I think I have your

21  position on that.

22       MR. KHARITON:  Could I just show Your Honor a

23  couple of very quick demonstratives that I think --

24       THE COURT:  Yes.

25       MR. KHARITON:  Okay.  So I am going to use this.

1        So this is from the declaration of one of the

2   Plaintiff's declarants, Mr. Troche.  So he is describing the

3   invention that the inventors McKenney and Adams conceived of.

4        And he is specifically saying -- and this is the

5   highlighted part.  I mean, he is describing sort of the way

6   that this cooling mechanism works:  Heat is transferred from

7   the heat transfer element, i.e., these are the rotating

8   vanes, to the spinning member -- oh, they are attached to the

9   spinning member.  So from the rotating vanes they are moving

10  to the stationary heat transfer element, so the second vanes,

11  which is thermally connected to the enclosure.  Right?

12       So, again, this is talking about a direct thermal

13  path that exists between the stationary vanes and the

14  enclosure, the exterior of the enclosure.

15       It is not -- you know, the invention doesn't

16  contemplate that the heat, once it goes into the stationary

17  collar or the stationary vanes, that it takes some circuitous

18  path to get -- eventually get out of the enclosure somehow.

19       No, it specifically -- the invention specifically

20  contemplates a direct thermal path, and that is really

21  highlighted in the claim language which specifically requires

22  the second vanes to be adapted such that heat is readily

23  transferred from there to the exterior of the enclosure.

24       THE COURT:  Okay.  So you would describe the DG3 as

25  having secondary vanes that are configured -- that are not

1    configured such that heat can be readily transferred to the

2    exterior of the enclosure because, instead, the heat is

3    transferred inside the enclosure to seawater, and then the

4    seawater carries the heat to the surrounding environment

5    without passing through the surface itself?

6              MR. KHARITON:  Yeah, the accused product is

7    effectively designed to do the complete opposite of what is

8    required by the claim.  Instead of --

9              THE COURT:  Okay.  And so this is just a

10   bigger-picture question to set the table a little bit.  I

11   understand that sometimes patent claim drafters will put

12   limitations in just because it is an assumption about the

13   intended use case of a claimed invention, and that when that

14   happens, it is permissible for people to design around it by

15   finding a way to change the assumption.  I think that is what

16   you are saying is going on here.

17             But would there be -- would there be a

18   technological reason why it would be advantageous for the

19   drafters here, the inventors here, to have required that the

20   heat flow through the outer surface of the enclosure?

21             MR. KHARITON:  Yeah, I mean, they specifically

22   describe that in the specification, and that's --

23             THE COURT:  Is that the part I read, or is there

24   another part you want to point me to?

25             MR. KHARITON:  I think it is Column 4.  And so it

1    is -- I'm not sure if this is exactly the same place we were

2    talking about earlier.  But it is Column 4, and it's Lines 45

3    through 50.

4           And they talk about -- they just described the

5    first aspect of their invention, which is this -- you know,

6    the cooling method that doesn't involve liquid, essentially.

7           They are saying -- well, actually, this is real

8    advantageous because, you know, essentially because we are

9    providing this ready cooling path straight to the exterior of

10   the enclosure, we don't have to have all of these other

11   components like a cooling pump, a motor, filter, heat

12   exchanger, and that simplifies the -- simplifies the design

13   substantially.

14          THE COURT:  Right.  That is what I was getting at

15   earlier with my reading from the summary about criticizing

16   the prior methods as being complicated because they required

17   pumping.  So this is -- this is the same thought.  This is

18   what I was alluding to earlier when I talked about

19   simplicity.

20          So you are suggesting there was a -- at the time

21   the inventors were inventing and describing their claims,

22   that this -- there would have been a technological reasoning

23   to limit their claims to apparatuses having this --

24          MR. KHARITON:  Yes.

25          THE COURT:  -- heat transfer mechanism that flowed

1    through the exterior surface?

2         MR. KHARITON:  Yes.  There is both a technological

3    reason and I think, well, a legal reason because that is the

4    only invention that is really described in the specification

5    unless we talk about this other alternative embodiment in

6    Figures 10 through 14, which was restricted out and never

7    claimed.

8         THE COURT:  Okay.

9         MR. KHARITON:  Yes, I mean, that's our position.

10         THE COURT:  Okay.  So that's your infringement

11    position.

12         And then on obviousness, I mean, I have read all of

13    your briefing, but did you have anything you wanted to

14    respond to what Mr. Duston said about obviousness this

15    afternoon?

16         MR. KHARITON:  I will just -- I will very briefly

17    say that, from our reading of Seakeeper's reply brief, it

18    does not appear that they are disputing that all of the claim

19    elements are disclosed in the prior art in one reference or

20    another.

21         Really, they are attacking, you know, the

22    motivation to combine these references, and there is

23    discussion of teaching away.  There is discussion of

24    secondary considerations.

25         But they are not only disputing that all of these

1  elements, you know, the bearings, the flywheel that are

2  supported by the bearings, the interleaved cooling fins or

3  vanes, that all of that is disclosed in the prior art

4  somewhere.

5          So, really, the only issue here is the existence of

6  a motivation to combine.

7          There is no -- I mean, they haven't put in any -- I

8  know there is a declaration from Mr. Troche, who is obviously

9  an interested party and not a neutral expert, that purports

10  to rebut that motivation to combine.

11          But I think, you know, for the purposes of

12  defeating a preliminary injunction or TRO, our burden is only

13  to show that there is a substantial question of invalidity,

14  and I think, you know, the record here shows that there is.

