# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

SEAKEEPER, INCORPORATED,

Plaintiff,

v.

DOMETIC CORPORATION, DOMETIC
GROUP AB, and DOMETIC MARINE
CANADA, INC.

Defendant.

C.A. No. 25- 0484-JCB

**JURY TRIAL DEMANDED**

## FIRST AMENDED COMPLAINT

Plaintiff Seakeeper Inc. ("Seakeeper"), by and through its undersigned attorneys, for its

Complaint against Defendants Dometic Corporation ("Dometic"), Dometic Group AB ("Dometic

Group)" and Dometic Marine Canada Inc. ("Dometic Canada") (collectively, "Defendants")

alleges as follows.

## NATURE OF THE ACTION

1.      This is an action under the patent laws of the United States, 35 U.S.C. § 100 *et seq.* for patent infringement by Defendant of U.S. Patent No. 7,546,782 ("the '782 patent"), as well as an action for false and misleading advertising under the Lanham Act § 43(a), 15 U.S.C. §1125(a).

2.      The acts of infringement and false and misleading advertising relate to Defendants' ongoing manufacture, use, sale, importation, offer to sell and/or contribution to, active inducement or encouragement of others to do any of the foregoing, within the United States.

## THE PARTIES

3.    Seakeeper is a corporation organized and existing under the laws of the Delaware, having its principal place of business at 5460 Pottsville Pike, Leesport, PA 19533.

4.    Seakeeper, founded in 2003, by entrepreneur Shepard McKenney and naval architect John Adams, is the global leader in marine motion control technology. Initially inspired by the need to minimize boat roll, Seakeeper's founders integrated advanced gyroscopes to effectively counteract the rolling motion experienced at sea, dramatically improving onboard comfort.

5.    Seakeeper's product line has revolutionized boating through gyroscopic stabilizers that eliminate up to 95% of boat roll, significantly enhancing comfort and reducing seasickness for those on board. Seakeeper's gyrostabilizer technology has been widely adopted, with tens of thousands of units installed and demand rapidly growing.

6.    On information and belief, Dometic is a corporation organized and existing under the laws of the state of Delaware with a principal place of business at 5600 N River Rd Ste 2500, Rosemont, Illinois 60018.

7.    On information and belief, Dometic Group is a Swedish corporation with a principal place of business at Hemvärnsgatan 15 6tr, Solna, SE, SE-171 54, Sweden.

8.    On information and belief, Dometic Canada is a Canadian corporation with a principal place of business at 3831 No 6 Rd, Richmond, BC V6V 1P6, Canada.

9.    On information and belief, Dometic Canada, together with Dometic are an integral part of the Dometic Group's global marine segment and each have extensive, continuous, and systematic contacts with the United States.

2

10.     Dometic Canada is an indirect subsidiary of Dometic and, ultimately, Dometic Group. On information and belief, Dometic does business as "Dometic Marine."  In the alternative, Dometic Canada does business and has done business actively and systematically in the United States, including within this District since at least 2011, as Dometic Marine. In the further alternative, both Dometic and Dometic Canada collectively and in concert do business and have done business actively and systematically in the United States, including within this District since at least 2011, as Dometic Marine.

11.     Dometic Canada maintains physical locations and operational facilities in various U.S. states, including on information and belief a facility at 640 North Lewis Road, Limerick, PA 19468, among others, through which Dometic Canada transacts business across the United States, including in this District, by, among other things, the marketing, sale and support of products.

**JURISDICTION AND VENUE**

12.     Seakeeper incorporates and realleges the foregoing paragraphs.

13.     This Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. §§ 1331 and 1338(a) because this action involves substantial claims arising under the United States Patent Act (35 U.S.C. § 100 *et seq.*) and the Lanham Act (15 U.S.C. §1125(a)).

14.     This Court has personal jurisdiction over Dometic because Dometic is a corporation organized and existing under the laws of the state of Delaware.

15.     This Court has personal jurisdiction over Dometic Canada. Dometic Canada, in its own name and/or doing business as Dometic Marine or as the marine division of Dometic, has purposefully availed itself of the benefits and protections of Delaware's laws such that it should reasonably anticipate being hailed into court here.

3

16. This Court has personal jurisdiction over Dometic Canada because, among other things, on information and belief and described in more detail below: (1) Dometic Canada itself and through its parent company, Dometic, offers the accused Dometic DG3 product for sale in the United States, including in Delaware, and induces its parent and third parties to so offer the accused product for sale (*see infra*, ¶¶53-66); (2) Dometic Canada, through the website of its Delaware-incorporated parent, Dometic, to solicit U.S. customers, including customers in this District, such as by allowing prospective customers to request product information and engage with sales teams capable of selling and/or demonstrating the accused DG3s products at stores within in this district (*see, e.g., infra*, ¶¶60-61); (3) Dometic Canada, alone or together with Dometic, contracted with a U.S. boat manufacturer, Regulator Marine, Inc. ("Regulator"), supplies Regulator with accused DG3 product for its Regulator 35 boat model sold and/or offered for sale in the U.S. and in this district (*see infra*, ¶58); ); (4) Dometic Canada has participated in designing the accused DG3,  among other things, to comply with U.S. regulatory standards, and provided product documentation, labeling, and instructions tailored to U.S. customers, training for U.S.-based sales and service personnel, and participated in U.S. trade shows and marketing campaigns promoting the accused products; and, (5) on information and belief, Dometic Canada has purposefully directed activities at the United States and this District by itself or through its parent designing, approving, and directing the marketing strategy for the accused products sold in the United States, including in this District, including reviewed and approved advertising materials disseminated by its U.S. parent that are the subject of Plaintiff's claims and knew and intended that those materials would be distributed to consumers in this District, and that such claims caused Plaintiff to suffer reputational and commercial injury in this District. For example, due to Delaware's extensive coastline, numerous marinas, and seasonal

boating culture, it is recognized as a strong market for both new and resold boats of the type suitable for the accused DG3 product The claims asserted herein arise out of and relate directly to the above activities.

17.     This Court has personal jurisdiction over Dometic Group with respect to the alleged Lanham Act claims. Among other things, Dometic Group has, on information and belief, (1) designed, approved, and directed the challenged marketing for the accused products in the United States, including in this District;  (2) participated in reviewing, drafting, authorizing, and disseminating, and approving the representations by Dometic and Dometic Canada that form the basis of Plaintiff's claims, including communications directed to U.S. customers and partners, which were expressly aimed at the United States market, including this District, and causing injury here among potential direct and indirect purchasers; and, (3) shares integrated operations, including unified branding, consolidated financial reporting, and centralized decision-making with respect to product development, marketing, and compliance of the DG3, and dictates the strategic direction and approves significant operational decisions of Dometic and Dometic Canada. The claims asserted herein arise out of and relate directly to those activities. Dometic Group also has purposefully availed itself of the benefits and protections of Delaware's laws such that it should reasonably anticipate being hailed into court here.

18.     Alternatively, under Fed. R. Civ. P. 4(k)(2), Dometic Group is not subject to jurisdiction in any state's court of general jurisdiction, the claim against Dometic Group arises under federal law, and this Court's exercise of jurisdiction over Dometic Group comports with due process.

19.     Venue is proper in this Court under 28 U.S.C. §§ 1391(b)(1) and 1400(b) because Dometic is resident of this district as a corporation organized and existing under the laws of the

5

state of Delaware, and under § 1391(c)(3) as Dometic Canada and Dometic Group are foreign corporations and are subject to this Court's personal jurisdiction for at least the reasons set forth above.

## BACKGROUND

### Seakeeper's Founders

20.    Seakeeper was founded in 2003 by two marine industry veterans: Shepard "Shep" McKenney and John Adams. McKenney is an entrepreneur, and Adams is a naval architect known for his expertise in boat motion control. Together, they teamed up to create an innovative gyroscopic stabilizer that would forever change recreational boating by virtually eliminating boat roll.

21.    Seakeeper was started with a clear mission: to transform the boating experience by eliminating the debilitating roll of boats and making rides smoother and safer. The founders were driven by a desire to solve the age-old problem of seasickness and discomfort caused by a boat's rolling motion.

### Seakeeper's Initial Years of Investment

22.    Prior to the introduction of Seakeeper's innovations, other, less than satisfactory, solutions to the problem of boat roll had been attempted.  For example, stabilizers such as external hull fins had traditionally been employed.  These stabilization systems were largely limited to large yachts and commercial vessels and created added drag, were vulnerable to damage, and only worked while underway. Their effectiveness was limited, especially for smaller vessels.

23.    McKenney and Adams set out to develop a practical, modern gyro system that could stabilize recreational boats without those drawbacks. Their vision was to eliminate up to

95% of boat roll, the rocking that causes seasickness and fatigue, thereby making boating far more enjoyable for everyone.

24.    Starting essentially as a garage venture, McKenney and Adams began developing their gyro technology in a small workshop on Solomons Island, Maryland. They invested years in research and development. Seakeeper's first prototype was installed on a 43-foot Viking sportfish yacht in 2006, proving the concept.

25.    By 2008, after further years of research and development, Seakeeper officially launched its first commercial product (the Seakeeper M7000 gyro) and secured its first boatbuilder partnership.

### Seakeeper's Original Innovation

26.    A control moment gyro is a torque amplification device.  It uses controlled precession of stored angular momentum to produce large control torques, commonly referred to as gyro dynamics. The torque generated by a control moment gyro helps keep boats steady by reducing side-to-side rolling. A control moment gyro works by using a flywheel, held in place by bearings, that spins and creates strong forces used to balance the movement of the boat.

27.    Before Seakeeper's innovations, marine gyros were big, heavy and limited to large vessels.  Because their flywheels spun in air, they were subject to air resistance, constraining their speeds. Air friction is a major factor contributing to the power required for spinning the gyro up, and the dominant factor in maintaining flywheel speed because air friction goes up with the cube of rpm.

28.    In order to provide sufficient angular momentum at these slower speeds, their flywheels were large and heavy.  For a given weight of the flywheel, increasing the diameter of the flywheel is the most energy efficient way to increase its angular momentum, and thus its

effectiveness. The reason is that (all other things being equal) the angular momentum goes up with the square of the radius of gyration of the flywheel. Such flywheels were only practical on larger ships that could more easily accommodate large flywheels.

29.     The resulting power required to operate these gyros was also beyond the capacity of most boats.  Ships, with their extensive power plants, had large generators available to power such gyro stabilizers, whereas many small boats have minimum electrical resources.

30.     While it is possible to reduce both the weight and size of a flywheel, to achieve sufficient force for stabilization it becomes necessary to increase the speed at which the flywheel spins.  However, while angular momentum goes up arithmetically with rpm, the power required to overcome air friction rises exponentially, requiring even more power.

31.     Thus, small boats were caught in a bind. If the weight of the flywheel was increased, the device would be too heavy. If the diameter of the flywheel was increased, it would be too large.  If the flywheel was spun faster, it would require too much power. Collectively, prior to the innovations of McKenney and Adams, these problems appeared insurmountable for small boats.

32.     McKenney and Adams conceived of employing a vacuum enclosure to achieve high flywheel speeds with reduced size and power requirements.  Seakeeper's M7000 gyro features a flywheel spinning at high speeds within a vacuum-sealed enclosure, generating gyroscopic torque to counteract vessel movement. The introduction of the Seakeeper M7000 in 2008 effectively created a new market for gyroscopic stabilizers in recreational and smaller commercial boats.

33.     McKenney and Adams patented their concept. For example, on June 4, 2003, they filed U.S. Patent Application No. 10/454,905 which was duly issued on December 13, 2005 by

the United States Patent Office as U.S. Patent No. 6,973,847, entitled "Gyroscopic Roll Stabilizer for Boats."

