# EXHIBIT 2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

SEAKEEPER, INCORPORATED,

    Plaintiff,

    v.

DOMETIC CORPORATION, DOMETIC GROUP AB, and DOMETIC MARINE CANADA, INC.

    Defendant.

C.A. No. 25- 0484-JCB

**JURY TRIAL DEMANDED**

## FIRST AMENDED COMPLAINT

Plaintiff Seakeeper Inc. ("Seakeeper"), by and through its undersigned attorneys, for its Complaint against ~~Defendant~~Defendants Dometic Corporation ("Dometic" ~~or "Defendant"~~), Dometic Group AB ("Dometic Group)" and Dometic Marine Canada Inc. ("Dometic Canada") (collectively, "Defendants") alleges as follows.

## NATURE OF THE ACTION

1.    This is an action under the patent laws of the United States, 35 U.S.C. § 100 *et seq.* for patent infringement by Defendant of U.S. Patent ~~Nos~~No. 7,546,782 ("the '782 patent") ~~and 8,117,930 ("the '930 patent"~~, as well as an action for false and misleading advertising under the Lanham Act § 43(a), 15 U.S.C. §1125(a).

2.    The acts of infringement and false and misleading advertising relate to ~~Defendant's~~Defendants' ongoing ~~and/or imminent~~ manufacture, use, sale, importation, offer to

sell and/or contribution to, active inducement or encouragement of others to do any of the foregoing, within the United States.

## THE PARTIES

3.    Seakeeper is a corporation organized and existing under the laws of the Delaware, having its principal place of business at 5460 Pottsville Pike, Leesport, PA 19533.

4.    Seakeeper, founded in 2003, by entrepreneur Shepard McKenney and naval architect John Adams, is the global leader in marine motion control technology. Initially inspired by the need to minimize boat roll, Seakeeper's founders integrated advanced gyroscopes to effectively counteract the rolling motion experienced at sea, dramatically improving onboard comfort.

5.    Seakeeper's product line has revolutionized boating through gyroscopic stabilizers that eliminate up to 95% of boat roll, significantly enhancing comfort and reducing seasickness for those on board. Seakeeper's ~~gyrostabilizing~~gyrostabilizer technology has been widely adopted, with tens of thousands of units installed and demand rapidly growing.

6.    On information and belief, Dometic is a corporation organized and existing under the laws of the state of Delaware with a principal place of business at 5600 N River Rd Ste 2500, Rosemont, ~~IL,~~Illinois 60018.

7.    On information and belief, Dometic Group is a Swedish corporation with a principal place of business at Hemvärnsgatan 15 6tr, Solna, SE, SE-171 54, Sweden.

8.    On information and belief, Dometic Canada is a Canadian corporation with a principal place of business at 3831 No 6 Rd, Richmond, BC V6V 1P6, Canada.

9.      On information and belief, Dometic Canada, together with Dometic are an integral part of the Dometic Group's global marine segment and each have extensive, continuous, and systematic contacts with the United States.

10.     Dometic Canada is an indirect subsidiary of Dometic and, ultimately, Dometic Group. On information and belief, Dometic does business as "Dometic Marine."  In the alternative, Dometic Canada does business and has done business actively and systematically in the United States, including within this District since at least 2011, as Dometic Marine. In the further alternative, both Dometic and Dometic Canada collectively and in concert do business and have done business actively and systematically in the United States, including within this District since at least 2011, as Dometic Marine.

11.     Dometic Canada maintains physical locations and operational facilities in various U.S. states, including on information and belief a facility at 640 North Lewis Road, Limerick, PA 19468, among others, through which Dometic Canada transacts business across the United States, including in this District, by, among other things, the marketing, sale and support of products.

## JURISDICTION AND VENUE

12.     7. Seakeeper incorporates and realleges the foregoing paragraphs.

13.     8. This Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. §§ 1331 and 1338(a) because this action involves substantial claims arising under the United States Patent Act (35 U.S.C. § 100 *et seq.*) and the Lanham Act (15 U.S.C. §1125(a)).

14.     9. This Court has personal jurisdiction over Dometic because Dometic is a corporation organized and existing under the laws of the state of Delaware.

3

15. This Court has personal jurisdiction over Dometic Canada. Dometic Canada, in its own name and/or doing business as Dometic Marine or as the marine division of Dometic, has purposefully availed itself of the benefits and protections of Delaware's laws such that it should reasonably anticipate being hailed into court here.

16. This Court has personal jurisdiction over Dometic Canada because, among other things, on information and belief and described in more detail below: (1) Dometic Canada itself and through its parent company, Dometic, offers the accused Dometic DG3 product for sale in the United States, including in Delaware, and induces its parent and third parties to so offer the accused product for sale (*see infra*, ¶¶53-66); (2) Dometic Canada, through the website of its Delaware-incorporated parent, Dometic, to solicit U.S. customers, including customers in this District, such as by allowing prospective customers to request product information and engage with sales teams capable of selling and/or demonstrating the accused DG3s products at stores within in this district (*see, e.g., infra*, ¶¶60-61); (3) Dometic Canada, alone or together with Dometic, contracted with a U.S. boat manufacturer, Regulator Marine, Inc. ("Regulator"), supplies Regulator with accused DG3 product for its Regulator 35 boat model sold and/or offered for sale in the U.S. and in this district (*see infra*, ¶58); ); (4) Dometic Canada has participated in designing the accused DG3, among other things, to comply with U.S. regulatory standards, and provided product documentation, labeling, and instructions tailored to U.S. customers, training for U.S.-based sales and service personnel, and participated in U.S. trade shows and marketing campaigns promoting the accused products; and, (5) on information and belief, Dometic Canada has purposefully directed activities at the United States and this District by itself or through its parent designing, approving, and directing the marketing strategy for the accused products sold in the United States, including in this District, including reviewed and

4

approved advertising materials disseminated by its U.S. parent that are the subject of Plaintiff's claims and knew and intended that those materials would be distributed to consumers in this District, and that such claims caused Plaintiff to suffer reputational and commercial injury in this District. For example, due to Delaware's extensive coastline, numerous marinas, and seasonal boating culture, it is recognized as a strong market for both new and resold boats of the type suitable for the accused DG3 product The claims asserted herein arise out of and relate directly to the above activities.

17.     This Court has personal jurisdiction over Dometic Group with respect to the alleged Lanham Act claims. Among other things, Dometic Group has, on information and belief, (1) designed, approved, and directed the challenged marketing for the accused products in the United States, including in this District;  (2) participated in reviewing, drafting, authorizing, and disseminating, and approving the representations by Dometic and Dometic Canada that form the basis of Plaintiff's claims, including communications directed to U.S. customers and partners, which were expressly aimed at the United States market, including this District, and causing injury here among potential direct and indirect purchasers; and, (3) shares integrated operations, including unified branding, consolidated financial reporting, and centralized decision-making with respect to product development, marketing, and compliance of the DG3, and dictates the strategic direction and approves significant operational decisions of Dometic and Dometic Canada. The claims asserted herein arise out of and relate directly to those activities. Dometic Group also has purposefully availed itself of the benefits and protections of Delaware's laws such that it should reasonably anticipate being hailed into court here.

18.     Alternatively, under Fed. R. Civ. P. 4(k)(2), Dometic Group is not subject to jurisdiction in any state's court of general jurisdiction, the claim against Dometic Group arises

5

under federal law, and this Court's exercise of jurisdiction over Dometic Group comports with due process.

19.    ~~10.~~ Venue is proper in this ~~District with respect to Dometic pursuant to~~Court under 28 U.S.C. §§ 1391(b)(1) and 1400(b) because Dometic is resident of this district as a corporation organized and existing under the laws of the state of Delaware, and under § 1391(c)(3) as Dometic Canada and Dometic Group are foreign corporations and are subject to this Court's personal jurisdiction for at least the reasons set forth above.

## BACKGROUND

### Seakeeper's Founders

20.    ~~11.~~ Seakeeper was founded in 2003 by two marine industry veterans: Shepard "Shep" McKenney and John Adams. McKenney is an entrepreneur, and Adams is a naval architect known for his expertise in boat motion control. Together, they teamed up to create an innovative gyroscopic stabilizer that would forever change recreational boating by virtually eliminating boat roll.

21.    ~~12.~~ Seakeeper was started with a clear mission: to transform the boating experience by eliminating the debilitating roll of boats and making rides smoother and safer. The founders were driven by a desire to solve the age-old problem of seasickness and discomfort caused by a boat's rolling motion.

### Seakeeper's Initial Years of Investment

22.    ~~13.~~ Prior to the introduction of Seakeeper's innovations, other, less than satisfactory, solutions to the problem of boat roll had been attempted. For example, stabilizers such as external hull fins had traditionally been employed. These stabilization systems were largely limited to large yachts and commercial vessels and created added drag, were vulnerable

6

to damage, and only worked while underway. Their effectiveness was limited, especially for smaller vessels.

23.    14. McKenney and Adams set out to develop a practical, modern gyro system that could stabilize recreational boats without those drawbacks. Their vision was to eliminate up to 95% of boat roll, the rocking that causes seasickness and fatigue, thereby making boating far more enjoyable for everyone.

24.    15. Starting essentially as a garage venture, McKenney and Adams began developing their gyro technology in a small workshop on Solomons Island, Maryland. They invested years in research and development. Seakeeper's first prototype was installed on a 43-foot Viking sportfish yacht in 2006, proving the concept.