15          THE COURT:  At the time that the IPR was

16  instituted, what was the standard inside the agency, inside

17  the PTO, to institute?

18          MR. KHARITON:  So the IPR was never instituted

19  because the --

20          THE COURT:  Oh, okay.

21          MR. KHARITON:  Essentially, and I know Mr. Duston

22  said that IPRs were unsuccessful.  I don't think that is a --

23  well, the petitions were withdrawn, but they were withdrawn

24  due to a technicality, essentially.

25          The petitioner made an error, really almost, you

1  know, almost like a clerical error where instead of citing a

2  published patent application by Adams, so one of the

3  inventors here, which would have been prior art, they cited

4  this patent which does not qualify as prior art.

5          And they could have refiled the petition after

6  voluntarily withdrawing them, but they -- for one reason or

7  another they chose not to do that.

8          But the point is that the Patent Office, the PTAB,

9  never actually ruled on the merits of the petition and said,

10  oh, well, you know, these arguments don't make sense or they

11  don't raise a reasonable likelihood of success.  The PTAB

12  never got that far.

13          THE COURT:  It was -- so the petition was withdrawn

14  before the institution decision?

15          MR. KHARITON:  Yes, it was withdrawn after

16  Seakeeper filed that preliminary response in one of IPRs

17  right before they filed the patent response and the other IPR

18  before the PTAB decided institution in either one.

19          THE COURT:  And what year was all that?

20          MR. KHARITON:  I think that was 2017, if I am not

21  mistaken, 2017 or 2018.

22          THE COURT:  So at that time there was still -- I

23  mean, I don't think you can necessarily read anything into

24  it, but there was still eight or nine years left on the

25  patent?

1          MR. KHARITON:  Yes.

2          THE COURT:  And then what do you have to say about

3    the confidential meeting to potentially acquire Seakeeper or

4    partner with it or do some sort of business enterprise with

5    it in 2024 and what that may have to say about obviousness as

6    a secondary indicia?

7          MR. KHARITON:  I don't think that says anything

8    about obviousness.  You know, there is a lot of discussion

9    about that meeting or those conversations that were being

10   had.  But the Dometic Corporation was not a party, and it was

11   really the Swedish parent, the Dometic Group AB.

12          But, you know, there is no trade -- claim for a

13   trade secret misappropriation in this case.  Certainly, there

14   is not one before the Court for the purposes of this TRO

15   hearing.

16          You know, there is a suggestion that as a result of

17   that meeting the -- you know, the patented features of the

18   '782 patent were somehow copied into the Dometic product.

19          I mean, the fact is, you know, the patent had been

20   around for a very long time.  It was issued I think in 2006.

21   These features, that interleaving of cooling vanes, you know,

22   it is not something that Seakeeper even really invented.  I

23   mean, they were found in other prior art references.

24          Now, of course, I mean, there is going to be a

25   dispute about whether it might have been obvious to

1   incorporate those features into a gyrostabilizer.  Our

2   position is that it would have been.

3          But the point is, you know, I think it is quite a

4   leap to say that Dometic ended up incorporating some version

5   of that design into their product, that that necessarily had

6   to come from -- well, certainly not from the discussions that

7   were being had between Seakeeper and Dometic -- yeah,

8   Seakeeper and Dometic, or from -- even from the patents.

9   Because, again, those kinds of structures had been disclosed

10  in the prior art.

11         THE COURT:  All right.  And I think there was some

12  suggestion that there were some other features maybe

13  disclosed or highlighted in those discussions.

14         It seems to me like that would support more of a

15  trade secret claim than a patent claim.  But if it is

16  determined to be relevant to patent obviousness, your

17  position is that was with the parent entity, and there is no

18  evidence of sharing of that with the Canadian company?

19         MR. KHARITON:  Yeah, I'm not even sure if -- to me,

20  as I read the complaint, I mean, maybe there is some

21  discussion about certain marketing or commercial information

22  being shared during that meeting as opposed to any technical

23  information that might have been shared.  So I don't -- I'm

24  struggling to see how anything that might have been discussed

25  during those meetings would have had any impact on

1    obviousness.

2            THE COURT:  Okay.  Well, I think you mentioned a

3    couple of demonstratives.  If you have any more that you did

4    want to display, I can see those at this time, or you can

5    just submit them.  You can hand them up, and I can look them

6    over in chambers.

7            MR. KHARITON:  No, Your Honor.  I think I covered

8    everything I needed to cover.  Unless you have any more

9    questions, then I think I will conclude my presentation.

10           THE COURT:  Okay.  Thank you, Mr. Khariton.

11           All right.  Mr. Duston, I will give you a chance to

12   briefly reply in support of your motion.

13           If I could invite you to start off where we left

14   off.  You can pick between the infringement or obviousness,

15   but perhaps we could start with the patent law issues.

16           MR. DUSTON:  So I will just work backwards through

17   that argument, Your Honor.

18           THE COURT:  Okay.

19           MR. DUSTON:  Let me start --

20           THE COURT:  That will be obviousness first then --

21           MR. DUSTON:  Yes, Your Honor.

22           THE COURT:  -- with the confidential meeting?

23           Could you explain your theory of how that bears on

24   the confidential -- how the confidential meeting bears on

25   secondary indicia?

1          MR. DUSTON:  Certainly, Your Honor.  It has mainly

2     to do with the copying evidence, which indicates that at the

3     time of that meeting, the design that was contemplated by

4     Dometic did not include a feature that would allow for the

5     removal of heat on the flywheel side of the bearing.