### Seakeeper's Further Essential Innovations in Cooling

34.    Having conquered problems relating to a high-torque stabilization system through use of a vacuum enclosure, among other advances, McKenney and Adams observed that the high heat produced by the moving parts within the system presented a unique problem with such vacuum-sealed environments.  Flywheels racing at thousands of RPM generate not only stabilizing torque but also intense thermal energy.

35.    Flywheels supported in an ambient environment can dissipate heat by air convection. If the flywheel is enclosed in a partial vacuum, such as described in U.S. Pat. No. 6,973,847, there is not enough air to permit adequate convection. Seakeeper's design, with its nearly airless vacuum chamber, could not vent or dissipate this heat through air.

36.    Heat differentials were possible at bearing locations.  Bearings were positioned between the rotating flywheel and stationary support.  This stationary support is conductively connected to the device's outer enclosure.  Because the stationary support is thermally connected to the outer enclosure, heat located at its interface with the bearings can be more effectively drawn off, than can the heat building up where the rotating flywheel and bearing meet.  These rising temperature differences can threaten the gyro's precise tolerances. In a marine environment, failure of an overheated gyro might occur precisely when it was needed most.

37.    McKenney and Adams' use of a vacuum allowed smaller, lighter gyros to generate massive stabilizing force, but only if they could conquer the thermal challenge.

38.    McKenney and Adams overcame this additional challenge through further extensive research. McKenney and Adams determined traditional cooling methods were

9

unsuitable for a vacuum environment. Bearings supporting the heavy flywheel must survive high rates of speed. Conventional cooling lubricants, such as oil, would vaporize in the vacuum. While a special grease ultimately solved the need for lubrication, the problem of carrying away the excessive heat remained.

39. After years of work, McKenney and Adams achieved what many thought impossible. McKenney and Adams conceived of an apparatus having a first heat transfer element attached to and spinning with the spinning member. This first heat transfer element moves relative to a second heat transfer element that is stationary and thermally connected to the enclosure. The first and second heat transfer elements are shaped and positioned in close proximity to one another so that substantial heat is transferred from the first heat transfer element to the second heat transfer element.

40. The close proximity of the two promotes heat transfer by conduction. Gaseous conduction benefits from the fact that the thermal conductivity of a gas increases with temperature so that as the gas warms up it will conduct more heat across the gap (for a fixed temperature differential) between the rotating and stationary vanes.

41. The relative rotational movement, combined with this proximity, creates rotating cavity flows that also promote heat transfer by gaseous convection. Rotating cavity flows will exist in the small gaps between the fixed and rotating vanes even in a partial vacuum. In some applications, the gas density and/or rotational speed will be high enough that gaseous convection will augment the gaseous conduction cooling. The rotating flow circulates the gas molecules so they are continuously transported from the hot rotating vanes to the cooler stationary vanes.

42.    Heat may be conducted from the heat generating components to the rotating vanes by solid conduction, then across the air gap to the stationary vanes by gaseous conduction and convection and then by conduction and convection to the atmosphere or a heat sink.

43.    The design permits heat to be removed passively without circulating any fluids inside the enclosure. This considerably simplifies the device or machine, as a coolant pump, motor, filter and heat exchanger are not required. Grease can replace oil as a lubricant, reducing frictional torque.

44.    Seakeeper's breakthrough—compact, fully internal gyros with efficient vacuum-enclosed flywheels and a proprietary cooling system—made stabilization viable for vessels of all sizes at rest or low speed. By solving the long-standing issue of boat roll in a compact, self-contained package, Seakeeper introduced an entirely new category of marine technology, transforming expectations for comfort and usability across the boating world.

45.    With friction no longer causing overheating from within, the founders' vision to bring gyroscopic stabilizers to recreational and smaller commercial boats could be realized. The gyroscopic stabilizers could now run without overheating, even in the hottest engine rooms or tropical climates, freeing it from the last major constraint.

46.    The improved Seakeeper gyro could spin roughly three times faster than an equivalent non-vacuum gyro without extra power. It could deliver the same stabilizing ability with a flywheel weighing only one-third of what earlier designs required, and it needed only about half the electrical power to operate, making it feasible on much smaller boats.

47.    These advances turned the Seakeeper® into a must-have technology. What had begun as an idea in a Maryland garage in 2002 was, by the late 2000s, a practical reality.

48.    The marine industry's reception evolved from skepticism to fervent adoption as the benefits were demonstrated. Fishermen and yacht owners who long previously accepted nauseating roll as just part of boating, had a product that could provide rock-solid decks and steady stomachs. This was all enabled by the innovations developed by McKenney and Adams to remove heat from within the vacuum enclosure.

49.    By 2013, Seakeeper had shipped its 1,000th Seakeeper® unit, and the pace of adoption has accelerated since. In the following years, the company expanded its product line from one flagship model to a whole family of gyros, scaling the technology to both larger and smaller boats. Today, Seakeeper® gyros can be found on vessels from 23-foot center-console fishing boats to 200-foot mega-yachts.

50.    From a business standpoint, solving the overheating problem was the key to Seakeeper's success. It gave the young company a proprietary, patented solution no competitor had, and justified the years of investment when sales finally took off.

**SEAKEEPER'S PATENTED TECHNOLOGIES**

51.    On January 12, 2006, Seakeeper filed a patent application directed to this advance in control moment gyro technology. On June 16, 2009, the U.S. Patent & Trademark Office issued U.S. Patent No. 7,546,782 ("the '782 patent") titled "Cooling bearings, motors and other rotating heat generating components." The '782 patent lists Shepard McKenney and John Adams as inventors. A true and correct copy of the '782 patent is attached as Exhibit A.

52.    The '782 patent claims are directed to a cooling apparatus for transferring heat from and cooling one or more heat generating components that support or drive a flywheel or other spinning member. The '782 patent is valid and duly issued, and will not expire until at least February 11, 2027.

12

**DEFENDANTS' PRODUCT AND INFRINGING CONDUCT**

53.    On February 12, 2025, Defendants issued a press release announcing the DG3 product, which "marks Dometic's entry into the rapidly growing vessel stabilizer market." *See* Exhibit B. Eric Fetchko, the President of Dometic's Marine Division, emphasized that Defendants were "not just launching a new product, we're taking Dometic into an important new category for the global boating business." *Id.* On February 11, 2025, Defendants, for the first time, revealed the DG3 to the public at the 2025 Miami International Boat Show, which represented Defendants' entry into the vessel stabilization market. *See* https://www.youtube.com/watch?v=mcfgMCTFv0M (Fetchko Speech at 2025 Miami Boat Show) (referred to herein as either "Dometic DG3" or "Dometic's DG product").

54.    Dometic operates a website that offers marine products for sale in the United States. *See* https://www.dometic.com/en-us/outdoor/activities/marine (archived at https://perma.cc/H4MX-HZ4T). In the "Contact Us" portion of dometic.com, the site expressly states that it is the property of "Dometic Corporation." https://www.dometic.com/en-us/contact-us?srsltid=AfmBOopKI7t_j2T19WBOJyOJ72DRNsjJ6_zr6cj1jlU0Uw-Vmf7W7ik4 (archived at https://perma.cc/P8LR-94B8). On the "Terms and Conditions of Sale (Consumer)" portion of dometic.com, it states: "These Dometic Terms and Conditions of Sale (Consumer) ('Terms of Sale') govern all consumer orders for products, including spare parts ('Products'), placed by any individual or organization ('you' or 'your') from the ***Dometic Corporation ('Dometic', 'we', 'our' or 'us') through our website at dometic.com*** ('Website'), as well as any and all subsequent use of such Products." https://www.dometic.com/en-us/terms-and-conditions-consumer?srsltid=AfmBOorClCwvLBOQ7HSaegCVN4I3GzbAyycgshm_yRmrHl1VrMquVkNr (archived at https://perma.cc/DE9Z-E5K8) (emphasis added). On the privacy policy portion of

13

dometic.com, it states: "Thank you for accessing the DOMETIC CORPORATION (U.S.) Website (the 'Website' or 'dometic.com/en-us/us') *operated by DOMETIC CORPORATION* ('Dometic')." https://www.dometic.com/en-us/professional/privacy-policy?srsltid=AfmBOoorXJ0-Eooy_n6JO-Spi4fhWlftX0629LKxumF1YCiHz37XGPUb (archived at https://perma.cc/WS9B-NPH6) (emphasis added).

55.     On dometic.com, a site owned and operated by Dometic, Dometic offers the accused Dometic DG3 gyroscope product for sale. *See* https://www.dometic.com/en-us/outdoor/boat/stabilization/gyroscopic-stabilizers (archived at https://perma.cc/8TND-7WR3). Dometic's website lists the accused Dometic DG3 product, and asserts that the product is "sold in our dealer network." *See*  https://www.dometic.com/en-us/outdoor/boat/stabilization/gyroscopic-stabilizers/14-1411-141101-141101001-374846?v=9620018742 (archived at https://perma.cc/WCQ4-FF4Z). One such identified dealer, Mobtown Offroad, LLC, is located in this district.  Within the page displaying the accused DG3 product, Dometic provides a link to "find a store," which directs potential DG3 customers to stores, including one in this district (Mobtown Offroad, LLC).

56.     On dometic.com, a site owned and operated by Dometic, Dometic provides a YouTube video in which an accused DG3 product is shown installed in a boat and in use. *See* https://www.dometic.com/en/outdoor/boat/stabilization/gyroscopic-stabilizers/14-1411-141101-141101001-374846?v=9620018742 (archived at https://perma.cc/7F55-CEJU).

57.     Dometic Marine has sold the infringing DG3 in the United States.  Dometic Marine has entered into an agreement or agreements to sell the infringing DG3 product to at least Regulator for use on its 35-foot model boat.  Pursuant to that agreement, Dometic Marine has delivered infringing DG3 products to Regulator and worked in concert with Regulator to design

Regulator's 35-foot model boat to accommodate the infringing DG3 and to install the infringing DG3 in one or more boats manufactured by Regulator.  Such installations are evidenced by the following image showing a DG3 installed in a Regulator Marine 35-foot model boat located in Miami, Florida at the Miami 2025 Boat Show:



https://www.youtube.com/watch?v=Qn0m1x6rJEM at 2:18.

58.    Dometic Marine has induced Regulator to offer the DG3 for sale in this District and throughout the United States.  Regulator Marine has offered to sell the DG3 in this District and throughout the United States as a direct and proximate result of these infringing actions. The following images are true and correct copies of emails generated by a resident of this District order information after their use of Regulator's website to "Build a Boat" containing the DG3 product at a price of $58,595:



See https://www.regulatormarine.com/boat-builder/35/.

59.    Dometic Marine has offered to sell the DG3 in this District and throughout the United States.  Dometic Marine offers the DG3 on its Dometic USA website (dometic.com). The following true and correct images from that website show that Dometic offers the DG3 for sale through its dealer network ("Sold in our dealer network"):

16



https://www.dometic.com/en-us/outdoor/boat/stabilization/gyroscopic-stabilizers/14-1411-141101-141101001-374846?v=9620018742 (archived at https://perma.cc/WCQ4-FF4Z).

60.    Dometic's website directs purchasers to its network of dealers using an interactive "Find in store" feature.  That feature directs purchasers to authorized Dometic Marine dealers throughout the United States, including in this District, as illustrated from the following image of Dometic's website when this feature is invoked in connection with the offer of the DG3:



61.    Dometic's website previously indicated a specific suggested price for the DG3 (*i.e.* "$43,999 USD"). https://www.dometic.com/en-us/support/faq/gyro-01?srsltid=AfmBOorVksUbivUoiG8Vp-86Zk2suwJ3HFh6c28BjhGIW7lcC05GvHos (archived at https://perma.cc/EWK9-Q3B7). Dometic's website further proposes terms and conditions relating to the purchase of the infringing DG3 by both consumers and OEMs. Dometic's Standard Terms and Conditions of Sale (B2B) provide that they apply to the sale of all goods by "**Dometic Corporation** or any Dometic Corporation subsidiary (respectively, a 'Seller') to any customer ('Buyer').") https://www.dometic.com/en-us/professional/terms-of-sale-b2b (emphasis added). The terms and conditions specify delivery terms. *See* Section 2. They specify the transfer of title and risk of loss. *Id.* at Section 5. They specify the price at which products will be purchased. *Id.* at Section 8 ("Buyer shall purchase the Goods from Seller at the price[s] (the 'Price[s]') set forth in Seller's published price list in force as of Seller's shipping date.").