25.    16. By 2008, after further years of research and development, Seakeeper officially launched its first commercial product (the Seakeeper M7000 gyro) and secured its first boatbuilder partnership.

**Seakeeper's Original Innovation**

26.    17. A control moment gyro is a torque amplification device.  It uses controlled precession of stored angular momentum to produce large control torques, commonly referred to as gyro dynamics. The torque generated by a control moment gyro helps keep boats steady by reducing side-to-side rolling. A control moment gyro works by using a flywheel, held in place by bearings, that spins and creates strong forces used to balance the movement of the boat.

27.    18. Before Seakeeper's innovations, marine gyros were big, heavy and limited to large vessels.  Because their flywheels spun in air, they were subject to air resistance, constraining their speeds. Air friction is a major factor contributing to the power required for

spinning the gyro up, and the dominant factor in maintaining flywheel speed because air friction goes up with the cube of rpm.

28.     ~~19.~~ In order to provide sufficient angular momentum at these slower speeds, their flywheels were large and heavy.  For a given weight of the flywheel, increasing the diameter of the flywheel is the most energy efficient way to increase its angular momentum, and thus its effectiveness. The reason is that (all other things being equal) the angular momentum goes up with the square of the radius of gyration of the flywheel. Such flywheels were only practical on larger ships that could more easily accommodate large flywheels.

29.     ~~20.~~ The resulting power required to operate these gyros was also beyond the capacity of most boats.  Ships, with their extensive power plants, had large generators available to power such gyro stabilizers, whereas many small boats have minimum electrical resources.

30.     ~~21.~~ While it is possible to reduce both the weight and size of a flywheel, to achieve sufficient force for stabilization it becomes necessary to increase the speed at which the flywheel spins.  However, while angular momentum goes up arithmetically with rpm, the power required to overcome air friction rises exponentially, requiring even more power.

31.     ~~22.~~ Thus, small boats were caught in a bind. If the weight of the flywheel was increased, the device would be too heavy. If the diameter of the flywheel was increased, it would be too large.  If the flywheel was spun faster, it would require too much power. Collectively, prior to the innovations of McKenney and Adams, these problems appeared insurmountable for small boats.

32.     ~~23.~~ McKenney and Adams conceived of employing a vacuum enclosure to achieve high flywheel speeds with reduced size and power requirements.  Seakeeper's M7000 gyro features a flywheel spinning at high speeds within a vacuum-sealed enclosure, generating

8

gyroscopic torque to counteract vessel movement. The introduction of the Seakeeper M7000 in 2008 effectively created a new market for gyroscopic stabilizers in recreational and smaller commercial boats.

33. 24. McKenney and Adams patented their concept. For example, on June 4, 2003, they filed U.S. Patent Application No. 10/454,905 which was duly issued on December 13, 2005 by the United States Patent Office as U.S. Patent No. 6,973,847, entitled "Gyroscopic Roll Stabilizer for Boats."

<strong>Seakeeper's Further Essential Innovations in Cooling</strong>

34. 25. Having conquered problems relating to a high-torque stabilization system through use of a vacuum enclosure, among other advances, McKenney and Adams observed that the high heat produced by the moving parts within the system presented a unique problem with such vacuum-sealed environments.  Flywheels racing at thousands of RPM generate not only stabilizing torque but also intense thermal energy.

35. 26. Flywheels supported in an ambient environment can dissipate heat by air convection. If the flywheel is enclosed in a partial vacuum, such as described in U.S. Pat. No. 6,973,847, there is not enough air to permit adequate convection. Seakeeper's design, with its nearly airless vacuum chamber, could not vent or dissipate this heat through air.

36. 27. Heat differentials were possible at bearing locations.  Bearings were positioned between the rotating flywheel and stationary support.  This stationary support is conductively connected to the device's outer enclosure.  Because the stationary support is thermally connected to the outer enclosure, heat located at its interface with the bearings can be more effectively drawn off, than can the heat building up where the rotating flywheel and bearing meet.  These rising temperature differences can threaten the gyro's precise tolerances. In

a marine environment, failure of an overheated gyro might occur precisely when it was needed most.

37. 28. McKenney and Adams' use of a vacuum allowed smaller, lighter gyros to generate massive stabilizing force, but only if they could conquer the thermal challenge.

38. 29. McKenney and Adams overcame this additional challenge through further extensive research. McKenney and Adams determined traditional cooling methods were unsuitable for a vacuum environment. Bearings supporting the heavy flywheel must survive high rates of speed.  Conventional cooling lubricants, such as oil, would vaporize in the vacuum. While a special grease ultimately solved the need for lubrication, the problem of carrying away the excessive heat remained.

39. 30. After years of work, McKenney and Adams achieved what many thought impossible. McKenney and Adams conceived of an apparatus having a first heat transfer element attached to and spinning with the spinning member. This first heat transfer element moves relative to a second heat transfer element that is stationary and thermally connected to the enclosure.  The first and second heat transfer elements are shaped and positioned in close proximity to one another so that substantial heat is transferred from the first heat transfer element to the second heat transfer element.

40. 31. The close proximity of the two promotes heat transfer by conduction. Gaseous conduction benefits from the fact that the thermal conductivity of a gas increases with temperature so that as the gas warms up it will conduct more heat across the gap (for a fixed temperature differential) between the rotating and stationary vanes.

41. 32. The relative rotational movement, combined with this proximity, creates rotating cavity flows that also promote heat transfer by gaseous convection.  Rotating cavity

10

flows will exist in the small gaps between the fixed and rotating vanes even in a partial vacuum. In some applications, the gas density and/or rotational speed will be high enough that gaseous convection will augment the gaseous conduction cooling. The rotating flow circulates the gas molecules so they are continuously transported from the hot rotating vanes to the cooler stationary vanes.

42.    33. Heat may be conducted from the heat generating components to the rotating vanes by solid conduction, then across the air gap to the stationary vanes by gaseous conduction and convection and then by conduction and convection to the atmosphere or a heat sink.

43.    34. The design permits heat to be removed passively without circulating any fluids inside the enclosure. This considerably simplifies the device or machine, as a coolant pump, motor, filter and heat exchanger are not required. Grease can replace oil as a lubricant, reducing frictional torque.

44.    35. Seakeeper's breakthrough—compact, fully internal gyros with efficient vacuum-enclosed flywheels and a proprietary cooling system—made stabilization viable for vessels of all sizes at rest or low speed. By solving the long-standing issue of boat roll in a compact, self-contained package, Seakeeper introduced an entirely new category of marine technology, transforming expectations for comfort and usability across the boating world.

45.    36. With friction no longer causing overheating from within, the founders' vision to bring gyroscopic stabilizers to recreational and smaller commercial boats could be realized. The gyroscopic stabilizers could now run without overheating, even in the hottest engine rooms or tropical climates, freeing it from the last major constraint.

46.    37. The improved Seakeeper gyro could spin roughly three times faster than an equivalent non-vacuum gyro without extra power. It could deliver the same stabilizing ability

11

with a flywheel weighing only one-third of what earlier designs required, and it needed only about half the electrical power to operate, making it feasible on much smaller boats.

47. 38. These advances turned the Seakeeper® into a must-have technology. What had begun as an idea in a Maryland garage in 2002 was, by the late 2000s, a practical reality.

48. 39. The marine industry's reception evolved from skepticism to fervent adoption as the benefits were demonstrated. Fishermen and yacht owners who long previously accepted nauseating roll as just part of boating, had a product that could provide rock-solid decks and steady stomachs. This was all enabled by the innovations developed by McKenney and Adams to remove heat from within the vacuum enclosure.

49. 40. By 2013, Seakeeper had shipped its 1,000th Seakeeper® unit, and the pace of adoption has accelerated since. In the following years, the company expanded its product line from one flagship model to a whole family of gyros, scaling the technology to both larger and smaller boats. Today, Seakeeper® gyros can be found on vessels from 23-foot center-console fishing boats to 200-foot mega-yachts.

50. 41. From a business standpoint, solving the overheating problem was the key to Seakeeper's success. It gave the young company a proprietary, patented solution no competitor had, and justified the years of investment when sales finally took off.

### SEAKEEPER'S PATENTED TECHNOLOGIES

51. 42. On January 12, 2006, Seakeeper filed a patent application directed to this advance in control moment gyro technology. On June 16, 2009, the U.S. Patent & Trademark Office issued U.S. Patent No. 7,546,782 ("the '782 patent") titled "Cooling bearings, motors and other rotating heat generating components." The '782 patent lists Shepard McKenney and John Adams as inventors. A true and correct copy of the '782 patent is attached as Exhibit A.

52.    ~~43.~~ The '782 patent claims are directed to a cooling apparatus for transferring heat from and cooling one or more heat generating components that support or drive a flywheel or other spinning member. The '782 patent is valid and duly issued, and will not expire until at least February 11, 2027.