6          The patents that they filed contemporaneous with

7     that meeting showed only a design that ran fluid through the

8     stationary center post to remove heat from the device, and

9     did not indicate that there was any solution that Dometic

10    then had to remove heat from the flywheel side of the

11    bearing, which is, as we have discussed, you know, was an

12    exceedingly difficult problem until Adams and McKenney

13    developed this solution of interleaving fins that would allow

14    a path for that heat to exit the device, which didn't require

15    it to exit through the bearing and out through the stationary

16    post.

17          THE COURT:  Right.

18          MR. DUSTON:  So at that time they had no solution

19    for this program.  And between that meeting in 2024 and their

20    launch of the device in 2025, the DG3, they -- they glommed

21    on to the solution that we had touted during the meeting that

22    we had with them in 2024 that we had indicated was one of the

23    features of our product that had led -- one of the principal

24    features of our product that had led to its commercial

25    success and the market share and other performance that we

1  had achieved through that product.  That was -- that was

2  the -- sort of the --

3          THE COURT:  Okay.  So your theory is less about

4  whether the meeting was -- in fact, your theory doesn't turn

5  on whether the meeting was confidential at all?

6          MR. DUSTON:  Not for the obviousness --

7          THE COURT:  Not for obviousness -- okay.

8          MR. DUSTON:  -- and secondary factors, Your Honor.

9          THE COURT:  So your theory is something along the

10 lines of, even though your client's, Seakeeper's '782 patent

11 had been out there for 15 years, and Dometic could have

12 looked at it and figured out that interleaving vanes was one

13 solution to evaluate, your point is, well, for whatever

14 reason, we hadn't come to that, and that would show that just

15 as the inventors had to make the appropriate level

16 of -- inventive leap to get a patent, it was also not obvious

17 to others in the field until you pointed it out.  Is that

18 something along the lines --

19         MR. DUSTON:  Exactly right, Your Honor.

20         THE COURT:  -- of what you were saying?  Okay.

21         MR. DUSTON:  It wasn't --

22         THE COURT:  So the confidential part -- I think

23 that is what threw me off because that made it --

24         MR. DUSTON:  Well, the confidential --

25         THE COURT:  -- sound like it was a trade secret

1    issue.

2            But that actually doesn't matter.  This could have

3    been a public meeting, but as long as you pointed it out and

4    they weren't aware of it, your theory kind of works.

5            MR. DUSTON:  For this particular point, Your Honor.

6            THE COURT:  For that part of it.

7            MR. DUSTON:  There is this -- we do rely on the

8    fact that this meeting was confidential, and that plans were

9    shared with them about what direction we were intending to

10   head and which particular boat models and lengths we were

11   going to focus upon, which led them to essentially slip in

12   behind us and target the soft underbelly that we had revealed

13   to them we would not be focusing on in the coming years.

14   ███████████████████████████████████████████████

15   ███████████████████████████████████████████████████

16   ███████████████████████████████████████████████████

17   ████████████████████████████████████

18           And they took that, Your Honor, and used it against

19   us by going after the market that they knew would be open to

20   them.  That is primarily the confidential meeting in 2024.

21           But to Your Honor's point, it didn't even occur to

22   them, this so-called obvious solution to removing heat from

23   the bearing -- from the flywheel side of the bearing.  It

24   wasn't in their minds at the time that they were

25   contemplating their own device.

```
1              After listening to us and talking about the
2    performance of our device and what was the cause of that
3    performance, suddenly they realized the need for that
4    particular feature --
5              THE COURT:  Right.
6              MR. DUSTON:  -- and they adopted it.
7              THE COURT:  But what you pointed out to them was
8    something that you had already told the public --
9              MR. DUSTON:  Correct, Your Honor.
10             THE COURT:  -- in your patent?
11             MR. DUSTON:  That is true.
12             THE COURT:  So it wasn't -- that particular part
13   wasn't confidential?
14             MR. DUSTON:  That is right, Your Honor.
15             THE COURT:  Okay.  I think I understand where I was
16   not following you.
17             Okay.  So that is the secondary indicia.
18             And then on motivation to combine, I mean, I think
19   I have your arguments from the papers.
20             On infringement, is there anything that you wanted
21   to say in response on this mention of Column 4 and the
22   emphasis on passive cooling?
23             MR. DUSTON:  So let me -- let me jump to -- I
24   actually wanted to come back to something Your Honor had
25   raised, which was Column 6.
```

1          And I think you are dead on, Your Honor, on this

2    reference here.

3          THE COURT:  No.  You think that my playing devil's

4    advocate was good for your client.  Well, that is the whole

5    point.

6          Okay.  But, no, tell me why you think that I am so

7    right.

8          MR. DUSTON:  So looking at this Column 6 around

9    Lines 40, okay, you are talking about -- this is talking

10   about this separate structure that is applied to the exterior

11   of the device.

12         THE COURT:  Uh-huh, the collar.

13         MR. DUSTON:  Okay.  This cooling collar assembly.

14         THE COURT:  Right.

15         MR. DUSTON:  Right.  And in this cooling collar

16   assembly, they are talking about heat generated by the

17   bearing inner races.  This is -- in this case, the inner

18   races in this particular depiction, the inner races are

19   associated with the moving or spinning part.

20         THE COURT:  Uh-huh.

21         MR. DUSTON:  The heat generating by the bearing

22   inner races and electric motor rotor is transferred to the

23   exterior by the cooling collar assemblies 50 and 52.  Okay?

24         Now, let's take a look at the cooling collar

25   assemblies 50 and 52.