62.    The following true and correct images from that website show that Dometic Marine specifies further payment terms, including that the DG3 can be purchased using flexible payment options available through Klarna, which is a Swedish company that offers a "buy now, pay later" financing option:

https://www.dometic.com/en-us/outdoor/boat/stabilization/gyroscopic-stabilizers/14-1411-141101-141101001-374846?v=9620018742 (archived at https://perma.cc/WCQ4-FF4Z).

19

63.    Dometic Marine solicits potential purchasers of its infringing DG3 product throughout the United States and in this District via an interactive web form.  A true and correct image of that web form is shown below:

https://www.dometic.com/en-us/outdoor/lp/marinelp-gyroscopic-stabilization/contact-form?srsltid=AfmBOoqIVyDLrISjuRuxhYmXLXfcjfrLaAt2JPtnfhOoj-i15G1D6ztP (archived at https://perma.cc/4S9B-9M5T).

64.    Dometic represents that the accused DG3 product was made, sold, and offered for sale by Dometic Canada. *See* D.I. 41 at 12-13 (". . . the company responsible for its design, manufacture, and distribution is [Dometic Canada]"). In doing so, Dometic Canada relied on

20

Dometic's U.S. website, dometic.com, to offer the accused DG3 product for sale in the United States under terms and conditions provided by Dometic. Thus, on information and belief, Dometic Canada and Dometic act in concert to offer the DG3 product for sale in the United States, Dometic acted as Dometic Canada's agent in such activities, and/or Dometic Canada induces Dometic to offer the DG3 for sale in the United States.

65.     Dometic represents that the accused DG3 product was made, sold, and offered for sale by Dometic Canada. *See* D.I. 41 at 12-13 (". . . the company responsible for its design, manufacture, and distribution is [Dometic Canada]"). Thus, Dometic Canada admits that the acts set forth in the preceding paragraphs, specifically Paragraphs 53-64 are also conducted by Dometic Canada.

66.     Dometic has represented that: (1) it "advertises, distributes, and sells its products to consumers" in the United States using the "Dometic" trademark; (2) the "Dometic" mark has "become associated exclusively with" Dometic in the United States; and (3) it "develops, manufactures, and sells marine products" bearing the "Dometic" mark in the United States. D.I. 121 at 3 *citing* Complaint, *Dometic Corp. v. CitiMarine LLC*, No. 1:20-cv-23317 (S.D. Fla. Aug. 10, 2020), Doc. 1 at 3-5.  The DG3 product is offered for sale, sold, and marketed under the Dometic trademark.

67.     The DG3 is a marine gyrostabilizer designed to enhance boat stability by minimizing roll motion at sea. The DG3 was presented in various videos as having the following internal structure:



*See* Dometic YouTube Video, previously available

https://www.youtube.com/watch?v=6c1JaSP0cOo, at 1:08 (after the filing of the initial

complaint, Dometic marked this video "private").  Dometic also described its use of a cooling

loop to remove heat withdrawn using the method developed by McKenney and Adams for their

Seakeeper® product. *See* https://www.youtube.com/watch?v=NM33FWzQc5c&t=92s (Dometic

Sales Rep. Video) at 7:31.

68.     The DG3 originally employed a first and second plurality of vanes to dissipate

heat.  The first plurality is attached to the spinning flywheel (green).  The second set is stationary

and attached to the enclosure:



69.    After the filing of this lawsuit, Defendants modified the design of the DG3. Notwithstanding this redesign, Defendants' modified DG3 retained vanes utilizing the same heat transfer path to extract heat from the bearing elements attached to the spinning flywheel.

70.    As a consequence of Defendants' infringement Seakeeper has lost profits from the sale of its gyrostabilizer product, as well as those associated with products anticipated to be sold in conjunction with those gyrostabilizers. Beyond these lost sales, Defendants' actions have damaged the reputation of Seakeeper's products and eroded their price. Defendants have further unjustly enriched itself through its misappropriation of Seakeeper's technology.

## DEFENDANTS' DECEPTIVE TRADE PRACTICES

71.    Prior to the introduction of their DG3, Defendants had never made or sold a gyrostabilizer. To persuade skeptical customers, it was essential for Defendants to convince them that Defendants' design was a proven commodity. To do so, Defendants made false and

23

misleading claims concerning the degree of development and testing their designs had undergone.

72.    Upon information, no significant testing was performed on the current design of the DG3 before its commercial launch.  Upon information and belief, Defendants began manufacturing unproven redesigned units for shipment to customers in May 2025, at least four months before the manufacture of such units for internal testing. Despite this, Dometic Group, on behalf of itself and the other Defendants represented that the redesigned DG3 was "the result of **years of engineering, testing and refinement**[.] https://www.dometicgroup.com/globalassets/4-dometicgroup/press/a-news-2025/press-backgrounder---dometic-dg384.pdf?ref=676D57AA4C. Defendants' further falsely claimed:

> Our product engineers from around the world collaborated on the development of the DG3, a project that for many years, remained top secret, undergoing **extensive testing to refine every component** of the product.… Engineering techniques that had never been used before within a gyro were applied, adapted and **perfected in countless trials** within the Dometic Marine Vancouver facility.

https://www.dometic.com/en/article/marinejournal-the-launch-of-the-dometic-dg3-gyro-stabilizer.

73.    Defendants have also made false comparative claims understood as referencing Seakeeper's product. For example, Defendants falsely claim their DG3 product reduces maintenance costs with bearings lasting three times longer than those used in Seakeeper's product, such as in the following example:

> With 40% lower power consumption and bearings that last three times longer than the competition, our marine gyro allows you to enjoy more time on the water with less maintenance and energy usage.

https://www.dometic.com/en-us/outdoor/lp/marinelp-gyroscopic-stabilization.

74.    Although Defendant did not identify Plaintiff by name, the statements were made in a context where reasonable consumers would understand them to refer to Plaintiff given Seakeeper's 95% share and wide-recognition as the leader of the gyrostabilizer market. Indeed, as further explained, representatives from Dometic Group and Dometic Canada explained to Seakeeper representatives that they viewed Seakeeper and its products as essentially the "Kleenex" of marine stabilization products—in other words that Seakeeper's products served to define this product segment. At least for these reasons,  Defendants' reference to the competition would have been understood by purchasers and potential purchasers as a reference to Seakeeper and more specifically to its Seakeeper 3 model.  *See, e.g.,* https://rnmarine.com/news/dometiclaunchesdg3 ("Dometic's New DG3 Gyro & Comparing To Seakeeper 3") (accessed May 10, 2026).

75.    Defendants' statements on bearing life suggest the existence of test data supportive of these claims. On information and belief, Defendants do not possess data establishing the lifespan of bearings used in either of its DG3 designs, or that Seakeeper's bearings last only one-third as long.

76.    Defendants have also made false and misleading claims that the DG3 consumes 40% less power.  *See, e.g.,* https://media.dometic.com/externalassets/ dg3_9620018742_120383.pdf?ref=2113317502 ("Introducing the first truly active gyro on the recreational market. DG3 boasts industry-leading spin up and down times, coupled with a remarkable 40% reduction in power consumption."); https://www.dometicgroup.com/en-us/press-media/press-releases/dometic-expands-its-marine-business-with-new-innovative-gyrostabilizer-dometic-dg3-3F9DBD570387E723 ("Overall, the DG3 reduces power consumption by an impressive 40% compared to competing solutions.") As explained above,

Defendants' statements would have been understood by purchasers and potential purchasers as a comparison between the operating power consumption of the DG3 and that of Seakeeper's gyrostabilizers, specifically its Seakeeper 3 model.  Defendants claims of reduced power consumption are false and misleading.  Both the DG3 and the Seakeeper 3 reportedly consume similar amounts of power.  *See, e.g., https://media.dometic.com /externalassets/dg3_9620018742_120383.pdf?ref=2113317502* (operating power) and https://www.seakeeper.com/seakeeper-products/seakeeper-3/ (operating power).

77.    The subjects of Defendants' false and misleading statements are significant to the decision of purchasers and potential purchasers, including end-users, in buying gyrostabilizers such as the DG3 and the Seakeeper 3.  Defendants' statements are particularly likely to confuse potential buyers that may be new to boating and not understand how to operate a gyrostabilizer product. The importance of and reliance upon Defendants' statements concerning the DG3 is evidenced by the fact that boat builders and boating commentators have repeated these claims to end-user customers as reasons to equip purchased boats with the DG3.  *See, e.g.,* https://www.regulatormarine.com/blog/regulator-plus-the-new-dometic-dg3-gyro-stabilizer/ (noting that Regulator's introduction of the first boat to be equipped with the DG3 "Follow[ed] years of testing and collaboration[.]"); *id.* (noting that the DG3 has "40% lower power consumption thanks to slower spin speeds and smart flywheel design"); https://biggamefishingjournal.com/dometic-dg3-gyro/ (noting that the DG3 achieves "a remarkable 40 percent reduction in power consumption" and is "virtually maintenance-free" as a consequence of "longer bearing life," among other reasons). The persistence of these marketing claims amongst purchasers, potential purchasers and commentators points to the necessity that corrective advertising form part of the ordered relief.

78.     As a consequence of Defendants' false advertising Seakeeper has lost, and is likely to lose, profits from the sale of its gyrostabilizer product, as well as those associated with products anticipated to be sold in conjunction with those gyrostabilizers. Beyond these lost sales, Defendants' actions have damaged the reputation of Seakeeper's products and eroded their price. Defendants have further unjustly enriched themselves through their false and misleading marketing.

**DEFENDANTS' ACCESS TO CONFIDENTIAL SEAKEEPER INFORMATION**

79.     More than a year ago, in January 2024, Dometic Group approached Seakeeper expressing an interest in acquiring Seakeeper.  Dometic Group represented that it wished to discuss incorporating Seakeeper's gyrostabilizer products into its Marine division product line. Dometic Group was apparently seeking to develop its own gyrostabilizer product at that time. Nevertheless, Dometic Group executives, including executives from Dometic and Dometic Canada, explained to Seakeeper representatives that they viewed Seakeeper and its products as essentially the "Kleenex" of marine stabilization products—in other words that Seakeeper's products served to define this product segment.  These Dometic executives represented that they sought to acquire Seakeeper in lieu of developing their own gyrostabilizer product.

80.     On February 4, 2024, as part of Dometic Group's potential acquisition of Seakeeper, Dometic Group and Seakeeper entered into a confidentiality agreement under which Seakeeper shared its confidential and proprietary business and technical information with Dometic Group, including to representatives of Dometic Canada.  Dometic Group agreed to only use Seakeeper's confidential information for the purpose of "evaluating, negotiating and consummating a Potential Transaction between the parties." Ex. C at 2.

81.     In reliance upon the terms of the Non-Disclosure Agreement and the representations of Dometic's executives, Seakeeper shared confidential financial and technical information with Dometic Group, including to executives of Dometic Canada.  This information encompassed information concerning the sales of Seakeeper® products, its profit margins, its assessment of the market for gyrostabilizers, its plans for future developments and new products, its marketing plans and intended target segments, its market assessments and competitive intelligence, as well as details concerning Seakeeper's technical advances essential to Seakeeper's market dominance.