~~44. On June 15, 2009, Seakeeper filed a further patent application directed to this advance in control moment gyro technology. On February 21, 2012, the U.S. Patent & Trademark Office issued U.S. Patent No. 8,117,930 ("the '930 patent") titled "Cooling bearings, motors and other rotating heat generating components." The '930 patent lists Shepard McKenney and John Adams as inventors. A true and correct copy of the '930 patent is attached as Exhibit B.~~

~~45. The '930 patent claims are directed to a cooling apparatus for transferring heat from and cooling one or more heat generating components that support or drive a flywheel or other spinning member. The '930 patent is valid and duly issued, and will not expire until at least April 5, 2026.~~

## ~~DEFENDANT'S~~DEFENDANTS' PRODUCT AND INFRINGING CONDUCT

53.    ~~46.~~ On February 12, 2025, ~~Dometic~~Defendants issued a press release announcing the DG3 product, which "marks Dometic's entry into the rapidly growing vessel stabilizer market." *See* Exhibit B. Eric Fetchko, the President of Dometic's Marine Division, emphasized that ~~Dometic is~~Defendants were "not just launching a new product, we're taking Dometic into an important new category for the global boating business." *Id.*  On February 11, 2025, ~~Dometic~~Defendants, for the first time, revealed ~~its~~the DG3 to the public at the 2025 Miami International Boat Show, which represented ~~Dometic's~~Defendants' entry into the vessel stabilization market. *See* https://www.youtube.com/watch?v=mcfgMCTFv0M (Fetchko Speech

13

at 2025 Miami Boat Show) (referred to herein as either "Dometic DG3" or "Dometic's DG product").

54.     Dometic operates a website that offers marine products for sale in the United States. *See* https://www.dometic.com/en-us/outdoor/activities/marine (archived at https://perma.cc/H4MX-HZ4T). In the "Contact Us" portion of dometic.com, the site expressly states that it is the property of "Dometic Corporation." https://www.dometic.com/en-us/contact-us?srsltid=AfmBOopKI7t_j2T19WBOJyOJ72DRNsjJ6_zr6cj1jlU0Uw-Vmf7W7ik4 (archived at https://perma.cc/P8LR-94B8). On the "Terms and Conditions of Sale (Consumer)" portion of dometic.com, it states: "These Dometic Terms and Conditions of Sale (Consumer) ('Terms of Sale') govern all consumer orders for products, including spare parts ('Products'), placed by any individual or organization ('you' or 'your') from the ***Dometic Corporation ('Dometic', 'we', 'our' or 'us') through our website at dometic.com*** ('Website'), as well as any and all subsequent use of such Products." https://www.dometic.com/en-us/terms-and-conditions-consumer?srsltid=AfmBOorClCwvLBOQ7HSaegCVN4I3GzbAyycgshm_yRmrHl1VrMquVkNr (archived at https://perma.cc/DE9Z-E5K8) (emphasis added). On the privacy policy portion of dometic.com, it states: "Thank you for accessing the DOMETIC CORPORATION (U.S.) Website (the 'Website' or 'dometic.com/en-us/us') ***operated by DOMETIC CORPORATION*** ('Dometic')." https://www.dometic.com/en-us/professional/privacy-policy?srsltid=AfmBOoorXJ0-Eooy_n6JO-Spi4fhWlftX0629LKxumF1YCiHz37XGPUb (archived at https://perma.cc/WS9B-NPH6) (emphasis added).

55.     On dometic.com, a site owned and operated by Dometic, Dometic offers the accused Dometic DG3 gyroscope product for sale. *See* https://www.dometic.com/en-us/outdoor/boat/stabilization/gyroscopic-stabilizers (archived at https://perma.cc/8TND-7WR3).

14

Dometic's website lists the accused Dometic DG3 product, and asserts that the product is "sold in our dealer network." *See* https://www.dometic.com/en-us/outdoor/boat/stabilization/gyroscopic-stabilizers/14-1411-141101-141101001-374846?v=9620018742 (archived at https://perma.cc/WCQ4-FF4Z). One such identified dealer, Mobtown Offroad, LLC, is located in this district. Within the page displaying the accused DG3 product, Dometic provides a link to "find a store," which directs potential DG3 customers to stores, including one in this district (Mobtown Offroad, LLC).

56.     On dometic.com, a site owned and operated by Dometic, Dometic provides a YouTube video in which an accused DG3 product is shown installed in a boat and in use. *See* https://www.dometic.com/en/outdoor/boat/stabilization/gyroscopic-stabilizers/14-1411-141101-141101001-374846?v=9620018742 (archived at https://perma.cc/7F55-CEJU).

57.     Dometic Marine has sold the infringing DG3 in the United States. Dometic Marine has entered into an agreement or agreements to sell the infringing DG3 product to at least Regulator for use on its 35-foot model boat. Pursuant to that agreement, Dometic Marine has delivered infringing DG3 products to Regulator and worked in concert with Regulator to design Regulator's 35-foot model boat to accommodate the infringing DG3 and to install the infringing DG3 in one or more boats manufactured by Regulator. Such installations are evidenced by the following image showing a DG3 installed in a Regulator Marine 35-foot model boat located in Miami, Florida at the Miami 2025 Boat Show:

(Added)



https://www.youtube.com/watch?v=Qn0m1x6rJEM at 2:18.

58.     Dometic Marine has induced Regulator to offer the DG3 for sale in this District and throughout the United States.  Regulator Marine has offered to sell the DG3 in this District and throughout the United States as a direct and proximate result of these infringing actions. The following images are true and correct copies of emails generated by a resident of this District order information after their use of Regulator's website to "Build a Boat" containing the DG3 product at a price of $58,595:

16



See https://www.regulatormarine.com/boat-builder/35/.

59.     Dometic Marine has offered to sell the DG3 in this District and throughout the United States.  Dometic Marine offers the DG3 on its Dometic USA website (dometic.com). The following true and correct images from that website show that Dometic offers the DG3 for sale through its dealer network ("Sold in our dealer network"):

17

(Added)



https://www.dometic.com/en-us/outdoor/boat/stabilization/gyroscopic-stabilizers/14-1411-141101-141101001-374846?v=9620018742 (archived at https://perma.cc/WCQ4-FF4Z).

60.    Dometic's website directs purchasers to its network of dealers using an interactive "Find in store" feature.  That feature directs purchasers to authorized Dometic Marine dealers throughout the United States, including in this District, as illustrated from the following image of Dometic's website when this feature is invoked in connection with the offer of the DG3:



(Added graphics)

61.    Dometic's website previously indicated a specific suggested price for the DG3 (*i.e.* "$43,999 USD"). https://www.dometic.com/en-us/support/faq/gyro-01?srsltid=AfmBOorVksUbivUoiG8Vp-86Zk2suwJ3HFh6c28BjhGIW7lcC05GvHos (archived at https://perma.cc/EWK9-Q3B7). Dometic's website further proposes terms and conditions relating to the purchase of the infringing DG3 by both consumers and OEMs. Dometic's Standard Terms and Conditions of Sale (B2B) provide that they apply to the sale of all goods by "**Dometic Corporation** or any Dometic Corporation subsidiary (respectively, a 'Seller') to any customer ('Buyer').") https://www.dometic.com/en-us/professional/terms-of-sale-b2b (emphasis added).  The terms and conditions specify delivery terms.  *See* Section 2.  They specify the transfer of title and risk of loss.  *Id.* at Section 5. They specify the price at which products will be purchased.  *Id.* at Section 8 ("Buyer shall purchase the Goods from Seller at the price[s] (the 'Price[s]') set forth in Seller's published price list in force as of Seller's shipping date.").

62.    The following true and correct images from that website show that Dometic Marine specifies further payment terms, including that the DG3 can be purchased using flexible payment options available through Klarna, which is a Swedish company that offers a "buy now, pay later" financing option:

https://www.dometic.com/en-us/outdoor/boat/stabilization/gyroscopic-stabilizers/14-1411-141101-141101001-374846?v=9620018742 (archived at https://perma.cc/WCQ4-FF4Z).

63.    Dometic Marine solicits potential purchasers of its infringing DG3 product throughout the United States and in this District via an interactive web form. A true and correct image of that web form is shown below:

https://www.dometic.com/en-us/outdoor/lp/marinelp-gyroscopic-stabilization/contact-form?srsltid=AfmBOoqIVyDLrISjuRuxhYmXLXfcjfrLaAt2JPtnfhOoj-i15G1D6ztP (archived at https://perma.cc/4S9B-9M5T).

64.    Dometic represents that the accused DG3 product was made, sold, and offered for sale by Dometic Canada. *See* D.I. 41 at 12-13 (". . . the company responsible for its design, manufacture, and distribution is [Dometic Canada]"). In doing so, Dometic Canada relied on

21

Dometic's U.S. website, dometic.com, to offer the accused DG3 product for sale in the United States under terms and conditions provided by Dometic. Thus, on information and belief, Dometic Canada and Dometic act in concert to offer the DG3 product for sale in the United States, Dometic acted as Dometic Canada's agent in such activities, and/or Dometic Canada induces Dometic to offer the DG3 for sale in the United States.

65.     Dometic represents that the accused DG3 product was made, sold, and offered for sale by Dometic Canada. *See* D.I. 41 at 12-13 (". . . the company responsible for its design, manufacture, and distribution is [Dometic Canada]"). Thus, Dometic Canada admits that the acts set forth in the preceding paragraphs, specifically Paragraphs 53-64 are also conducted by Dometic Canada.

66.     Dometic has represented that: (1) it "advertises, distributes, and sells its products to consumers" in the United States using the "Dometic" trademark; (2) the "Dometic" mark has "become associated exclusively with" Dometic in the United States; and (3) it "develops, manufactures, and sells marine products" bearing the "Dometic" mark in the United States. D.I. 121 at 3 *citing* Complaint, *Dometic Corp. v. CitiMarine LLC*, No. 1:20-cv-23317 (S.D. Fla. Aug. 10, 2020), Doc. 1 at 3-5.  The DG3 product is offered for sale, sold, and marketed under the Dometic trademark.