1        Okay.  Here is -- let me see if I can rotate it.

2        THE COURT:  Yeah.

3        MR. DUSTON:  Okay.  I got it.

4        Okay.  Cooling collar assemblies, 50 and 52.  Okay?

5        So here is the cooling collar assembly 50 at the

6    top of the device.  Right?  It is sitting on the exterior of

7    the enclosure.

8        THE COURT:  Yeah, arguably, it is part of the

9    exterior, surface.

10       MR. DUSTON:  Well, I don't think that is right,

11    Your Honor.

12       THE COURT:  Right.

13       MR. DUSTON:  Because the enclosure itself has never

14    been identified as incorporating the collars.  The collars --

15    these assemblies are all talked about as being placed on the

16    device.  But -- but this is talking about heat -- going back

17    to Column 6 again, Column 6, line 40.

18       So heat generated by the bearing inner races is

19    transferred to the exterior by the cooling collar assemblies.

20       Okay.  So the heat is transferred via the

21    interleaved fins through the enclosure, into the cooling

22    collar, and then to the exterior.

23       THE COURT:  Right.  Okay.

24       MR. DUSTON:  Now, what is the exterior?  It has got

25    to be the atmosphere.  The only thing exterior to the cooling

1      collar is the atmosphere.

2              THE COURT:  Yeah, I mean, that was the point that I

3      was making as devil's advocate, and I think it is not totally

4      clear.  But, obviously, I see where you are going with that

5      point since I made it.

6              The next sentence says that each collar assembly

7      includes an inner rotating collar and an outer stationary

8      collar.  That is just talking about how the collar locks on

9      to the rest of it, right?

10             MR. DUSTON:  I believe that is correct.

11             THE COURT:  That is not the rotation of the

12     flywheel; that is the screwing it on.

13             MR. DUSTON:  I think that is correct, Your Honor.

14             THE COURT:  I thought so.

15             Okay.  Well, I think I have your point there about

16     what that could mean and what "exterior to the collar" means.

17             Okay.

18             MR. DUSTON:  I'm going to talk about the DG3 and

19     this infringement argument for a moment.

20             THE COURT:  All right.

21             MR. DUSTON:  Okay.  And, Counsel, am I okay to show

22     this?  We have my clients in the room.

23             MR. KHARITON:  That is something redacted from our

24     briefing, so --

25             MR. DUSTON:  I realize that.

1          MR. KHARITON:  Yeah, so --

2          THE COURT:  It looks like our other spectators have

3     left, and if you --

4          MR. DUSTON:  Do you want our clients to step out

5     for a moment?

6          MR. KHARITON:  I think I would prefer that, yes.

7          (Seakeeper representatives leave the courtroom.)

8          THE COURT:  So we will still be taking a record of

9     this.  If anything you say, as opposed to show, needs to be

10    sealed, you will just need to file a motion.

11         MR. DUSTON:  Very good, Your Honor.

12         THE COURT:  And there will be an appropriate time

13    when the transcript may or may not be requested.

14         MR. DUSTON:  So there was emphasis made by counsel

15    on this paragraph of Mr. Troche's declaration, paragraph 29.

16         And he emphasized this statement:  Heat is

17    transferred with the heat transfer element attached to the

18    spinning member to the stationary heat transfer element.

19         That's -- heat is transferred from the -- from one

20    set of vanes that is moving to the stationary set of vanes.

21         And that stationary set of vanes is thermally

22    connected to the enclosure.  That is what he emphasized.

23         Now, first of all, Mr. Troche is not speaking to

24    what the claim means here.  In fact, the very next sentence

25    is, he is stating that this is -- his discussion of what is

1    illustrated in Figure 2.  And as we have talked about, the

2    speculation doesn't govern what the claim means; the claim

3    governs what the claim means.

4         But in any event, this statement is equally

5    applicable to the DG3.  Because in the DG3 -- okay.  Here is

6    the -- here is the DG3.  Let see if we can blow this up.

7         THE COURT:  I can read it if you are blowing it up

8    for -- oh, you are blowing it out.  That's fine.

9         MR. DUSTON:  There we go.

10        Okay.  So in this scenario, you see this gray area

11   here.  These are the --

12        THE COURT:  Stationary vanes.

13        MR. DUSTON:  These are the stationary vanes, right?

14   And these stationary vanes are thermally connected to the

15   enclosure.

16        Now, there is an additional cooling channel here,

17   but heat is flowing through those vanes into the enclosure,

18   the metallic enclosure.

19        THE COURT:  Uh-huh.

20        MR. DUSTON:  Okay.  Then heat is being drawn off.

21   Not only heat.  I hazard to guess that there -- that that

22   enclosure heats up, and that those cooling channels are not

23   100 percent effective at removing any heat that enters the

24   enclosure.

25        But those things are thermally connected to the

1     enclosure.  All right?

2              Now, there has been a lot of discussion that the

3     vanes take the heat -- they do not take the heat.

4              THE COURT:  I mean, I guess that is true if the

5     blue enclosure is itself thermally conductive, which I don't

6     know if it is made of metal or plastic or --

7              MR. DUSTON:  No, it is made of metal, Your Honor.

8              THE COURT:  Okay.  I mean, I just don't -- I

9     haven't seen enough declarations to know, but --

10             MR. DUSTON:  To encase a flywheel spinning at

11    nearly 10,000 RPM, it's going to be -- if that flywheel comes

12    apart, you are going to want something to hold that together.

13             But in any event, Your Honor, there has also been

14    talk that these vanes are communicating heat and transferring

15    the heat inside the enclosure, not exterior to the enclosure.