82.     Following these discussions and its receipt of confidential Seakeeper information and plans, Dometic Group discontinued discussions. A little over one year later, Dometic Marine announced its DG3 gyrostabilizer product. As noted above, Dometic Marine's DG3 product incorporated Seakeeper's patented cooling technology.

83.     Prior to its discussions with Seakeeper at which Defendants were apprised of Seakeeper's technology, Dometic Canada had disclosed its design for a marine gyrostabilization product to the United States Patent Office.  In a 2021 patent application, Dometic Canada depicted a design for a product that lacked the multiple cooling vanes employed in Seakeeper's commercial products.  As shown below in Figure 66 of Dometic Canada's patent application publication, the design did not employ the particular interleaved vane design present in Seakeeper's commercial product as a means of cooling the heat generating components:

28



FIG. 66

U.S. Patent Appl. No. 2024/0400167 (the "Dometic Patent App.") at Figure 66.

84.    In filings with the United States Patent Office as late as May 2024, Dometic Canada depicted a design synonymous with its eventual commercial product which did not employ Seakeeper's commercial cooling vane design. *See* Dometic Patent App.

85.    Within a year of their confidential discussions with Seakeeper, however, Defendants had radically overhauled their design to now copy the patented cooling technologies in the manner embodied in the Seakeeper products.

86.    Additionally, Defendants specifically chose to target the 35-foot boat segment in view of information that Seakeeper shared with them during their confidential discussions.

87.    Defendants' actions further targeted a specific customer of Seakeeper's. Defendants persuaded that customer to discontinue purchases from Seakeeper in favor of Defendants' infringing product.

88.    Dometic has further indicated that the next iteration of its infringing product will target another market segment that Defendants have chosen based upon confidential information Seakeeper shared with Defendants concerning Seakeeper's plans and product development and marketing strategies.

## IRREPARABLE HARM TO SEAKEEPER

89.    Defendants' entry into the gyrostabilizer market for recreational and small commercial boats, a market in which Seakeeper has about a 95% market share, has and will continue to irreparably harm Seakeeper. Seakeeper has and will continue to suffer irreparable harm from the continued infringement due to the loss of market share in the recreational and small commercial boat gyrostabilizer market. As a leader in marine stabilization technology, Seakeeper's market position and customer relationships are critical assets that cannot be restored through monetary damages alone. Continued infringement has and continues to threaten to erode Seakeeper's competitive edge, diminish its brand loyalty, and cause long-term harm that injunctive relief is necessary to prevent.

90.    Defendants' entry into the market has also caused irreparable harm by affecting Seakeeper's relationship with boat builders.  As just one example, Independent Boat Builders, Inc. ("IBBI") is a purchasing cooperative composed of independently owned boat manufacturing companies. IBBI allows its members to pool their purchasing power to negotiate more favorable pricing and terms with suppliers of marine components and materials. The organization represents a significant share of the North American recreational boat market, giving it substantial leverage in supplier negotiations.

91.    If Defendants are accepted as an approved vendor by the IBBI, Seakeeper will suffer irreparable harm due to the structural and long-term nature of boat design decisions made

30

by IBBI member manufacturers. Because IBBI members commit to incorporating only components from approved vendors, acceptance of Defendants would result in widespread adoption of Defendants' infringing product across multiple boat lines. Boat manufacturers would design their hulls and internal layouts around Defendants' system specifications, effectively locking Seakeeper out of future sales opportunities even if infringement is later proven. This design-based exclusion would not only cause Seakeeper immediate market share loss, but also result in lasting damage to its customer relationships, competitive position, and ability to re-enter key OEM channels—harms that cannot be adequately remedied by monetary damages alone.

92.     Seakeeper has invested significant resources into the research and development of its proprietary marine stabilization technology, which represents years of innovation, engineering expertise, and market cultivation. If Defendants are allowed to continue their infringement, it will undermine Seakeeper's ability to maintain its competitive position as the industry leader in this specialized field. The presence of an infringing product in the market—particularly one offered through influential purchasing groups like IBBI—dilutes the value of Seakeeper's technological advancements and discourages further investment in innovation. This erosion of competitive differentiation and the disincentive to continue R&D efforts constitute irreparable harm, as they affect Seakeeper's long-term ability to lead, grow, and compete in a high-tech, evolving marketplace.

93.     Seakeeper will also suffer irreparable harm to its reputation and brand if Defendants, through their infringing product, gains acceptance in the marketplace. Seakeeper has built its brand on innovation, performance, and reliability in marine stabilization technology, and any confusion between its patented systems and Defendants' infringing product threatens to dilute that reputation. If boat builders and consumers associate Defendants' product with similar

functionality or performance, especially if it underperforms or lacks Seakeeper's engineering quality, Seakeeper's brand image as the industry leader may be irreversibly damaged. This erosion of trust and differentiation in a competitive, reputation-driven industry cannot be completely undone through monetary compensation and constitutes irreparable harm.

94.     At the 2025 Miami International Boat Show, Dometic's DG3 product was awarded an Innovation Award, an honor for which Seakeeper was also a nominee. This public recognition of Defendants' product not only lent legitimacy to the infringing product, but also directly undermined Seakeeper's position as the recognized innovator in the marine stabilization space. Such an award significantly influenced market perception, dealer confidence, and OEM purchasing decisions, all of which are deeply tied to brand prestige and technological leadership. The reputational damage resulting from the loss of this high-profile accolade to an infringing competitor cannot be undone, nor can it be fully compensated by monetary damages, as the long-term impact on Seakeeper's brand credibility, perceived innovation, and market influence constitutes clear irreparable harm.

## COUNT I – INFRINGEMENT OF THE '782 PATENT

95.     Seakeeper incorporates and realleges the foregoing paragraphs.

96.     The '782 patent is cooling apparatuses with improved cooling efficiency, capable of cooling a flywheel or other spinning member. The '782 patent inventors discovered building vanes into the enclosure containing a flywheel or other spinning member at below-ambient pressure or below-ambient density results in a more efficient cooling of the parts that are subjected to heat-generating friction.

97.     The '782 patent issued with 23 claims. Independent claim 11 recites:

11. Cooling apparatus for transferring heat from and cooling one or more heat generating components that support or drive a flywheel or other spinning member; the apparatus comprising:

an enclosure enclosing the spinning member, the enclosure containing a gas at below-ambient pressure or below-ambient density, wherein an axis of rotation about which the spinning member spins defines an axial direction;

a first plurality of vanes attached to the spinning member such that the first plurality of vanes spin with the spinning member relative to the enclosure, wherein the first vanes are cylindrical elements extending in a first direction substantially parallel to the axial direction;

a second plurality of vanes fixed relative to the enclosure and the spinning member such that the first vanes move with respect to the second vanes, wherein the second vanes are cylindrical elements extending in a second direction substantially parallel to the axial direction and opposite the first direction, the second vanes defining cylindrical shaped channels into which the first vanes extend so that the first and second vanes are interleaved; and

wherein the first and second vanes are positioned in close proximity to one another so that substantial heat is transferred from the first vanes to the second vanes and the second vanes are configured such that that heat can be readily transferred from the second vanes to the exterior of the enclosure.

98.     Dometic and Dometic Canada have directly and indirectly infringed at least claim 11 of the '782 patent under 35 U.S.C. § 271(a), (b), and (c) as a consequence of their manufacture, use, sale, offer to sell and/or importation of the original DG3 product and/or their respective inducement of one another and/or their customers (*e.g.* Regulator and their end-users) to offer to sell, offer to sell, import, or use the infringing product.

99.     As illustrated below, the original DG3 product includes an enclosure that encloses a spinning member at below-ambient pressure or below-ambient density, whereby the spinning member defines an axial direction.

100.    As illustrated below, the original DG3 product includes a first plurality of vanes attached to the spinning member such that the first plurality of vanes spin with the spinning

33

member relative to the enclosure, where the first vanes are cylindrical elements extending in a first direction substantially parallel to the axial direction.

101.    As illustrated below, the original DG3 product includes a second plurality of vanes fixed relative to the enclosure and the spinning member such that the first vanes move with respect to the second vanes, where the second vanes are cylindrical elements extending in a second direction substantially parallel to the axial direction and opposite the first direction, the second vanes defining cylindrical shaped channels into which the first vanes extend so that the first and second vanes are interleaved.

102.    As illustrated below, the first and second vanes are positioned in close proximity to one another so that substantial heat is transferred from the first vanes to the second vanes and the second vanes are configured such that that heat can be readily transferred from the second vanes to the exterior of the enclosure.

103.    The following diagram illustrates that the original DG3 product embodies the elements of at least claim 11 of the '782 patent:

34



104.    Defendants more recently modified the DG3.  The modified DG3 continues to infringe at least Claim 1 of the '782 Patent. Although Defendants' current design reduces the total number of vanes, it retains at least a plurality of both first and second vanes and utilizing the same heat transfer path from which heat is extracted from the bearing elements attached to the spinning flywheel.

105.    The manufacture, use, sale, offer for sale and/or importation of Dometic's DG3 product infringes the claims of the '782 patent, and one or more of the aforementioned actions by Dometic and Dometic Canada constitute direct infringement of the claims of the '782 patent.

106.    The manufacture, sale, offer for sale and/or importation of the DG3 product infringes the claims of the '782 patent, and one or more of the aforementioned actions of Dometic and Dometic Canada induced the other and third parties, including contract

manufacturers and their end-users, to commit acts that constitute infringement of the '782 patent in violation of 35 U.S.C. § 271(b). For example, the sale of the original and modified DG3 product induced infringement by actively, knowingly and intentionally aiding, abetting, directing, encouraging, or otherwise instructing their customers to use the DG3 product in a manner that constitutes infringement of the '782 patent.

107.    The manufacture, sale, offer for sale and/or importation of Defendants' DG3 product infringes the claims of the '782 patent, and one or more of the aforementioned acts of Dometic and Dometic Canada contributed to the infringement of the '782 patent by third parties, including contract manufacturers in violation of 35 U.S.C. § 271(c). Those Defendants have done so knowing that their DG3 product constitutes a material part of Seakeeper's patent invention, and knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use.

108.    As a consequence of those Defendants' actions alleged above, customers and contract builders, among others, have committed acts that would constitute direct infringement of the '782 patent.

109.    Those Defendants knew about the '782 patent by at least as early as February 2024 during their due diligence as part of Dometic AB's potential acquisition of Seakeeper.

110.    Those Defendants have no reasonable basis for believing that Dometic's DG3 product will not infringe one or more valid claims of the '782 patent and no reasonable basis for believing that the infringed claims are invalid.

111.    Defendants' The actions of Dometic and Dometic Canada in manufacturing, using, importing, selling, and/or offering for sale of the DG3 product, and inducing and contributing to such acts by one another and by third parties, constitutes willful infringement.

112.    This case is "exceptional," and Seakeeper is entitled to an award of reasonable attorneys' fees under 35 U.S.C. § 285.

113.    Seakeeper has suffered damages as a result of the infringement of the '782 patent. Seakeeper is entitled to an award of compensatory damages, including at least reasonable royalties for the alleged infringement of the '782 patent.

114.    The acts of infringement by set forth above will cause Seakeeper irreparable harm for which it has no adequate remedy at law, and those acts will continue unless enjoined by this Court.

115.    Seakeeper is entitled to a preliminary injunction prohibiting Defendants from manufacturing, using, offering for sale, or selling Dometic's DG3 and related products in the United States before expiration of the '782 patent.

## COUNT II – FALSE ADVERTISING

116.    Seakeeper incorporates and realleges the foregoing paragraphs.

117.    Defendants have used false and misleading descriptions of fact and representations of fact in commercial advertising and promotion that misrepresent the nature, characteristics, qualities, and performance and comparative qualities of Plaintiff's marine gyroscopic stabilizers.