67.     ~~47.~~ The ~~Dometic~~ DG3 is a marine gyrostabilizer designed to enhance boat stability by minimizing roll motion at sea. ~~Dometic's~~The DG3 was presented in various videos as having the following internal structure:

22



*See* Dometic YouTube Video, <u>previously available</u>

https://www.youtube.com/watch?v=6c1JaSP0cOo, at 1:08 <u>(after the filing of the initial</u>

<u>complaint, Dometic marked this video "private")</u>.  Dometic also described its use of ~~an internal~~

~~glycol~~<u>a</u> cooling loop~~, which is circulated and cooled in the same manner as~~ <u>to remove heat</u>

<u>withdrawn using</u> the method developed by McKenney and Adams for their Seakeeper® product.

*See* https://www.youtube.com/watch?v=NM33FWzQc5c&t=92s (Dometic Sales Rep. Video) at

7:31.

      <u>68.</u>    ~~48.~~ The ~~Dometic~~ DG3 ~~employes~~<u>originally employed</u> a first and second plurality

of vanes to dissipate heat.  The first plurality is attached to the spinning flywheel (green).  The

second set is stationary and attached to the enclosure:

23



69.     After the filing of this lawsuit, Defendants modified the design of the DG3. Notwithstanding this redesign, Defendants' modified DG3 retained vanes utilizing the same heat transfer path to extract heat from the bearing elements attached to the spinning flywheel.

70.     As a consequence of Defendants' infringement Seakeeper has lost profits from the sale of its gyrostabilizer product, as well as those associated with products anticipated to be sold in conjunction with those gyrostabilizers. Beyond these lost sales, Defendants' actions have damaged the reputation of Seakeeper's products and eroded their price. Defendants have further unjustly enriched itself through its misappropriation of Seakeeper's technology.

**DEFENDANTS' DECEPTIVE TRADE PRACTICES**

71.     Prior to the introduction of their DG3, Defendants had never made or sold a gyrostabilizer. To persuade skeptical customers, it was essential for Defendants to convince them that Defendants' design was a proven commodity. To do so, Defendants made false and

misleading claims concerning the degree of development and testing their designs had undergone.

72.    Upon information, no significant testing was performed on the current design of the DG3 before its commercial launch.  Upon information and belief, Defendants began manufacturing unproven redesigned units for shipment to customers in May 2025, at least four months before the manufacture of such units for internal testing. Despite this, Dometic Group, on behalf of itself and the other Defendants represented that the redesigned DG3 was "the result of **years of engineering, testing and refinement**[.] https://www.dometicgroup.com/globalassets/4-dometicgroup/press/a-news-2025/press-backgrounder---dometic-dg384.pdf?ref=676D57AA4C. Defendants' further falsely claimed:

> Our product engineers from around the world collaborated on the development of the DG3, a project that for many years, remained top secret, undergoing **extensive testing to refine every component** of the product.… Engineering techniques that had never been used before within a gyro were applied, adapted and **perfected in countless trials** within the Dometic Marine Vancouver facility.

https://www.dometic.com/en/article/marinejournal-the-launch-of-the-dometic-dg3-gyro-stabilizer.

73.    Defendants have also made false comparative claims understood as referencing Seakeeper's product. For example, Defendants falsely claim their DG3 product reduces maintenance costs with bearings lasting three times longer than those used in Seakeeper's product, such as in the following example:

> With 40% lower power consumption and bearings that last three times longer than the competition, our marine gyro allows you to enjoy more time on the water with less maintenance and energy usage.

https://www.dometic.com/en-us/outdoor/lp/marinelp-gyroscopic-stabilization.

25

74.     Although Defendant did not identify Plaintiff by name, the statements were made in a context where reasonable consumers would understand them to refer to Plaintiff given Seakeeper's 95% share and wide-recognition as the leader of the gyrostabilizer market. Indeed, as further explained, representatives from Dometic Group and Dometic Canada explained to Seakeeper representatives that they viewed Seakeeper and its products as essentially the "Kleenex" of marine stabilization products—in other words that Seakeeper's products served to define this product segment. At least for these reasons, Defendants' reference to the competition would have been understood by purchasers and potential purchasers as a reference to Seakeeper and more specifically to its Seakeeper 3 model. *See, e.g.,* https://rnmarine.com/news/dometiclaunchesdg3 ("Dometic's New DG3 Gyro & Comparing To Seakeeper 3") (accessed May 10, 2026).

75.     Defendants' statements on bearing life suggest the existence of test data supportive of these claims. On information and belief, Defendants do not possess data establishing the lifespan of bearings used in either of its DG3 designs, or that Seakeeper's bearings last only one-third as long.

76.     Defendants have also made false and misleading claims that the DG3 consumes 40% less power. *See, e.g.,* https://media.dometic.com/externalassets/ dg3_9620018742_120383.pdf?ref=2113317502 ("Introducing the first truly active gyro on the recreational market. DG3 boasts industry-leading spin up and down times, coupled with a remarkable 40% reduction in power consumption."); https://www.dometicgroup.com/en-us/press-media/press-releases/dometic-expands-its-marine-business-with-new-innovative-gyrostabilizer-dometic-dg3-3F9DBD570387E723 ("Overall, the DG3 reduces power consumption by an impressive 40% compared to competing solutions.") As explained above,

Defendants' statements would have been understood by purchasers and potential purchasers as a comparison between the operating power consumption of the DG3 and that of Seakeeper's gyrostabilizers, specifically its Seakeeper 3 model.  Defendants claims of reduced power consumption are false and misleading.  Both the DG3 and the Seakeeper 3 reportedly consume similar amounts of power.  *See, e.g., https://media.dometic.com /externalassets/dg3_9620018742_120383.pdf?ref=2113317502* (operating power) and https://www.seakeeper.com/seakeeper-products/seakeeper-3/ (operating power).

77.    The subjects of Defendants' false and misleading statements are significant to the decision of purchasers and potential purchasers, including end-users, in buying gyrostabilizers such as the DG3 and the Seakeeper 3.  Defendants' statements are particularly likely to confuse potential buyers that may be new to boating and not understand how to operate a gyrostabilizer product. The importance of and reliance upon Defendants' statements concerning the DG3 is evidenced by the fact that boat builders and boating commentators have repeated these claims to end-user customers as reasons to equip purchased boats with the DG3.  *See, e.g.,* https://www.regulatormarine.com/blog/regulator-plus-the-new-dometic-dg3-gyro-stabilizer/ (noting that Regulator's introduction of the first boat to be equipped with the DG3 "Follow[ed] years of testing and collaboration[.]"); *id.* (noting that the DG3 has "40% lower power consumption thanks to slower spin speeds and smart flywheel design"); https://biggamefishingjournal.com/dometic-dg3-gyro/ (noting that the DG3 achieves "a remarkable 40 percent reduction in power consumption" and is "virtually maintenance-free" as a consequence of "longer bearing life," among other reasons). The persistence of these marketing claims amongst purchasers, potential purchasers and commentators points to the necessity that corrective advertising form part of the ordered relief.

78. As a consequence of Defendants' false advertising Seakeeper has lost, and is likely to lose, profits from the sale of its gyrostabilizer product, as well as those associated with products anticipated to be sold in conjunction with those gyrostabilizers. Beyond these lost sales, Defendants' actions have damaged the reputation of Seakeeper's products and eroded their price. Defendants have further unjustly enriched themselves through their false and misleading marketing.

### ~~DEFENDANT'S~~DEFENDANTS' ACCESS TO CONFIDENTIAL SEAKEEPER INFORMATION

79. ~~49.~~ More than a year ago, in January 2024, ~~Dometic's parent~~Dometic Group approached Seakeeper expressing an interest in acquiring Seakeeper.  Dometic Group represented that it wished to discuss incorporating Seakeeper's ~~gyrostabilizing~~gyrostabilizer products into its Marine division product line. Dometic Group was apparently seeking to develop its own ~~gyrostabilizing~~gyrostabilizer product at that time.  Nevertheless, Dometic Group executives, including executives from Dometic and Dometic Canada, explained to Seakeeper representatives that they viewed Seakeeper and its products as essentially the "Kleenex" of marine stabilization products—in other words that Seakeeper's products served to define this product segment.  These Dometic executives represented that they sought to acquire Seakeeper in lieu of developing their own ~~gyrostabilizing~~gyrostabilizer product.

80. ~~50.~~ On February 4, 2024, as part of ~~Dometic's~~Dometic Group's potential acquisition of Seakeeper, Dometic Group and Seakeeper entered into a confidentiality agreement under which Seakeeper shared its confidential and proprietary business and technical information with Dometic Group, including to representatives of Dometic Canada.  Dometic Group agreed to

only use Seakeeper's confidential information for the purpose of "evaluating, negotiating and consummating a Potential Transaction between the parties." ~~Id~~Ex. C at 2.

81.     ~~51.~~ In reliance upon the terms of the Non-Disclosure Agreement and the representations of Dometic's executives, Seakeeper shared confidential financial and technical information with Dometic Group, including to executives of Dometic Canada.  This information encompassed information concerning the sales of Seakeeper® products, its profit margins, its assessment of the market for gyrostabilizers, its plans for future developments and new products, its marketing plans and intended target segments, its market assessments and competitive intelligence, as well as details concerning Seakeeper's technical advances essential to Seakeeper's market dominance.