16    All right?

17             Well, this -- if what that -- by that counsel means

18    that the heat is transferred to this coolant channel and the

19    liquid within it --

20             THE COURT:  Uh-huh.

21             MR. DUSTON:  -- this coolant channel is not inside

22    the enclosure.  This coolant channel is bored into the

23    enclosure.

24             The inside of the enclosure is this gasless area in

25    here.  So the heat is not being communicated -- it is not

1    being handed off while it is still inside the enclosure.  It

2    is being handed off after it has been removed from the inside

3    of the enclosure, and it is being passed along in part, not

4    entirely, but in part to a coolant that is additionally used

5    to remove it to the exterior, to the atmosphere, to somewhere

6    outside of the device, Your Honor.

7            And let's point out, too, that this claim does not

8    require that the vanes carry the heat all the way to the

9    exterior.

10            THE COURT:  Right.  It just says that they are

11    configured such that the heat can be.

12            MR. DUSTON:  Can be, right.

13            THE COURT:  Yeah.

14            MR. DUSTON:  Right, Your Honor.  That is exactly

15    right.

16            THE COURT:  Yeah.

17            MR. DUSTON:  They are the first step of this

18    journey.  Each -- a journey of a thousand miles begins with

19    one step.  These vanes are the first step of the path.

20    Remove these vanes, and there is no path.  There is no

21    removal of heat if you remove these vanes.

22            So these vanes are part of that path.  They are

23    configured to readily transfer heat to the exterior.

24            THE COURT:  So on this view, even if the phrase

25    "the exterior of the enclosure" means the surface that is on

the outside of the enclosure, you would say that the DG3
still infringes because it has vanes that are configured such
that the heat can be transferred to that surface for the
reason you just said, even if most of the heat is, in fact,
transferred through the surface by the coolant pipes?

MR. DUSTON:  I think that is correct, Your Honor.
But I also think that the whole assumption that the claim is
limited to transferring heat to the surface of the enclosure
when surface of the enclosure is used within the
specification very precisely when it is meant to refer to the
surface.  And in this claim it is not a reference to the
surface but instead to the enclosure.

And as Claim 6 indicates, the only logical meaning
of enclosure -- or the exterior of the enclosure is to mean
to move heat into the atmosphere, to move heat outside --
somewhere outside of the device, however that gets done.
Whether it is by air cooling or it is by moving liquid that
carries that heat to the outside of the device, that is what
"to the exterior" means.

THE COURT:  Yeah, I mean, that is obviously the
ultimate goal.  The question is whether there was a claim to
doing it in a narrower way because it would be passive, and
that would have advantages.

But we can address that further, later in the case.

Can I move you along to --

1          MR. DUSTON:  Yes, Your Honor, please do.

2          THE COURT:  -- any final obviousness?  I think we

3    covered that.

4          You want to turn to the equities and talk a little

5    bit about my questions to your friend on the other side, you

6    know, the most immediate motion before the Court is the TRO.

7          I think we heard that if Dometic Marine Canada is

8    subject to the Court's personal jurisdiction, an injunction

9    might keep it from shipping -- a TRO, excuse me, might keep

10   it from shipping 12 units in June, something like that.

11         Does that -- I know you would contend every lost

12   sale and every customer relationship damaged is irreparable,

13   but does that lessen somewhat the extent of the irreparable

14   harm?

15         MR. DUSTON:  It is still irreparable, Your Honor,

16   even if it's -- even if, as counsel suggested, would be

17   minimal, it is still irreparable.  It is likely to lead to

18   harm for which we can't recover.

19         And if we are talking about balance of hardships, I

20   still have not heard any articulation from Dometic as to what

21   a 28-day delay in the shipment of less than 12 units is going

22   to occasion to his client, as compared to what happens when

23   our prices are eroded, where prices set by Dometic force us

24   to move our prices, not just for the SK3 but for the more

25   profitable SK4, which we need to use in order to compete

1    against Dometic.  We have to move those prices down into line

2    with Dometic's prices.  We cannot move those prices back up.

3         One shipment, two shipments, three shipments will

4    have that kind of price erosion effect on our ability to

5    price the SK4, which is -- which was subject to a particular

6    plan when we thought that we had patent protection for the

7    next two years, which has been up-ended by Dometic's decision

8    to come in here and ship these products.

9         So I think on balance, Your Honor, there is no

10   question that the balance of hardships here favors Seakeeper

11   and not Dometic, Your Honor.

12        THE COURT:  Do you think that the Court should just

13   go ahead and rule on the preliminary injunction motion here?

14   Because as we all talked through this, it seems like the 28

15   days' issue is -- it is rapidly fleeting, and for these 12

16   units that they may be shipping, they have already apparently

17   found a buyer for them, so some sort of deal has already been

18   made?  "They" being Dometic Marine Canada.

19        So if I just -- if I say all we are doing is 28

20   days, we are going to come back and have another round on the

21   preliminary injunction.  You know, if the buyer was inclined

22   to hold off from buying your product until this point, they

23   will probably be inclined to wait another 28 days to see what

24   happens.

25        Whereas if I enter a preliminary injunction, that

1  would last until final judgment in the case.  So if you got a

2  preliminary injunction, that may actually cure some of this

3  harm you are talking about.

4         I am just not sure a TRO is really going to cause a

5  hypothetical buyer who has already gotten this far to

6  suddenly, you know, cancel their contract with Dometic Marine

7  Canada and switch back, as opposed to just keep things

8  paused.

9         What do you think about that?

10        MR. DUSTON:  Well, Your Honor, if you are

11 suggesting that you are going to enter a PI, I am not going

12 to stand in your way.