118.    Defendants' statements are literally false, and/or misleading by necessary implication, and/or unsubstantiated establishment claims.

119.    Upon information and belief, these false statements actually deceived, or have a tendency to deceive, a substantial segment of Plaintiff's customers and potential customers. This deception is material in that it is likely to influence the purchasing decisions of Plaintiff's customers.

120.    Defendants' false advertising occurred in interstate commerce.

121.    Defendants' false and misleading advertising statements and omissions injure both consumers and Plaintiff.

122.    Defendants' false and misleading advertising statements and omissions violate the Lanham Act § 43(a), 15 U.S.C. §1125(a).

123.    Defendants have violated 15 U.S.C. § 1125(a).

124.    Defendants have caused, and will continue to cause, immediate and irreparable injury to Plaintiff, including injury to its business, reputation, and goodwill, for which there is no adequate remedy at law. As such, Plaintiff is entitled to an injunction under 15 U.S.C. §1116 restraining Defendants, their agents, employees, representatives and all persons acting in concert with them from engaging in further acts of false advertising, and ordering removal of all Defendants' false advertisement.

125.    Pursuant to 15 U.S.C. §1117, Plaintiff is entitled to recover from Defendants the damages sustained by Plaintiff as a result of Defendants' acts in violation of Lanham Act § 43(a), including but not limited to the profits lost as a consequence of Defendants' actions.

126.    Pursuant to 15 U.S.C. §1117, Plaintiff is further entitled to recover from Defendants the gains, profits and advantages that they have obtained as a result of their acts. Plaintiff is also entitled to recover the sums necessary to issue corrective advertising necessary to negating the continuing harm occasioned by Defendants' false and misleading statements.

38

## COUNT III – UNLAWFUL PRACTICE (6 *DEL. C.* § 2513)

127. Seakeeper incorporates and realleges the foregoing paragraphs.

128. Defendants have used false and misleading descriptions of fact and representations of fact in commercial advertising and promotion that misrepresent the nature, characteristics, qualities, and performance and comparative qualities of Plaintiff's marine gyroscopic stabilizers.

129. Defendants' statements are literally false, and/or misleading by necessary implication, and/or unsubstantiated establishment claims.

130. Upon information and belief, these false statements actually deceive, or have a tendency to deceive, a substantial segment of Plaintiff's customers and potential customers. This deception is material in that it is likely to influence the purchasing decisions of Plaintiff's customers.

131. Defendants' false and misleading advertising statements and omissions injure both consumers and Plaintiff.

132. As a direct result of these unlawful practices, Seakeeper has suffered damages. Plaintiff is at present unable to ascertain the full extent of the monetary damages it has suffered by reason of Defendants' acts.

133. Defendants have caused, and will continue to cause, immediate and irreparable injury to Plaintiff, including injury to its business, reputation, and goodwill, for which there is no adequate remedy at law. As such, Plaintiff is entitled to an injunction restraining Defendants, their agents, employees, representatives and all persons acting in concert with them from further using unlawful practices.

**PRAYER FOR RELIEF**

**WHEREFORE**, Seakeeper respectfully requests the following relief:

A.    A judgment, pursuant to 35 U.S.C. § 271(a), (b), and/or (c), that the commercial manufacture, use, offering to sell, or sale within the United States, and/or importation into the United States of Defendants' Product has infringed the '782 patent;

B.    A preliminary injunction that Defendants are prevented from manufacturing, using, importing, selling, or offering to sell Dometic's DG3 product and related products until a date not earlier than the date of expiration of the '782 patent;

C.    An award, pursuant to 35 U.S.C. § 284, of damages or other monetary relief to compensate Seakeeper for Defendants' engagement in the manufacture, use, offer for sale, sale, marketing, distribution, and/or importation of Dometic's DG3 product, or any product the making, using, offering for sale, sale, marketing, distribution, and/or importation of which infringes the '782 patent;

D.    A judgment pursuant to 35 U.S.C. § 285 that this case against Defendants is an exceptional case and an award of enhanced damages, attorneys' fees and costs;

E.    For temporary, preliminary and permanent injunctive relief prohibiting Defendants, their agents, or anyone working for, in concert with or on behalf of Defendants from engaging in false or misleading advertising with respect to the their Dometic's DG3 product and/or violating Lanham Act § 43(a), which relief includes but is not limited to removal of all false or misleading advertisements and corrective advertising to remedy the effects of Defendants' false advertising;

F.  For an order requiring Defendants to correct any erroneous impression persons may have derived concerning the nature, characteristics, or qualities of their DG3 product and Plaintiff's Seakeeper 3 product, including without limitation, the placement of corrective advertising and providing written notice to the public;

G.  That Defendants be adjudged to have violated 15 U.S.C. §1125(a) by unfairly competing against Plaintiff by using false, deceptive or misleading statements of fact that misrepresent the nature, quality and characteristics of their DG3 product;

H.  That Defendants be adjudged to have unlawfully and unfairly competed against Plaintiff under the laws of the State of Delaware, 6 *Del. C.* §2513*;*

I.  That Plaintiff be awarded damages Plaintiff has sustained in consequence of Defendants' conduct;

J.  That Plaintiff be awarded Defendants' profits obtained by Defendant as a consequence of Defendants' conduct;

K.  That such damages and profits be trebled and awarded to Plaintiff as a result of Defendants' willful, intentional and deliberate acts in Plaintiff violation of Lanham Act § 43(a);

L.  That Plaintiff recover its costs and reasonable attorneys' fees;

M.  That all of Defendants' misleading and deceptive materials and products be destroyed as allowed under 15 U.S.C. §1118;

N.  That Plaintiffs be granted prejudgment and post judgment interest; and

O.  That Plaintiff have such other and further relief as the Court deems just and proper.

41

**DEMAND FOR A JURY TRIAL**

Seakeeper hereby demands a jury trial on all issues so triable.


OF COUNSEL:

MARSHALL, GERSTEIN & BORUN LLP
6300 Willis Tower
233 S. Wacker Drive
Chicago, IL 60606
(312) 474-6300


Dated:  May __, 2026

/s/ DRAFT_____
Steven J. Fineman (#4025)
Kelly E. Farnan (#4395)
Christine D. Haynes (#4697)
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
302-651-7700
fineman@rlf.com
farnan@rlf.com
haynes@rlf.com

*Attorneys for Plaintiff*
*Seakeeper, Inc.*

42

# EXHIBIT A

US007546782B2

## (12) United States Patent
### Adams et al.

(10) Patent No.: **US 7,546,782 B2**
(45) Date of Patent: **Jun. 16, 2009**

(54) **COOLING BEARINGS, MOTORS AND OTHER ROTATING HEAT GENERATING COMPONENTS**

(75) Inventors: **John D. Adams**, Lusby, MD (US); **Shepard W. McKenney**, Drayden, MD (US)

(73) Assignee: **Seakeeper, Inc.**, Solomons, MD (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 395 days.

(21) Appl. No.: **11/330,896**

(22) Filed: **Jan. 12, 2006**

(65) **Prior Publication Data**

US 2007/0157749 A1    Jul. 12, 2007

(51) **Int. Cl.**
*F16C 15/00* (2006.01)
*H02K 1/32* (2006.01)

(52) **U.S. Cl.** ........................................... 74/5.95; 310/64

(58) **Field of Classification Search** .................. 74/5.22, 74/5.34, 5.37, 5.7, 5.95, 572.1, 572.11; 310/52, 310/55, 64, 65

See application file for complete search history.

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 2,330,121 A | * | 9/1943 | Heintz | 310/52 |
| 3,062,507 A | | 11/1962 | Andrus | |
| 3,421,578 A | * | 1/1969 | Marton | 165/186 |
| 3,706,231 A | * | 12/1972 | Noar et al. | 74/5 R |
| 3,999,400 A | * | 12/1976 | Gray | 62/115 |
| 4,262,483 A | * | 4/1981 | DeGeus | 60/641.8 |
| 4,290,316 A | * | 9/1981 | Noar et al. | 74/5.46 |
| 4,569,639 A | | 2/1986 | Hannibal et al. | |
| 6,373,158 B1 | | 4/2002 | Hsu et al. | |
| 6,527,865 B1 | | 3/2003 | Sajoto et al. | |
| 6,664,680 B1 | | 12/2003 | Gabrys | |
| 6,973,847 B2 | | 12/2005 | Adams et al. | |
| 2005/0040776 A1 | | 2/2005 | Sibley | |
| 2005/0271528 A1 | | 12/2005 | Stones | |

* cited by examiner

*Primary Examiner*—Roger Pang
(74) *Attorney, Agent, or Firm*—Fish & Richardson P.C.

(57) **ABSTRACT**

Cooling apparatus for transferring heat from and cooling one or more heat generating components that support or drive a flywheel or other spinning member. The apparatus may include a first heat transfer element attached to and spinning with the spinning member, a second heat transfer element stationary with respect to the spinning member, wherein the first and second heat transfer elements move relative to one another, and wherein the first and second heat transfer elements are shaped and positioned in close proximity to one another so that substantial heat is transferred from the first heat transfer element to the second heat transfer element. Alternatively, the apparatus may include a set of rotating vanes mounted to rotate with the spinning member, an orifice configured to direct a spray of cooling liquid onto the rotating vanes, wherein the cooling liquid is sprayed onto the rotating vanes at a radially inward location, so that the liquid flows radially outward over the surface of the vanes as a thin film of liquid, and is thrown off the vanes by centrifugal action, and collecting apparatus configured to collect the liquid thrown off of the vanes.

**23 Claims, 8 Drawing Sheets**





FIG. 1



FIG. 2

FIG. 3



*FIG. 4*



*FIG. 5*



FIG. 6



FIG. 7



FIG. 8



FIG. 9



FIG. 10



FIG. 11



FIG. 12



FIG. 13



FIG. 14

US 7,546,782 B2

**1**

# COOLING BEARINGS, MOTORS AND OTHER ROTATING HEAT GENERATING COMPONENTS

## TECHNICAL FIELD

This invention relates to methods and apparatus for cooling bearings, motors, and other heat generating components that support and drive rotating machinery, e.g., flywheels that are enclosed in a partial vacuum.

## BACKGROUND

A control moment gyro ("CMG") used for roll attenuation in boats is dependent on a heavy flywheel operating at high rotational speeds. The spinning flywheel is supported by bearings that are subjected to high axial and radial loads. As a result, these bearings produce a substantial amount of friction-generated heat, which must be dissipated in order to avoid dangerous heat build up. If the flywheel is supported in a conventional, ambient environment, the heat can be dissipated by air convection, which can be assisted by having a fan blow air across the outer and inner bearing races and the adjacent metal members. But if the flywheel is enclosed in a partial vacuum, e.g., as described in our patent, U.S. Pat. No. 6,973,847, there may not be enough air to permit convection. The same cooling problem may exist in other devices in which flywheels spin in partially evacuated enclosures (e.g., mechanical energy storage devices) and manufacturing processes that use evacuated chambers containing spinning elements that require heat generating bearings. At present, flywheel energy storage devices typically use expensive magnetic bearings (which do not generate frictional heat) instead of much less expensive rolling element bearings. One reason is that there are no proven methods of removing the heat from the inner races of rolling element bearings in a partial vacuum except by jetting or circulating cooling oil through the bearings, and this tends to create large power losses.