82.     ~~52.~~ Following these discussions and its receipt of confidential Seakeeper information and plans, Dometic Group discontinued discussions. A little over one year later, Dometic Marine announced its DG3 gyrostabilizer product. As noted above, ~~Dometic's~~Dometic Marine's DG3 product incorporated Seakeeper's patented cooling technology.

83.     ~~53.~~ Prior to its discussions with Seakeeper at which ~~Dometic was~~Defendants were apprised of Seakeeper's technology, Dometic Canada had disclosed its design for a marine gyrostabilization product to the United States Patent Office.  In a 2021 patent application, Dometic Canada depicted a design for a product that lacked the multiple cooling vanes employed in Seakeeper's ~~patent~~commercial products.  As shown below in Figure 66 of ~~Dometic's~~Dometic Canada's patent application publication, the ~~Dometic~~ design did not employ the particular interleaved ~~vanes~~vane design present in Seakeeper's commercial product as a means of cooling the heat generating components:

29



FIG. 66

U.S. Patent Appl. No. 2024/0400167 (the "Dometic Patent App.") at Figure 66.

84. ~~54.~~ In filings with the United States Patent Office as late as May 2024, Dometic Canada depicted a design synonymous with its eventual commercial product which did not employ Seakeeper's ~~patented~~commercial cooling ~~vanes~~vane design. *See* Dometic Patent App.

85. ~~55.~~ Within a year of ~~its~~their confidential discussions with Seakeeper, however, ~~Dometic~~Defendants had radically overhauled ~~its~~their design to now copy the patented cooling technologies in the manner embodied in the Seakeeper products.

86. ~~56.~~ Additionally, ~~Dometic~~Defendants specifically chose to target the 35-foot boat segment in view of information that Seakeeper shared with ~~it~~them during their confidential discussions.

87. ~~57. Dometic's~~Defendants' actions further targeted a specific customer of Seakeeper's. ~~Dometic~~Defendants persuaded that customer to discontinue purchases from Seakeeper in favor of ~~Dometic's~~Defendants' infringing product.

30

88.    58. Dometic has further indicated that the next iteration of its infringing product will target another market segment that ~~Dometic has~~Defendants have chosen based upon confidential information Seakeeper shared with ~~Dometic~~Defendants concerning Seakeeper's plans and product development and marketing strategies.

**IRREPARABLE HARM TO SEAKEEPER**

89.    59. ~~Dometic's~~Defendants' entry ~~in~~into the gyrostabilizer market for recreational and small commercial boats, a market in which Seakeeper has about a 95% market share, has and will continue to irreparably harm Seakeeper. Seakeeper has and will continue to suffer irreparable harm from the continued infringement due to the loss of market share in the recreational and small commercial boat gyrostabilizer market. As a leader in marine stabilization technology, Seakeeper's market position and customer relationships are critical assets that cannot be restored through monetary damages alone. Continued infringement ~~threatens~~has and continues to threaten to erode Seakeeper's competitive edge, diminish its brand loyalty, and cause long-term harm that injunctive relief is necessary to prevent.

90.    60. ~~Dometic's~~Defendants' entry into the market has also caused irreparable harm by affecting Seakeeper's relationship with boat builders. As just one example, Independent Boat Builders, Inc. ("IBBI") is a purchasing cooperative composed of independently owned boat manufacturing companies. IBBI allows its members to pool their purchasing power to negotiate more favorable pricing and terms with suppliers of marine components and materials. The organization represents a significant share of the North American recreational boat market, giving it substantial leverage in supplier negotiations.

91.    61. If ~~Dometic is~~Defendants are accepted as an approved vendor by the IBBI, Seakeeper will suffer irreparable harm due to the structural and long-term nature of boat design

31

decisions made by IBBI member manufacturers. Because IBBI members commit to incorporating only components from approved vendors, acceptance of ~~Dometic~~Defendants would result in widespread adoption of ~~Dometic's~~Defendants' infringing product across multiple boat lines. Boat manufacturers would design their hulls and internal layouts around ~~Dometic's~~Defendants' system specifications, effectively locking Seakeeper out of future sales opportunities even if infringement is later proven. This design-based exclusion would not only cause Seakeeper immediate market share loss, but also result in lasting damage to its customer relationships, competitive position, and ability to re-enter key OEM channels—harms that cannot be adequately remedied by monetary damages alone.

92. ~~62.~~ Seakeeper has invested significant resources into the research and development of its proprietary marine stabilization technology, which represents years of innovation, engineering expertise, and market cultivation. If ~~Dometic is~~Defendants are allowed to continue ~~its~~their infringement, it will undermine Seakeeper's ability to maintain its competitive position as the industry leader in this specialized field. The presence of an infringing product in the market—particularly one offered through influential purchasing groups like IBBI—dilutes the value of Seakeeper's technological advancements and discourages further investment in innovation. This erosion of competitive differentiation and the disincentive to continue R&D efforts constitute irreparable harm, as they affect Seakeeper's long-term ability to lead, grow, and compete in a high-tech, evolving marketplace.

93. ~~63.~~ Seakeeper will also suffer irreparable harm to its reputation and brand if ~~Dometic~~Defendants, through ~~its~~their infringing product, gains acceptance in the marketplace. Seakeeper has built its brand on innovation, performance, and reliability in marine stabilization technology, and any confusion between its patented systems and ~~Dometic's~~Defendants'

32

infringing product threatens to dilute that reputation. If boat builders and consumers associate ~~the Dometic~~Defendants' product with similar functionality or performance, especially if it underperforms or lacks Seakeeper's engineering quality, Seakeeper's brand image as the industry leader may be irreversibly damaged. This erosion of trust and differentiation in a competitive, reputation-driven industry cannot be completely undone through monetary compensation and constitutes irreparable harm.

94.    ~~64.~~ At the 2025 Miami International Boat Show, Dometic's DG3 product was awarded an Innovation Award, an honor for which Seakeeper was also a nominee. This public recognition of ~~Dometic's~~Defendants' product not only ~~lends~~lent legitimacy to the infringing product, but also directly ~~undermines~~undermined Seakeeper's position as the recognized innovator in the marine stabilization space. Such an award significantly ~~influences~~influenced market perception, dealer confidence, and OEM purchasing decisions, all of which are deeply tied to brand prestige and technological leadership. The reputational damage resulting from the loss of this high-profile accolade to an infringing competitor cannot be undone, nor can it be fully compensated by monetary damages, as the long-term impact on Seakeeper's brand credibility, perceived innovation, and market influence constitutes clear irreparable harm.

### COUNT I – INFRINGEMENT OF THE '782 PATENT

95.    ~~65.~~ Seakeeper incorporates and realleges the foregoing paragraphs.

96.    ~~66.~~ The '782 patent is cooling apparatuses with improved cooling efficiency, capable of cooling a flywheel or other spinning member. The '782 patent inventors discovered building vanes into the enclosure containing a flywheel or other spinning member at below-ambient pressure or below-ambient density results in a more efficient cooling of the parts that are subjected to heat-generating friction.

97. ~~67.~~ The '782 patent issued with 23 claims. Independent claim 11 recites:

11. Cooling apparatus for transferring heat from and cooling one or more heat generating components that support or drive a flywheel or other spinning member; the apparatus comprising:

an enclosure enclosing the spinning member, the enclosure containing a gas at below-ambient pressure or below-ambient density, wherein an axis of rotation about which the spinning member spins defines an axial direction;

a first plurality of vanes attached to the spinning member such that the first plurality of vanes spin with the spinning member relative to the enclosure, wherein the first vanes are cylindrical elements extending in a first direction substantially parallel to the axial direction;

a second plurality of vanes fixed relative to the enclosure and the spinning member such that the first vanes move with respect to the second vanes, wherein the second vanes are cylindrical elements extending in a second direction substantially parallel to the axial direction and opposite the first direction, the second vanes defining cylindrical shaped channels into which the first vanes extend so that the first and second vanes are interleaved; and

wherein the first and second vanes are positioned in close proximity to one another so that substantial heat is transferred from the first vanes to the second vanes and the second vanes are configured such that that heat can be readily transferred from the second vanes to the exterior of the enclosure.

98. ~~68.~~ Dometic ~~manufactures, uses, sells, offers for sale and/or imports Defendant's Product constituting infringement of~~ and Dometic Canada have directly and indirectly infringed at least claim 11 of the '782 patent under 35 U.S.C. § 271(a), (b), and (c)~~.~~ as a consequence of their manufacture, use, sale, offer to sell and/or importation of the original DG3 product and/or their respective inducement of one another and/or their customers (*e.g.* Regulator and their end-users) to offer to sell, offer to sell, import, or use the infringing product.

99. ~~69.~~ As illustrated below, ~~Dometic's~~ the original DG3 product includes an enclosure that encloses a spinning member at below-ambient pressure or below-ambient density, whereby the spinning member defines an axial direction.

34

100.    70. As illustrated below, ~~Dometic's~~the original DG3 product includes a first plurality of vanes attached to the spinning member such that the first plurality of vanes spin with the spinning member relative to the enclosure, where the first vanes are cylindrical elements extending in a first direction substantially parallel to the axial direction.

101.    71. As illustrated below, ~~Dometic's~~the original DG3 product includes a second plurality of vanes fixed relative to the enclosure and the spinning member such that the first vanes move with respect to the second vanes, where the second vanes are cylindrical elements extending in a second direction substantially parallel to the axial direction and opposite the first direction, the second vanes defining cylindrical shaped channels into which the first vanes extend so that the first and second vanes are interleaved.