13        THE COURT:  Well, I'm just wondering -- I mean, I

14 think both motions are ripe.  They have been filed.  All of

15 the briefing is in.  And I am -- I suppose I am asking for

16 your position on, regardless of how I rule, do you think the

17 Court should rule on those together?  Or do you think there

18 needs to be a ruling on the TRO, and then some sort of

19 further proceedings on preliminary injunction?

20        MR. DUSTON:  I think, Your Honor, that there is

21 enough in this record to merit entering not only a TRO but a

22 preliminary injunction.

23        But if Your Honor was disinclined to enter either

24 of those two requests, then what I would ask is that most

25 likely that disinclination was due perhaps to some

1    uncertainties about the facts or that further argument would

2    perhaps persuade Your Honor that after denying a TRO, that a

3    PI would still be appropriate.

4         And so I would ask Your Honor, if you were inclined

5    to deny the TRO, that we set this matter as quickly as

6    possible for a PI.

7         THE COURT:  For a PI.  I think that is what I am

8    getting at is, which is, I wonder if, given what I hear about

9    the concreteness of the irreparable harm in 28 days versus

10   over the year or so -- potentially more than a year, two

11   years it could take to resolve the case, if most of the

12   irreparable harm would be prevented by a quick ruling on a

13   PI, as opposed to a quick ruling on a TRO that is going to

14   expire in 28 days.

15        I think the one potential other benefit of moving

16   more quickly to a PI ruling would be that we could get the

17   parties' briefing on the amount of a Rule 65(c) injunction

18   bond, which hasn't been briefed up.

19        But as I mentioned -- I am curious to get your

20   reaction to this.  I mentioned to your friend on the other

21   side, it is a provision of the Federal Rules of Criminal

22   Procedure that is a directive to the courts, not necessarily

23   just a right that can be waived, but an actual directive.

24        And on top of that, Congress has told courts in

25   other contexts lately, at least some houses of it -- or one

1    House has told courts to be more cognizant of that

2    requirement.

3            So do you have a proposed structure for addressing

4    the amount of any injunction bond, like a proposed timeline

5    where the Defendant would file some documentation on that and

6    then you would have a proposed timeline to respond?

7            MR. DUSTON:  So I agree with Your Honor that moving

8    straight to the grant of a PI would make sense in this

9    circumstance.  It would also -- it would also enable

10   Defendant to take an appeal --

11           THE COURT:  Right.

12           MR. DUSTON:  -- to the Federal Circuit.

13           THE COURT:  Might get some appellate guidance.

14           MR. DUSTON:  Might get some appellate guidance.

15           And then with respect to the bond, my only concern

16   about procedures surrounding the bond has to do with the fact

17   that most likely the injunction doesn't take effect until the

18   bond is posted, unless Your Honor would make an exception to

19   that.

20           And so I would not want to delay the effect of the

21   injunction unduly in order to, you know, engage in bond

22   discussions, which, quite frankly, Your Honor, should have

23   been engaged in in this proceeding.

24           So if we were going to give the Defendant an

25   opportunity to present a number in support for that, I would

1    ask that that be done immediately.

2              THE COURT:  Right.  I think I could come up with a

3    non-speculative number, but it might give me a little more

4    comfort if I had some data.

5              And as I stated, Rule 65(c) is phrased as a

6    directive to the court, the court may issue a preliminary

7    injunction or a TRO only if the movant gives security in an

8    amount the court considers proper.

9              Again, I think I could come up with one, but I

10   might direct some further briefing.  I will do that in

11   writing though.  But it would have to be quick.

12             On the equities, I will ask you the same question

13   that I asked Mr. Khariton, which is, are there any middle

14   ground -- assuming that I think it is fuzzy where we

15   ultimately go on claim construction, and I would need to hear

16   more, is there any middle ground that you have come up with,

17   such as, well, the Defendant can offer for sale certain

18   models but not others, or it can't refer to certain things in

19   the marketing?  Anything along those lines?

20             MR. DUSTON:  You know, I'm hard-pressed to come up

21   with a solution for that and not knowing what the Defendant

22   may be capable of doing.

23             (Seakeeper representatives return to the

24             courtroom.)

25             MR. DUSTON:  You know, in the early correspondence

1    when we were trying to seek a cease and desist from the

2    Defendant, there was an indication that they were still in

3    the planning stages, in the design stages with respect to

4    their product.

5         I don't know if they can remove this feature.  I

6    suspect that if they can't, it simply shows how essential it

7    is, but it would seem to me if they have a design-around --

8         THE COURT:  Yeah.

9         MR. DUSTON:  -- that they might be able to

10   present.

11        THE COURT:  What about, assuming there is personal

12   jurisdiction, what about enjoining sales but not offers for

13   sale?  That would seem to address some of the harm.  Not all

14   of the harm.  And that is why I am calling it a middle

15   ground.  But have you given any thought to that?

16        MR. DUSTON:  The problem is that the price erosion

17   is one of the -- one of the largest -- one of the most

18   significant irreparable harms that we face in terms of our

19   ability to -- in terms of the fact that we will be

20   permanently now discounting our products.

21        Whether or not Dometic remains in the market, the

22   customers will never go back to a higher price after we are

23   forced to deal with them at a lower price.

24        We also have the IBBI situation, the buying groups

25   who are all now, you know, knocking on our door indicating

1  that since there is a competitor, now we have to -- we have

2  to kowtow to them.

3           THE COURT:  Well --

4           MR. DUSTON:  And that could be a problem where they

5  are simply making offers and trying to line up sales without

6  actually shipping.