Two types of heat flow—conduction and convection—need to be distinguished. Heat conduction occurs by molecules bumping into other molecules. Thus, when you place your hand on a warm radiator, the fast moving molecules in the warm metal bump into molecules in your skin, transferring energy to them. Heat convection occurs when molecules are moved as a consequence of air (or other gas or liquid) flowing from one location to another. Thus, the warm radiator heats a room by conduction of heat to air immediately adjacent the surface of the radiator, and then by convection as that warmed air flows around the room. The warmth in the air is transferred to the occupants of the room by conduction, when the molecules in warm air contact the skin or clothing of the person. Heat conduction may occur through a gas, liquid, or solid. When it occurs through a gas, it can be called gaseous conduction. When it occurs through a solid (e.g., through a metal or other good conductor of heat), it can be called solid conduction.

Fourier's law of heat conduction defines one dimensional heat transfer between two parallel surfaces by gaseous conduction:

$$Q = KA\,\Delta T/\Delta X$$

Where $Q$=heat transfer (watts)

$K$=thermal conductivity of the gas (watts/m–Deg C.)

$A$=area of the parallel surface (m2)

$\Delta T$=temperature differential between the two heat transfer surfaces (deg C.)

$\Delta X$=distance between the heat transfer surfaces (m)

**2**

As shown in the equation, the amount of heat transferred is directly proportional to the thermal conductivity of the gas, the area of the surfaces, and the temperature difference between the surfaces, and is inversely proportional to the distance between the surfaces. The thermal conductivity of the gas ($K$) is constant irrespective of pressure until the pressure is so low that the gas molecular mean free path is equal to or greater than the distance between the surfaces ($\Delta X$). This means that the amount of heat transferred will be independent of pressure until the gas mean free path is equal to or greater than the distance between the surfaces. Below the pressure where the gas molecular mean free path is greater than the distance between the surfaces, the gas molecules will continue to conduct heat but now there is a reduction in the thermal conductivity (and the amount heat transferred) with further reductions in the gas pressure.

## SUMMARY

We have discovered practical techniques for transferring heat away from heat generating components, e.g., bearings and motors, that support and drive rotating machinery such as flywheels. Typically, heat will build up on the inner races of the bearings that support the flywheel (but other sources of heat, such as motor heat, air drag or windage are also possible). Such a build up of heat on the inner races can lead to failure of the apparatus, as a large temperature differential can result between the inner and outer bearing races. The outer races typically remain cooler because heat can flow (by conduction through abutting metal members) from the outer races to the exterior of the enclosure, where the heat is dissipated by convection (air passing across the warm exterior surface). Only a small amount of heat is conducted across the bearings (from the inner to outer races), and thus the inner races and the flywheel to which they are attached tend to rise in temperature. The rising temperatures can destroy the effectiveness of bearing lubricant, and can also subject the inner race to thermal expansions not seen by the cooler outer race with resulting catastrophic destruction of the bearings and apparatus.

Known cooling techniques include immersing the bearings in a circulating oil bath or jetting oil through the bearings (as in a gas turbine engine) or pumping a large volume of air/oil mist through the bearings (as in machine tool spindles) to lubricate and cool them. However, these methods are complicated and they tend to increase the heat generated by the bearing as the viscous drag of the rolling elements churning through the oil substantially increases the power required to drive the flywheel or other spinning member. The air/oil mist method is not applicable to vacuum applications as it requires substantial air flow. Some machine tool manufacturers pump water down a hole that is gun drilled through the spindle shaft to remove heat from the bearings and motor. This is also difficult to apply to vacuum applications as the water must be maintained at ambient pressure to prevent it from vaporizing.

In a first aspect, the invention features cooling apparatus for transferring heat from and cooling one or more heat generating components that support or drive a flywheel or other spinning member. The apparatus comprises a first heat transfer element attached to and spinning with the spinning member, a second heat transfer element stationary with respect to the spinning member, wherein the first and second heat transfer elements move relative to one another, and wherein the first and second heat transfer elements are shaped and positioned in close proximity to one another so that substantial heat is transferred from the first heat transfer element to the second heat transfer element. The close proximity of the two

US 7,546,782 B2

3

surfaces or elements promotes heat transfer by gaseous conduction. The relative rotational movement and close proximity of the elements creates rotating cavity flows that promote heat transfer by gaseous convection. These rotating flows continually circulate air molecules from the hotter first element to the cooler second element.

In preferred implementations, one or more of the following may be incorporated. Heat transfer between the first and second heat transfer elements may occur both by gaseous conduction and convection. Heat transfer between the first and second heat transfer element may be primarily by gaseous conduction. The first and second heat transfer elements may have closely spaced exposed surfaces across which heat is transferred. The first heat transfer element may comprise a plurality of first vanes, the second heat transfer element may comprise a plurality of second vanes, the first vanes may move with respect to the second vanes, the first vanes may extend into gaps between the second vanes so that the first and second vanes are interleaved, and substantial heat may be transferred from the first vanes to the second vanes. An enclosure may surround the spinning member, the first heat transfer element may comprise the outer surface of the spinning member, and the second heat transfer element may comprise the inner surface of the enclosure spaced by a small gap from the spinning member so that substantial heat is transferred by gaseous conduction from the spinning member to the enclosure. The separation between the first vanes and second vanes may be greater than 0.025 mm but less than 10 mm. The spinning member may be enclosed within an enclosure containing a gas at below-ambient pressure or below-ambient density, the first heat transfer element and first vanes may spin relative to the enclosure, the second heat transfer element and second vanes may be fixed relative to the enclosure, and the second heat transfer element may be positioned so that heat can be readily transferred from the second heat transfer element to the exterior of the enclosure. The gas may be both below-ambient pressure and below-ambient density. The axis of rotation about which the spinning member spins may define an axial direction, the first vanes may be cylindrical elements extending in a first axial direction from a first base attached to the spinning member, the second vanes may be cylindrical elements extending in a second axial direction, opposite the first axial direction, from a second base attached to the enclosure, and the gaps between the second vanes may be cylindrical channels shaped and positioned to receive the cylindrical first vanes. The axis of rotation about which the spinning member spins may define an axial direction, the first and second vanes may be planar elements extending in radial directions perpendicularly to the axial direction, and the gaps between the second vanes may be planar channels shaped and positioned to receive the planar first vanes. The first and second heat transfer elements may be located adjacent a bearing that supports the spinning member, the bearing may have an inner race and an outer race, the first vanes and inner race may be attached to the spinning member so heat flows by conduction from the inner race to the first vanes and from the spinning member to the first vanes, the outer race may be attached to the enclosure, and the inner race, spinning member, first vanes and second vanes may be sized and positioned so that heat from the inner race of the bearing flows by solid conduction from the inner race to the spinning member and to the first vanes, by solid conduction from the spinning member to the first vanes, and by gaseous conduction and convection from the first vanes to the second vanes, and by solid conduction from the second vanes to the exterior of the enclosure. The apparatus may comprise at least two bearings, each with its own first and second heat transfer elements as described.

4

The spinning member may be a flywheel and the flywheel and enclosure may be part of gyroscopic roll stabilizer for a boat. The invention may further comprise a heat sink to which heat flows from the second vanes. The heat sink may comprise air-cooled fins on the exterior of the enclosure. The gas between the first and second transfer elements may have a molecular mean free path equal to or less than the distance between the heat transfer elements. The invention may further comprise a plurality of sets of first and second vanes. The gas may have a higher thermal conductivity than air. The heat generating component may comprise one or more bearings. The heat generating component may comprise one or more electrical motors.

The gap between the hotter rotating vanes and the cooler non-rotating vanes may be kept very small, and thus provide a heat path to the exterior of the device as long as the rotating vanes are hotter than the stationary vanes. Heat may be conducted from the heat generating components to the rotating vanes by solid conduction, then across the air gap to the stationary vanes by gaseous conduction and convection and then by conduction and convection to the atmosphere or a heat sink.

This first aspect of the invention has significant advantages. For example, as applied to ambient and above ambient pressure conditions, it does not require pumping large volumes of air or cooling fluid to cool the heat generating components. However, even greater advantages are found at below ambient pressure, wherein convective cooling with air becomes more difficult because of the reduced pressure, and radiant heat transfer may be negligible because the temperature differentials may not be large enough to transfer a significant amount of heat. Reliance on gaseous conduction benefits from the fact that the thermal conductivity of a gas increases with temperature so that as the gas warms up it will conduct more heat across the gap (for a fixed temperature differential) between the rotating and stationary vanes. This helps stabilize thermal behavior.

Rotating cavity flows will exist in the small gaps between the fixed and rotating vanes even in a partial vacuum. In some applications, the gas density and/or rotational speed will be high enough that gaseous convection will augment the gaseous conduction cooling. The rotating flow circulates the gas molecules so they are continuously transported from the hot rotating vanes to the cooler stationary vanes.

The first aspect permits heat to be removed passively without circulating any fluids inside the enclosure. This considerably simplifies the device or machine, as a coolant pump, motor, filter and heat exchanger are not required. Grease lubricated bearings can be used and these will have less frictional torque than oil lubricated bearings.

In a second aspect, the invention features cooling apparatus for transferring heat from and cooling one or more heat generating components that support or drive a flywheel or other spinning member. The apparatus comprises a set of rotating vanes mounted to rotate with the spinning member, an orifice configured to direct a spray of cooling liquid onto the rotating vanes, wherein the cooling liquid is sprayed onto the rotating vanes at a radially inward location, so that the liquid flows radially outward over the surface of the vanes as a thin film of liquid, and is thrown off the vanes by centrifugal action; and collecting apparatus configured to collect the liquid thrown off of the vanes.

Preferred implementations of this aspect of the invention may incorporate one or more of the following. The invention may further comprise cooling apparatus configured to cool the liquid collected by the collecting apparatus, and wherein the cooled liquid may be returned to the orifice. There may be

US 7,546,782 B2

5

a plurality of sprays of cooling liquid, each stream may be narrower than the gap between the rotating vanes, and each stream may be directed so that it generally travels between the vanes to the radially inward location. The cooling liquid may be an oil. The spinning member may be enclosed within an enclosure containing a gas at below-ambient pressure or below-ambient density, the rotating vanes may rotate with the spinning member within the enclosure, and the orifice may be fixed relative to the enclosure. The vapor pressure of the cooling liquid may be lower than the operating pressure of the gas within the enclosure. There may be a plurality of sets of rotating vanes. The oil used for cooling may also be used for lubrication of at least one bearing.

The liquid cooling aspect of the invention has significant advantages. For example, the cooler liquid film moving at high speed across the hotter surface of the rotating vanes makes for a very efficient heat exchanger. The oil exiting the vanes can be readily collected and cooled, either passively or actively, and then returned to the orifice to be sprayed on the vanes again.

For very high-speed flywheel bearings, oil lubrication is mandatory and in this case the liquid cooling scheme has an advantage, as oil can be used for cooling and lubricating the bearings. The amount of oil required to lubricate the bearings is very small. Therefore, jetting the oil onto the rotating vanes for cooling requires far less power than jetting or circulating the oil through the bearings as in traditional bearing cooling schemes.

Both the first and second aspects of the invention overcome the problem of cooling rotating components that generate heat and are enclosed in a partial vacuum. They both will permit the development of control moment gyros (CMGs) for stabilizing small boats and the development of flywheel energy storage devices that use rolling element bearings, as now there is a way of removing the heat from these rotating components that does not increase operating power requirements. Additionally, the invention may assist in cooling the inner races of bearings, motors and other rotating heat generating components that operate in confined spaces at ambient or above ambient pressure (e.g. machine tool spindles).

Other features and advantages of the invention will be found in the detailed description, drawings, and claims.

DESCRIPTION OF DRAWINGS

FIG. 1 is a cross-sectional view of a boat stability CMG incorporating an implementation of the first aspect of the invention.

FIG. 2 is an enlargement of the upper bearing portion 2-2 of FIG. 1.

FIG. 3 is an enlargement of the lower bearing portion 3-3 of FIG. 1

FIG. 4 is a cross-sectional view (taken along 4-4 in FIG. 5) through the outer heat transfer element of the implementation of FIG. 1.