102.    72. As illustrated below, the first and second vanes are positioned in close proximity to one another so that substantial heat is transferred from the first vanes to the second vanes and the second vanes are configured such that that heat can be readily transferred from the second vanes to the exterior of the enclosure.

103.    73. The following diagram illustrates that ~~Dometic's~~the original DG3 product embodies the elements of at least claim 11 of the '782 patent:



104.     Defendants more recently modified the DG3.  The modified DG3 continues to infringe at least Claim 1 of the '782 Patent. Although Defendants' current design reduces the total number of vanes, it retains at least a plurality of both first and second vanes and utilizing the same heat transfer path from which heat is extracted from the bearing elements attached to the spinning flywheel.

105.     74. The manufacture, use, sale, offer for sale and/or importation of Dometic's DG3 product infringes the claims of the '782 patent, and one or more of Dometic'sthe aforementioned actions constitutesby Dometic and Dometic Canada constitute direct infringement of the claims of the '782 patent.

106.     75. The manufacture, sale, offer for sale and/or importation of Dometic'sthe DG3 product infringes the claims of the '782 patent, and one or more of Dometic'sthe aforementioned

36

actions ~~are inducing~~of Dometic and Dometic Canada induced the other and third parties, including contract manufacturers and their end-users, to commit acts that constitute infringement of the '782 patent in violation of 35 U.S.C. § 271(b). For example, ~~Dometic's~~the sale of ~~its~~the original and modified DG3 product ~~induces~~induced infringement by actively, knowingly and intentionally aiding, abetting, directing, encouraging, or otherwise instructing ~~its~~their customers to use the DG3 product in a manner that constitutes infringement of the '782 patent.

107.    ~~76.~~The manufacture, sale, offer for sale and/or importation of ~~Dometic's~~Defendants' DG3 product infringes the claims of the '782 patent, and one or more of ~~Dometic's actions contribute~~the aforementioned acts of Dometic and Dometic Canada contributed to the infringement of the '782 patent by third parties, including contract manufacturers in violation of 35 U.S.C. § 271(c). ~~Dometic has~~Those Defendants have done so knowing that ~~its~~their DG3 product constitutes a material part of Seakeeper's patent invention, and knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use.

108.    ~~77.~~As a consequence of ~~Dometic's~~those Defendants' actions alleged above, customers and contract builders, among others, have committed acts that would constitute direct infringement of the '782 patent.

109.    ~~78. Dometic~~Those Defendants knew about the '782 patent by at least as early as February 2024 during ~~its~~their due diligence as part of ~~Dometic's~~Dometic AB's potential acquisition of Seakeeper.

110.    79. Dometic hasThose Defendants have no reasonable basis for believing that Dometic's DG3 product will not infringe one or more valid claims of the '782 patent and no reasonable basis for believing that the infringed claims are invalid.

80. Dometic's manufacture, use, importation, sale, and/or offer for sale of Dometic's DG3 product constitutes willful infringement.

111.    Defendants' The actions of Dometic and Dometic Canada in manufacturing, using, importing, selling, and/or offering for sale of the DG3 product, and inducing and contributing to such acts by one another and by third parties, constitutes willful infringement.

112.    81. This case is "exceptional," and Seakeeper is entitled to an award of reasonable attorneys' fees under 35 U.S.C. § 285.

113.    82. Seakeeper has suffered damages as a result of Dometic'sthe infringement of the '782 patent. Seakeeper is entitled to an award of compensatory damages, including at least reasonable royalties for Dometic'sthe alleged infringement of the '782 patent.

114.    83. The acts of infringement by Dometic set forth above will cause Seakeeper irreparable harm for which it has no adequate remedy at law, and those acts will continue unless enjoined by this Court.

115.    84. Seakeeper is entitled to a preliminary injunction prohibiting DometicDefendants from manufacturing, using, offering for sale, or selling Dometic's DG3 and related products in the United States before expiration of the '782 patent.

**COUNT II – INFRINGEMENT OF THE '930 PATENTFALSE ADVERTISING**

116.    85. Seakeeper incorporates and realleges the foregoing paragraphs.

117.    Defendants have used false and misleading descriptions of fact and representations of fact in commercial advertising and promotion that misrepresent the nature,

38

characteristics, qualities, and performance and comparative qualities of Plaintiff's marine gyroscopic stabilizers.

118. Defendants' statements are literally false, and/or misleading by necessary implication, and/or unsubstantiated establishment claims.

119. Upon information and belief, these false statements actually deceived, or have a tendency to deceive, a substantial segment of Plaintiff's customers and potential customers. This deception is material in that it is likely to influence the purchasing decisions of Plaintiff's customers.

~~86. The '930 patent is cooling apparatuses with improved cooling efficiency, capable of cooling a flywheel or other spinning member. The '930 patent inventors discovered building vanes into the enclosure containing a flywheel or other spinning member at below-ambient pressure or below-ambient density results in a more efficient cooling of the parts that are subjected to heat-generating friction.~~

~~87. The '930 patent issued with 17 claims. Independent claim 1 recites:~~

~~1. A gyroscopic roll stabilizer for a boat, the stabilizer comprising:~~

120. Defendants' false advertising occurred in interstate commerce.

~~a flywheel, the flywheel being configured to be spun about a spin axis;~~

121. Defendants' false and misleading advertising statements and omissions injure both consumers and Plaintiff.

~~a first plurality of vanes coupled to the flywheel such that the first plurality of vanes spin with the flywheel relative to an enclosure;~~

122. Defendants' false and misleading advertising statements and omissions violate the Lanham Act § 43(a), 15 U.S.C. §1125(a).

~~a second plurality of vanes fixed relative to the enclosure and the flywheel such that the first plurality of vanes spin with respect to the second plurality of vanes, the second plurality of vanes defining gaps into which the~~

39

first plurality of vanes extend so that the first and second plurality of vanes are interleaved;

at least one rotating heat generating component coupled to the flywheel and positioned such that heat is transferred from the heat generating component to the first plurality of vanes;

the enclosure surrounding the first plurality of vanes, the second plurality of vanes, the heat generating component, and a portion or all of the flywheel, the enclosure containing a below-ambient density gas and maintaining a below-ambient pressure, wherein the below ambient density gas has a thermal conductivity at least 5 times greater than air; and

wherein the flywheel, the first plurality of vanes, the second plurality of vanes, the heat generating component, the enclosure, and the gimbal structure are configured so that, when installed in the boat, the stabilizer damps roll motion of the boat.

88. Dometic manufactures, uses, sells, offers for sale and/or imports Defendant's Product constituting infringement of at least claim 1 of the '930 patent under 35 U.S.C. § 271(a), (b), and (c).

89. As illustrated below, Dometic's DG3 product includes an enclosure that encloses a flywheel at below-ambient pressure and below-ambient density, whereby the flywheel is configured to be spun about a spin axis.

90. As illustrated below, Dometic's DG3 product includes a first plurality of vanes coupled to the flywheel such that the first plurality of vanes spin with the flywheel relative to an enclosure.

91. As illustrated below, Dometic's DG3 product includes a second plurality of vanes defining gaps into which the first plurality of vanes extend so that the first and second plurality of vanes are interleaved.

92. As illustrated below, Dometic's DG3 product includes at least one rotating heat generating component that is coupled to the flywheel and positioned such that heat is transferred from the heat generating component to the first plurality of vanes.

93. As illustrated below, Dometic's DG3 product includes an enclosure containing a below-ambient density gas and maintaining a below-ambient pressure. On information and belief, the enclosure in Dometic's DG3 contains helium, which has a thermal conductivity at least 5 times greater than air.

94. As illustrated below, in Dometic's DG3 product, the flywheel, the first plurality of vanes, the second plurality of vanes, the heat generating component, the enclosure, and the gimbal structure are configured so that, when installed in the boat, the stabilizer damps roll motion of the boat.

95. The following diagram illustrates that Dometic's DG3 product embodies the elements of at least claim 1 of the '930 Patent:



41

96. The manufacture, use, sale, offer for sale and/or importation of Dometic's DG3 product infringes the claims of the '930 patent, and one or more of Dometic's actions constitutes direct infringement of the claims of the '930 patent.

97. The manufacture, sale, offer for sale and/or importation of Dometic's DG3 product infringes the claims of the '930 patent, and one or more of Dometic's actions are inducing third parties, including contract manufacturers to commit acts that constitute infringement of the '930 patent in violation of 35 U.S.C. § 271(b). For example, Dometic's sale of its DG3 product induces infringement by actively, knowingly and intentionally aiding, abetting, directing, encouraging, or otherwise instructing its customers to use the DG3 product in a manner that constitutes infringement of the '930 patent.

98. The manufacture, sale, offer for sale and/or importation of Dometic's DG3 product infringes the claims of the '930 patent, and one or more of Dometic's actions contribute to the infringement of the '930 patent by third parties, including contract manufacturers in violation of 35 U.S.C. § 271(c). Dometic has done so knowing that its DG3 product constitutes a material part of Seakeeper's patented invention, and knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use.

99. As a consequence of Dometic's actions alleged above, customers and contract builders, among others, have committed acts that would constitute direct infringement of the '930 patent.

100. Dometic knew about the '930 patent by at least as early as February 2024 during its due diligence as part of Dometic's potential acquisition of Seakeeper.

42

101. Dometic has no reasonable basis for believing that Dometic's DG3 product will not infringe one or more valid claims of the '930 patent and no reasonable basis for believing that the infringed claims are invalid.