7           THE COURT:  Yeah.  In this hypothetical world, your

8  client would be able to tell its potential customers, you

9  know, the Court saw enough to enjoin whatever party from

10  actually selling you this device through the end of the case.

11  If you want your device now, you can buy it from us.

12           Is that -- would you reject that if that is all

13  that was offered?

14           MR. DUSTON:  Yeah, that makes us the bad guy.  That

15  is going to put our reputation in harm's way I think if we

16  have to force the client --

17           THE COURT:  No more than a -- no more than a bad

18  guy filing this lawsuit.

19           MR. DUSTON:  Well, we are not the bad guys,

20  Your Honor, at least in our view.

21           THE COURT:  No.  I said "no more than."  I didn't

22  say there was any bad-guy quality at all, but no more than

23  filing the lawsuit.

24           Okay.  So that's -- those are my questions on the

25  equities.

1        Did you have any facts you wanted to put on the

2   table about jurisdiction, particularly on facts that might

3   bring this case within the Tigo line of cases or show an

4   agent relationship between Dometic Corporation and Dometic

5   Marine Canada?

6        MR. DUSTON:  Well, I think we have laid these out

7   in our briefing, Your Honor, but let me just quickly point to

8   them and primarily, you know, the connections between these

9   two entities.

10        So, for example, Your Honor --

11        THE COURT:  Is the agency relationship primarily

12   driven by the Dometic Corporation employee at the boat show?

13   What would be Exhibit A, do you think?

14        MR. DUSTON:  I mean, well, one exhibit is -- you

15   know, here is -- here is their website.  This is Dometic

16   Corporation, which has been acknowledged by Defendant's

17   counsel.  This is Dometic Corporation's website.

18        This is their DG3 telling people to -- that this

19   can be sourced from their dealer network, dealer network that

20   happens to be throughout Delaware.

21        When you click on find a store for the DG3, it

22   points you to all these locations in Delaware.  Right?  They

23   say they don't make the DG3, so they are obviously serving as

24   an agent for the Canadian company that is routing the DG3

25   through their sales efforts.

1          But it goes both ways, Your Honor.  Because on

2     their website, they have terms of sale for the DG3.  This is

3     at the bottom of the DG3 -- here is the DG3 product page

4     right here on their website.  And down at the bottom are a

5     set of purchase order terms, terms of sale, terms and

6     conditions for consumers.

7          When you click on those, these terms and

8     conditions -- these are terms of conditions by Dometic

9     Corporation or any Dometic Corporation --

10          Let's move it over here.

11          -- subsidiary.

12          Okay.  So it goes both ways.  Dometic Corporation

13     on its website selling the DG3 directing people to their

14     dealer networks, dealer networks including Delaware, are

15     setting out terms and conditions of that sale for themselves

16     and for their subsidiaries, including Dometic Canada.

17          So in terms of control here, which has been --

18     which has been denied, here we have Dometic Corporation that

19     is spelling out exactly what terms and conditions, warranty,

20     delivery, limitations on liability, et cetera, not only for

21     the sales they make but for the sales made by their

22     subsidiaries.

23          THE COURT:  And so under Rule 65(d)(2), the persons

24     bound by an injunction or a restraining order include the

25     parties, the parties' agents, and any other persons in active

1    concert or participation with one of those entities.

2          MR. DUSTON:  And as the Tigo case, Your Honor,

3    points out, this is such a situation where you have

4    multiple -- you have several corporations acting collectively

5    as a group being labeled and presented to the world as the

6    marine division or marine business of Dometic.  And it is not

7    specific to Canada or U.S. Dometic Corporation or whatnot.

8          It is all under the same umbrella, the same --

9    trademarks are used.  I heard counsel indicate that the

10   trademarks are used throughout --

11         THE COURT:  The family.

12         MR. DUSTON:  -- the Dometic group, not just Dometic

13   Corporation.

14         But Dometic Corporation in 2020 was the party that

15   filed saying they had the exclusive right to enforce those

16   trademarks in the United States, that harm to those

17   trademarks was not harm to a whole bunch of entities.

18         It was harm directly to them, that they themselves

19   were the party that was positioned -- here we go.  These are

20   the some of the paragraphs from that complaint.  Okay?

21         Dometic -- Dometic Corporation has taken

22   substantial steps to ensure the products are of the highest

23   quality.  They control the quality of the products bearing

24   those marks in the United States.

25         All right.  They have specific -- these are -- they

1  say that use of these trademarks indicates to people that

2  Dometic Corporation has been responsible for specific quality

3  controls that authorized resellers, et cetera, are required

4  to follow.

5          So Dometic Corporation is not a stranger to Dometic

6  Canada.  These two parties are in close cahoots with one

7  another in terms of getting these products to market.

8          And I will say this, too, Your Honor:  There is a

9  lot of discussion about there has not been infringement, or

10  there has not been infringement in Delaware.

11          But there has, Your Honor.  Because under 271(a),

12  infringement isn't limited to making a sale or shipping a

13  product.  An offer of infringement --

14          THE COURT:  An offer of sale.

15          MR. DUSTON:  -- an offer of sale, rather, is an

16  infringement.  And we have presented evidence that those

17  offers are, in fact, being made into Delaware, that parties,

18  Regulator specifically with whom they have a contract, has

19  made offers into Delaware to sell the DG3 at a specific

20  price, $57,000 and change.  And they provided a purchase

21  order which all that the person has to do is accept.

22          So these -- these infringing offers have been

23  directed into Delaware through the inducing acts -- here

24  is the form from one of Regulator's dealers, Bluewater.