FIG. 5 is a plan view (taken along 5-5 in FIG. 4) looking up at the vanes of the heat transfer element of FIG. 4.

FIG. 6 is an elevation view of the heat transfer element of FIG. 4.

FIG. 7 is a plan view (taken along 7-7 in FIG. 6) looking down at the top surface of the heat transfer element of FIG. 4.

FIG. 8 is a cross-sectional view (taken along 8-8 in FIG. 9) through the inner heat transfer element of the implementation of FIG. 1

FIG. 9 is a plan view (taken along 9-9 in FIG. 8) looking down at the top surface of the inner heat transfer element of FIG. 8.

6

FIG. 10 is a cross-sectional view of a boat stability CMG incorporating a liquid cooling implementation of the second aspect of the invention.

FIG. 11 is an enlargement of the upper bearing portion 11-11 of FIG. 10.

FIG. 12 is an enlargement of the upper bearing portion 12-12 of FIG. 10

FIG. 13 is an elevation of the set of rotating vanes of the implementation of FIG. 10.

FIG. 14 is a cross-sectional view of the set of rotating vanes of FIG. 13.

DETAILED DESCRIPTION

There are a great many possible implementations of the invention, too many to describe herein. Some possible implementations that are presently preferred are described below. It cannot be emphasized too strongly, however, that these are descriptions of implementations of the invention, and not descriptions of the invention, which is not limited to the detailed implementations described in this section but is described in broader terms in the claims.

Shown in FIG. 1 is a gyroscopic roll stabilizer 10 for small boats (of the type described in U.S. Pat. No. 6,973,847, incorporated herein by reference). A steel flywheel 12 spins within an aluminum enclosure 14, which is evacuated to a below-ambient pressure, and may include a below-ambient density gas (e.g., helium or hydrogen) to reduce friction on the spinning flywheel. An electric motor (frameless DC brushless) 16 integrated within the interior of the enclosure drives the flywheel, which is supported by an upper bearing assembly 18 and lower bearing assembly 20.

As shown in the enlargements of FIGS. 2-3, each bearing assembly includes an outer housing 22, 24, outer race 26, 28, inner race 30, 32, and balls 34. Seals 36 are provided on both the top and bottom of each bearing. Upper and lower retainers 40, 42 hold the upper bearing in place. These bearings are lubricated by a grease pack.

Heat generated by the bearing inner races and electric motor rotor, is transferred to the exterior by cooling collar assemblies 50, 52 (one of many implementations of the heat transfer elements) located adjacent each bearing. Each cooling collar assembly includes an inner rotating collar 54, 56, and an outer stationary collar 58, 60 that also forms the enclosure end cap. Collars 54, 56, 58, 60 may be constructed of a variety of materials with good heat conductivity (e.g., aluminum, copper, or plastic).

As shown in FIGS. 4-5, the outer collars 58, 60 have ten cylindrical vanes 62, each of a different radius. Cylindrical gaps 64 are formed between the vanes. The vanes are approximately 2.77 mm in radial thickness, and the radial separation between vanes (i.e., the radial width of the gaps) is approximately 4.78 mm. The vanes 62 are about 32 mm in length along the axial direction.

The inner collars 54, 56 have eleven cylindrical vanes 66 and cylindrical gaps 68 between the vanes (FIGS. 2-3), each of a different radius, and sized and positioned so that the vanes 66 mate with vanes 62 of the mating outer collars. Vanes 66 are approximately the same length (32 mm), width, and radial thickness as vanes 62, and are received in gaps 64 between vanes 62.

After inner and outer collars are mated, with vanes interleaved, the radial separation between a rotating vane from one collar and a stationary vane from another is approximately 1 mm. To improve heat transfer by gaseous conduction, this separation may be made as small as possible subject to practical limitations such as machining and operating tolerances.

US 7,546,782 B2

**7**

In partial vacuum applications, the separation is typically not less than the mean free path of the gas molecules at the operating pressure. This small separation ensures that the gas thermal conductivity is not reduced by the vacuum pressure and assists heat transfer by gaseous convection.

In one implementation, the operating pressure is 1 Torr, the operating temperature is 100 C., and the molecular mean free path of air is 0.066 mm, which is significantly less that the 1 mm radial separation In practice, the distance may vary from these general guidelines so long as substantial heat is transferred across the separation.

As shown in FIGS. 6-7, the exterior surfaces of outer collars **58**, **60** have additional heat transfer vanes **70**, which transfer heat from the collar to the surrounding atmosphere (by conduction at the surface of the vanes, with convection moving air past the vanes).

In the implementation shown, the rotating and stationary vanes **66**, **62** each have a total surface area of 0.34 square meters. A typical temperature differential between the rotating and stationary vanes is 15 C., and air conduction alone will transfer 153 watts across the gap to cool the bearing inner race at this differential. If it is necessary to provide more cooling, the stationary vanes could be actively cooled by blowing air over them (outside the containment) to create a bigger temperature differential between the rotating and stationary vanes. A 30 C. temperature differential would transfer 306 watts by gaseous conduction alone. Alternatively, the amount of heat transfer could be increased by back filling the vacuum chamber with helium or hydrogen after the initial pump down. Helium's thermal conductivity is approximately 5.6 times that of air, and therefore a 15 C. temperature differential would transfer 855 watts of heat by gaseous conduction alone. If further increases in heat transfer were required the radial separation between the fixed and rotating vanes could be reduced from 1 mm to 0.5 mm. It is typically feasible to operate with that small a radial separation as machines like CMGs and flywheel energy storage devices are typically manufactured to very tight tolerances (less than 0.025 mm typically), and their flywheels are supported in very high precision rolling element bearings. If the flywheel is enclosed in helium at 1 Torr, the radial separation is 0.5 mm, and the temperature differential is 15 C., then 1710 watts of heat can be transferred from the bearing inner races by gaseous conduction alone. It is also possible to adjust the amount of heat transferred by increasing or decreasing the surface area of the vanes.

These examples show how the cooling method and apparatus can be adjusted to provide the amount of cooling that the heat generating components require in order to achieve stable operating temperatures. The designer can vary the vane area, radial separation, gas type, gas density and the temperature difference between the rotating and stationary vanes to get the optimum solution for a specific application.

FIGS. **10-14** show an implementation of the liquid cooling scheme. The liquid cooling implementation also depends on cooling collars on the rotating shaft adjacent to the primary source of heat, i.e., the inner race of the flywheel bearings. However, with liquid cooling, the fins on the collars consist of spaced planar disks extending radially outward from the shaft, and there are no mating fixed fins attached to the flywheel containment. Rather, cooling is accomplished by oil jets positioned on the containment outboard of the disks which squirt streams of oil between the rotating disks and toward the center of the flywheel shaft, thus conducting the heat from the disks to the oil, which is then flung by centrifugal force outward to be collected by an inner liner inside the containment but outside the perimeter of the flywheel. This,

**8**

in turn, forces the hot oil to follow the inner curvature of the containment on its downward gravitational path, where it transfers the heat to the containment, aided by interior ridges on the containment which increase the surface area contacted by the oil. The oil is collected in a sump at the bottom of the device, where it is pumped back up to the oil jets, completing the cooling cycle.

Turning to FIG. **10**, the heat generated by the bearing inner races and electric motor rotor, is transferred to upper and lower cooling collar assemblies **71**, **72** located adjacent to the upper and lower bearing inner races **73**, **74**. In the case of the upper bearing, a stationary housing **75** surrounds the upper cooling collar and forms the enclosure end cap. In the case of the lower bearing, the stationary housing **76** surrounding the lower cooling collar is part of the oil reservoir assembly **77**.

The reservoir assembly also contains the cooling oil **78**, cooling pump **79**, cooling pump motor **80**, and a filter and valves (not shown). The cooling collar assemblies **71**, **72** may be constructed of a variety of materials that have good thermal conductivity (e.g. aluminum and copper).

As shown in more detail in FIGS. **11-14**, the cooling collar assemblies each have 4 horizontal vanes that form 3 gaps between the vanes. The inner radius of the gaps is 54 mm, the outer radius is 89 mm, and the width of the gaps is 2.4 mm. The upper and lower stationary housings that surround the cooling collars each contain 3 oil jets **81** (one per gap). These jets are mounted and oriented such that they spray a stream of cooling oil into and parallel to the gaps between the horizontal vanes. The jet orifice diameter is 0.64 mm where the stream exits.

The very thin stream of cooling oil contacts the bottom of each gap in the cooling collar vanes and is redirected by the high speed of rotation such that it creates a thin film that completely covers the vane surfaces before centrifugal forces throw the film off. The cooler oil film moving at high speed across the hotter vane surface picks up heat by conduction and carries it away by convection. The result is very efficient heat transfer from the inner race of the bearing to the cooling collar, and then to the cooling oil.

The heated oil exiting the upper collar vanes strikes the stationary housing **75**, drops through holes in the bearing housing **82** and is collected by an inner liner **83** inside the containment but outside the perimeter of the flywheel **84**. The liner is mounted to interior ribs of the containment **85** to increase the surface area in contact with the oil. This liner/rib arrangement forces the hot oil to follow the inner curvature of the containment on its downward gravitational path to the reservoir below the lower bearing. As the oil follows this contour, it transfers heat to the cooler containment, which steadily decreases the oil temperature until it reaches the reservoir **77**.

There may also be a bypass oil flow that is sprayed on the containment between the ribs and liner just below the upper bearing. This bypass flow increases the amount of oil in contact with the containment and helps cool the oil in the reservoir.

The hot oil exiting the vanes of the lower collar **72** drops into the reservoir **77** without significant cooling. At any point in time, the reservoir contains a mix of oil from the upper collar that has been cooled by the containment, bypass oil that has been cooled by the containment, and oil from the lower collar that has not been cooled. The containment's internal and external surface areas and external cooling may be designed so that sufficient heat is extracted from the oil exiting the upper collar and from the bypass oil flow to cool the mix of oil in the reservoir. The oil in the reservoir is picked up by the pump and pumped back up to the oil jets and sprayed

US 7,546,782 B2

9

10

on the upper and lower collars and through the bypass jets, thus completing the cooling cycle.

This particular cooling collar implementation has a total vane surface area of 0.093 square meters in contact with oil. The oil pump delivers 0.5 liter per minute per collar or 0.165 liter per minute per jet. The temperature of the oil increases 15 deg C. (from its entry onto the vanes to its exit from the vanes) to transfer 250 watts of heat from the bearing inner race and maintain the inner race at a temperature in the range of 80-100 C.

Like the scheme of FIGS. 1-9, the liquid cooling scheme is flexible if it is necessary to provide more cooling. The cooling vane area, number of gaps/jets, and cooling flow rate can all be increased to increase the rate of heat transfer from the bearing inner races and motor to the containment. If the oil used for heat transfer is not sufficiently cooled by the containment, then forced air cooling can be applied to the exterior of the containment. Alternatively, the reservoir oil can be circulated through a dedicated oil/air or oil/water heat exchanger to extract more heat from the oil and further lower the oil's temperature prior to spraying it on the collars.

Additionally, in some very high-speed flywheel applications, it may be necessary to use oil instead of grease to lubricate the bearings. In these cases, the same oil used for heat transfer with the cooling collars can be used for lubricating the bearings. The amount of oil required to lubricate the bearings is very small. Therefore it can be delivered by a number of methods including jetting, micro dosing, wicking or by letting a small amount of the oil exiting the collar vanes enter the bearing.

Many other implementations other than those described above are within the invention, which is defined by the following claims. As mentioned earlier, it is not possible to describe here all possible implementations of the invention, but a few possibilities not mentioned above include the following:

Implementations of the first aspect of the invention may include multiple vane or collar assemblies installed on a single shaft to cool a number of heat generating components or improve cooling of one component. Gases which have higher thermal conductivities and specific heats than air (e.g. helium and hydrogen) may be used to improve the heat transfer in partial vacuum and enclosed applications. The vane assemblies may be constructed of good heat conducting metals (such as copper and aluminum) or thermally conductive plastics.