102. Dometic's manufacture, use, importation, sale, and/or offer for sale of Dometic's DG3 product constitutes willful infringement.

123.    103. This case is "exceptional," and Seakeeper is entitled to an award of reasonable attorneys' fees under 35Defendants have violated 15 U.S.C. § 285 1125(a).

104. Seakeeper has suffered damages as a result of Dometic's infringement of the '930 patent. Seakeeper is entitled to an award of compensatory damages, including reasonable royalties for Dometic's infringement of the '930 patent.

124.    Defendants have caused, and will continue to cause, immediate and irreparable injury to Plaintiff, including injury to its business, reputation, and goodwill, for which there is no adequate remedy at law. As such, Plaintiff is entitled to an injunction under 15 U.S.C. §1116 restraining Defendants, their agents, employees, representatives and all persons acting in concert with them from engaging in further acts of false advertising, and ordering removal of all Defendants' false advertisement.

125.    Pursuant to 15 U.S.C. §1117, Plaintiff is entitled to recover from Defendants the damages sustained by Plaintiff as a result of Defendants' acts in violation of Lanham Act § 43(a), including but not limited to the profits lost as a consequence of Defendants' actions.

126.    Pursuant to 15 U.S.C. §1117, Plaintiff is further entitled to recover from Defendants the gains, profits and advantages that they have obtained as a result of their acts. Plaintiff is also entitled to recover the sums necessary to issue corrective advertising necessary to negating the continuing harm occasioned by Defendants' false and misleading statements.

43

## COUNT III – UNLAWFUL PRACTICE (6 *DEL. C.* § 2513)

127. Seakeeper incorporates and realleges the foregoing paragraphs.

128. Defendants have used false and misleading descriptions of fact and representations of fact in commercial advertising and promotion that misrepresent the nature, characteristics, qualities, and performance and comparative qualities of Plaintiff's marine gyroscopic stabilizers.

129. Defendants' statements are literally false, and/or misleading by necessary implication, and/or unsubstantiated establishment claims.

130. Upon information and belief, these false statements actually deceive, or have a tendency to deceive, a substantial segment of Plaintiff's customers and potential customers. This deception is material in that it is likely to influence the purchasing decisions of Plaintiff's customers.

131. Defendants' false and misleading advertising statements and omissions injure both consumers and Plaintiff.

132. As a direct result of these unlawful practices, Seakeeper has suffered damages. Plaintiff is at present unable to ascertain the full extent of the monetary damages it has suffered by reason of Defendants' acts.

133. Defendants have caused, and will continue to cause, immediate and irreparable injury to Plaintiff, including injury to its business, reputation, and goodwill, for which there is no adequate remedy at law. As such, Plaintiff is entitled to an injunction restraining Defendants, their agents, employees, representatives and all persons acting in concert with them from further using unlawful practices.

105. The acts of infringement by Dometic set forth above will cause Seakeeper irreparable harm for which it has no adequate remedy at law, and those acts will continue unless enjoined by this Court.

106. Seakeeper is entitled to a preliminary injunction prohibiting Dometic from manufacturing, using, offering for sale, or selling Dometic's DG3 and related products in the United States before expiration of the '930 patent.

## PRAYER FOR RELIEF

**WHEREFORE**, Seakeeper respectfully requests the following relief:

A. A judgment, pursuant to 35 U.S.C. § 271(a), (b), and/or (c), that the commercial manufacture, use, offering to sell, or sale within the United States, and/or importation into the United States of Defendant'sDefendants' Product has infringed the '782 and '930 patentspatent;

B. A preliminary injunction that Dometic isDefendants are prevented from manufacturing, using, importing, selling, or offering to sell Dometic's DG3 product and related products until a date not earlier than the date of expiration of both the '782 and '930 patentspatent;

C. An award, pursuant to 35 U.S.C. § 284, of damages or other monetary relief to compensate Seakeeper for Dometic'sDefendants' engagement in the manufacture, use, offer for sale, sale, marketing, distribution, and/or importation of Dometic's DG3 product, or any product the making, using, offering for sale, sale, marketing, distribution, and/or importation of which infringes the '782 and '930 patentspatent;

D. A judgment pursuant to 35 U.S.C. § 285 that this case against ~~Dometic~~Defendants is an exceptional case and an award of enhanced damages, attorneys' fees and costs; ~~and~~

E. For temporary, preliminary and permanent injunctive relief prohibiting Defendants, their agents, or anyone working for, in concert with or on behalf of Defendants from engaging in false or misleading advertising with respect to the their Dometic's DG3 product and/or violating Lanham Act § 43(a), which relief includes but is not limited to removal of all false or misleading advertisements and corrective advertising to remedy the effects of Defendants' false advertising;

F. For an order requiring Defendants to correct any erroneous impression persons may have derived concerning the nature, characteristics, or qualities of their DG3 product and Plaintiff's Seakeeper 3 product, including without limitation, the placement of corrective advertising and providing written notice to the public;

G. That Defendants be adjudged to have violated 15 U.S.C. §1125(a) by unfairly competing against Plaintiff by using false, deceptive or misleading statements of fact that misrepresent the nature, quality and characteristics of their DG3 product;

H. That Defendants be adjudged to have unlawfully and unfairly competed against Plaintiff under the laws of the State of Delaware, 6 *Del. C.* §2513;

I. That Plaintiff be awarded damages Plaintiff has sustained in consequence of Defendants' conduct;

J. That Plaintiff be awarded Defendants' profits obtained by Defendant as a consequence of Defendants' conduct;

K.  That such damages and profits be trebled and awarded to Plaintiff as a result of Defendants' willful, intentional and deliberate acts in Plaintiff violation of Lanham Act § 43(a);

L.  That Plaintiff recover its costs and reasonable attorneys' fees;

M.  That all of Defendants' misleading and deceptive materials and products be destroyed as allowed under 15 U.S.C. §1118;

N.  That Plaintiffs be granted prejudgment and post judgment interest; and

O.  E. SuchThat Plaintiff have such other and further relief to Seakeeper as thisthe Court may deemdeems just and proper.

**DEMAND FOR A JURY TRIAL**

Seakeeper hereby demands a jury trial on all issues so triable.

|  |  |
|---|---|
| | /s/ *Kelly E. FarnanDRAFT*_____ |
| OF COUNSEL: | Steven J. Fineman (#4025) |
| | Kelly E. Farnan (#4395) |
| MARSHALL, GERSTEIN & BORUN LLP | Christine D. Haynes (#4697) |
| 6300 Willis Tower | Richards, Layton & Finger, P.A. |
| 233 S. Wacker Drive | One Rodney Square |
| Chicago, IL 60606 | 920 North King Street |
| (312) 474-6300 | Wilmington, DE 19801 |
| | 302-651-7700 |
| | fineman@rlf.com |
| Dated:  April 21May __, 20252026 | farnan@rlf.com |
| | haynes@rlf.com |
| | |
| | *Attorneys for Plaintiff* |
| | *Seakeeper, Inc.* |

47

# EXHIBIT 3

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| SEAKEEPER, INCORPORATED<br><br>Plaintiff,<br><br>v.<br><br>DOMETIC CORPORATION,<br><br>Defendant. | C.A. No. 25-484-JCB<br><br>**JURY TRIAL DEMANDED** |

**PLAINTIFF'S RULE 26(a)(1) INITIAL DISCLOSURES**

Pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure, Plaintiff Seakeeper, Incorporated ("Seakeeper" or "Plaintiff") provides the following initial disclosures based upon the information reasonably available to Plaintiff at this time. Seakeeper's investigation is ongoing, and it reserves the right to supplement and amend these disclosures, to otherwise disclose relevant information to Defendant in response to other discovery requests, and to include additional information acquired during the course of this litigation pursuant to Fed. R. Civ. P. 26(e).

A. **The name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment.**

The following individuals may have discoverable information that Seakeeper may use to support its claims or defenses in this action. Seakeeper provides this identification without any concession, agreement, admission, or waiver relating to the relevance or admissibility, for any purpose, of any particular information, evidence, or testimony, and without waiver of any

privilege or immunity. Plaintiff reserves the right to amend the following list to identify different

and/or additional individuals as discovery continues and new facts come to light.

| Name | Subjects |
|---|---|
| One or more named inventor(s) of the Asserted Patents<br><br>Shepard W. McKenney<br><br>John D. Adams<br><br>These individuals may be contacted through counsel at Marshall, Gerstein, & Borun LLP. | Mr. McKenney, a named inventor on U.S. Patent Nos. 7,546,782 and 8,117,930 (the "Asserted Patents"), may have information regarding the conception and reduction to practice of the purported invention, the Asserted Patents, prosecution of the Asserted Patents, state of the art and prior art to the Asserted Patents and market for gyroscopic stabilizers.<br><br>Mr. Adams, a named inventor on the Asserted Patents, may have information regarding the conception and reduction to practice of the purported invention, the Asserted Patents, prosecution of the Asserted Patents, state of the art and prior art to the Asserted Patents and market for gyroscopic stabilizers. |
| Past and/or present employees, affiliates and/or agents of Defendant and its affiliates, and any witnesses identified in Defendant's Rule 26(a)(1) initial disclosures, in Defendant's responses to Plaintiff's interrogatories, and any individuals identified in documents produced by Defendant or its affiliates | Design, development, operation, manufacture, sale, use, offer to sell, promotion, marketing, advertising, importation, distribution, and testing of all variations of Dometic's DG3 product and any other similarly configured gyroscopic stabilization products (collectively, the "Accused Products"), data and financial information related to the Accused Products and products sold with, or as a result of, or whose sales are influenced by, the sales or promotion of the Accused Products, the Asserted Patents, knowledge thereof, and infringement thereof, the advertising, promotion, and marketing of the Accused Products and claims made with respect thereto, including the existence or absence of support therefor, the prior art, the damages recoverable by Plaintiff, including but not limited to profits lost to Defendant or its affiliates and the factors relating to the calculation of a reasonable royalty, and, information obtained from or acquired by Defendants or its affiliates concerning Plaintiff, its products, or its |