25  All right?  Accepted.

1          THE COURT:  Right.  But this would have to rely on

2     an offer for sale theory since this is not a contributory

3     infringement theory as to Dometic Corporation, right?  I

4     mean, you are not saying there is some part they are

5     providing; you are saying they are directly infringing

6     through an offer for sale?

7          MR. DUSTON:  The offer of sale, there is a direct

8     infringing act in Delaware is my point, Your Honor, and that

9     the offer for sale is a direct infringement in Delaware, and

10    that was induced by Dometic, which is an act of indirect

11    infringement.  And Dometic is guilty of that indirect

12    infringement.

13         And I heard counsel indicate that there are -- he

14    acknowledged that there are costs, specific dollar amounts

15    set forth on the Dometic Corporation website.  He described

16    them as manufacturer's suggested retail prices.

17         That says it all, Your Honor.  That is Dometic

18    Corporation telling dealers, instructing them to offer the

19    DG3 at a particular price.  That is inducement, and that is

20    what Regulator has now done.

21         THE COURT:  My last question on, really on all of

22    the motions before the Court today, would be circling back to

23    the irreparability of any harm.

24         Is one type of installation, assuming it is

25    infringing, more difficult to quantify in damages than

1    another as between DG3 selling for new boats, new

2    installations, and selling retrofits?

3            In other words, if a PI or TRO were to limit the

4    Defendant and its collaborators to selling the DG3 only for

5    retrofits, would that address the most -- the most

6    irreparable harm you are alleging by prohibiting the new

7    boats with all of the relationship and lock-in effects that

8    come with new boats?

9            MR. DUSTON:  So let me answer it this way:  First

10   of all, I think your question started out with whether or not

11   one would not be irreparable but the other would.  I think

12   they are both irreparable.

13           THE COURT:  The degree of irreparability though.

14           MR. DUSTON:  I mean, in terms of our business is 75

15   percent OEM and 25 percent retrofits, you know, the dollar

16   impact of the irreparable harm might be lower, but it still

17   remains irreparable harm, and there is no threshold that I am

18   aware of under Rule 56 that says, you know, as long as most

19   of the irreparable harm is avoided, you can go ahead and

20   infringe freely.

21           THE COURT:  No, I agree, it is not a threshold.

22   But the Court has to balance all of the equities, as well as

23   balance what I can tell right now about likelihood of

24   success.

25           It seems like the stronger of your two arguments

1    for irreparable harm had to do with quantifying loss of

2    lock-in, network effects, that sort of thing, boat design

3    plans.  Once they are made, are much harder to change.

4    Versus a lost sale in a retrofit doesn't necessarily involve

5    as much of a difficulty at quantifying that.

6            I mean, you probably have some baseline of your

7    retrofit sales, and then you could measure whether they go up

8    or down or -- it seems like it would be easier to quantify

9    that loss if it is ultimately a loss for which the Defendant

10   is liable, and maybe it is not.

11           And so -- I am just trying to assess the relative

12   irreparability of them.  I think you have given me your

13   position, but if you have any other reaction.

14           MR. DUSTON:  I understand what you are saying,

15   Your Honor.  I think -- I think it is not that it would be

16   any easier to measure that loss, but it would probably be

17   admittedly a lower -- a lower -- a lower amount ultimately, a

18   lower impact if it were just -- if it were just retrofits

19   versus new boats.

20           But still we have the problem of at what price are

21   these retrofits offered?  And is that price going to then

22   push the needle down on our sales to OEMs, for example?  And

23   then those parties who buy the DG3, if they had bought a

24   Seakeeper instead, those are repeat customers for us.

25           They model up at some point.  They upgrade.  They

1    have trade-ins.  They have maintenance.  They have all sorts

2    of other ancillary revenue streams.  And they have word of

3    mouth, right?  They go and tell other people that they have

4    got Seakeepers.  They have people out on their boats.

5         I mean, that is why Dometic takes people out on

6    these boats.  The minute you stand on one of these boats,

7    Your Honor, and flip that switch, you will never go back to

8    the old days.  I mean, that deck is rock solid.

9         And we need those installations in order to sell

10   and drive our sales, not just for -- not just for retrofits

11   but this word of mouth.

12        Kind of like the pharmaceutical industry that

13   spends all this time on TV advertising prescription

14   medications.  It is not like you can go out and get those

15   prescription medications.  What they are doing is telling

16   people to go to their doctors and demand that prescription

17   medicine.

18        That is what is happening here.  These people

19   experience Seakeeper, and they demand from dealers and OEMs

20   that they equip their boats with Seakeepers.  That's what we

21   mean.

22        THE COURT:  I believe it.  I do believe it.  Both

23   of these products solve a felt market demand.  I would agree

24   with that.  That -- it seems that gyroscopes and hydrofoils

25   are two revolutions in ship stability in the past, I don't

1    know, 50, 60 years.

2              All right.  Anything else?

3              MR. DUSTON:  Nothing at the moment, Your Honor.

4              THE COURT:  Okay.  Well, the motion -- motions are

5    submitted.  And I will issue my ruling as I am able.

6              Thank you again.

7              MR. DUSTON:  Thank you, Your Honor.

8              THE COURT:  All right.  Court is adjourned.

9              (Hearing adjourned at 4:54.)

10

11                        CERTIFICATION

12

13              I HEREBY CERTIFY that the foregoing is a true

14   and correct transcript from the stenographic notes of the

15   proceedings in the above-entitled matter to the best of my

16   ability.

17

18   /s/ Shea Sloan                        June 3, 2025
     SHEA SLOAN, CSR, RPR
19   FEDERAL OFFICIAL COURT REPORTER

20

21

22

23

24

25