Gaseous conduction and convective cooling may be provided by keeping the gap between the flywheel and its enclosure very small, thereby permitting heat to flow from the flywheel rim and/or disc to the cooler enclosure. This arrangement may provide a second path of heat transfer or it may be the principal heat transfer path.

Liquid cooling implementations may include multiple vane or collar assemblies installed on a single shaft to cool a number of heat generating components or improve cooling of one component. If oil is used as the coolant fluid, it can also be used to lubricate the bearings. The vane assemblies may be constructed of good heat conducting metals (such as copper and aluminum) or thermally conductive plastics. The fluid used for cooling could be oil, water, or a heat transfer fluid.

Both the first and second aspects of the invention will work in a pressured environment, at ambient pressure, or in a partial vacuum.

As used in the claims, when an element is said to be "attached to" another element that includes the case of there

being one or more intermediate elements between the elements, as well as the case in which the elements are in direct contact.

Not all of the features described above and appearing in some of the claims below are necessary to practicing the invention. Only the features recited in a particular claim are required for practicing the invention described in that claim. Features have been intentionally left out of claims in order to describe the invention at a breadth consistent with the inventors' contribution. For example, although in some implementations, interleaved vanes are used to transfer heat, such interleaved vanes are not required to practice the invention of other claims. Although in some implementations, liquid coolant is circulated over vanes, liquid coolant is not required to practice the invention of other claims.

What is claimed is:

1. Cooling apparatus for transferring heat from and cooling one or more heat generating components that support or drive a flywheel or other spinning member; the apparatus comprising:

an enclosure enclosing the spinning member, the enclosure containing a gas at below-ambient pressure or below-ambient density;

a first plurality of vanes attached to the spinning member such that the first plurality of vanes spin with the spinning member relative to the enclosure;

a second plurality of vanes fixed relative to the enclosure and the spinning member such that the first vanes move with respect to the second vanes, the second vanes defining gaps into which the first vanes extend so that the first and second vanes are interleaved; and

wherein:

the first and second vanes are located adjacent a bearing that supports the spinning member,

the bearing has an inner race and an outer race,

the first vanes and inner race are attached to the spinning member so heat flows by conduction from the inner race to the first vanes and from the spinning member to the first vanes,

the outer race is attached to the enclosure, and

the inner race, spinning member, first vanes and second vanes are sized and positioned so that heat from the inner race of the bearing flows by solid conduction from the inner race to the spinning member and to the first vanes, by solid conduction from the spinning member to the first vanes, and by gaseous conduction and convection from the first vanes to the second vanes, and by solid conduction from the second vanes to the exterior of the enclosure.

2. The apparatus of claim 1 wherein heat transfer between the first and second vanes is primarily by gaseous conduction.

3. The apparatus of claim 1 wherein the first and second vanes have closely spaced exposed surfaces across which heat is transferred.

4. The apparatus of claim 1 wherein the separation between the first vanes and second vanes is greater than 0.025 mm but less than 10 mm.

5. The apparatus of claim 1 wherein the gas is both below-ambient pressure and below-ambient density.

6. The apparatus of claim 1 wherein the spinning member is a flywheel and the flywheel and enclosure are part of gyroscopic roll stabilizer for a boat.

7. The apparatus of claim 1 further comprising a heat sink to which heat flows from the second vanes.

8. The apparatus of claim 7 wherein the heat sink comprises air-cooled fins on the exterior of the enclosure.

US 7,546,782 B2

11

9. The apparatus of claim 1 wherein the gas has a molecular mean free path equal to or less than the distance between the first and second vanes.

10. The apparatus of claim 1 wherein the gas has a higher thermal conductivity than air.

11. Cooling apparatus for transferring heat from and cooling one or more heat generating components that support or drive a flywheel or other spinning member; the apparatus comprising:

an enclosure enclosing the spinning member, the enclosure containing a gas at below-ambient pressure or below-ambient density, wherein an axis of rotation about which the spinning member spins defines an axial direction;

a first plurality of vanes attached to the spinning member such that the first plurality of vanes spin with the spinning member relative to the enclosure, wherein the first vanes are cylindrical elements extending in a first direction substantially parallel to the axial direction;

a second plurality of vanes fixed relative to the enclosure and the spinning member such that the first vanes move with respect to the second vanes, wherein the second vanes are cylindrical elements extending in a second direction substantially parallel to the axial direction and opposite the first direction, the second vanes defining cylindrical shaped channels into which the first vanes extend so that the first and second vanes are interleaved; and

wherein the first and second vanes are positioned in close proximity to one another so that substantial heat is transferred from the first vanes to the second vanes and the second vanes are configured such that that heat can be readily transferred from the second vanes to the exterior of the enclosure.

12

12. The apparatus of claim 11 wherein heat transfer between the first and second vanes occurs both by gaseous conduction and convection.

13. The apparatus of claim 12 wherein heat transfer between the first and second vanes is primarily by gaseous conduction.

14. The apparatus of claim 12 wherein the first and second vanes have closely spaced exposed surfaces across which heat is transferred.

15. The apparatus of claim 14 wherein the separation between the first vanes and second vanes is greater than 0.025 mm but less than 10 mm.

16. The apparatus of claim 11 wherein the gas is both below-ambient pressure and below-ambient density.

17. The apparatus of claim 11 wherein the spinning member is a flywheel and the flywheel and enclosure are part of gyroscopic roll stabilizer for a boat.

18. The apparatus of claim 11 further comprising a heat sink to which heat flows from the second vanes.

19. The apparatus of claim 18 wherein the heat sink comprises air-cooled fins on the exterior of the enclosure.

20. The apparatus of claim 11 wherein the gas has a molecular mean free path equal to or less than the distance between the first and second vanes.

21. The apparatus of claim 11 wherein the gas has a higher thermal conductivity than air.

22. The apparatus of claim 11 wherein the heat generating component comprises one or more bearings.

23. The apparatus of claim 11 wherein the heat generating component comprises one or more electrical motors.

*  *  *  *  *

UNITED STATES PATENT AND TRADEMARK OFFICE
## CERTIFICATE OF CORRECTION

PATENT NO.         : 7,546,782 B2                              Page 1 of 1
APPLICATION NO. : 11/330896
DATED              : June 16, 2009
INVENTOR(S)       : John D. Adams

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Column 11, line 31, in claim 11 delete 2nd "that" and insert --the--.

Signed and Sealed this

Sixth Day of October, 2009

David J. Kappos
*Director of the United States Patent and Trademark Office*

# EXHIBIT B



PRESS RELEASE

2025

# Dometic expands its Marine business with new innovative gyrostabilizer Dometic DG3

Litchfield IL – February 12, 2025

**The introduction of the groundbreaking DG3 Gyrostabilizer marks Dometic's entry into the rapidly growing vessel stabilizer market. Leveraging its industry-leading engineering technology and seamless ecosystem, Dometic transforms the way boats stay steady amid waves and wakes, delivering a smooth, safe, and seasick-free ride for all.**



Outdoor and marine tech solutions leader Dometic today introduced its revolutionary gyrostabilizer DG3, designed to elevate the boating experience with its cutting-edge technology. This innovation not only enhances the ride for seasoned boaters but also opens up the market to those who have previously avoided boating due to motion sickness.

The DG3 leverages Dometic's proven technologies and advanced manufacturing expertise, seamlessly integrated with Dometic's extensive portfolio of world-class steering systems. This innovative system elevates vessel ride and roll control to a completely new level.

As the first in a planned series of advanced gyrostabilizers, the DG3 marks Dometic's entry into a new market, expanding its offerings into the rapidly growing vessel stabilizer sector. This move supports Dometic's continued growth in the marine industry.

The marine stabilizer market is growing rapidly, with significant growth in the leisure boat sector. The DG3 is specifically designed for the 35- to 41-foot boat market, serving as the first model in this new series.

**What is a vessel stabilizer?**

A vessel stabilizer is a device that helps minimize the rolling motion of a boat, ensuring a smoother sailing experience even in rough seas. It enhances passenger comfort, reduces motion sickness, and improves onboard security by maintaining stability in high waves or deep-water conditions.





2025

### Why Dometic DG3?

#### 1.   Groundbreaking spin up/down time

The DG3 reduces spin-up time by more than 65%, reaching full readiness in just 16 minutes, compared to the typical 50 minutes required by current systems in the market. No more long waits—just get ready to sail out.

The system's downtime is equally impressive, fully lowering in just 20 minutes, a significant improvement over the eight or more hours (15X faster) required by current systems.

This means the DG3 minimizes energy consumption and allowing boaters to continue their activities—whether boating or fishing—without needing to adjust their plans to accommodate stabilization setup or downtime.

#### 2.   Highly energy efficient

Dometic's solution revolutionizes energy use in gyrostabilizers. The system introduces innovations in energy storage and recapture, enabling the battery to recharge efficiently. It also incorporates Dometic's proprietary, industry-proven Inverted Roller Screw technology for true dynamic control and significantly improved roll reduction performance.

Featuring a slower-spinning flywheel, larger, more robust bearings, patent-pending inner race cooling, parallel path cooling, and a titanium heat exchanger, the DG3 is designed to stay cool and operate reliably. Overall, the DG3 reduces power consumption by an impressive 40% compared to competing solutions.

#### 3.   Fully electric

Unlike other systems with hydraulic technology, DG3's Roller Screw technology provides actively controlled flywheel procession. Dometic's proprietary all-electric procession actuator replaces hydraulic actuators that require fluid and are prone to troublesome leaks. The solution enhances long-term durability, minimizes required service and reduces total cost of ownership.

"We're not just launching a new product, we're taking Dometic into an important new category for the global boating business," said Dometic Marine Segment President Eric Fetchko. "This introduction also exemplifies our ability to apply our revolutionary Inverted Roller Screw technology in new ways for the benefit of boaters worldwide. Response from our global boat building partners has been very positive, and we're already at work on expanding our gyrostabilizer series," added Fetchko. "We are excited about bringing this new technology to the marine market and exploring new ways we can integrate it with our other ride and control solutions in the future."

Dometic has designed the DG3 as an easy "drop-in" replacement for other comparably sized systems available in the market today.  The DG3 fits within the same footprint and clearance specifications and features reversible mounting feet to address common challenges encountered by installers. To meet the needs of today's boating market, Dometic's DG3 is compatible with 12-, 24- and 48-volt house battery systems.

The Dometic DG3 is available for boat manufacturers around the world and the first customer has just announced their new boats with the DG3 as an option at Miami International Boat Show 2025.

[End]

**Note to Editors**

- Photos can be found [here](here)





2025

## About Dometic

Dometic is a global outdoor tech company on a mission to make mobile living easy. Leveraging our core expertise in cooling, heating, power & electronics, mobility, and space optimization, we empower more people to connect with nature and elevate their sense of freedom in the outdoors. We achieve this by creating smart, sustainable, and reliable products with outstanding design. Millions of people around the world use our products while camping and exploring nature with their cars, RVs, or boats. Our range of offerings includes installed products for land vehicles and boats, as well as standalone solutions for outdoor enthusiasts. We employ approximately 7,000 people globally and sell our products in more than 100 countries. In 2024, we reported net sales of SEK 25 billion (USD 2.3 billion) and are headquartered in Stockholm, Sweden.

**For more information on Dometic, please visit:**
http://www.dometic.com.

## PRESS CONTACT

Minako Nakatsuma Olofzon
pr@dometic.com
+46 8 501 025 41

Laurie Louvier
Laurie.Louvier@dometic.com
+1 217 851 9000