2

| Name | Subjects |
|---|---|
|  | business, and the circumstances under which obtained/acquired, and the use and disclosure thereof. |
| Third party customers or potential customers of Defendant | Design, development, sale, use, offers to sell, and financial information related to the Accused Products, the advertising, promotion, and marketing of the Accused Products and claims made with respect thereto, the damages recoverable by Plaintiff, including but not limited to profits lost to Defendant or its affiliates and the factors relating to the calculation of a reasonable royalty. |
| Andrew Semprevivo

He may be contacted through counsel at Marshall, Gerstein, & Borun LLP. | Mr. Semprevivo is the President and Chief Executive Officer of Seakeeper. He is knowledgeable about Seakeeper's sales, marketing, pricing, and related topics for Seakeeper's gyroscopic stabilization products. He may have discoverable information relevant to the Asserted Patents, Seakeeper's damages and the nature and identity of harms to Plaintiff, negotiations with affiliates of Defendant and the disclosure of information thereto concerning Plaintiff, its products, or its business, Defendant's marketing and promotion of, and similar or related actions of its affiliates, relating to the Accused Products |
| Nick Troche

He may be contacted through counsel at Marshall, Gerstein, & Borun LLP. | Mr. Troche is the Chief Technology Officer at Seakeeper. He may have discoverable information relevant to, among other things, marine gyroscopic stabilization products, including but not limited to Seakeeper's gyroscopic stabilizer products, and the invention(s) claimed and/or described in U.S. Patent Nos. 7,546,782 and 8,117,930, as well as the nature and identity of harms to Plaintiff. |
| Will Cimino

He may be contacted through counsel at Marshall, Gerstein, & Borun LLP. | Mr. Cimino is the Chief Commercial Officer of Seakeeper. He has previously served as Seakeeper's Director of Global Sales and Vice President of Growth and Strategy. He may have discoverable information about Seakeeper's sales, marketing and pricing of its |

3

| Name | Subjects |
|---|---|
|  | gyroscopic stabilization products, as well as the overall market for gyroscopic stabilization products and related topics, information relevant to Seakeeper's damages and the nature and identity of harms to Plaintiff, and Defendant's marketing and promotion of, and similar or related actions of its affiliates, relating to the Accused Products. |
| Rebecca Smitha<br><br>She may be contacted through counsel at Marshall, Gerstein, & Borun LLP. | Ms. Smitha is the Chief Financial Officer of Seakeeper. She may have discoverable information about Seakeeper's internal operations, as well as sales, marketing and pricing of its gyroscopic stabilization products, and related topics, and information relevant to Seakeeper's damages and the nature and identity of harms to Plaintiff. |
| Eric Fetchko | Mr. Fetchko is believed to have information concerning the design, development, sale, use, offers to sell, and financial information related to the Accused Products. |
| Gary Reich | Mr. Reich is believed to have information concerning the design, development, sale, use, offers to sell, and financial information related to the Accused Products. |
| Employees of Regulator Marine, Inc. | Believed to have information concerning the design, development, sale, use, offers to sell, and financial information related to the Accused Products. |
| Employees of Bluewater Yacht Sales | Believed to have information concerning the design, development, sale, use, offers to sell, and financial information related to the Accused Products. |
| Derry William Lappin | Mr. Lappin is believed to have information concerning the design, development, testing, sale, use, offers to sell, and financial information related to the Accused Products. |
| Mark Isaac Dyck | Mr. Dyck is believed to have information concerning the design, development, testing, |

4

| Name | Subjects |
|---|---|
|  | sale, use, offers to sell, and financial information related to the Accused Products. |
| Trevor Daniel Boleac | Mr. Boleac is believed to have information concerning the design, development, testing, sale, use, offers to sell, and financial information related to the Accused Products. |
| Noam Dean Davidson | Mr. Davidson is believed to have information concerning the design, development, testing, sale, use, offers to sell, and financial information related to the Accused Products. |
| Kevin Sean Stopp | Mr. Stopp is believed to have information concerning the design, development, testing, sale, use, offers to sell, and financial information related to the Accused Products. |
| Mackenzie Douglas Hart | Ms. Hart is believed to have information concerning the design, development, testing, sale, use, offers to sell, and financial information related to the Accused Products. |
| Ray Tat Lung Wong | Mr. Wong is believed to have information concerning the design, development, testing, sale, use, offers to sell, and financial information related to the Accused Products. |

Plaintiff's investigation of this matter is ongoing. Accordingly, Plaintiff reserves the right to supplement these disclosures in accordance with the Federal Rules of Civil Procedure and the Local Rules. Seakeeper further identifies, and incorporates by reference, all persons identified in the documents and things that have and will be produced in this lawsuit, all persons identified in discovery responses, all persons identified in connection with any prior art, and all persons identified in depositions or in briefs or any supporting documents in this action. Seakeeper further identifies, and reserves the right to call, all individuals disclosed by any other party, or third party, in its disclosures in this action, or any other action involving the Asserted Patents or

5

patents related thereto. Plaintiff further reserves the right to seek additional depositions for good cause should other individuals or entities be identified as having knowledge regarding the Accused Products.

**B.      A copy—or a description by category and location—of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment**

Seakeeper may rely on documents, electronically stored information, or tangible things in its possession, custody, or control in its offices in the United States, or other locations, or in the offices of its outside consultants, counsel, or other professionals over which Seakeeper has control. Plaintiff provides the following identification without any concession, agreement, admission, or waiver relating to the relevance or admissibility, for any purpose, of particular information, evidence, or testimony, and without waiver of any privilege or immunity.

Seakeeper identifies the following categories of documents:

(a) the Asserted Patents and their file histories;

(b) documents relating to the assignment of the Asserted Patents;

(c) documents about the development of the inventions described and claimed in the Asserted Patents;

(d) documents about sales and marketing of gyroscopic stabilization products including all documents that may be relevant to the determination of an appropriate measure of damages for Defendant's infringing conduct;

(e) documents concerning the development, production, marketing and sales of the Accused Products including publicly available information regarding any variation of Defendant's DG3 product; and

(f)  documents describing the functions and features of the Accused Products, including manuals, brochures, and technical information.

**C.    A computation of each category of damages claimed by the disclosing party—who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered**

Seakeeper seeks compensatory damages under 35 U.S.C. § 284 in the form of profits lost on lost sales of its patented products and those products and services whose sale is related to those products and/or a reasonable royalty for Defendant's infringement of the Asserted Patents. A specific computation of these damages is not possible at this time in part because Seakeeper has not yet received any discovery from Defendant including Defendant's sales information for the Accused Products. Seakeeper reserves the right to supplement this response following the production of such information by Defendant. Seakeeper further seeks enhanced damages of three times the amount of compensatory damages for Defendant's willful infringement.

Under 35 U.S.C. § 285, Seakeeper further seeks an award of attorneys' fees and costs because this is an exceptional case.

Further, to the extent discovery reveals that Defendant and its agents have made false and misleading claims with respect to the Accused Products, Plaintiff reserves the right to seek compensatory and punitive damages related thereto, disgorgement of profits and attorneys' fees.

**D.    For inspection and copying as under Rule 34, any insurance agreement under which an insurance business may be liable to satisfy all or part of a possible judgment in the action or to indemnify or reimburse for payments made to satisfy the judgment**

Plaintiff is currently unaware of any insurance agreement under which an insurance business may be liable to satisfy all or part of a possible judgment in this action or to indemnify or reimburse for payments made to satisfy any judgment.

OF COUNSEL:

MARSHALL, GERSTEIN & BORUN LLP
6300 Willis Tower
233 S. Wacker Drive
Chicago, IL 60606
(312) 474-6300

/s/ Steven J. Fineman
Steven J. Fineman (#4025)
Kelly E. Farnan (#4395)
Christine D. Haynes (#4697)
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
302-651-7700
fineman@rlf.com
farnan@rlf.com
haynes@rlf.com

*Attorneys for Plaintiff*
*Seakeeper, Inc.*

Dated: December 8, 2025

**CERTIFICATE OF SERVICE**

I hereby certify that on December 8, 2025, a true and correct copy of the foregoing document was caused to be served by e-mail on the following counsel:

**BY E-MAIL**

Andrew C. Mayo
Brian A. Biggs
Ashby & Geddes
500 Delaware Avenue, 8th Floor
Wilmington, DE 19801

**BY E-MAIL**

Oleg Khariton
Dinsmore & Shohl LLP
255 E. Fifth Street
Suite 1900
Cincinnati, OH 45202

**BY E-MAIL**

Michael. A. Xavier
Dinsmore & Shohl LLP
1775 Sherman Street
Suite 2600
Denver, CO 80203

*/s/ Christine D. Haynes*
Christine D. Haynes (#4697)
haynes@rlf.com